# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**E.M.** )
)
Plaintiff, )
)
v. )          Case No. 1:19-cv-00657 RC
)
**SHADY GROVE REPRODUCTIVE** )
**SCIENCE CENTER, P.C.** )
)
Defendant. )
_____ )

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Lori Vaughn Ebersohl (D.C. Bar #428793)
Hannah Hutchison (D.C. Bar # Pending)
APATOFF PETERS EBERSOHL, LLP
252 N. Washington Street
Falls Church, VA  22046
Telephone: (703) 534-4440
Facsimile: (301) 279-2819
Email: lebersohl@apatoffpeters.com

*Attorneys for Defendant Shady Grove*
*Reproductive Science Center, P.C.*

# TABLE OF CONTENTS

STATEMENT OF FACTS ............................................................................................ 1

LEGAL STANDARD................................................................................................... 8

ARGUMENT................................................................................................................ 9

I.   COUNT I FAILS TO STATE A CLAIM FOR VIOLATION OF THE D.C.
     HUMAN RIGHTS ACT ..................................................................................... 9

     A. Shady Grove Did Not Discriminate Against E.M. ........................................ 9

     B. Shady Grove Did Not Retaliate Against E.M................................................ 12

II.  COUNT II FAILS TO STATE A CLAIM OF A VIOLATION OF THE
     CPPA FOR UNLAWFUL TRADE PRACTICES ..................................................... 13

III. COUNT III FAILS TO STATE A CLAIM FOR BREACH OF THE EGG
     FREEZING CONTRACT................................................................................... 15

IV.  COUNT IV FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT
     BASED ON THE PATIENT BILL OF RIGHTS..................................................... 17

V.   COUNT V FAILS TO STATE A CLAIM FOR BREACH OF COVENANT
     OF GOOD FAITH AND FAIR DEALING............................................................ 20

VI.  COUNT VI FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT ......... 20

VII. COUNT VII FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL.... 22

VIII. COUNT X FAILS TO STATE A CLAIM FOR FRAUD ..................................... 23

IX.  COUNT IX FAILS TO STATE A CLAIM FOR FRAUDULENT
     INDUCEMENT OF CONTRACT ....................................................................... 26

X.   COUNT VIII FAILS TO STATE A CLAIM FOR NEGLIGENT
     MISREPRESENTATION................................................................................... 27

XI.  COUNT XI FAILS TO STATE A CLAIM FOR INTENTIONAL
     INFLICTION OF EMOTIONAL DISTRESS........................................................ 28

CONCLUSION........................................................................................................... 29

# TABLE OF AUTHORITIES

## <u>Cases</u>

*3D Global Solutions, Inc. v. MVM, Inc.*
   552 F. Supp. 2d 1 (D.D.C. 2008) ......................................................................... 25

*Ashcroft v. Iqbal*
   556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ....................................... 9

*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007) ............................................................................................. 9

*\*Blocker-Burnette v. District of Columbia*
   842 F. Supp. 2d 329 (D.D.C. 2012) ..................................................................... 12

*\*Blodgett v. Univ. Club*
   930 A.2d 210 (D.C. 2007) ................................................................................... 12

*Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the United States*
   325 F.R.D. 10 (D.D.C. 2018) .............................................................................. 31

*Brown v. Sessoms*
   774 F.3d 1016 (D.C. Cir. 2014) .......................................................................... 17

*Carter v. Urban Serv. Sys. Corp.*
   324 F. Supp. 3d 19 (D.D.C. 2018) ................................................................. 29, 30

*Caulfield v. Stark*
   893 A.2d 970 (D.C. 2005) ................................................................................... 16

*\*Cooke-Seals v. District of Columbia*
   973 F. Supp. 184 (D.D.C. 1997) ......................................................................... 32

*Didden v. Brody*
   2011 D.C. Super. LEXIS 19 (D.C. Super. Ct. 2011) ........................................... 15

*District of Columbia v. Thompson*
   570 A.2d 277 (D.C. 1990) ................................................................................... 32

*\*Dorn v. McTigue*
   157 F. Supp. 2d 37 (D.D.C. 2001) ...................................................................... 15

*\*Duncan v. Children's Nat'l Med. Ctr.*
   702 A.2d 207 (D.C. 1997) ................................................................................... 32

*Emerine v. Yancey*
     680 A.2d 1380 (D.C. 1996) ................................................................ 23

*Hogan v. Forsyth Country Club Co.*
     79 N.C. App. 483, 340 S.E.2d 116 (N.C. App. 1986) ......................... 32

*Jones v. District of Columbia*.................................................................
     314 F. Supp. 3d 36 (D.D.C. 2018) ...................................................... 13

*\*Levine v. Am. Psychological Ass'n (In re APA Assessment Fee Litig.)*
     766 F.3d 39 (D.C. 2014) ............................................................... 23, 24

*Libre by Nexus v. BuzzFeed, Inc.*
     311 F. Supp. 3d 149 (D.D.C. 2018) ...................................................... 9

*Lipton v. MCI Worldcom, Inc.*
     135 F. Supp. 2d 182 (D.C. 2001) .......................................................... 2

*Meehan v. U.S. Office Prods. Co. (In re U.S. Office Prods. Co. Sec. Litig.)*
     251 F. Supp. 2d 77 (D.D.C. 2003) ...................................................... 31

*Mero v. City Segway Tours of Wash. DC, LLC*
     826 F. Supp. 2d 100 (D.D.C 2011) ..................................................... 22

*Plesha v. Ferguson*
     725 F. Supp. 2d 106 (D.D.C. 2010) ................................................ 23, 24

*Propp v. Counterpart Int'l*
     39 A.3d 856 (D.C. 2012) .................................................................... 13

*RDP Techs., Inc. v. Cambi AS*
     800 F. Supp. 2d 127 (D.D.C. 2011) .................................................... 18

*Red Lake Band of Chippewa Indians v. United States DOI*
     624 F. Supp. 2d 1 (D.D.C 2009) ......................................................... 17

*\*Rocha v. Brown & Gould, LLP*
     101 F. Supp. 3d 52 (D.D.C. 2015) .................................................. 24, 25

*Saucier v. Countrywide Home Loans*
     64 A.3d 428 (D.C. 2013) .................................................................... 27

*Schiff v. AARP*
     697 A.2d 1193 (D.C. 1997) ........................................................... 22, 23

*Shekoyan v. Sibley Int'l Corp.*
  217 F. Supp. 2d 59 (D.D.C. 2002) ........................................................................ 27

*Sherrod v. McHugh*
  334 F. Supp. 3d 219 (D.D.C 2018) ........................................................................ 32

*Slate v. Public Defender Serv.*
  31 F. Supp. 3d 277 (D.D.C. 2014) .......................................................................... 2

*\*Stevens v. AMTRAK*
  517 F. Supp. 2d 314 (D.C. Cir. 2008) ............................................................ 13, 14

*United States ex rel. Folliard v. CDW Tech. Servs., Inc.*
  722 F. Supp. 2d 20 (D.D.C. 2010) ........................................................................ 26

*United States ex rel. Joseph v. Cannon*
  642 F.2d 1373 (D.C. 1981) .................................................................................... 26

*United States ex rel. Westrick v. Second Chance Body Armor, Inc.*
  685 F. Supp. 2d 129 (D.D.C. 2010) ...................................................................... 26

*United States Telesis, Inc. v. Ende*
  64 F. Supp. 3d 65 (D.D.C. 2014) ............................................................................ 1

*Vanover v. Hantman*
  77 F. Supp. 2d 91 (D.D.C. 1999) ............................................................................ 3

*\*Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*
  799 A.2d 381, 385 (D.C. 2002) ............................................................................ 10

*Williams v. District of Columbia*
  9 A.3d 484 (D.C. 2010) ........................................................................................ 33

*Xereas v. Heiss*
  933 F. Supp. 2d 1 (D.D.C. 2013) .................................................................... 27, 29

## **Statutes**

45 C.F.R. 164.312 ...................................................................................................... 7

D.C. Code § 1-2519 .................................................................................................... 9

D.C. Code § 2-1401.02 ...................................................................................... 10, 11, 12

D.C. Code § 2-1402.61 .............................................................................................. 12

D.C. Code § 28-3904 ................................................................................................. 14

D.C. Code § 2-1401.31 ................................................................................................ 9

Fed. R. Civ. P. 12 ....................................................................................................... 8

Fed. R. Civ. P. 9 .................................................................................................. 9, 24

**<u>Other Authorities</u>**

Restatement (Second) of Contracts § 39 (1981) ...................................................... 18

Defendant Shady Grove Reproductive Science Center, P.C. ("Shady Grove"), by undersigned counsel, has moved this Court to enter an Order dismissing all eleven counts of the Complaint filed in this action by Plaintiff E.M. ("E.M."): Count I (Violation of D.C. Human Rights Act), Count II (Violation of D.C. Consumer Protections Procedures Act), Count III (Breach of Contract), Count IV (Breach of Contract), Count V (Breach of the Covenant of Good Faith and Fair Dealing), Count VI (Unjust Enrichment), Count VII (Promissory Estoppel), Count VIII (Negligent Misrepresentation), Count IX (Fraudulent Inducement of Contract), Count X (Fraud), and Count XI (Intentional Infliction of Emotional Distress).

Plaintiff has filed a "kitchen sink Complaint," making unsupported, inherently contradictory allegations against one of the leading fertility practices in the United States. At the same time that she denigrates Shady Grove with wholly unsupported claims that it has engaged in "massive fraud" against its patients, she pleads with this Court to order Shady Grove to enter an injunction requiring Shady Grove to reaccept her as a patient and to perform an elective medical procedure on her body. Such inconsistent allegations highlight the frivolous nature of this lawsuit. All of the counts of the Complaint fail to state a claim upon which relief may be granted and should be dismissed.

## STATEMENT OF FACTS

The following is alleged in the Complaint:[1]

Shady Grove Reproductive Science Center, P.C. ("Shady Grove") is a medical practice providing infertility treatment to single people and couples throughout Maryland, D.C., and

---

[1] For purposes of a motion to dismiss, the well-pleaded allegations of the complaint are taken as true. "[C]onclusory legal allegations devoid of any factual support," however, are not considered. *United States Telesis, Inc. v. Ende*, 64 F. Supp. 3d 65, 67 (D.D.C. 2014). If this case goes forward, the defendants will aggressively defend against Plaintiff's allegations.

Northern Virginia. E.M. sought infertility treatments from Shady Grove at various times from 2012 through 2019.

Boiling the facts down to their essence and disregarding the conclusory and irrelevant allegations, E.M. asserts that in dismissing her from its practice, Shady Grove breached its alleged contracts with E.M., discriminated and retaliated against her in violation of the D.C. Human Rights Act ("DCHRA"), and made false statements to her with the intent to defraud her.

### 2012 – The Egg Freezing Contract

At the age of 39 in 2012, E.M. initially presented to Shady Grove to perform the elective fertility service on her referred to as freezing her eggs or cryopreservation procedure. (Compl. ¶¶ 5-6). E.M. chose Shady Grove to provide her these services because she believed, based on Shady Grove's website and marketing materials, that Shady Grove was highly qualified and experienced in the field of fertility services. (Compl. ¶ 19). In consulting with Shady Grove to freeze her eggs, Shady Grove presented her with "all the material terms" in the "Consent for Oocyte (Egg) Retrieval, Cryopreservation and Storage" (the "Egg Freezing Contract"), a copy of which is attached as **Exhibit A**.[2]

**Most importantly, the Egg Freezing Contract explicitly states that Shady Grove is not obliged to do anything further with E.M.'s eggs after the cryopreservation procedure**

---

[2] When the plaintiff fails to introduce a pertinent document as part of its pleadings, defendant may introduce the exhibit as part of its motion attacking the pleading.  It is proper for a trial court in deciding a motion to dismiss to consider materials that are central to the allegations in the complaint, even where they are not attached to the Complaint. *See, e.g., Slate v. Public Defender Serv.*, 31 F. Supp. 3d 277, 288 (D.D.C. 2014) (considering documents central to plaintiff's claim and referenced in complaint); *Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.C. 2001) (citing *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999)). Therefore, the documents discussed herein, which were identified in the Complaint and are central to E.M.'s claims, (Compl. ¶ 22), are properly considered by the court in deciding this motion to dismiss.

**and specifically states that Shady Grove is not obliged to later perform an egg thaw and fertilization procedure.**  (Exh. A at 9). E.M. expressly agreed:  Shady Grove "at its sole discretion, may choose for any reason not to participate in the later thawing, fertilization, or transfer of [my] eggs, but at [my] direction, would facilitate the transfer of [my] cryopreserved eggs to another facility."  (Exh. A at 8).  In this same document, E.M. again "acknowledge[d] that [Shady Grove] reserves the right to terminate its participation in the cryopreservation of my eggs, and/or may, at its sole discretion, refuse to participate in the thawing and/or fertilization *in vitro* and/or transfer of resulting embryos to my or another woman's uterus."  (Exh. A at 9).

Plaintiff accepted the terms of this contract and executed the document on October 13, 2012. Shortly thereafter, Shady Grove began the treatment to retrieve and freeze E.M.'s eggs. (Compl. ¶ 24; Exh. A at 10). This egg freeze cycle resulted in six cryopreserved eggs: five mature eggs, and one immature egg. (Compl. ¶ 24). Plaintiff alleges that she paid approximately $7,850 pursuant to the Egg Freezing Contract, and an additional $6,115 for the medications required for the procedure. (Compl. ¶ 26).

**E.M.'s Subsequent Fertility Treatments**

In 2015, E.M. again came to Shady Grove accompanied by J.S., who she represented to be her partner, and not a donor, and to whom she was not married and with whom she did not share a household. (Compl. ¶¶ 35, 42).  Plaintiff alleges that she chose to return to Shady Grove because of its success rates, its experience, the quality of care, and the quality of its facilities and embryology lab. (Compl. ¶ 36).  From 2015 through 2017, E.M. and J.S. underwent fertility treatments with Shady Grove known as intra-uterine insemination ("IUI") and *in vitro* fertilization ("IVF") treatments.  (Compl. ¶ 41).  J.S. executed financial documents acknowledging that he, along with E.M., was financially responsible for the fertility treatments.

3

A copy of Financial Policy Agreement executed on August 5, 2015 is attached as **Exhibit B**.  In the Financial Policy agreement, E.M. and J.S. "agree[d] to be financially responsible for services rendered . . . ."  (Exh. B at 2).

In addition, both E.M. and J.S. executed the following agreements:

1.  The "Genetic Disease Screening Informed Consent Form" executed October 13, 2015, a copy of which is attached as **Exhibit C**.

2.  The IUI Consent: "Consent to Ovulation Induction, Monitoring and/or Insemination Treatment" executed on November 10, 2015, a copy of which is attached as **Exhibit D**.  In this agreement, E.M. and J.S. both consented to the treatment, acknowledged the risks, acknowledged that J.S. as E.M.'s partner would provide his sperm for use in the procedure, and acknowledged that they were both financially responsible to Shady Grove for this treatment.  (Exh. D at 1-2).

3.  The IVF Consent: "Assisted Reproduction:  In Vitro Fertilization, Intracytoplasmic Sperm Injection, Assisted Hatching, and Embryo Freezing Consent" executed on May 24, 2016, a copy of which is attached as **Exhibit E**.  In this agreement, both E.M. and J.S. authorized Shady Grove to perform certain procedures on E.M., to use J.S.'s sperm as her partner (and to not use an anonymous donor or known donor sperm), to place embryo's into E.M.'s uterus, to cryopreserve embryos that are not transferred, and to freeze unfertilized eggs.  (Exh. E at 2-5).

4.  Along with the IVF Contract on May 24, 2015, E.M. and J.S. executed Shady Grove's "Multi-Cycle Discount Program Information & Agreement" (the "Multi-Cycle Agreement"), which is attached as **Exhibit F**.  The Multi-Cycle Agreement provides the financial terms under which E.M. and J.S. agreed to pay for the IVF treatments.  It also provided that "Shady Grove Fertility may, at its sole discretion, terminate this Agreement. . . . [and that] Shady Grove may not disclose such reasons for termination."  (Exh. F at 6 of 8).

5.  On May 11, 2017, E.M. and J.S. signed another "Multi-Cycle Discount Program Information & Agreement," acknowledging and agreeing again to the payment terms for the IVF treatments, a copy of which is attached as **Exhibit G**.  On this document, E.M. handwrote on the first page "per pages 4-5 of this document, if two IVF cycles are not completed, refund/cancellation provisions apply."

6.  On June 5, 2016, both E.M. and J.S., as her partner, signed the "Consent to Change/Update for Intracytoplasmic Sperm Injection, Assisted Hatching, and/or Embryo Freezing," a copy of which is attached as **Exhibit H**.  In this document, E.M. and J.S. both consented to the ICSI procedure.

      7.   Again, on September 26, 2016, both E.M. and J.S., as her partner, signed the "Consent to Change/Update for Intracytoplasmic Sperm Injection, Assisted Hatching, and/or Embryo Freezing," a copy of which is attached as **Exhibit I**.  Again, E.M. and J.S. both consented to the ICSI procedure.

(Compl. ¶ 22) ("Plaintiff signed every informed consent form related to [the fertility

treatments]").

      E.M. spent $38,086 on the above treatments, plus an additional $27,287 for medications.

(Compl. ¶ 41).

**The Shared Help Treatment Discount Program**

      To assist persons or couples in their fertility journey, Shady Grove developed a patient

financial assistance program known as the Shared Help Treatment Discount Program (the

"Shared Help Program").  The Shared Help Program provides a discount to patients based upon

household income, as that term is defined by Shady Grove.  The Shared Help Program bases

eligibility on, among other things, a gross annual household income of $95,000 or less.  (Compl.

¶¶ 60-61).

      Several years prior to 2019, E.M. had asked Shady Grove whether she alone without J.S.

qualified for the Shared Help Program.  She was informed that if she took the position that she

alone was financially responsible for the fertility treatments and applied for the Shared Help

Program without J.S., J.S. would be deemed a donor, which designation would "impose[] a

number of requirements including a six-month quarantine."  (Compl. ¶ 63).  Therefore, E.M. did

not apply at that time.  (Compl. ¶ 64).

**E.M.'s Egg Thaw Procedure**

      In January 2019, at the age of 45, E.M. decided to attempt to become pregnant with her

limited supply of frozen eggs from 2012. (Compl. ¶ 51). J.S. communicated this to E.M.'s Shady

Grove nurse, Robin Peterson ("Peterson"), and Peterson scheduled the procedure, pending the

results of her thyroid level tests.  (Compl. ¶¶ 51-52).  Shady Grove provided the necessary

consent form and agreement that she and J.S. must sign prior to the procedure being performed.

A copy of the "Consent to Thaw, Inseminate and Transfer Previously Cryopreserved Oocytes"

that they were provided is attached as **Exhibit J** (the "Thaw and Fertilize Procedure"). Neither

E.M. nor J.S. signed the consent form to begin the procedure.  Instead, they sought revisions to

this document. (Compl. ¶ 75). E.M. and J.S. attended their first monitoring appointment on

January 15, day 3 of E.M.'s menstrual cycle.  (Compl. ¶ 52).  Plaintiff does not allege that she

had begun taking any medications or that there had been any procedures performed on her at this

appointment.

      After this January 15 appointment, and prior to agreeing to the terms required by Shady

Grove for the Thaw and Fertilize Procedure (Exh. J), E.M. had several outstanding questions and

concerns about (1) her clinical protocol; (2) her eligibility for Shady Grove's discount program;

and (3) the fact that Shady Grove requires a patient's partner to consent to all the procedures,

along with the patient. (Compl. ¶ 54).

      First, E.M. needed to confirm whether a natural cycle meant *no* medication, or simply

limited medication and whether Shady Grove still recommended Assisting Hatching with the

Thaw and Fertilize Procedure.  (Compl. ¶¶ 56-57). Second, E.M. believed that she alone met the

criteria for Shady Grove's Shared Help Program.  (Compl. ¶ 62). Finally, E.M. disputed Shady

Grove's Thaw and Fertilization Procedure agreement.  Despite the fact that J.S. had consented to

the procedures to be performed on E.M.'s body in prior agreements with respect to previous

fertility treatments, E.M now believed that J.S. should not be allowed to consent to (1) the

thawing of her eggs, and (2) procedures on her body.  (Compl. ¶¶ 67, 68).  Therefore, E.M.

would not sign the consent to proceed with the Thaw and Fertilization Procedure as written,

believing that it was "inaccurate and misleading" and "might cause a misunderstanding or confusion among the clinical staff" at Shady Grove.  (Compl. ¶ 69).  E.M. believed that Shady Grove in the past had "made errors in her treatment" not paying appropriate attention to detail, (Compl. ¶ 70), because it allegedly had sent an unencrypted email to her containing her protected health information.[3]  (Compl. ¶ 71).

**E.M.'s Negotiations with Shady Grove Over the Egg Thaw Procedure**

On January 15 through January 21, E.M. had numerous telephone calls with Shady Grove staff, from the Nurse, Office Supervisor, Regional Executive Director to her doctor.  (Compl. ¶¶ 77-134).  In these calls, E.M. took the position that, among other things (1) "she alone would be making all decisions regarding her frozen eggs;" (Compl. ¶ 83); (2) indicated that Shady Grove should only consider her income for its Shared Help Program (Compl. ¶ 100); (3) indicated that she alone had financial responsibility for the fertility treatments, without J.S. (Compl. ¶ 54); and (4) indicated that her position was that J.S. could not consent to treatments on her body. (Compl. ¶ 68).

E.M.'s characterizations of J.S.'s role was contrary to the positions this couple had taken previously with Shady Grove, (Exhs. B, C, D, E, F, G, H, I), and caused concern with Shady Grove that J.S. was now a donor as opposed to a partner.  (Compl. ¶ 84).  Numerous Shady Grove staff informed E.M. that if J.S. was now a donor and not a partner different conditions and requirements must be put in place, including sperm freeze at cryopreservation bank, a waiting

---

[3] Sending of protected health information by standard electronic mail is not a violation of the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA"). Encryption is an addressable, not mandatory, requirement under applicable HIPAA regulations. *See, e.g.*, 45 C.F.R. 164.312(a)(2)(iv), (e)(2)(ii).  *See also*, https://www.hhs.gov/hipaa/for-professionals/faq/2001/is-the-use-of-encryption-mandatory-in-the-security-rule/index.html.

period, a social worker visit, and a legal contract. (Compl. ¶ 112).  E.M. disputed that these were

appropriate conditions to place on her.  (Compl. ¶ 116).  As these discussions escalated and

increased, in short, the parties never reached agreement over the terms under which Shady Grove

would perform the Thaw and Fertilization Procedure on E.M.  Ultimately, Shady Grove

withdrew from the process making the decision that it would not perform the procedure on E.M.

(Compl. ¶ 136).

In letters dated January 22, 2019 and February 15, 2019, Shady Grove informed E.M. and

J.S. that they were dismissed from the practice. (Compl. ¶¶ 156-57). These letters explained that

the "recent events and interactions with the physicians and staff of Shady Grove have

irreversibly compromised th[eir] relationship."  Shady Grove further explained that the

information she had "received was consistent with [Shady Grove's] long-standing policies and

procedures [regarding donors and partners]." Copies of these letters are attached as **Exhibits K**

**and L**.

## LEGAL STANDARD

A motion to dismiss is properly granted where the complaint fails to state a claim upon

which relief can be granted. Fed. R. Civ. P. 12(b)(6); *Libre by Nexus v. BuzzFeed, Inc.*, 311 F.

Supp. 3d 149, 153 (D.D.C. 2018). A claim is plausible on its face "when the plaintiff pleads

factual content that allows a court to draw the reasonable inference that the defendant is liable for

the misconduct alleged. *Libre by Nexus*, 311 F. Supp. 3d at 153 (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)).

In evaluating the sufficiency of a complaint, the Court must accept as true all the factual

allegations in the complaint. *Id.* The Court need not accept as true any legal conclusions

"couched as [factual allegations]" *Id*. (quoting *Iqbal*, 556 U.S. at 678). Therefore, "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Additionally, for all claims of fraud or mistake, a plaintiff must plead facts with particularity regarding the circumstances constituting fraud. Fed. R. Civ. P. 9(b).

## ARGUMENT

## I.    COUNT I FAILS TO STATE A CLAIM FOR VIOLATION OF THE DC HUMAN RIGHTS ACT

Plaintiff has failed state a claim under the DCHRA. Plaintiff alleges that Shady Grove discriminated against her based on her marital status, her source of income, and her familial responsibilities. Plaintiff further alleges that Shady Grove retaliated against her by treating J.S. as a donor and by dismissing her from the practice when she complained of discrimination. However, E.M. fails to allege that Shady Grove even considered her protected status in taking these actions.

### A.   <u>**Shady Grove Did Not Discriminate Against E.M.**</u>

Under the DCHRA, it is unlawful discrimination to "deny, directly or indirectly, any person the full and equal employment of the […] services, facilities, privileges, advantages, and accommodations of any place of public accommodation" "wholly or in part for a discriminatory reason", including marital status, source of income, or familial responsibilities. D.C. Code 2-1401.31(a). A *prima facie* claim for discrimination under the DCHRA requires that the plaintiff meet a three-part test, showing that (1) she is in a protected class; (2) defendant denied "goods, services, facilities, privileges, advantages, [or] accommodations", and (3) defendant did so "wholly or partially for a discriminatory reason." D.C. Code § 1-2519(a); see *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 385 (D.C. 2002) (finding no marital status discrimination when terminated employee relied on indirect evidence and inferences of discrimination).

**Marital Status**

E.M. has failed to set forth facts sufficient to state a claim under the DCHRA for discrimination based on marital status. Plaintiff alleges that in 2019 Shady Grove imposed additional conditions to continue treatment on her, disallowed her from taking financial responsibility for her treatment, discontinued her care, and ultimately dismissed her from the practice, inferring without support that these all occurred because Plaintiff is single and not married to J.S. (Compl. ¶ 183).

First, E.M has not alleged a *prima facie* case of discrimination based on marital status. The DCHRA defines "marital status" as "state of being married, in a domestic partnership, single, divorced, separated, or widowed […]." D.C. Code § 2-1401.02(17).  In 2019, Shady Grove questioned E.M. about her relationship to J.S. after she indicated that he would not consent to procedures on her body and would not be financially responsible for her treatments. These questions were to determine whether E.M. would be qualified for the Shared Help Program and to determine whether E.M. and J.S. would need to comply with additional Shady Grove requirements if E.M. was now treating J.S. as a donor. Nowhere does E.M. allege that Shady Grove asked her about her marital status. To the contrary, Shady Grove has always known E.M's marital status since she first presented in 2012 and she and J.S. first presented to Shady Grove in 2015.  This cause of action is entirely premised on E.M.'s inference that she "never would have been asked" questions by Shady Grove if she were "not legally single."  These unsupported, bare inferences do not meet the standard requiring a plaintiff to allege facts sufficient to plead a discrimination cause of action based on marital status.

**Source of Income**

Plaintiff has not sufficiently stated a claim based on a theory of source of income discrimination under the DCHRA. Plaintiff alleges that Shady Grove refused to allow Plaintiff to continue treatment unless, first, J.S. "contributed to [E.M.]'s treatment," and second, required her to visit with a social worker and hire an attorney based on E.M.'s financial arrangements with J.S. (Compl. ¶ 39). This does not state a cause of action. Importantly, the Complaint does not allege that Shady Grove discriminated against E.M. based on her occupation or profession, which is practicing law, and which is her source of income.

 "Source of income" means the "point, the cause, or the form of the origination, or transmittal of gains of property accruing to a person in a stated period of time; including, but not limited to, money and property secured from any occupation, profession or activity […]". D.C. Code § 2-1401.02(29); *see Blodgett v. Univ. Club,* 930 A.2d 210 (D.C. 2007) (holding no source of income discrimination where plaintiff excluded from club based on his use of club facilities to expound racist and antisemitic views, not because expounding those views was his source of income). Here, E.M. has failed to allege that Shady Grove ever discriminated against her based on her "source of income," her occupation, or her profession, which is practicing law.

**Familial Responsibilities**

The Complaint fails to allege that Shady Grove discriminated against E.M. based on her familial responsibilities. Plaintiff alleges that Shady Grove required that she and J.S. visit with a mental health provider and obtain a legal contract "because of the family responsibilities that it perceived she and J.S. would assume" and to evaluate whether Shady Grove would "allow" Plaintiff and E.M. to have a child. (Compl. ¶ 39). This does not support a cause of action.

"Familial responsibilities" means "state of being, or the potential to become, a contributor to the support of a person or persons in a dependent relationship […]." D.C. Code § 2-1401.02(15); *Blocker-Burnette v. District of Columbia*, 842 F. Supp. 2d 329 (D.D.C. 2012) (finding no familial responsibility discrimination just because plaintiff fired for failing to show up to meeting because she went home to take care of daughter and ill father). E.M. fails to allege that Shady Grove discriminated against her based on her support of a person in a dependent relationship.

### B. <u>Shady Grove Did Not Retaliate Against E.M.</u>

Under the DCHRA, it is unlawful to "retaliate against […] any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, […] any right granted or protected under this chapter." D.C. Code § 2-1402.61(a).  The plaintiff must set forth allegations setting forth a *prima facie* case. *Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012).

A plaintiff must allege that: (1) she was engaged in protected activity; (2) the defendant took a materially adverse action; and (3) there is a causal connection between the protected activity and the materially adverse action. *Jones v. District of Columbia*, 314 F. Supp. 3d 36 (D.D.C. 2018). Where the plaintiff is alleging the defendant admitted to a causal connection, the person telling the plaintiff of the retaliation must be one with personal knowledge of the decision-making process. *Stevens v. AMTRAK*, 517 F. Supp. 2d 314, 2007 U.S. Dist. LEXIS 45794 (D.D.C. 2007), aff'd, 275 Fed. Appx. 14, 2008 U.S. App. LEXIS 8545 (D.C. Cir. 2008) (no retaliation where phone recording of supervisor telling plaintiff that she was not promoted in retaliation for making prior complaints of discrimination where supervisor not part of the promotion decision). Further, mere knowledge that a plaintiff engaged in a protected activity cannot alone suffice as a causal connection. *Stevens*, 517 F. Supp. 2d at 320 (interviewers'

knowledge of plaintiff's prior lawsuit not sufficient to show causal connection between the prior lawsuit and decision not to promote plaintiff).

Plaintiff has failed to allege a causal connection between an alleged protected activity and Shady Grove dismissing her as a patient. Plaintiff alleges that she was dismissed from the practice for (1) complaining the Defendant's actions were discriminatory; (2) attempting to exercise her right to be financially responsible regardless of source of income; and (3) asking to speak to the legal department regarding unfair treatment. Further, Plaintiff alleges that Dr. Osborn "specifically told us that she was discontinuing my treatment because I had claimed that [Shady Grove's] actions and demands over the last few days were discriminatory and retaliatory."  (Declaration of E.M., 5).

There is no causal connection alleged between E.M.'s protected activity and Shady Grove's decision to dismiss her from the practice. Plaintiff herself asserts that she was informed that Shady Grove was dismissing her from the practice because she was questioning the quality of Shady Grove's consent forms and requesting that Shady Grove revise them for her, and her distrust of Shady Grove's medical practice. (Compl. ¶ 143). Although E.M. alleges that Dr. Osborn specifically stated that Shady Grove's actions were due to the fact that E.M. was claiming their treatment was discriminatory, Plaintiff acknowledges that the decision to terminate her was not made by Dr. Osborn, as that decision was "out of her hands" and that she was only the messenger.  Having failed to set forth a causal connection between a protected activity and her termination, Count I should be dismissed.

## II.    COUNT II FAILS TO STATE A CLAIM OF A VIOLATION OF THE CPPA FOR UNLAWFUL TRADE PRACTICES

Plaintiff alleges that Shady Grove committed 24 different unfair and deceptive trade practices in violation of the D.C. Consumer Protection Procedures Act ("CPPA").

The Act prohibits misleading or deceiving a consumer by "represent[ing] that goods or services have a . . . sponsorship, approval, certification, . . . that they do not have;" "represent[ing] that goods or services are of [a] particular standard [or] quality . . . if in fact they are of another;" and "misrepresent[ing] . . . a material fact which has a tendency to mislead." D.C. Code §§ 28-3904(a)-(e). To state a claim under the CPPA, E.M. must allege that a false representation was made.  Further, the CPPA affords recovery for a physician's alleged intentional misrepresentation only if the plaintiff can allege that the misrepresentation was made with entrepreneurial motive.  *Dorn v. McTigue*, 157 F. Supp. 2d 37, 46 (D.D.C. 2001).  A patient may recover damages from a physician under the statute only if there is a nexus between the alleged misrepresentation and the entrepreneurial aspect of the medical practice, generated by entrepreneurial motive.  *Id.* at 47; *Didden v. Brody*, 2011 D.C. Super. LEXIS 19 at *5 (D.C. Super. Ct. 2011) (dismissing CPPA claim where no nexus between statement and entrepreneurial aspects of medical practice).  "[F]or example, by using a misleading sales pitch to get the medical business."  *Caulfield v. Stark*, 893 A.2d 970, 978 (D.C. 2005). The plaintiff must allege that the defendant's alleged statements were aimed at entrepreneurial motives.

First, for all the reasons set forth in the fraud argument, *infra* at 23-26*,* which argument is incorporated by this reference, the CPPA claim fails because no misrepresentation is alleged.

Moreover, the Complaint fails to allege the necessary nexus between the alleged statements and an entrepreneurial motive.  Plaintiff alleges in conclusory fashion that defendant's' violations of the CPPA are related to "the entrepreneurial, commercial or business side of its practice."  (Compl. ¶ 194).  However, not one of the 24 alleged "violations" set forth in the Complaint supports such a conclusion.  (Compl. ¶¶196-200).  Fatal to E.M.'s claim is the fact that all 24 of the alleged statements were made to NOT obtain further business from E.M.

Instead of alleging that these statements were made to induce her to pay for and receive additional services from Shady Grove, they had the opposite effect:  Shady Grove refused to perform additional services on E.M., and, as a result, the statements had a negative economic impact on Shady Grove.  Shady Grove did not perform the procedure on E.M. and did not obtain any further economic benefit from E.M.  Shady Grove dismissed the Plaintiff and would not allow her to pay it any additional funds to perform the Egg Thaw and Fertilize Procedure.  Indeed, Shady Grove refunded the Plaintiff money when it dismissed her as a patient. (Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction at 28).

Therefore, Plaintiff has failed to state a claim under the CPPA because she has failed to allege the representations made by Shady Grove were false or misleading and has failed to allege the necessary nexus for a CPPA claim involving a medical practice.

### III.    COUNT III FAILS TO STATE A CLAIM FOR BREACH OF THE EGG FREEZING CONTRACT

Plaintiff alleges that Shady Grove breached the Egg Freezing Contract (or, as Plaintiff terms it, the Egg Freezing Program) by requiring a mental health consultation and a parental rights contract, by imposing these requirements a day before her appointment, and by dismissing her from the practice.  However, in making these allegations, Plaintiff ignores the express language of the written contract between the parties stating that Shady Grove is under no obligation to participate in the thawing or fertilization of E.M.'s eggs. (Exh. A 8,9). Thus, because Shady Grove had never agreed to perform the procedure, and E.M. and J.S. had not accepted Shady Grove's offer to do so as set forth in the Egg Thaw and Fertilization Contract, Shady Grove was within its rights to require further conditions on E.M. prior to agreeing to thaw and fertilize her eggs.

To establish a breach of contract claim, the Plaintiff must show (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach. *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014). Further, under well-established contract law principles, the plain and unambiguous meaning of an instrument is controlling, and a court determines the intention of the parties from the language used by the parties to express their agreement. *Red Lake Band of Chippewa Indians v. United States DOI*, 624 F. Supp. 2d 1, 15 (D.D.C 2009). Where the contract is unambiguous, as evidenced by the plain language of the contract, the court's inquiry is at an end, and the plain language of the contract controls. *Id.* A contract is unambiguous when there is only one reasonable interpretation. *Id*.

Additionally, a valid contract requires offer, acceptance, and mutual assent. *RDP Techs., Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 141 (D.D.C. 2011). Mutual assent, or a meeting of the minds, "takes the form of an offer or proposal by one party followed by an acceptance by the other party." *Id*. Where there is no meeting of the minds, a contract cannot exist. *Id*. A counter-offer is an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer. Restatement (Second) of Contracts § 39 (1981). Unless there is acceptance of the counter-offer and a meeting of the minds, no contract is formed. *See RDP Techs., Inc.*, 800 F. Supp. 2d at 141.

Here, the parties never reached agreement that Shady Grove would perform the Thaw and Fertilize Procedure on E.M.  She never signed the Thaw and Fertilize Contract. Instead, E.M. negotiated with Shady Grove to change the terms under which Shady Grove would provide the service, requesting revisions to the Thaw and Fertilize Procedure. (Compl. ¶ 75). Because the parties had not reached agreement on the terms under which Shady Grove would perform this

16

procedure, Shady Grove was within its rights to impose whatever contractual conditions it deemed necessary in determining whether it would enter into a new contract with E.M. to perform this procedure, including requiring a mental health consultation and/or that a legal contract be drafted between E.M. and J.S.

Under well-established contract principles, E.M. rejected Shady Grove's offer to perform the services by requesting that Shady Grove revise the consent document for her. Shady Grove was within its rights to reject E.M.'s counteroffer.

At the time Shady Grove made the decision to dismiss E.M. from its medical practice on January 18, 2019, there was no contract between the parties to perform the egg thaw and fertilization procedure as there was no meeting of the minds as to the conditions under which Shady Grove would be obligated to so perform.  Because there was no contract, there was no breach of contract. Therefore, this Court should dismiss Count III of the Complaint.

## IV.   COUNT IV FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT BASED ON THE PATIENT BILL OF RIGHTS

The Complaint fails to allege facts sufficient to establish that the Patient Bill of Rights is a contract.  Even if the Court determines that it is, the Complaint fails to allege that Shady Grove breached any obligations thereunder. E.M.'s allegations misread the plain meaning of the Bill of Rights. A copy of the Patient Bill of Rights E.M. attached to her Motion for Temporary Restraining Order and Preliminary Injunction and which she refers to in the Complaint is attached hereto as **Exhibit M**.

1. **Financial Responsibility for Treatment**:  Plaintiff alleges that Shady Grove "refused to allow Plaintiff to assume financial responsibility for or pay for her own treatment, and conditioned her treatment on Plaintiff's source of payment." (Compl. ¶ 221). However, the Patient Bill of Rights does not provide a patient the right to take sole financial responsibility.

Rather the Patient Responsibility Statement merely provides that a patient is obligated to assure that the financial obligations of her health care are fulfilled as promptly as possible, making all reasonable efforts to meet any agreed upon financial payment plan.  Indeed, throughout E.M.'s treatment with Shady Grove from the time she presented J.S. as her partner in 2015, Shady Grove required - and E.M. and J.S. agreed - that J.S. would be responsible for the fertility treatments along with E.M.  (Exhs. B - G).

2. **Questions about Clinical Treatment**:  E.M. alleges that Shady Grove "failed to respond to Plaintiff's reasonable questions about her clinical treatment and the risks thereof." (Compl. ¶ 221). Prior to her dismissal, plaintiff alleges that she had questions regarding whether a natural cycle meant no medication or limited medication, and whether she should do assisted hatching. Shady Grove met its obligations to answer Plaintiff's reasonable questions during her treatments. The Complaint alleges that when E.M. spoke with her nurse and with the Office Supervisor, both expressed to her when they did not have an answer to her clinical questions and that they would consult with others to get her an answer.  However, once plaintiff had been dismissed from the practice, the Bill of Rights does not state that Shady Grove is under an obligation to continue to answer questions about procedures or treatments it would not be performing.

3. **Respect and Dignity**:  Plaintiff alleges that Shady Grove "failed to treat Plaintiff with respect and dignity but instead threatened to treat J.S. as a sperm donor because she had inquired about [Shady Grove]'s discount program, wanted to be financially responsible and pay for her own medical care, and stated that she was single."  On their face, these allegations do not support a claim that E.M. was not treated with respect and dignity under the Patient Bill of Rights.

4. **Continuity of Care:**  Fourth, Plaintiff alleges that Shady Grove failed to provide Plaintiff with reasonable continuity of care by (1) stopping her treatment (2) leaving Plaintiff in medical limbo for approximately a month and refusing to respond to any of Plaintiff's repeated attempts to get answers or resolve her status with Shady Grove; and (3) by recommending providers that it could not guarantee would provide medically equivalent care. The Patient Bill of Rights provides that a patient may expect "reasonable" continuity of care.  It does not require Shady Grove to provide all treatments to all patients under all situations.  Shady Grove dismissed E.M. prior to beginning a medical procedure.  There is no violation of continuity of care alleged in the Complaint.

5. **Answer Questions**.  Plaintiff alleges that Shady Grove "refused to answer questions on its required consent forms so that her consent would be "informed."  Shady Grove repeatedly answered her questions in various conversations with Shady Grove staff, but Plaintiff was unhappy with their answers and continued asking to speak to more people, attempting to contact Shady Grove's legal counsel, and even its CEO.  (Compl. ¶¶ 93, 100, 114, 157).

6. **Reasonable Resolution**.  Finally, E.M. alleges that Shady Grove failed to seek reasonable resolution of E.M.'s questions and concerns because it dismissed her and decided that it would not perform an elective procedure on her.  The Patient Bill of Rights does not grant the unfettered right to all patients that Shady Grove will provide all procedures on them.  The Complaint fails to allege that this provision was violated.

For the foregoing reasons, Plaintiff failed to allege a breach of contract based upon the Patient Bill of Rights.  Therefore, this Court should dismiss Count IV.

19

**V.     COUNT V FAILS TO STATE A CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

Plaintiff alleges that Shady Grove breached its covenant of good faith and fair dealing, but fails to allege that a contract existed to provide a basis for the covenant.

The District of Columbia law recognizes an implied covenant of good faith and fair dealing in every contract. *Hais v. Smith*, 547 A.2d 986, 987-88 (D.C. 1988). However, there must actually be a contract to provide the basis for the implied covenant. See *Mero v. City Segway Tours of Wash. DC, LLC*, 826 F. Supp. 2d 100, 106 (D.D.C 2011) ("the absence of a contract alone is sufficient to defeat the implied covenant claim").

Here, E.M. fails to sufficiently allege the existence of a contract to provide a basis for her implied covenant claim. E.M. had not yet entered into the Thaw and Fertilize Contract (Compl. ¶ 75). Shady Grove was well within its rights to negotiate, or to decline to enter into and perform on, a subsequent agreement with E.M. Shady Grove and E.M. never agreed to any the terms that would govern the Thaw and Fertilize Procedure. Because E.M. has not alleged a contract that would support this claim, the Court should dismiss Count V.

**VI.     COUNT VI FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT**

In Count VI, E.M. purports to assert a claim for "Unjust Enrichment." The factual predicate for this is unclear. It appears that she is alleging that she paid Shady Grove money for fertility treatments in the past and now that Shady Grove is refusing to perform an additional procedure, the egg thaw and fertilization procedure, Shady Grove must refund the money she paid for past services – which services are not alleged to have been performed in anything other than an exemplary fashion. (Compl. ¶ 229-32).

Unjust enrichment is an equitable concept based upon the notion of implied contract or quasi contract. It is black letter law that there cannot be an express and implied contract for the

20

same thing existing at the same time. *Schiff v. AARP*, 697 A.2d 1193, 1194 n2 (D.C. 1997)

(finding no claim for unjust enrichment where valid express contract existed). The fact that one

party benefitted does not change the rule when work is performed under a contract. *Id*. A claim

of unjust enrichment will fail when the parties have a contract governing an aspect of their

relationship. *Levine v. Am. Psychological Ass'n (In re APA Assessment Fee Litig.)*, 766 F.3d 39,

46 (D.C. 2014). Specifically,

> Unjust enrichment is an equitable quasi-contract claim based on a contract
> implied in law. Such a claim is a legal fiction designed to permit recovery by
> contractual remedy in cases where, in fact, there is no contract, but where
> circumstances are such that justice warrants a recovery as though there had been a
> promise. Unjust enrichment will not lie when the parties have a contract
> governing an aspect of their relation, because a court will not displace the terms
> of that contract and impose some other duties not chosen by the parties.

*Id*.; *See also Emerine v. Yancey*, 680 A.2d 1380, 1383 (D.C. 1996) (finding recovery

under unjust enrichment is unavailable in actions arising from express contract); *Plesha*

*v. Ferguson*, 725 F. Supp. 2d 106, 111 (D.D.C. 2010) (explaining unjust enrichment

presupposes that an express enforceable contract does not exist); *Schiff*, 697 A.2d at 1194

n2 (affirming lower court's dismissal of unjust enrichment claim when complaint

sufficiently alleged existence of two express contracts).

Here, E.M. entered into a series of valid contracts with Shady Grove for each of the

fertility procedures that Shady Grove performed on her (Exhs. A – I) (Compl., ¶ 22). Therefore,

she cannot now be heard to claim that these contracts unjustly enriched Shady Grove. Moreover,

the Egg Freezing Contract specifically states that Shady Grove is not obligated to do anything

further with E.M.'s frozen eggs and specifically was not obligated it to participate "in the later

thawing fertilization, of transfer" of E.M.'s eggs. (Exh. A at 8 and 9).

E.M. is barred by the bargain she struck; she cannot now undo the deal by claiming that by paying Shady Grove for fertility services that Shady Grove previously provided, Shady Grove now owes her repayment for those services because it will not perform additional procedures on her.  It is not a court's duty to "displace the terms of [a] contract and impose some other duties not chosen by the parties." *Levine*, 766 F.3d at 46.  Because the subject matter of this alleged cause of action is covered by express contract and because E.M. fails to allege that Shady Grove received anything of benefit from E.M. beyond the price of the treatments and procedures previously agreed upon, this Court should dismiss Count VI.

## VII.    COUNT VII FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL

Plaintiff alleges that Shady Grove made a number of unspecified promises to induce her to enter into the Egg Freezing Contract and continue her fertility treatments with Shady Grove.

A well-pleaded claim of promissory estoppel must allege (1) there was a promise (2) the promise reasonably induced reliance on it, and (3) the promisee relied on the promise to her detriment. *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52 (D.D.C. 2015). It is well-established that a claim of promissory estoppel fails where an express contract controls. *Plesha v. Ferguson*, 725 F. Supp. 2d 106, 112 (D.D.C. 2010); *Rocha*, 101 F. Supp. 3d at 82 ("promissory estoppel is available only in the absence of an express, enforceable contract."); *3D Global Solutions, Inc. v. MVM, Inc.*, 552 F. Supp. 2d 1, 7 (D.D.C. 2008) (cause of action for promissory estoppel exists "only in the absence of an express, enforceable contract."). Additionally, reliance on an alleged promise is unreasonable as a matter of law when it is completely at odds with the terms of a written agreement covering the same transaction. *Rocha*, 101 F. Supp. 3d at 76.

E.M. concedes that she entered into the Egg Freezing Contract and all subsequent agreements with Shady Grove regarding the fertility treatments performed on her. (Compl. ¶ 22). The Egg Freezing Contract explicitly states that Shady Grove is *not* obligated to perform a

subsequent thaw and fertilization procedure for E.M. (Exh. A). Therefore, not only is a claim of promissory estoppel unavailable, but her reliance on alleged representations at odds with the explicit statement to the contrary contained in the parties' express contract is unreasonable as a matter of law.

Further, E.M. fails to allege a clear and unambiguous promise on which she reasonably relied. At best, the Complaint contains statements of future wishes and desires. By Plaintiff's own admission, the parties were negotiating the terms under which Shady Grove would perform an additional procedure on her: the egg thaw and fertilization procedure. (Compl. ¶75) (E.M. and J.S. sought "revisions" to the Consent to Thaw Contract). The Complaint details the parties' extensive negotiations regarding the terms under which Shady Grove would perform the procedure in the future. (Compl. ¶ 108-13). These negotiations were unsuccessful; that does not give rise to a claim for promissory estoppel. A valid contract existed between the parties, and Plaintiff's reliance on terms contrary to the written contract was unreasonable. The Complaint's failure to identify a promise E.M. relied on to her detriment mandates dismissal of Count VII.

## VIII.   COUNT X FAILS TO STATE A CLAIM FOR FRAUD

Count X alleges that Shady Grove defrauded E.M. and makes the bald, unsupported allegation that Shady Grove has engaged in "long-term and massive fraud that has not only injured [her] but also defrauded countless other [Shady Grove] patients." (Compl. ¶ 256).

Fraud is a serious allegation that is not taken lightly due to the harm that comes to an entity's reputation and good will by such allegations. *See United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, 685 F. Supp. 2d 129, 134-35 (D.D.C. 2010) (citing *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 n. 103 (D.C. 1981)). A party is not permitted to charge another with fraud unless she is in a position and is willing to put herself on

record as to what the fraud consists of specifically. Courts do not allow fraud claims to move forward if they are not well-grounded in fact. Thus, Rule 9(b) mandates that a party must plead fraud with particularity. To meet those requirements, the Complaint must specify the time, place and content of the alleged misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the alleged fraud. *United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, 722 F. Supp. 2d 20 (D.D.C. 2010). General or conclusory allegations of fraud are insufficient. *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 73 (D.D.C. 2002). In this case, the allegations in the Complaint do not even come close to meeting the heightened pleading requirements.

Under District of Columbia law, the elements of fraud and fraudulent inducement are the same. *Xereas v. Heiss*, 933 F. Supp. 2d 1, 10 (D.D.C. 2013). The plaintiff must allege with particularity that a defendant (1) made a false representation, (2) of a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) that plaintiff relied upon that representation to her detriment. *Saucier v. Countrywide Home Loans*, 64 A.3d 428 (D.C. 2013); Fed. R. Civ. P. 9(b).

Here, the Complaint fails to set forth the circumstances of the fraud, including the specific time, place or content of the representations.  Although Plaintiff alleges that Shady Grove has "engaged in a long-term and massive fraud," the Complaint is completely devoid of any specific allegations to support such an egregious, harmful allegation.  Indeed, Plaintiff's primary request for relief in this case is that this Court order Shady Grove to continue to treat her so that she can realize her most personal and important goal of conceiving biological children. (Compl. 64-65).  Alleging that Shady Grove has engaged in a "massive fraud" flies in the face of such a request.  If E.M. truly believed that Shady Grove defrauded her and countless others, the

last thing she would be requesting of this Court is to have Shady Grove perform additional medical treatments on her body.

In Count X and "in the alternative," E.M. vaguely refers to false representations "detailed above" in the previous 254 paragraphs of a 66-page Complaint. Such general allegations of "fraud in the air" fail to satisfy the stringent pleading requirements for a fraud cause of action. At paragraph 249 of the Complaint, E.M. alleges that the false representations were with respect to (1) Shady Grove's leadership in the fertility industry in allowing patients to use their own cryopreserved eggs; (2) the superiority of Shady Grove's laboratory and embryologists; (3) Shady Grove's compliance with its Patient Bill of Rights; (4) treating Plaintiff's frozen eggs as her property; and (5) the fact that an egg freezing patient can return to Shady Grove for the Thaw and Fertilization Procedure.

Strikingly absent from the Complaint is any allegation that any of these five statements are false. Indeed, as stated above, Plaintiff's requested relief in this case belies that the first and second statements are false. There is no allegation in the Complaint that Shady Grove is anything other than a leader in the fertility industry, allows patients to use their own cryopreserved eggs, and that it has superior embryologists performing in superior laboratories. As set forth *supra* at 17-19, there is no allegation that Shady Grove did not comply with its Patient Bill of Rights. Fourth, there is no allegation to support the vague claim that Shady Grove does not treat a patient's frozen eggs as her property. While the Complaint alleges that during the negotiations over whether Shady Grove would revise its Consent form for E.M., there was a discussion among her and Shady Grove staff concerning this subject, there is not one allegation in the Complaint that supports the bald allegation that this Plaintiff was ever not allowed to treat her frozen eggs as her own. Finally, there is no allegation that patient's who have frozen their eggs

cannot return to Shady Grove for the Thaw and Fertilization Procedure.  The fact that these parties were not able to reach an agreement under which Shady Grove would perform this procedure on E.M. does not establish that this is a false statement pled with sufficient particularity to meet the heightened pleading requirements of Rule 9(b).

Plaintiff has failed to allege that Shady Grove made a false representation of material fact that she relied on to her detriment.  The allegations contained in Count X of the Complaint do not even come close to meeting the particularity requirements of Rule 9(b). Therefore, this Court should dismiss Count X.

## IX.    COUNT IX FAILS TO STATE A CLAIM FOR FRAUDULENT INDUCEMENT OF CONTRACT

Plaintiff alleges that Shady Grove fraudulently induced her to enter into multiple contracts over six and a half years by making false representations about (1) Shady Grove's leadership in the fertility industry, (2) the experience of its laboratory and embryologists, (3) that Shady Grove complies with its Patient Bill of Rights, (4) that Shady Grove treats a Plaintiff's frozen eggs as her property, and (5) that a patient has the right to return to Shady Grove to have her eggs thawed in its laboratory.

The elements of fraud and fraudulent inducement are the same. *Xereas*, 933 F. Supp. 2d at 10. Fraudulent inducement to enter a contract requires "a misrepresentation or omission that pertains to an essential term of a contract and the intent to convince a [party] to enter the contract." *Carter v. Urban Serv. Sys. Corp.*, 324 F. Supp. 3d 19, 30 (D.D.C. 2018).  A complaint must allege (1) a false representation (2) made in reference to a material fact, (3) with the knowledge of its falsity, (4) and with the intent to deceive, (5) and that the party to whom to representation has been made takes an action in reliance upon the representation. *Id*.

26

Here, Plaintiff's claims for fraudulent inducement must be dismissed. First, for all the reasons set forth in the fraud argument, *supra* at 23-26, which is incorporated by this reference, the fraudulent inducement claim fails because no misrepresentation is alleged.

Further, Plaintiff fails to even point to which contracts she alleges she was fraudulently induced to enter.

Thus, the Court should dismiss Count IX of the Complaint as Plaintiff has failed to state a claim for fraudulent inducement.

## X.    COUNT VIII FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION

Plaintiff alleges that Shady Grove made negligent misrepresentations to Plaintiff regarding (1) Shady Grove's leadership in the fertility industry, (2) the experience of its laboratory and embryologists, (3) that Shady Grove complies with its Patient Bill of Rights, (4) that Shady Grove treats a Plaintiff's frozen eggs as her property, (5) that a patient has the right to return to Shady Grove to have her eggs thawed in its laboratory and (6) that treating J.S. as a donor rather than partner and requiring a social worker visit and contract, and ultimately dismissing Plaintiff were consistent with its long-standing policies and required by the FDA.

To state a claim for negligent misrepresentation, a party must show that (1) the defendant made a false statement or omission of a fact, (2) the statement or omission was in violation of a duty to exercise reasonable care, (3) the false statement or omission involved a material issue, (4) the plaintiff reasonably and to her detriment relied on the false information, and (5) the defendant's challenged conduct proximately caused injury to the plaintiff. *Meehan v. U.S. Office Prods. Co. (In re U.S. Office Prods. Co. Sec. Litig.)*, 251 F. Supp. 2d 77, 100 (D.D.C. 2003). "[T]he elements of a negligent misrepresentation claim are the same as those of a fraudulent misrepresentation claim, except a negligent misrepresentation claim does not include the state of

mind requirements of fraud." *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the United States*, 325 F.R.D. 10, 12 (D.D.C. 2018).

Here, for all the reasons set forth in the fraud argument, *supra* at 23-26, which is incorporated by this reference, the negligent misrepresentation claim fails because no misrepresentation is alleged.

Thus, the Court should dismiss Count VIII of the Complaint as Plaintiff has failed to state a claim for negligent misrepresentation.

## XI.   COUNT XI FAILS TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

E.M. alleges that she has suffered extreme stress and mental anguish for which she should be awarded damages because Shady Grove would not agree to perform a medical procedure on her under the conditions that she dictated. (Compl. ¶¶ 263-77). To successfully state a claim for intentional infliction of emotional distress, a plaintiff must allege that the defendant (1) engaged in extreme and outrageous conduct, (2) had the intent to cause or disregard of a substantial probability of causing severe emotional distress, (3) a causal connection between the conduct and the injury exists, and (4) severe emotional distress. *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997) (affirming grant of motion to dismiss and finding as a matter of law that conduct as alleged did not rise to the level of outrageousness).

There is no general duty of care to avoid causing mental distress. Simply put, a party will not be held liable for all conduct that causes mental distress to another. *Id.* at 11 (citing *District of Columbia v. Thompson*, 570 A.2d 277, 290 (D.C. 1990)).  Thus, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Sherrod v. McHugh*, 334 F. Supp. 3d 219, 263-64 (D.D.C 2018). This "is a very demanding standard, infrequently met." *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 188 (D.D.C. 1997) (granting motion to dismiss and holding allegations of a pattern of discrimination and abuse of supervisory power through incidents of harassment did not amount to "extreme and outrageous" conduct); *Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 340 S.E.2d 116, 123 (N.C. App. 1986) (refusal to grant pregnancy leave or permission to go to hospital and cursing of pregnant employee, while improper, did not constitute outrageous conduct as a matter of law); *Williams v. District of Columbia*, 9 A.3d 484, 494 (D.C. 2010) (granting motion to dismiss finding that employer-employee conflicts do not generally rise to level of outrageous conduct).

In this case, Plaintiff fails to state a cause of action for intentional infliction of emotional distress. The allegations do not amount to "extreme and outrageous" conduct. The gravamen of Plaintiff's claim is that Shady Grove stated that it would not perform the egg thaw and fertilization procedure on E.M. unless certain conditions were met. E.M. disagreed that she should have to comply with those requirements. Thus, the parties never reached an agreement that Shady Grove would perform any further treatments on her. To the extent she suffered stress and emotional distress as a result, the facts as alleged in the Complaint are insufficient to impute intentional, reckless, outrageous conduct on the part of Shady Grove that would support the tort of intentional infliction of emotional distress as a matter of law. Therefore, this Court should dismiss Count XI.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Defendant Shady Grove requests that this Court enter an Order dismissing the Complaint in its entirety for failure to state a claim. A proposed order is attached.

Dated: March 27, 2019           Respectfully submitted,

/s/ Lori Vaughn Ebersohl
Lori Vaughn Ebersohl (D.C. Bar No. 428793)
Hannah Hutchison (D.C. Bar No. Pending)
APATOFF PETERS EBERSOHL, LLP
252 N. Washington Street
Falls Church, VA  22046
Telephone: (703) 534-4440
Facsimile: (301) 279-2819
Email: lebersohl@apatoffpeters.com

*Attorneys for Defendant Shady Grove Reproductive Science Center, P.C.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2019 I caused the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will automatically send a notification of such filing to the following counsel of record:

> Lee E. Berlik
> Jay M. McDannell, Of Counsel
> BERLICKLAW, LLC
> 1818 Library Street, Suite 500
> Reston, Virginia 20190
> Tel: (703) 722-0588
> <u>JMcDannel@Berliklaw.com</u>


> /s/ *Lori Vaughn Ebersohl*
> Lori Vaughn Ebersohl