SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

E.M.

                    Plaintiff,

            v.                                  Civil Action No: **19 - 0 0 0 1 3 7 1**

**SHADY GROVE REPRODUCTIVE
SCIENCE CENTER P.C.**
2021 K Street, N.W., Suite 701
Washington, D.C.  20037,

                    Defendant.

RECEIVED
Civil Clerk's Office

MAR 0 6 2019

Superior Court of the
District of Columbia
Washington, D.C.

## VERIFIED COMPLAINT

This case involves Plaintiff E.M.                    's lifelong dream to have biological children,

and Defendant's unlawful, retaliatory, and discriminatory withholding of medical treatment –

which Defendant has represented Plaintiff cannot obtain elsewhere without risking adverse

medical consequences – at a critical stage of her care, significantly jeopardizing Plaintiff's

chances of having her own family.  Plaintiff is a 45-year old woman who has been a patient of

Defendant's fertility clinic for approximately six and one half years, when she froze five mature

eggs at the age of 39 and entered into a contract with SGF to become a patient in SGF's fertility

preservation "Egg Freezing Program," the bookends of which are freezing eggs and later using

frozen eggs.  Based on its own representations, SGF's fertility clinic and laboratory is the largest

and most sophisticated in the area, if not in the country.  When Plaintiff returned to SGF to use

those eggs in January 2019, Defendant abruptly stopped her medical treatment in the middle of

this "egg thaw cycle" and is now refusing to treat her further.

Without immediate and permanent injunctive relief enjoining Defendant's dismissal of Plaintiff as a patient and requiring it to complete her treatment in its Egg Freezing Program, she will suffer permanent and irrevocable harm, as Plaintiff cannot replace her priceless eggs, and, given the unnecessary medical risks of transferring the eggs to another laboratory and Defendant's dominant technology and experience in this area, Plaintiff does not simply have the option of seeking medically equivalent treatment elsewhere.  Defendant's bad faith, retaliatory and discriminatory conduct – in breach of Plaintiff's contracts with Defendant, and in violation of the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.* ("DCHRA") and the District of Columbia Consumer Protection and Procedures Act, D.C. Code §§ 28–3901 *et seq.* ("CPPA"), has been nothing short of outrageous.

In support thereof, Plaintiff alleges the following:

## PARTIES

1.      Plaintiff E.M.              is an individual residing in the District of Columbia.

2.      Defendant Shady Grove Reproductive Science Center P.C. is a Maryland professional corporation that is registered as a foreign corporation with the District of Columbia's Corporations Division.  Shady Grove Reproductive Science Center P.C. has two registered trade names in the District of Columbia – "Shady Grove Fertility RSC" and "Shady Grove Fertility Reproductive Science Center" – but instead typically refers to itself using one of two trade names that are unregistered in the District of Columbia – "Shady Grove Fertility Center," and "Shady Grove Fertility" (all of these names, collectively, referred to as "SGF").  Shady Grove Fertility, LLC is a Maryland limited liability corporation, and is the sole shareholder in Shady Grove Reproductive Science Center P.C.  "Shady Grove Fertility Centers"

2

and "Shady Grove Fertility Reproductive Science Center" are registered trade names in the State of Maryland for Shady Grove Reproductive Science Center P.C.

## JURISDICTION

3.      This Court has subject matter jurisdiction over this matter pursuant to D.C. Code § 11-921.

4.      This Court has personal jurisdiction over this matter pursuant to D.C. Code §§ 13-422 and 13-423 because Defendant SGF maintains offices in the District of Columbia, provides services in the District of Columbia, uses real property in the District of Columbia, and has transacted business in the District of Columbia.

## FACTUAL ALLEGATIONS

**SGF's EGG FREEZING PROGRAM:  STAGE 1 (CRYOPRESERVATION)**

5.      In 2012, the American Society of Reproductive Medicine ("ASRM") lifted the "experimental" label from egg freezing, and elective fertility preservation services first became widely available.

6.      Plaintiff first became a patient of SGF in 2012 when she was 39 years old.  She did so specifically to have her eggs frozen with SGF.  Upon information and belief, and based on Defendant's representations, egg quality diminishes with age, particularly after the age of 40.

7.      SGF currently states on its website that "[a] woman's age is the single most important factor affecting fertility" and that "[b]y freezing [eggs] when you're in your mid- to late-30s, your fertility at that point in time will be preserved for the future." https://www.shadygrovefertility.com/treatments-success/egg-freezing.  This is consistent with representations Defendant made to Plaintiff to induce her to enroll as an egg freezing patient in what Defendant now refers to as the "Egg Freezing Program."

3

8.      Freezing and thawing were the two bookends of the "Egg Freezing Program," a comprehensive program to preserve fertility at a snapshot in time for future use. https://www.shadygrovefertility.com/treatments-success/egg-freezing.

9.      Upon information and belief, an egg freezing cycle, similar to an in-vitro fertilization ("IVF") cycle, is a multi-week process timed to a woman's menstrual cycle.  It involves frequent, increasing to daily, bloodwork and ultrasound monitoring appointments over a period of weeks and medication injections several times a day.  The objective of these medications is to trigger the body to mature multiple eggs in a single month, rather than the one egg typically matured and released by the ovaries.  At the end of a successful cycle, the eggs are surgically removed and cryopreserved for future fertility use in the "egg thaw" stage of the Egg Freezing Program.

10.      Defendant does not separately market egg thawing services.  Every reference to egg thawing on SGF's website is in connection with Defendant's Egg Freezing Program.

11.      SGF currently states on its website that "[t]hawing frozen eggs" is one of the "benefits" that it offers to "egg-freezing patients" in the Egg Freezing Program and that SGF has unmatched experience in thawing frozen eggs.  As SGF itself puts it:

> Thawing frozen eggs is an incredibly important aspect of the egg freezing program, as this is a very sensitive technique that can decrease your chances of conception if the right practitioner is not performing the thaw. At Shady Grove Fertility, we have a depth and breadth of experience with thawing that is unparalleled. More than 50,000 babies have been born at our center, and a growing number of those babies have been born from frozen eggs and embryos.

https://www.shadygrovefertility.com/treatments-success/egg-freezing.  This is consistent with representations Defendant made to Plaintiff to induce her to enroll as an egg freezing patient.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

12.     SGF currently states on its website that "[w]hen a patient is ready to use her eggs, they are thawed, inseminated using a partners sperm or donor sperm and then fertilized embryos are grown in our IVF lab."  (emphasis added)  https://www.shadygrovefertility.com/blog/treatments-and-success/is-egg-freezing-right-for-you/.  This is consistent with representations Defendant made to Plaintiff to induce her to enroll in as an egg freezing patient.

13.     SGF currently states on its website that Plaintiff can "return" to SGF when she is "ready to conceive and need[s] to use her frozen eggs."  https://www.shadygrovefertility.com/treatments-success/egg-freezing/egg-freezing.  This is consistent with representations Defendant made to Plaintiff to induce her to enroll as an egg freezing patient.

14.     Defendant evaluates the success of the Egg Freezing Program based on patient outcomes following an egg thaw cycle, specifically "post-warming survival, fertilization, implantation, clinical pregnancy, and live birth rates."  https://www.fertstert.org/article/S0015-0282(15)02037-3/abstract; https://www.shadygrovefertility.com/treatments-success/egg-freezing/egg-freezing.

15.     At the time she enrolled as an egg freezing patient, Plaintiff knew that she was choosing a fertility clinic for a long-term relationship, as every clinic she assessed (including SGF) impressed upon her the importance of having the same lab that froze the eggs eventually thaw the eggs.

16.     SGF additionally represented to Plaintiff that when considering fertility preservation, the other critical questions were the quality of the lab and the experience of the technicians.  SGF represented that its technicians and its laboratory were of the highest quality.

17.     SGF states on its website that cryopreserved eggs are stored "within the highly-controlled laboratory environment at Shady Grove Fertility" that has "redundant safeguards and

5

quality control protocol."   https://www.shadygrovefertility.com/blog/resources/

embryo-options-new-resources-for-patients-with-cryopreserved-embryos-eggs-or-sperm/.  This

is consistent with representations Defendant has made to Plaintiff throughout her time as a

patient.

18.     Upon information and belief, transferring eggs to a different facility would incur

medical risk because cryopreserved eggs are extremely delicate and must be stored and moved in

highly controlled conditions at extremely low temperatures.  Upon information and belief, even a

slight transport error or a slight temperature fluctuation could irrevocably damage or destroy

cryopreserved eggs.  https://www.washingtonpost.com/news/morning-mix/wp/2018/03/09/2000-

frozen-eggs-and-embryos-possibly-compromised-after-fertility-clinic-temperature-

malfunction/?utm_term=.3ac61d17869f; https://www.urmc.rochester.edu/MediaLibraries/

URMCMedia/fertility-center/documents/Fertility-Clinic-Shipping-Waiver-rev.pdf;

http://www.austinivf.com/wp-content/uploads/2016/01/Embryo-Oocyte-Sperm-Transport-from-

Ovagen-Fertility.pdf.

19.     Plaintiff was induced to work with SGF because of these factors and these

representations.  These are the same reasons that Plaintiff believes necessitate her completing her

treatment with her frozen eggs at the same laboratory now.

20.     At the time Plaintiff enrolled as an egg freezing patient, Defendant presented to

her all the material terms of the program.  These terms and promises included that Plaintiff's

frozen eggs were her property, that egg thawing was a crucial aspect of her treatment, that she

should return to use her frozen eggs when she was ready, that she should consult with her SGF

doctor when she did so, that her frozen eggs would be thawed and inseminated in SGF's lab, that

her embryos would be grown in SGF's lab, that SGF's technicians and laboratory were of the

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

highest quality, that SGF would evaluate success based on factors such as pregnancy and live

birth rates, and that the cost of the using her eggs would be the price SGF dictated per egg thaw

cycle at the time she returned to complete her treatment.

21.     Plaintiff did not have the opportunity to negotiate these terms but accepted this

contract and these terms to enroll as an egg freezing patient in approximately October 2012.

Plaintiff acted in reliance of these representations.

22.     Plaintiff signed every informed consent form related to and self-paid for this

treatment.  SGF did not provide a copy of the signed consent forms when Plaintiff requested her

full medical records in or around October 2016.

23.     In 2012, Plaintiff resided in the District of Columbia, paid for her treatment and

signed all relevant consent forms in the District of Columbia, and was being treated by a SGF

physician whose office was in the District of Columbia.  Plaintiff received most of her treatment

in her initial egg freezing cycle in the District of Columbia.

24.     In October 2012, Plaintiff accordingly completed an egg freezing "cycle" that

resulted in six cryopreserved eggs.  Five of these eggs were mature, and one egg was immature.

It is not clear whether the immature egg will be viable.  As SGF puts it, "Pregnancy is only

possible from mature eggs, so while the total number of eggs collected at the retrieval is relevant,

even more important is the number of mature eggs."  https://www.shadygrovefertility.com/

application/files/2814/6919/3788/Egg_Freezing_FAQ_May2016v4a.pdf

25.     Dr. Eric Widra ("Widra"), a reproductive endocrinologist (i.e. fertility doctor),

was Plaintiff's physician when she enrolled as an egg freezing patient.  Upon information and

belief, Widra is employed by Defendant.  Plaintiff and Widra discussed the "egg thawing"

component of the Egg Freezing Program starting at her initial consult.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

26.     Defendant has not responded to Plaintiff's repeated requests for a copy and explanation of her bills from and payments made to it.  Upon information and belief, Plaintiff paid Defendant at least $7,850 out of pocket to enroll as an egg freezing patient and for treatment in one egg freezing cycle, and has spent at least an additional $6,115 out of pocket on medications required by Defendant for that cycle.

27.     Upon information and belief, Plaintiff has paid between $530 and $600 out of pocket each year to store her cryopreserved eggs.

**PATIENT BILL OF RIGHTS**

28.     Defendant provided Plaintiff with a copy of SGF's Patient Bill of Rights and Patient Responsibility Statement ("Patient Bill of Rights"), which contained the material terms that SGF wanted to govern all interactions between Plaintiff and SGF and imposed obligations on each party.

29.     Plaintiff did not have the opportunity to negotiate these terms or the obligations it imposed on her, but accepted this contract and these terms as a condition of receiving medical treatment at SGF.  As additional consideration, Defendant was paid in full for all medical treatment provided to Plaintiff.

30.     The Patient Bill of Rights requires Plaintiff to take an active role in her own treatment and to make any concerns known, such as the ones detailed above.  Specifically, this document states that Plaintiff has the responsibility "[t]o participate in health care decisions… [t]o make known to her physician, attending nurse, or other health care personnel, any concerns or complaints she may have… [t]o make sure she understands all information regarding the implications of her …. surgery or procedure…."

8

31.     Pursuant to the Patient Bill of Rights, it was reasonable for Plaintiff to expect that Defendant would provide information about the best course of treatment and the risks of and benefits thereof, to treat her with respect, to provide treatment without regard to who paid for it as long as Patient accepted fiscal responsibility thereof, to provide treatment without any concern for abuse or harassment, and to provide a reasonable response to her questions and concerns without fear of discrimination or reprisal.  As SGF's Patient Bill of Rights specifically states, Plaintiff has the rights, *inter alia:*

- To expect to be treated with respect, consideration, and dignity….

- To expect treatment without regard to race, color, creed, religion, sex, national origin, or source of payment, except for fiscal responsibility thereof, without any concern for abuse or harassment….

- To be assured confidential treatment of disclosure of records and afforded the opportunity to approve or refuse the release of such information, except as permitted or required by law.

- To be provided, to the degree known, information regarding my diagnosis, treatment, and prognosis.

- To have the opportunity to participate in decisions regarding my health care.

- To request a second opinion, voice a complaint or grievance… without fear of discrimination or reprisal.

- To expect a reasonable response to any reasonable request for service

- To examine and receive an explanation of my bill, regardless of the source of payment.…

- To expect reasonable continuity of care…

- To have all of my patient rights apply to the person who has legal responsibility to make decisions regarding my medical care.

- To expect reasonable resolution of complaints at the Practice level.

32.     Several of the rights guaranteed to Plaintiff by the DCHRA, such as the right to be free from discrimination based on marital status, appear nowhere in SGF's Patient Bill Rights.

9

33.     Plaintiff has visited SGF's office locations at least dozens, and likely well in excess of fifty times for monitoring, consultations and treatment.  She has never seen the Patient Bill of Rights or any other notice "setting forth excerpts from or summaries of the pertinent provisions of [the Human Rights Law] and information pertinent to the filing of a complaint," posted in any office location, in D.C. or otherwise, in a "conspicuous place" or otherwise.

**SUBSEQUENT FERTILITY EFFORTS**

34.     In 2014, Plaintiff became pregnant naturally.  This pregnancy tragically ended in miscarriage approximately one month after her 41st birthday.

35.     J.S.            ("J.S.        ") was the father of Plaintiff's unborn child.  He is Plaintiff's best friend, and Plaintiff and J.S.        have been in a sexually intimate and strong emotionally supportive relationship for approximately a decade.  Plaintiff and J.S.        are not married or engaged, do not live together or share a household, and have no legal or financial ties.

36.     Plaintiff subsequently sought additional fertility treatment with Defendant rather than going elsewhere based on its representations about its success rates, its experience, the quality of its care, and the quality of its facilities and embryology lab.  Plaintiff also remained with SGF to ensure her continuity of care so that when she did return to use her frozen eggs, she was doing so with a clinic and/or clinical team who was intimately familiar with her medical history, and there would be no potential medical errors related to the transition of her care.

37.     Upon information and belief, transitioning care between medical providers is a frequent source of medical errors and maintaining continuity of care helps to reduce such errors.

38.     Dr. Barbara Osborn ("Osborn"), a reproductive endocrinologist (i.e. fertility doctor), was Plaintiff's physician for most of her subsequent fertility treatments with Defendant. Upon information and belief, Osborn is employed by Defendant.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

39.    Osborn's primary role in Plaintiff's treatment was to set a clinical protocol and address issues or questions as they arose.  The remainder of Plaintiff's physical treatment – including bloodwork and ultrasound monitoring, egg retrieval, and laboratory work – was typically performed by other SGF employees and physicians, whoever was working or on call on a given day.

40.    During these treatments, Defendant's strong and consistent message to Plaintiff and J.S.     was that given Plaintiff's age of over 40, every month counted.

41.    Plaintiff has self-paid in full for every one of these treatments, other than a handful of diagnostic consultations that were covered, in part, by her insurance.  Upon information and belief, Plaintiff paid Defendant at least an additional $38,086 out of pocket for subsequent fertility treatments, including multiple cycles of both intra-uterine insemination ("IUI") and IVF.  Upon information and belief, Plaintiff has spent at least an additional $27,287 out of pocket on medications required by Defendant.

42.    Although J.S.     is not Plaintiff's legal partner, he was Plaintiff's "sperm partner", as Defendant defines that term, for every single one of these IUI and IVF cycles.  As Osborn has acknowledged, J.S.     has been to almost every appointment Plaintiff has ever had with Defendant and is far more involved in this process than most husbands.

43.    Plaintiff and J.S.     have not represented to Defendant that they have ever formed a household.  J.S.     provided a different home address than Plaintiff when he first provided his medical and contact information to Defendant for his own evaluation.

44.    None of Plaintiff's treatments with SGF has resulted in a pregnancy or a birth.

45.    Plaintiff and J.S.'s     last IVF cycle, to date, was in November 2017.  This cycle was unsuccessful.  As of the end of that failed cycle, Plaintiff and J.S.     were still

11

enrolled in, and Plaintiff had paid in full for, Defendant's Multi-Cycle IVF Program, with one of the two cycles remaining in this program.

46.     In December 2017, at the age of 44, Plaintiff became naturally pregnant with J.S.      again.  Tragically, in 2018 Plaintiff also lost this pregnancy.

**SGF's EGG FREEZING PROGRAM:  STAGE 2 (THAWING FROZEN EGGS)**

47.     Plaintiff discovered after her 2018 miscarriage that her lifelong thyroid condition had been exacerbated, and her levels had to be brought back into a normal range in order to continue fertility treatments.  This is a months-long process that has been managed with her endocrinologists since July 2018.  During this time, Plaintiff and J.S.      have been in contact with their nurse contact at SGF, Robin Peterson ("Peterson"), and provided frequent updates to her on Plaintiff's progress.

48.     Upon information and belief, Peterson is employed by SGF.

49.     Upon information and belief, and based on Defendant's representations, an egg thaw cycle involves frequent appointments for monitoring via bloodwork and ultrasound, a carefully timed and delicately orchestrated egg thaw, a carefully timed fertilization of the thawed egg, incubation in the laboratory as the fertilized egg ideally develops into a viable embryo, and then a procedure to transfer the embryo.

50.     Defendant's laboratory will not perform an egg thaw over the weekend or over major holidays.  This means there is no guarantee that the timing of an egg thaw cycle will work in in any given month.  Defendant told Plaintiff and/or J.S.      that it would be unable to schedule her for an egg thaw cycle in December 2018 – regardless of whether her thyroid hormones were at the right level for treatment.

51.     In January 2019, Plaintiff's thyroid levels were approaching normal, and Plaintiff decided to use the first of her limited supply of frozen eggs.  J.S.      so informed Peterson.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

J.S.        further advised Peterson that Plaintiff's endocrinologist wanted to check Plaintiff's thyroid levels one final time before advising her whether conditions were optimal to continue. Peterson assured Plaintiff and J.S.        this was fine with Defendant as long as Plaintiff's thyroid results were in prior to her next monitoring appointment on January 21, 2019 and said Plaintiff and J.S.        could finalize all of the paperwork at that time.

52.        Peterson scheduled a date for Plaintiff with SGF's lab for an egg thaw and fertilization, and Plaintiff and J.S.        went in for the first monitoring appointment of this egg thaw cycle on January 15, 2019, Day 3 of Plaintiff's menstrual cycle.

53.        Upon information and belief, at the time Plaintiff began her egg thaw cycle she had a credit balance of more than $6,700 with SGF.  SGF represents that for fee-for-service patients such as Plaintiff, "[t]he cost for one cycle using your frozen eggs is $6,500," which includes the full egg thaw cycle, should a cryopreserved egg develop into a viable embryo that is transferred to a patient.  https://www.shadygrovefertility.com/treatments-success/egg-freezing/egg-freezing.

54.        At the time Plaintiff began her treatment on January 15, 2019, she realized there that she had a few outstanding questions regarding (1) her clinical protocol; (2) the breakdown of the costs of the treatment and eligibility for SGF's discount program; (3) a couple of items on Consent to Thaw, Inseminate, and Transfer Previously Cryopreserved Oocytes ("Consent to Thaw") forms provided and required by Defendant.

55.        Plaintiff believes that all of her questions were reasonable to ask and that, based on the SGF's Patient's Bill of Rights, in some cases she was required to ask.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

**Clinical Questions**

56.    At this first appointment for her egg thaw cycle, Plaintiff realized that she had not received the customary written protocol from Osborn or Peterson, a document that sets forth the key clinical elements of a treatment cycle.  Osborn had recommended a "natural cycle" protocol, but given the passage of more than a year since her last consultation, Plaintiff wanted to confirm this was still Osborn's recommendation and whether natural cycle meant <u>no</u> medication or simply limited medication.

57.    Plaintiff also had a question about language on the Consent to Thaw that stated "some programs have incorporated artificial or 'Assisted Hatching' into their treatment protocols because they believe it improves implantation rates and, ultimately, live birth rates, <u>although definitive evidence of this is lacking</u>."  Section II.E, Consent to Thaw at 5 (emphasis added). Section II.E. further went on to enumerate risks of using Assisted Hatching including embryo damage or death, a decreased ability to implant, an increased risk of twinning, and significantly more complicated pregnancies.  *Id.*  Plaintiff thought Osborn had nonetheless recommended assisted hatching so wanted to discuss this issue to determine which option would maximize her chances of having a healthy child.

58.    Plaintiff's goal then, now, and throughout her years of treatment with Defendant, is to maximize her chances of having a healthy child (ideally, healthy children).

**Financial Questions**

59.    Around the same time in January 2019, Plaintiff attempted to contact her previously-assigned financial counselor at SGF, Nancy Paredes ("Paredes"), to confirm the breakdown of costs in case any egg thaw cycle was unable to be completed through to implantation of a viable embryo.  This concern was especially relevant to Plaintiff as there was a

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

risk the January 2019 cycle could be cancelled due to laboratory availability.  Neither Paredes nor anyone else in the financial department returned her calls.

60.    In searching Defendant's website for other financial contacts, Plaintiff was reminded that Defendant offered a "Shared Help Discount Program" to help make treatment – including egg thaws – more affordable to patients.

61.    A patient must meet five stated "Eligibility Requirements" to qualify for SGF's Shared Help Discount Program: (1) "Gross annual household income (including business income, rents, capital gains, etc.) must be $95,000 or less based on last 2 years' U.S. federal tax returns (75 percent weighting toward most recent year)"; (2) "Meets normal medical criteria for desired treatment"; (3) "Uninsured or denied insurance coverage for the treatments and procedures"; (4) "U.S. resident"; and (5) "Re-qualification is required every 12 months. Patients must send in updated tax returns."  https://www.shadygrovefertility.com/affording-care/discount-programs/shared-help.

62.    Plaintiff believed she met all of the eligibility criteria for this program and, therefore, might qualify.

63.    Several years earlier, Plaintiff had asked her financial counselor about SGF's Shared Help Discount Program (or a similar program available at the time).  After that inquiry, her financial counselor had immediately contacted Osborn, who indicated she was upset Plaintiff was even asking about the program and said that she would immediately stop Plaintiff's treatment – and treat J.S.          as merely a "sperm donor" (a designation that imposes a number of requirements including a six-month quarantine) – if Plaintiff pursued this inquiry.

64.    Although this reaction seemed extreme and irrational to Plaintiff, she dropped her inquiry at the time because she was then in her 40s and could not risk delaying IVF treatment.

15

65.     Plaintiff renewed her inquiry into the Shared Help Discount Program in 2019, given the amount of money Plaintiff had spent with Defendant by that time and the financial burden of Stage 2 of the Egg Freezing Program.  Based on those factors, Plaintiff believed it made sense to follow up with SGF to determine if she qualified for a discount under the program.

**Questions Regarding Consent Forms**

66.     Plaintiff reasonably sought answers to several legal questions prior to signing the Consent to Thaw so that her consent would be "informed" consent.

67.     Through its Consent to Thaw form, Defendant seemingly would not allow Plaintiff to thaw any of her frozen eggs without J.S.'s        consent.  Section IX, Consent to Thaw at 8 (requiring J.S.        to consent to "[t]hawing of eggs in preparation for insemination and embryo culture.").  This seemed inconsistent with the fact that SGF agrees that "[y]our eggs are your property" and common sense.  https://www.shadygrovefertility.com/blog/treatments-and-success/egg-freezing-faq-the-most-common-questions-and-answers/.

68.     Defendant also required J.S.        to consent to procedures solely involving Plaintiff's body before treating Plaintiff, including "[h]ormone treatment to suppress menstrual function and to prepare the uterus for embryo transfer" and "[u]ltrasound examination and serial blood tests to monitor female hormone status and sufficiency of endrometrial preparation." Section IX, Consent to Thaw at 8.

69.     Plaintiff was confused by Defendant's requirements and wanted this legal document to be accurate and reflect legal reality.  Plaintiff was also concerned that seemingly inaccurate and misleading consent forms might cause a misunderstanding or confusion among the clinical staff about whether Plaintiff would be the individual responsible for making all

16

decisions regarding treatment involving her body and decisions about how many eggs to thaw during a cycle.

70.     It was particularly important to Plaintiff that details were correct and there was no confusion with her clinical staff because Plaintiff was using her irreplaceable cryopreserved eggs and could not afford any errors or miscommunications.  On several occasions in the past Defendant had made errors in her treatment because it did not pay appropriate attention to detail.

71.     For example, Defendant had improperly sent Plaintiff's protected health information ("PHI") to her via unencrypted email on multiple occasions in violation of the Security Rule and the Privacy Rule of the Health Insurance Portability and Accountability Act ("HIPAA") of 1996, Public Law 104-191.  In one instance, Defendant not only emailed a copy of Plaintiff's unencrypted medical protocol to her on April 24, 2017, but also emailed this detailed medical PHI to an unaffiliated third party.

72.     Plaintiff did not report these violations to the U.S. Department of Health and Human Services ("HHS") at the time, fearing retaliation by Defendant.  Plaintiff did, however, notify Defendant each time there was a breach, and each time Defendant acknowledged the breach and assured her that it would not happen again.  Plaintiff finally had to insist that Defendant could not contact her via email and to ask Defendant to delete her email address entirely from its system.  Although Defendant represented that it had done so, Plaintiff continued to receive email from Defendant.  On February 18, 2019, Defendant again sent Plaintiff an unencrypted email containing her PHI.  Plaintiff has reported this violation to HHS.

73.     Plaintiff was further concerned about consenting to hormone treatment, when such treatment had not been prescribed by Osborn.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

74.     Plaintiff had and has no concerns or issues with J.S.          signing any consent items related to using his sperm to inseminate the eggs, making decisions regarding fertilized eggs and embryos, and so forth.  Plaintiff and J.S.          do not in any way disagree on any of these issues.

75.     Neither Plaintiff nor J.S.          refused to sign any line of the Consent to Thaw, they simply had questions and sought clarifications and revisions.

**DISCRIMINATION AND RETALIATION**

76.     Rather than provide reasonable responses to Plaintiff's reasonable and legitimate questions and concerns about clinical, financial, and/or legal issues, Defendant retaliated against Plaintiff with a series of ever-changing and unconscionable demands of Plaintiff and J.S. and, ultimately, by threatening and actually discontinuing treatment of Plaintiff.  These events are summarized below.

**Tuesday, January 15, 2019 (p.m.)**

77.     Plaintiff spoke with Peterson in the afternoon of Tuesday, January 15, 2019, after her first monitoring appointment of the egg thaw cycle, when Peterson called with the results of Plaintiff's morning bloodwork and ultrasound.  Plaintiff raised her questions regarding assisted hatching and her missing protocol.  Plaintiff also noted she had legal and financial questions she thought would be best addressed by others at SGF.

**Wednesday, January 16, 2019 (p.m.)**

78.     Plaintiff called Paredes in the afternoon of Wednesday, January 16, 2019 (at least her second attempt) to try to verify the cost of the different components of the egg thaw cycle and to offer documentation to prove her eligibility for SGF's Shared Help Discount Program. Plaintiff could not reach Paredes but left a message on the voicemail attached to her number.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

79.     To date, Plaintiff has not received any reply from Paredes or anyone in SGF's financial office.

**Wednesday, January 16, 2019 (p.m.)**

80.     Plaintiff called left a voicemail with Peterson in the afternoon of Wednesday, January 16, 2019 to follow up on her outstanding clinical questions and to let her know Plaintiff was still waiting to hear from her endocrinologist regarding her thyroid levels.

**Thursday, January 17, 2019 (midday)**

81.     Plaintiff and Peterson spoke on the phone in the middle of the day on Thursday, January 17, 2019.  Peterson did not have any answers regarding Plaintiff's clinical questions.

82.     Plaintiff also told Peterson that she had been unable to reach anyone in SGF's financial office but had unanswered financial questions.

83.     Plaintiff further asked Peterson if she could speak with someone in SGF's legal department regarding her concerns with specific items on the consent forms.  Plaintiff raised these issues with Peterson to ensure that the clinical team understood that Plaintiff would be making all decisions regarding her own frozen eggs.  In response, Peterson informed Plaintiff that if J.S.           also signed this item on the Consent to Thaw – as Defendant was requiring – then SGF and its clinical team would consider Plaintiff's frozen eggs (even Plaintiff's unused eggs) to be jointly owned.

84.     Peterson then questioned Plaintiff about her relationship with J.S.           , questions that Plaintiff believes never would have been asked if Plaintiff were not legally single. Peterson also stated that if Plaintiff were in a single household, had sole ownership of her eggs (and wanted to keep it that way), and wanted to have sole responsibility for and pay for her

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

treatment herself, then this "would change everything" and Defendant would treat J.S.      not as a "sperm partner" but as a "sperm donor."

85.     Peterson explained to Plaintiff that classifying J.S.      as a "sperm donor" would impose a number of additional requirements, which she claimed were mandated by the FDA.  In brief, Peterson explained that treating J.S.      as a sperm donor would require J.S.      to go a sperm bank, freeze his sperm and quarantine it for six months, run a host of other tests, and then ship this frozen sperm to SGF and use thawed sperm (rather than fresh sperm) to inseminate Plaintiff's eggs.  This would not only significantly delay Plaintiff's treatment but also, upon information and belief, cost of thousands of dollars.

86.     Given Plaintiff's age, she cannot afford a six month wait before trying to use the first of her frozen eggs.

87.     Upon information and belief, and based on representations made by Defendant, using fresh sperm is medically superior to using frozen sperm.

88.     In contrast, a "sperm partner," as Defendant uses this term, is not subject to any of these requirements and simply provides the needed fresh sample at Defendant's facility on the day of the fertilization.

89.     The FDA has established requirements – the "donor eligibility rule" – to screen and test cell and tissue donors to increase the safety of these products, "and public confidence in their safety, by preventing the introduction, transmission and spread of communicable disease." https://www.fda.gov/BiologicsBloodVaccines/TissueTissueProducts/QuestionsaboutTissues/ucm102842.htm.

90.     The FDA's donor eligibility rules explicitly do not apply to and no screening, testing, or quarantine requirements are imposed on sperm from a "sexually intimate partner."  21

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

C.F.R. 1271.90(a)(2); 21 C.F.R. 1271.3(k)(1).  Sexual intimacy is the sole test of whether freezing and quarantining is required by the FDA, and none of the other concerns raised by Petersen appear in the regulations.

91.     Nothing in these FDA regulations states that the decision of whether to test and quarantine sperm for six months is based the source of payment for fertility treatments, a patient's marital status, who owns the eggs used (as long as they are used with a sexually intimate partner), or who signs a consent form authorizing use of frozen eggs or performing monitoring and bloodwork on a female patient.

92.     Defendant knows that Plaintiff and J.S.      are sexually intimate and that they have naturally conceived two children together.  Defendant has treated J.S.      as a "sperm partner" in all prior fertility treatments and used J.S.'s      fresh sperm delivered to Defendant's facility on the day of the insemination or fertilization for each of these treatments.

93.     Finally, Peterson indicated she would be contacting Osborn to discuss Plaintiff's legal and financial questions.  Plaintiff asked that her financial and legal questions be instead directed to someone in those departments and that Osborn address Plaintiff's clinical questions.

**Thursday, January 17, 2019 (p.m.)**

94.     Plaintiff next received a call from and spoke with Sarah Chris ("Chris") in the afternoon of Thursday, January 17, 2019, who identified herself as SGF's office supervisor.

95.     Chris again asked Plaintiff specific questions about the nature of Plaintiff's relationship with J.S.     .  Chris subsequently apologized to Plaintiff for the message she had received from Osborn years ago and from Peterson earlier that same day that SGF would treat J.S.      as a sperm donor if Plaintiff asked a financial counselor about qualifying for the Shared Help Discount Program.

21

96.     At the end of the conversation, Chris told Plaintiff that she would be speaking with SGF's in-house legal counsel regarding Plaintiff's questions and concerns and would follow up with her shortly.

**Friday, January 18, 2019 (a.m.)**

97.     Osborn called Plaintiff early the following morning, on Friday, January 18, 2019. Plaintiff understood that Osborn made this call because, as Osborn conveyed to Plaintiff, Osborn was upset that Plaintiff had asked for information regarding discount eligibility.

98.     Osborn told Plaintiff that she was not eligible for a discount because SGF's definition of "household" in its eligibility criteria means "any female patient and their 'sperm partner.'"  Plaintiff responded that SGF was, of course, free to set any rules it wanted for its own discount program but noted that her offense that Plaintiff had simply asked about the program was misplaced – and Plaintiff's question was reasonable – given that SGF's own website states that program eligibility depends on a patient's household income as reported on her U.S. federal tax returns.

99.     Osborn then offered Plaintiff a courtesy 20 percent discount for this egg thaw cycle.  Plaintiff appreciated the offer, but said that that she was only trying to see if she met SGF's eligibility requirements, not to ask for special treatment.

100.     Plaintiff then asked to speak with someone in Defendant's legal or financial counseling departments to confirm Osborn's understanding of Defendant's definition of "household", as Osborn additionally admitted that she did not write and was not that familiar with the details of the Shared Help Discount Program.  Plaintiff also stated that, of course, if this is how SGF's policy defines household, she would not ask for any discount.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

101.    Osborn then told Plaintiff that she "did not understand" and had concerns about Plaintiff's relationship with J.S.         because i) Plaintiff had asked about discount eligibility; ii) had said that she was single and wanted to take sole financial responsibility for her treatment; and iii) wanted to ensure that she retained ownership of her frozen eggs.  Osborn told Plaintiff that unless J.S.         signed paperwork as part of her household and shared financial responsibility for payment for Plaintiff's egg thaw cycle, then she would treat him as a sperm donor rather than as a sperm partner.

102.    Plaintiff believed and still believes that these actions were retaliatory and discriminatory, and that Defendant would never have threatened to treat J.S.         as a sperm donor rather as a sexually intimate partner if J.S.         were Plaintiff's husband.  Plaintiff said as much to Osborn.

103.    Plaintiff told Osborn that she believed this practice to be inconsistent with FDA regulations, which do not hinge on who pays for treatment but rather on whether J.S.         is her sexually intimate partner.  In response, Osborn stated that Defendant follows a different policy than the one mandated by the relevant FDA regulations, contradicting Peterson's earlier justification of these requirements.  Plaintiff has never been provided any copy of any such "policy" or found reference to one on SGF's website.

104.    Osborn did not attempt to address Plaintiff's clinical questions at any time during this call.

**Friday, January 18, 2019 (p.m.)**

105.    Chris called Plaintiff back later that same day, in the afternoon of Friday, January 18, 2019.  Plaintiff added J.S.         to this call as soon as she could and J.S.         was on the line for the latter half of the subsequent conversation.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

106.    During this call, Chris told Plaintiff that Defendant was now taking a completely different position than what it had told Plaintiff in previous calls.  Chris further told Plaintiff that she was just the "messenger" for Osborn.

107.    Specifically, Chris told Plaintiff that it was SGF's established "policy" that Plaintiff now had to choose from three "options."

108.    As Option 1, Defendant would be imposing a number of new demands and conditions before it would allow Plaintiff to use her own frozen eggs with J.S.      using fresh sperm as sperm partner rather than treating him as a sperm donor.

- First, Defendant required that J.S.      sign every single section of the Consent to Thaw, despite the fact that J.S.      has no ownership of Plaintiff's eggs and cannot legally consent to their use and cannot legally make decisions as to which medical procedures Plaintiff would be subject.  According to Chris, in the eyes of Defendant this would give J.S.      equal control and ownership over Plaintiff's frozen eggs, including the ones not used in this cycle.

- Second, Defendant stated that Plaintiff could not be solely financially responsible and pay for her own medical treatment but that J.S.      would be required to sign a form assuming joint financial responsibility.

- Finally, because Defendant had "discovered" that Plaintiff was single and lived alone – facts that it has known for years – and it "didn't understand" Plaintiff's relationship with J.S.      , Plaintiff could neither continue this egg thaw cycle nor start any further treatment until Plaintiff and J.S.      (a) saw a social worker in SGF's practice (who would then "report" to SGF), presumably to ask questions about their relationship and (b) hired a fertility attorney approved by

24

SGF (resulting in a significant additional time delay and expense) to draft a third-party contract between Plaintiff and J.S.        addressing issues of Defendant's choosing.  Chris emphasized that Plaintiff and J.S.        were required to hire an attorney that Defendant approved.  When asked, Chris could not articulate what needed to be in this contract and said that Plaintiff did not need to provide it to SGF.  Chris also stated, however, that Plaintiff and J.S.        would be required to waive attorney-client privilege so that this attorney could directly relay privileged conversations to Defendant and "vouch" for their relationship.

109.    Chris told Plaintiff that these conditions and demands were standard "policy" given that Plaintiff was single and SGF had questions about her relationship.

110.    Although Chris claimed that these requirements were Defendant's "policy", she could not provide any actionable details on what, specifically, Defendant was requiring from Plaintiff and J.S.        with respect to its demands related to either the social worker or the attorney and contract.  Chris agreed to look into these questions and follow up with Plaintiff and J.S.        .

111.    Defendant's own InVitro Fertilization Program Guide, which was provided to Plaintiff by Defendant at some point during the course of her treatment, explicitly states that a social worker evaluation "is not a mandatory requirement except if donor eggs, donor sperm, or a gestational carrier are being used."  InVitro Fertilization Program Guide at 15.  Plaintiff is not using donor eggs, donor sperm, or a gestational carrier.

112.    As Option 2, Chris told Plaintiff and J.S.        that if they did not comply with the terms of Option 1 in full and/or if Defendant decided based on its conversations with the attorney it was requiring them to hire and its social worker not to allow Plaintiff to have children

25

with J.S.         as her "sperm partner," then it was Defendant's "policy" to treat J.S.         as a

sperm donor.  As previously noted, Plaintiff is sexually intimate with J.S.         and has

conceived twice naturally with J.S.         , and J.S.         has extensively participated in and

been treated as Plaintiff's sperm partner during all of Plaintiff's previous IUI or IVF cycles.

Requiring J.S.         to be treated as a sperm donor is both medically and financially detrimental

and inconsistent with applicable FDA regulations.

113.    Finally, as <u>Option 3</u>, Chris told Plaintiff and J.S.         that if they did not like

either Option 1 or Option 2, they should leave the practice.

114.    Plaintiff repeated her request to Chris, yet again, to simply speak with

Defendant's legal counsel to talk through her consent concerns and to Osborn to talk about her

clinical concerns.

115.    Plaintiff asked numerous times why these conditions were being imposed, but

other than noting that Defendant had questions about Plaintiff's and J.S.'s         relationship,

Chris refused to answer.

116.    Plaintiff told Chris during the call that she believed that the way they were being

treated was discriminatory, retaliatory, violative of their rights, grossly unfair, and probably

unlawful.

117.    Chris stated to Plaintiff and J.S.         that the message she had conveyed

regarding the "options" had come from Osborn.  Chris indicated that she would have someone

with decision-making authority who understood and could speak to these issues call Plaintiff

back.

118.    Plaintiff and J.S.         were simply shocked by this conversation, which left

Plaintiff in tears and distraught.  Neither Plaintiff nor J.S.         had or have any idea whatsoever

26

why Plaintiff's asking few simple and completely reasonable questions triggered this type of response from Defendant, or why Defendant refused to simply let her talk to the appropriate individuals regarding Plaintiff's simple questions.

119.    Plaintiff's sole focus was to thaw one of her frozen eggs and try to get pregnant during her next cycle, doing whatever it took medically to maximize her chances of having healthy children and to quickly resolve any financial or legal questions she had.

120.    The conversation between Chris, Plaintiff, and J.S.        occurred on a Friday afternoon.  As Plaintiff's next monitoring appointment for her egg thaw cycle needed to be early the following Monday morning (also a federal holiday), there was absolutely no way to comply with the new demands of "Option 1" even if Defendant immediately provided the necessary details.  SGF effectively prevented Plaintiff from continuing her current treatment cycle.

121.    Neither Plaintiff nor J.S.        is aware of anything that changed between Friday morning, when Osborn offered to continue treatment at a discount, and Friday afternoon, when Defendant refused to treat Plaintiff further until and if she complied with newly imposed – but utterly unspecified – demands.

**Friday, January 18, 2019 (p.m.)**

122.    Chris had stated to Plaintiff that the message she had conveyed regarding the "options" had come from Osborn.  As this message conflicted with what Osborn had told Plaintiff mere hours ago and Plaintiff still had not received answers to her clinical questions, Plaintiff subsequently called Osborn's office on the afternoon of Friday, January 18, 2019.

123.    Osborn's receptionist/assistant answered the phone and put Plaintiff on hold when Plaintiff asked to speak with Osborn.  The receptionist then told Plaintiff that she had spoken with Osborn, that Osborn needed to finish up with a patient, and that Osborn had promised to

27

call Plaintiff back shortly.  Approximately one hour later, the receptionist called Plaintiff and told her that Osborn refused to speak with her and would not be calling her again.

**Friday, January 18, 2019 (p.m.)**

124.    Plaintiff then received a call from Vicki Gerber ("Gerber") at SGF on the afternoon of Friday, January 18, 2019.  Upon information and belief, Gerber is an employee of SGF and operates as its regional manager.

125.    As soon as possible, Plaintiff called J.S.        at work and added him to this call.

126.    Plaintiff initially believed that Gerber was the legal contact or decision maker that Chris had represented would be calling her back.  Instead, Gerber noted that she was not the decision maker, would not let Plaintiff or J.S.        talk to anyone else at SGF, and refused to provide Plaintiff the even the name of SGF's in-house legal counsel when asked.

127.    Gerber was aggressive in both manner and language on the call with both Plaintiff and J.S.       .  Gerber merely repeated the three "options" that Chris had set forth and told Plaintiff that she was "very happy" to present the third "option" of Plaintiff leaving the practice.

128.    In addition to prior conditions of "Option 1", Gerber added an additional condition to it – that Plaintiff would be required to provide SGF with a copy of the contract SGF was demanding that Plaintiff and J.S.        enter into, in order to make sure it included the specific language and terms that Defendant wanted.  Gerber told Plaintiff and J.S.        that Defendant would also then evaluate this contract before deciding whether it would allow Plaintiff to use her own frozen eggs with J.S.        as a sperm partner.

129.    J.S.        personally reassured Gerber on the phone that Plaintiff and J.S.        were 100 percent aligned in their thinking.  Gerber stated that this did not matter.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

130.    Plaintiff again asked why these conditions were being imposed.  Gerber refused to answer.

131.    Plaintiff again expressed that she believed that Defendant's actions were retaliatory, discriminatory, violative of their rights, grossly unfair, and possibly unlawful.

132.    Gerber refused to offer any clarification as to what was expected from either the contract or the social worker in "Option 1" so that Plaintiff and J.S.          could conceive with fresh sperm.  Instead, she repeatedly attempted to bully Plaintiff and J.S.          into making a choice, less than an hour after they were presented by one version of the "options" by Chris, and then again with a different version by Gerber on that call.  Only at the very end of the call did Gerber agree to follow up with more information, saying she did not know the answer to these questions herself, despite representing that these "options" reflected Defendant's "policy." She concluded the call by saying she would relay the question to someone who did.

133.    By the end of the call, J.S.          was leading the conversation with Gerber because Plaintiff was uncontrollably sobbing.

**Monday, January 21, 2019 (a.m./p.m.)**

134.    After refusing to speak with Plaintiff on Friday afternoon, Osborn called Plaintiff on early in the morning on Monday, January 21, 2019 and left a voicemail.

135.    Plaintiff hoped that Osborn was calling to discuss her clinical questions, or that Osborn was to provide the follow-up information that Gerber had promised on Friday afternoon. Plaintiff accordingly returned this call to schedule a time for both Plaintiff and J.S.          to speak with Osborn later that day.

136.    Plaintiff and J.S.          spoke with Osborn later that day.  During this call, Osborn abruptly cancelled Plaintiff's egg thaw cycle and stated that she would not be treating

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

Plaintiff further.  She also said that the three "options" presented just the previous business day were no longer available and threatened that Plaintiff would likely be dismissed from the practice as a patient and entirely prohibited from completing either the Egg Freezing Program or the Multi-Cycle IVF Program.

137.    After Plaintiff protested, Osborn told her that she had been unaware of some of the things Plaintiff had been told by Defendant and that Osborn would be reaching out to SGF's in-house legal counsel regarding Plaintiff's concerns.

138.    Osborn told Plaintiff that pending this discussion, if SGF was going to continue to refuse to allow Plaintiff to continue her care with it, even with another physician, Plaintiff would immediately receive a letter to that effect.  J.S.      requested and Plaintiff agreed that he should get a copy of any communication from Defendant.

139.    Osborn also encouraged Plaintiff to draft a letter to Defendant.  She refused, however, to provide the name or contact information of Defendant's counsel.

140.    Contradicting what Chris and others had previously told Plaintiff and J.S.      , Osborn said that this decision was "out of her hands" and that she was just the messenger.

141.    Plaintiff was dismayed and upset during the call with Osborn as a result of the seemingly arbitrary and retaliatory demands and actions she and SGF were taking.

142.    On this call, Osborn specifically cited to Plaintiff and J.S.      several alleged reasons for Defendant's actions and acknowledged that none of this would have come up if Plaintiff were married and shared a household with J.S.      .

143.    First, Osborn said she was refusing to treat Plaintiff further because Plaintiff raised questions about and sought clarity on treatment costs and certain items on the consent

forms, which Defendant considered "accusations" that showed distrust in the practice's medical decisions.

144.    Second, Osborn specifically stated that Defendant's actions were due to the fact that Plaintiff and J.S.        had claimed that their treatment over the last several days was discriminatory, retaliatory, unfair, potentially unlawful, and in violation of their rights.

145.    Third, Osborn said that Defendant's actions were taken because Plaintiff had inquired about discount eligibility and wanted to be financially responsible for and pay for her own medical treatment, which Osborn claimed raised questions about the relationship between Plaintiff and J.S.        .

146.    Fourth, Osborn stated that Plaintiff and J.S.'s        financial arrangements raised concerns about who would care for their child, even though in the same call, Osborn reiterated that J.S.        was far more involved than most husbands in Plaintiff's treatment.

147.    Finally, she called Plaintiff's requests to speak with someone in SGF's legal and or/ financial departments to answer questions constituted the "last straw" in their decision to terminate care.

148.    Neither Plaintiff nor J.S.        is aware of anything that changed between Friday afternoon, when they asked Defendant to provide details regarding what, exactly, they needed to do to satisfy Defendant's newly imposed demands, and Monday morning, when Osborn abandoned Plaintiff.

**SUBSEQUENT EVENTS**

149.    Plaintiff and J.S.        were left in medical limbo following the call with Osborn. Osborn had made it very clear on the phone that <u>she</u> would not be treating Plaintiff further, but explicitly stated that SGF would notify Plaintiff if it was terminating its relationship with

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

Plaintiff.  Plaintiff was therefore hopeful that Osborn had shared Plaintiff's concerns at SGF as she had indicated she would, and that Defendant would continue her treatment with another SGF physician.

150.    As of January 21, Plaintiff was still part of the Egg Freezing Program and the Multi-Cycle IVF Program, but was given no instructions on how to transition her medical care to another SGF physician.

151.    As neither Plaintiff nor J.S.      had heard from Defendant after their January 21 call with Osborn, Plaintiff subsequently made multiple attempts to contact Defendant: (1) on January 22, 2019, she left a voicemail with SGF's general counsel, Carrie Roll ("Roll"); (2) on February 6, 2019, Plaintiff and J.S.      mailed and faxed a letter to Roll and to SGF's CEO, Mark Segal ("Segal"); (3) on February 14, 2019, Plaintiff called Roll again and left another voicemail asking Roll to return her call.  None of these calls or letters were acknowledged.

152.    On Monday, February 18, 2019, Plaintiff still had not received any further information, so she decided to try to transition her care herself to another SGF physician and made an appointment with Dr. Anitha Nair in SGF's Ballston, Virginia office.

153.    Later that same day, Plaintiff received a call from SGF's Ballston office, canceling her appointment.  Plaintiff was informed that SGF had dismissed her from its practice and told that SGF sent a letter to that effect.

154.    Plaintiff had not received any such letter, and immediately left voicemails with both Roll's and Segal's offices.  Neither individual returned her call.

155.    On Thursday, February 21, 2019, Plaintiff received a call from Gerber in which Gerber claimed to have a sent a certified letter dismissing Plaintiff from the practice.  When

32

Plaintiff pressed Gerber to find out where it was sent and whether it was received, Gerber admitted that the letter had not been delivered.

156.    In the evening of February 21, 2019, Plaintiff finally received a letter from SGF via FedEx dated February 15, 2019, which was sent by Gerber was addressed to both Plaintiff and J.S.         (copying Roll, Segal, and Osborn).  The letter contained no substantive response to Plaintiff's letter to Roll and Segal of February 6.  It stated that Defendant had decided to dismiss Plaintiff and J.S.         from its practice, and that such dismissal was "consistent with SGF's long-standing policies and procedures… meeting the various regulatory and ethical standards that govern fertility practices."

157.    On March 1, 2019, Plaintiff received a second letter from SGF, dated January 22, 2019 but postmarked February 11, 2019.  This letter again did not include any substantive response to Plaintiff's concerns, but stated that SGF "fel[t] it best" for Plaintiff to continue her treatment elsewhere because SGF thought Plaintiff was "unhappy with our protocols and decisions" and was "unwilling to follow [SGF's] practice decisions."  It provided no information on how to transition her care or retrieve Plaintiff's frozen eggs still in SGF's possession, should she choose to do so.

158.    J.S.        , who was also dismissed from Defendant's practice, never received a copy of either letter from SGF.

159.    SGF's willful and negligent failure to timely respond to Plaintiff's concerns cost Plaintiff a second month of time in her limited window of fertility, as she was not able to initiate an egg thaw cycle or an IVF cycle in February through SGF or otherwise.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

**PLAINTIFF BELIEVES HER BEST CHANCE FOR A POSITIVE MEDICAL OUTCOME IS COMPLETING HER TREATMENT WITH SGF**

160.    The same factors that induced Plaintiff to enroll in the Egg Freezing Program, as alleged above, necessitate her completing the program with Defendant.

161.    Upon information and belief, a live birth is unlikely from every frozen egg, as a certain percentage may not survive a later thaw, may not fertilize, may not develop into a viable embryo, may not implant, and may not be carried to term.  Upon information and belief, Plaintiff's five mature eggs may not be a sufficient number to result in even one pregnancy or live birth.

162.    With such a limited number of eggs, it is imperative that Plaintiff receive medical treatment that provides her with the best opportunity for a positive outcome.  Plaintiff can afford to assume neither the risk of physically transferring her eggs to another lab, nor the risk of having a different lab thaw her eggs than froze the eggs even if physical transfer were successful.

163.    Transferring her extremely limited number of eggs to another facility introduces multiple levels of medical risk and would therefore compromise Plaintiff's care, as Defendant has itself represented to Plaintiff.

164.    Defendant has represented to Plaintiff that the least risky and best chance for a positive medical outcome – having her own children – is using her frozen eggs with SGF.

165.    Upon information and belief, and based on Defendant's representations, each embryology laboratory has its own freezing and thawing processes, using a different process for thawing than was used for freezing can compromise medical outcomes, and "accurate and reliable lab results can significantly impact patient outcomes."  SGF's website currently states that Defendant's laboratory and processes are of the "highest standard," are "state-of-the-art," and "have reached national and international distinction for offering highly sophisticated

34

laboratory procedures." https://www.shadygrovefertility.com/your-care-team/laboratories.  This is consistent with representations Defendant has made to Plaintiff.

166.    SGF's website currently states that Defendant offers "cutting edge fertility care," hires "the best of the best," "incorporate[s] the latest medical technologies, [and] invest[s] in top of the line equipment and medical facilities."  https://www.shadygrovefertility.com/our-centers/why-sgf.  This is consistent with representations Defendant has made to Plaintiff.

167.    SGF's website currently states that Defendant makes "decisions based on what is in the best interest of the patients."  https://www.shadygrovefertility.com/our-centers/why-sgf. This is consistent with representations Defendant has made to Plaintiff.

168.    In the letter Plaintiff received from Defendant dated February 15, 2019, Defendant was unable to identify even a single embryology laboratory that uses the same freezing and thawing processes as SGF.  Nor did Defendant provide Plaintiff with any information – either in this letter or at any other point in time – about the details of its freezing and thawing process so that she could try to locate another laboratory that uses the identical methods, should she choose to do.

169.    Upon information and belief, the Society for Assisted Reproductive Technology ("SART") "is the primary organization of professionals dedicated to the practice of IVF, or assisted reproductive technology (ART).  The organization represents the majority of the ART clinics in the country."  Upon information and belief, "SART reports birth outcome data from its member clinics. This provides reliable information for patients to make informed decisions and understand the likelihood of success with different treatment options."

https://www.sart.org/patients/what-is-sart/

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

170.    Defendant recommended four fertility clinics to Plaintiff in its letter dated February 15, 2019, but did not provide information about the laboratory processes used by any of them.  Of these four clinics, none had significantly equivalent clinical experience compared to SGF in using a patient's own cryopreserved eggs.  Based on preliminary numbers published by SART for 2016 (the newest year available), one clinic (CCRM Virginia) was too new to report results, and two clinics – Washington Fertility Center and Genetics & IVF -- had performed no cycles using a patient's cryopreserved and subsequently thawed eggs.

171.    Only one clinic – GW Medical Faculty Associates – recommended by SGF had performed any cycles involving thawing a patient's previously cryopreserved eggs according to SART preliminary data for 2016.  This clinic had only performed roughly one tenth of the number as Defendant's laboratory in Rockville, Maryland (7 cycles compared to 67 at SGF).  Of these seven cycles, only two resulted in a pregnancy.

172.    The process of fertility preservation with cryopreserved eggs is so new and so few clinics have significant experience in this area that, as SGF has itself represented, few other laboratories anywhere else in the country have published studies of its ability to produce live births using a patient's own cryopreserved eggs:  "SGF is one of the only fertility centers in the U.S. with peer-reviewed and published outcomes data from women who have frozen and then thawed their eggs to produce pregnancies."  https://www.shadygrovefertility.com/blog/fertility-health/22-egg-freezing-facts/.

173.    Defendant represents on its website that "it is important to get as much information … about the quality, experience, and expertise of the fertility center." https://www.shadygrovefertility.com/blog/fertility-health/22-egg-freezing-facts/.

36

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

174.    As alleged above in more detail, SGF's website currently states that it is critical that the "right practitioner" thaw her eggs and that SGF has a "depth and breadth of experience with thawing that is unparalleled." https://www.shadygrovefertility.com/treatments-success/egg-freezing. This is consistent with representations Defendant has made to Plaintiff.

175.    Plaintiff turns 46 in approximately three months and cannot afford to waste any time in continuing her treatment.  In addition, Plaintiff is on a "natural cycle" protocol for her egg thaw cycle, a protocol she can only pursue if she has regular menstrual cycles.  Given her previous negative reactions to certain medications and based on her consultations with Osborn, Plaintiff believes that a natural cycle approach is her best course of treatment.  With each passing month, Plaintiff's chances of being able to successfully use her thawed eggs, much less via a natural cycle protocol, diminish.

176.    Upon information and belief, there is no medical way to predict how much time Plaintiff has left before she will no longer be able to use her eggs.

**COUNT I**
**Violation of D.C. Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.***

177.    Plaintiff repeats and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

178.    Defendant's medical offices, in which it provides medical services, are places of public accommodations.

179.    The DCHRA is a remedial civil rights statute that is broadly construed.  The DCHRA establishes, among other things, that "[i]t shall be an unlawful discriminatory act" … "[t]o deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" "wholly or partially for a discriminatory reason based on the actual or perceived: race, color,

37

religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, disability, matriculation, political affiliation, source of income, or place of residence or business of any individual." D.C. Code § 2–1402.31(a).

180. Pursuant to the DCHRA, D.C. Code 1402.31(b): "Subterfuge. — It is further unlawful to do any of the above said acts for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, genetic information, disability, matriculation, political affiliation, source of income, or place of residence or business of any individual."

181. Pursuant to the DCHRA, D.C. Code § 2–1402.61, "[i]t shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of … any right granted or protected under this chapter."

182. As more specifically detailed in the previous allegations in this Complaint, Defendant violated these provisions in numerous ways and on multiple occasions. First, SGF discriminated against Plaintiff based on her marital status, source of income, and her and J.S.'s     actual or perceived family responsibilities. Second, SGF, coerced, threatened, retaliated against and interfered with Plaintiff when she attempted to exercise her rights protected under the DCHRA. In so doing, Defendant made a series of escalating demands and conditions of her continuing treatment – which themselves were violative of her rights – that were contrary to its past practices, its own published policies, and FDA regulations. SGF then discontinued her care in the middle of a treatment cycle, and ultimately, dismissed her from the practice and

38

prevented her from completing the second – and most crucial – part of the Egg Freezing

Program.

183.    Defendant violated the DCHRA by discriminating and retaliating against Plaintiff

on the basis of several protected conditions:

- Marital status.  Defendant discriminated and retaliated against Plaintiff on the basis or her actual or perceived marital status because she was single and SGF "did not understand" her relationship with J.S.        .  Defendant also refused to allow her to take financial responsibility for her own treatment if she wanted to continue with J.S.        as her sperm partner, instead threatening to treat him as a sperm donor. SGF would not have treated – or threatened to treat – J.S.        as a sperm donor or questioned their relationship (which is irrelevant to Plaintiff's medical care if she and J.S.        are sexually intimate) if she and J.S.        were married.

- Source of income.  Defendant discriminated and retaliated against Plaintiff on the basis of her actual or perceived source of income because Plaintiff wanted to assume sole responsibility and pay for her own medical treatment and stated that her source of income for these payments did not come from J.S.        .  Specifically, Defendant first refused to allow Plaintiff to continue treatment with J.S.        as her sperm partner unless J.S.        contributed to Plaintiff's treatment.  SGF then required her to meet new demands – such as hiring an attorney and visiting a social worker – based on Plaintiff's perceived source of income and financial arrangements with J.S.        , because SGF "did not understand" Plaintiff's and J.S.'s relationship.

- Family responsibilities.  Defendant discriminated and retaliated against Plaintiff based on her and J.S.'s        actual or perceived family responsibilities, which "means the state of being, or the potential to become, a contributor to the support of a person or persons in a dependent relationship" (D.C. Code § 2–1401.02(12)), by imposing conditions before Plaintiff could continue her treatment that it did not impose on all patients because of the family responsibilities that it perceived she and J.S.        would assume so that SGF could evaluate whether to "allow" Plaintiff and J.S.        to have a child.  Defendant further discriminated and retaliated against Plaintiff by terminating her treatment, in part, based on the perceived family responsibilities that it believed J.S.        would or would not assume.

184.    Defendant then violated the DCHRA by discontinuing Plaintiff's treatment when

she complained the imposition of these conditions were themselves discriminatory.  Osborn told

Plaintiff that none of this would have happened if Plaintiff were married and shared a household

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

with J.S.        , and told Plaintiff that she was discontinuing her care for a number of reasons,

including that Plaintiff had

- complained that Defendant's actions were discriminatory and violated her rights;

- attempted to exercise her right (without reprisal), as a single individual, to be financially responsible for and pay for her own medical treatment regardless of the source of income for such payment; and

-  asked to speak with someone in SGF's legal department regarding her unfair and discriminatory treatment and in a good-faith effort to resolve the issues.

185.    In addition, Defendant's Shared Help Discount Program – and/or Defendant's

execution thereof – violates the DCHRA because it discriminates against patients based on their

marital status, family responsibilities, and source of income for fertility treatments.

186.    Defendant's actions were based on ill will, recklessness, wantonness,

maliciousness and/or willful disregard of Plaintiff's rights.

187.    The DCHRA requires that "[e]very person subject to this chapter shall post and

keep posted in a conspicuous location where business or activity is customarily conducted or

negotiated, a notice whose language and form has been prepared by the Office, setting forth

excerpts from or summaries of, the pertinent provisions of this chapter and information pertinent

to the filing of a complaint."  D.C. Code § 2–1402.51.  Defendant violated this requirement

because several of the rights guaranteed to Plaintiff by the DCHRA, such as the right to be free

from discrimination based on marital status, appear nowhere in the Patient Bill of Rights.  Nor

does the Patient Bill of rights contain information about filing a complaint pursuant to the

DCHRA.  Defendant violated this requirement because, upon information and belief based on

the dozens, and likely well in excess of fifty times Plaintiff has visited Defendant's offices,

Defendant does not have the Patient Bill of Rights or any other notice as required by the

40

DCHRA posted in any office location, in D.C. or otherwise, in a "conspicuous place" or otherwise.

188.    Pursuant to the DCHRA, D.C. Code § 2–1402.67, "All permits, licenses, franchises, benefits, exemptions, or advantages issued by or on behalf of the government of the District of Columbia, shall specifically require and be conditioned upon full compliance with the provisions of this chapter; and shall further specify that the failure or refusal to comply with any provision of this chapter shall be a proper basis for revocation of such permit, license, franchise, benefit, exemption, or advantage."

189.    Pursuant to the DCHRA, a person seeking relief from an unlawful discriminatory practice may obtain a variety of remedies, including but not limited to payment of compensatory damages, reasonable fees and costs, civil fines payable to the General Fund, and injunctive relief "necessary to preserve such status quo or to prevent such [irreparable] harm, including the seeking of temporary restraining orders and preliminary injunctions." D.C. Code §§ 2–1403.07, 2–1403.13, § 2–1403.16. In addition, "punitive damages are considered a valid and sometimes even integral component of recovery under the DCHRA." *Parker-Williams v. Charles Tini & Assocs., Inc.,* 53 F.Supp.3d 149, 153 (D.D.C. 2014).

190.    Wherefore, Plaintiff seeks damages of $82,338 or such other amount to be proven at trial; punitive damages of $3,000,000 or such other amount as this Court may deem proper; reasonable attorneys' fees and costs; the imposition of civil fines payable to the General Fund; a revocation of any permit, license, franchise, benefit, exemption or advantage issued to Defendant by the D.C. government; and any other relief the Court may deem proper. Plaintiff also seeks a temporary restraining order and preliminary and permanent injunctive relief from Defendant's

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

discriminatory practices and retaliatory practices in violation of the DCHRA, specifically an

order that enjoins Defendant from:

(1) refusing to comply and act in accordance with the DCHRA, including retaliating or
discriminating against Plaintiff in any way;

(2) discontinuing her medical treatment or dismissing her from its medical practice;

(3) withholding the "egg thaw" component of the Egg Freezing Program or failing to
timely provide its best medical care and treatment under this program;

(4) imposing conditions on Plaintiff's use of her own frozen eggs, such as requiring
Plaintiff to seek the services of an attorney and/or social worker;

(5) refusing allow Plaintiff to alone consent to having bloodwork and ultrasound
monitoring of her own body;

(6) treating Plaintiff's cryopreserved eggs as jointly owned property rather than her sole
property;

(7) conditioning Plaintiff's treatment (including J.S.'s      role in that treatment) on
Plaintiff's source of income for payments to SGF, and discriminating against Plaintiff
in determining discount eligibility; and

(8) refusing to make a good faith and reasonable effort to resolve any questions, concerns
or issues raised by Plaintiff.

## COUNT II
### Violation of the District of Columbia Consumer Protections Procedures Act,
### D.C. Code §§ 28–3901 *et seq.*

191.    Plaintiff repeats and incorporates herein by reference the allegations in all other

paragraphs of this Complaint as though fully set forth herein.

192.    A main purpose of the CPPA is to "assure that a just mechanism exists to remedy

*all* improper trade practices and to deter the continuing use of such practices." D.C. Code § 28-

3901(b)(1) (emphasis added).  This includes trade practices that violate other laws, including the

common law.  It is a violation of the CPPA "for any person to engage in an unfair or deceptive

trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby."

D.C. Code § 28-3904.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

193.    Defendant provides and performs medical services.  The CPPA applies to the medical profession, as the performance of medical services is a "trade practice."  Plaintiff is a consumer of those services.

194.    Defendant's violations of the CPPA were not related to its actual practice of medicine but rather to the entrepreneurial, commercial, or business side of its practice.

195.    Defendant's violations of the CPPA were based on ill will, recklessness, wantonness, maliciousness and/or willful disregard of Plaintiff's rights.

196.    Pursuant to the CPPA, D.C. Code § 28-3904(e), it is an unfair or deceptive trade practice for any person to "misrepresent as to a material fact which has a tendency to mislead." Similarly, D.C. Code § 28-3904(f) states that it is an unfair or deceptive trade practice to "fail to state a material fact if such failure tends to mislead" and D.C. Code § 28-3904(f-1) states it is an unlawful or deceptive trade practice to "[u]se innuendo or ambiguity as to a material fact, which has the tendency to mislead."  As more specifically detailed in the previous allegations in this Complaint, Defendant violated these provisions in numerous ways and on multiple occasions, including, *inter alia:*

- imposing new demands and "conditions" on Plaintiff in the middle of her egg thaw cycle in order for her to continue to receive benefits under the Egg Freezing Program, representing that such conditions represented SGF policy, a statement that had the tendency to mislead, when, in fact, these demands and conditions were inconsistent with Defendant's past practices and written policy.  In addition, Defendant had failed to ever previously convey these conditions and terms to Plaintiff, an omission that had the tendency to mislead, much less at the time she enrolled in the Egg Freezing Program;

- representing to Plaintiff and J.S.      that she could continue her treatment cycle if she met these new demands and "conditions," a statement that had the tendency to mislead, but dismissing her from its care when she asked for specific details on what she had to do in order to comply; and

- representing that J.S.      must be treated as a sperm donor pursuant to FDA regulations, a statement that had tendency to mislead, when this was not true.

43

197.    Defendant has also violated this provision because

- it falsely represented that the Patient Bill of Rights granted certain rights and remedies to Plaintiff and imposed obligations on SGF, a statement that had the tendency to mislead, but failed to grant Plaintiff those rights or fulfill its obligations;

- it falsely represented that the Egg Freezing Program granted Plaintiff the right or benefit to return to SGF to use her frozen eggs when she was ready, have her eggs thawed and inseminated, and her embryos grown, in SGF's lab, statements that had the tendency to mislead, but failed to grant Plaintiff such rights or benefits; and

- it made false representations regarding its leadership in the fertility industry, such as the "unparalleled" superiority of its laboratory and embryologists in thawing eggs, statements that had the tendency to mislead.

198.    Pursuant to the CPPA, D.C. Code § 28-3904(e-1), it is an unfair or deceptive trade practice for any person to "[r]epresent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."  As more specifically detailed in the previous allegations in this Complaint, Defendant violated this provision in numerous ways and on multiple occasions, including, *inter alia:*

- falsely representing that Defendant had the right, under the Egg Freezing Program, to condition Plaintiff's treatment on J.S.'s        consent to bloodwork and monitoring of Plaintiff's own body;

- falsely representing that Defendant had the right, under the Egg Freezing Program, to condition Plaintiff's egg thaw cycle on her to consent to hormone treatment when such treatment was not part of Plaintiff's clinical protocol;

- falsely representing that Defendant had the right, under the Egg Freezing Program, to condition Plaintiff's treatment on J.S.'s        consent to thawing Plaintiff's frozen eggs.  Osborn later acknowledged to Plaintiff and J.S.       that Defendant did not in fact have this right;

- falsely representing that that Defendant was obliged under the Egg Freezing Program, and pursuant to a FDA requirement, to treat J.S.        a sperm donor if Plaintiff wanted to pay for her medical treatment under the Egg Freezing Program herself and retain control over her eggs;

- falsely representing that Plaintiff was obliged to satisfy additional new demands and conditions to receive treatment pursuant to the Egg Freezing Program pursuant to FDA regulations and Defendant's own policies, despite FDA regulations and

44

Defendant's own policies that state the contrary and despite never previously treating J.S.        as sperm donor; and

- informing Plaintiff that if J.S.        signed the Consent to Thaw form required by the Egg Freezing Program, her clinical staff would consider her frozen eggs, even the unused ones, to be jointly owned and no longer her property.  Plaintiff does not believe that this document would convey such ownership rights.

199.    Pursuant to the CPPA, D.C. Code § 28-3904(r), it is an unfair or deceptive trade practice for any person to "make or enforce unconscionable terms or provisions of sale or leases."  As noted above, particularly in the previous paragraph, Defendant made and enforced a number of unconscionable restrictions on her right to use her own frozen eggs.

200.    Defendant has also violated D.C. Code § 28-3904(e-1) because

- it falsely represented all of the services SGF provided to Plaintiff were in accordance with the Patient Bill of Rights, which granted Plaintiff certain rights and remedies and imposed obligations on SGF.  Defendant did not confer to Plaintiff those rights or satisfy these obligations; and

- it falsely represented Plaintiff had the right or benefit, under the Egg Freezing Program, to return to SGF to use her frozen eggs when she was ready and that her eggs would be thawed and inseminated, and her embryos grown, in SGF's lab. Defendant did not confer to Plaintiff such rights or benefits.

201.    Pursuant to the CPPA, D.C. Code § 28-3904(h), it is an unfair or deceptive trade practice for any person to "offer … services without the intent to sell them or without the intent to sell them as … offered."  Defendant violated this section by offering services without the intent to sell them or the intent to sell them as offered.  Defendant offered Plaintiff a discount for continued service without conditions on the morning of Friday, January 18, yet did not intend to provide such service as offered, changing the offer to be contingent on certain conditions that very afternoon.  Yet Defendant also did not intend to provide its services with the conditions offered at any time on Friday, January 18, as Defendant refused to provide any specific information as to what it was now requiring from Plaintiff.   By Monday morning (the next

45

weekday) Defendant refused to honor either the Friday morning or the Friday afternoon offers of service – or provide any other service – to Plaintiff.

202.    Pursuant to the CPPA, D.C. Code § 28-3904(j), it is an unfair or deceptive trade practice for any person to "make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions."  Defendant repeatedly violated this section by publishing detailed criteria for receiving a price reduction or discount on its website based on a patient's U.S. household income as reported on her U.S. federal tax returns, and then representing to Plaintiff that the discount did not exist as advertised.  Specifically, even though Plaintiff was solely financially responsible for her own medical treatment and the sole member of her household, Defendant not only refused to evaluate her discount eligibility on the basis of her household income but also retaliated against Plaintiff because she asked about the discount program, both during an earlier IVF cycle and during the egg thaw cycle in January 2019.

203.    Pursuant to the CPPA, D.C. Code § 28-3904(m), it is an unfair or deceptive trade practice for any person to "harass or threaten a consumer with any act other than legal process …."  Defendant violated this section through several telephone calls in which it threatened to either treat J.S.          as a sperm donor, impose a number demands and conditions that prevented her from completing her current thaw cycle, and/or terminate Plaintiff from its practice because Plaintiff inquired about discount program eligibility and wanted to assume financial responsibility and pay for her own medical care.  Even though Defendant claimed these conditions were its policy, it could not provide any details on how Plaintiff could reasonably comply.  Defendant also violated this section by subjecting Plaintiff to unnecessarily detailed and harassing questions about her relationship with J.S.          , seemingly to decide whether to "allow" Plaintiff to have children with him, rather than addressing the substance of Plaintiff's

46

legitimate questions.  The only question about their relationship that was relevant to Plaintiff's

medical care is whether she and J.S.         are sexually intimate.

204.    Pursuant to the CPPA, D.C. Code § 28-3904(a), it is an unfair or deceptive trade

practice for any person to "represent that goods or services have a source, sponsorship, approval

certification … characteristics, uses, [or] benefits that they do not have."  Defendant has violated

this provision because it now claims that certain of its services do not have certain

characteristics, benefits, or uses that Defendant previously claimed that they had.  For example:

- Defendant represented that it offers thawing frozen eggs as "benefit to egg-freezing
  patients" and that "[t]hawing frozen eggs is an incredibly important aspect of the egg
  freezing program," but has refused to provide this benefit to Plaintiff, who was a
  patient in the Egg Freezing Program;

- Defendant represented that as part of the Egg Freezing Program Plaintiff could return
  to SGF to use her frozen eggs when she was ready and that her eggs would be thawed
  and inseminated, and her embryos grown, in SGF's "unparalleled" lab but refused to
  provide these services;

- Defendant represented it offers as a "benefit" to patients in the Egg Freezing Program
  a financial program and further stated that the Shared Help Discount Program, which
  applies to egg thaw cycles, is based on a patient's household income as reported o
  U.S. tax returns.  Defendant subsequently refused to provide medical services to
  Plaintiff when she merely inquired as to the details of such financial program.
  Defendant violated this section by stating that eligibility for this program is not, in
  fact, based on a patient's household income as determined by her U.S. federal tax
  returns as it represents on its website;

- Defendant represented that all services provided by it would be in accordance with its
  Patient Bill of Rights, pursuant to which it agreed to grant Plaintiff certain rights and
  undertake certain obligations.  Defendant did not in fact grant Plaintiff such rights and
  remedies or fulfill its obligations; and

- Defendant represented to Plaintiff that the services it offered were in compliance with
  HIPAA privacy requirements and that she had a right to the privacy of her own
  medical records but consistently breached these privacy laws.

205.    Pursuant to the CPPA, D.C. Code § 28-3904(u), it is an unfair or deceptive trade

practice for any person to "represent that the subject of a transaction has been supplied in

accordance with a previous representation when it has not."  Defendant violated this section by

47

representing that it was its established policy, and consistent with the terms of the Egg Freezing Program, that Plaintiff must visit a social worker to receive medical treatment and use her own eggs with J.S.             as a sperm partner, when its own written policy representation previously provided to Plaintiff stated the contrary.  Defendant violated this section by imposing new conditions on Plaintiff before it would "allow" her to continue her medical treatment and try to have children with J.S.             as a sperm partner, claiming that this was its established policy. Yet this representation was inconsistent both with Defendant's previous representations to Plaintiff that she could pursue fertility treatment with J.S.             as her sperm partner without such conditions, and with Defendant "allowing" J.S.             to be Plaintiff's sperm partner for all previous IUI and IVF treatments with no additional conditions imposed.

206.    Pursuant to the CPPA, D.C. Code § 28-3905(k)(1), a person seeking relief from an unlawful trade practice may obtain a variety of remedies, including but not limited to treble damages, reasonable attorneys' fees, injunctive relief, punitive damages, and any other relief the Court may deem proper.

207.    Defendant has committed multiple violations of the CPPA as stated and described herein.

208.    Wherefore, Plaintiff seeks the return of any monies Defendant acquired by means of these unlawful trade practices in an amount of $82,338 or such other amount to be proven at trial, treble damages or $1500 per violation (whichever is greater), reasonable attorneys' fees, punitive damages, and any other relief the Court may deem proper.  Plaintiff also seeks an order enjoining Defendant from continuing these unlawful trade practices.

48

## COUNT III
### Breach of Contract (Egg Freezing Program)

209.     Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

210.     Based on Defendant's representations and inducements, Plaintiff paid Defendant thousands of dollars to enroll in SGF's Egg Freezing Program, the bookends of which are cryopreserving eggs and then later returning to use those eggs.

211.     At the time Plaintiff enrolled as a patient in SGF's Egg Freezing Program, Defendant presented to her all the material terms of the program and indicated an intent to be bound to these terms.  Plaintiff did not have the opportunity to negotiate these terms but accepted this contract and these terms to enroll in SGF's Egg Thawing Program.  SGF also demonstrated by its own subsequent actions its intent to be bound to these terms.

212.     Plaintiff had expressed her intent to use her frozen eggs to Defendant and was ready, willing, and able to perform her part of the second stage of Egg Freezing Program – the egg thaw cycle.   Defendant was paid for her initial monitoring appointment, and at the time Plaintiff began her egg thaw cycle she had a credit balance in her account with Defendant that exceeded the total cost of the program through to embryo transfer.

213.     Defendant had obligation to comply with the terms of the Egg Freezing Program and to provide the services to patient that it had promised, including thawing, inseminating her eggs, subsequently incubating her embryos, in SGF's laboratory.

214.     Defendant materially breached Egg Freezing Program first by imposing new contractual terms in the middle of her treatment – as a condition of continuing treatment – that had never been disclosed communicated to Plaintiff, were inconsistent with Defendant's past practice and written policy statements, and were inconsistent with applicable FDA regulations.

49

Defendant materially breached the Egg Freezing Program by making it impossible for Plaintiff to comply with these new terms in order to continue her treatment and cancelling her treatment when she nonetheless asked how to do so. Defendant materially breached the Egg Freezing Program by refusing to perform its obligations under this contract but instead stopping Plaintiff's treatment in the middle of an egg thaw cycle and subsequently dismissing Plaintiff from its practice without completing the egg thaw cycles promised as a right or benefit under the program.

215. Wherefore, Plaintiff demands a temporary restraining order and preliminary and permanent injunctive relief from Defendant's breach, specifically an order that enjoins Defendant from (1) dismissing her from its practice; (2) withholding treatment that Defendant contracted and promised to provide as part of the Egg Freezing Program; and (3) imposing additional conditions on Plaintiff's use of her own cryopreserved eggs. As alleged previously in this Complaint, Defendant's breach will irrevocably harm Plaintiff, and there is no adequate remedy at law, because she cannot simply go elsewhere to thaw her eggs without compromising her medical care and introducing an unacceptable level of risk. Plaintiff is now almost 46, and there is also no way for her to turn back the clock and obtain another set of younger eggs.

216. Wherefore, in the alternative, Plaintiff demands specific performance of the Egg Freezing Program.

217. Wherefore, in the alternative, Plaintiff seeks damages of $82,338 or such other amount to be proven at trial, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

## COUNT IV
### Breach of Contract (Patient Bill of Rights)

218.    Plaintiff re-alleges and incorporates by reference the allegations all other

paragraphs of this Complaint as though fully set forth herein.

219.    Defendant provided Plaintiff with a copy of SGF's Patient Bill of Rights, which

contains the material terms that SGF wants to govern all interactions between Plaintiff and SGF

and imposes obligations on each party.  Plaintiff but accepted this contract and these terms as a

condition of receiving medical treatment at SGF.  Plaintiff complied with her obligations under

the Patient Bill of Rights, and Defendant was paid in full for all medical treatment provided to

Plaintiff.

220.    As specifically alleged above, the Patient Bill of Rights grants Plaintiff a number

of rights and imposes responsibilities and obligations on Defendant.

221.    Defendant materially breached these obligations and the Patient Bill of Rights in

multiple ways, as specifically alleged above.  For example, Defendant

- refused to allow Plaintiff to assume financial responsibility for or pay for her own treatment, and conditioned her treatment on Plaintiff's source of payment;

- failed to respond to Plaintiff's reasonable questions about her clinical treatment and the risks thereof;

- failed to treat Plaintiff with respect and dignity but instead threatened to treat J.S.        as a sperm donor because she had inquired about SGF's discount program, wanted to be financially responsible and pay for her own medical care, and stated that she was single;

- failed to treat Plaintiff with respect and dignity by asking questions about her relationship and marital status because she wanted to assume financial responsibility for and pay for her own treatment;

- failed to provide Plaintiff with reasonable continuity of care by (1) stopping her treatment in the middle of the Egg Freezing Program, when Plaintiff had returned for the most crucial part of the program; (2) leaving Plaintiff in medical limbo for approximately a month and refusing to respond to any of Plaintiff's repeated attempts

51

to get answers or resolve her status with SGF; (3) recommending providers that it
could not guarantee would provide medically equivalent care;

- refused to answer basic questions regarding the breakdown of treatment costs and
  refused to answer questions on its required consent forms so that her consent would
  be "informed";

- failed to seek reasonable resolution of Plaintiff's questions and concerns at the
  Practice level after Plaintiff raised these questions – and then retaliated against
  Plaintiff – by (1) not only imposing new demands and terms in the middle of a
  treatment cycle before it would continue treatment but also making it impossible to
  comply with such conditions; (2) discontinuing Plaintiff's treatment and ultimately
  dismissing her from its practice, when she raised reasonable questions in good faith
  about the details of Defendant's demands; and

- harassed and retaliated against Plaintiff when she asked questions and raised
  concerns.

222.    Wherefore, Plaintiff demands a temporary restraining order and preliminary and
permanent injunctive relief from Defendant's breach, specifically an order that enjoins
Defendant from (1) harassing or retaliating against her in any way, such as by dismissing her
from its practice, refusing her treatment, or imposing conditions to her continuing treatment or to
her using her own frozen eggs with J.S.        as her sperm partner; (2) refusing to let Plaintiff
assume financial responsibility and pay for her own treatment; (3) withholding a clinical protocol
from Plaintiff or information regarding her medical treatment.  As alleged previously in this
Complaint, Defendant's breach and retaliatory actions will irrevocably harm Plaintiff, and there
is no adequate remedy at law.

223.    Wherefore, in the alternative, Plaintiff demands specific performance of the
Patient Bill of Rights, such as by providing a proper channel for reasonably resolving Plaintiff's
questions and concerns without reprisal or retaliation and treating her without regarding to her
source of payment.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

224.    Wherefore, in the alternative, Plaintiff seeks damages of $82,338 or such other amount to be proven at trial, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

**COUNT V**
**Breach of Covenant of Good Faith and Fair Dealing**
**(Egg Freezing Program and Patient Bill of Rights)**

225.    Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

226.    All contracts contain an implied duty of good faith and fair dealing, which means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Brown v. Sessoms*, 774 F.3d 1016, 1025 (D.C. Cir. 2014) (citation omitted).  As more specifically detailed in the previous allegations in this Complaint, Defendant violated this duty in numerous ways and on multiple occasions, including, *inter alia,* by:

- imposing new terms and conditions in the middle of her treatment that had never previously been disclosed and that Defendant did not intend to allow Plaintiff to satisfy, thereby by interfering with Plaintiff's performance of the Egg Freezing Program.  Defendant made it impossible for her to satisfy them and when Plaintiff nonetheless asked how for details on how to do so, discontinued her treatment the following business day, and later dismissed her from its care entirely;

- refusing to answer basic questions regarding the breakdown of treatment costs and refusing to answer questions on its required consent forms so that her consent would be "informed";

- willfully withholding treatment from Plaintiff and ultimately dismissing her from its practice to evade performance of its obligations and to strip Plaintiff of her right to receive treatment under the Egg Freezing Program;

- disregarding its own Patient Bill of Rights and retaliating and harassing Plaintiff, instead of reasonably attempting to answer her questions, when she tried to understand her clinical treatment, the required consent forms, and the breakdown of program costs (and potential eligibility for a discount);

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

- failing to provide her with a clinical protocol or performing any sort of medical basic diagnostic testing at the start of her egg thaw cycle; and

- imposing new terms in the middle of Plaintiff's treatment cycle that were inconsistent with applicable FDA regulations and Defendant's own past practices and prior written policy statements.

227.   Wherefore, Plaintiff seeks damages of $82,338 or such other amount to be proven at trial, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

## COUNT VI
## Unjust Enrichment

228.   Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

229.   Defendant induced Plaintiff to enroll as a patient in its Egg Freezing Program, for which Plaintiff paid a substantial sum to Defendant, representing to her that she would be able to return to use her frozen eggs in its laboratory when she was ready and that that its experience, processes, and facilities were of the highest quality.  Plaintiff also paid Defendant a substantial sum for subsequent fertility services in order to maintain this relationship and to ensure her continuity of care so that when she did return to use her frozen eggs, she was doing so with a clinic and/or clinical team who had worked with her for years and there would be no potential medical errors related to the transition of her care.

230.   Defendant is now refusing to provide Plaintiff with the benefit of the very bargain that that induced Plaintiff not only to enroll as a patient in its Egg Freezing Program – the right to use her eggs at SGF when she was ready to do so – but also to seek all subsequent fertility treatment with Defendant.  Yet Defendant received a substantial benefit at Plaintiff's expense.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

231.    Under these circumstances, and pursuant to the facts alleged more fully previously in this Complaint, it would be manifestly unjust for Defendant to retain its financial benefit.

232.    Wherefore, Plaintiff seeks damages of $48,936 or such other amount to be proved at trial, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

### Count VII
### Promissory Estoppel

233.    Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

234.    Defendant made a number of promises to Plaintiff to induce her to enroll in the Egg Freezing Program and to continue her fertility treatments with Defendant.  Plaintiff understood based on these promises that maintaining a long-term relationship with Defendant would maintain the continuity of care, thereby reducing the chance of medical errors, and ensure that she received the best possible care and best possible chance for a positive medical outcome from a clinic and/or a clinical staff when the critical time came for Plaintiff to use her limited number of irreplaceable eggs.

235.    Defendant further promised that she would be treated in accordance with the Patient Bill of Rights.

236.    Plaintiff reasonably relied on these promises to her detriment by paying Defendant a substantial sum directly for fertility treatments, pursuing all subsequent fertility treatment with Defendant, incurring substantial additional cost to purchase medications required by Defendant, and forgoing fertility preservation treatment at a different clinic when the

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

treatment first became available to her at the age of 39 or subsequently pursuing other fertility treatments elsewhere.

237.    Wherefore, Plaintiff seeks damages of $82,338 or such other amount to be proved at trial, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

## Count VIII
## Negligent Misrepresentation

238.    Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

239.     In the alternative, Defendant has made false statements in reference to material facts and/or made willful omissions of material facts that Defendant had a duty to disclose.

240.    These false representations include (1) SGF's leadership in the fertility industry, such as with respect to using a patient's own cryopreserved eggs; (2) the "unparalleled" superiority of its laboratory and embryologists; (3) that Defendant complies with its own Patient Bill of Rights; (4) that SGF treats Plaintiff's frozen eggs as her property; and/or (5) that an egg freezing patient can return to SGF under the Egg Freezing Program when she is ready so that her eggs will be thawed and fertilized, her embryos grown, in its laboratory.

241.    Each of these representations appear on Defendant's own website or in its own patient documentation, are some of the core marketing statements that Defendant uses to attract and retain patients, and are among the most critical criteria that patients – including Plaintiff – evaluate when selecting a fertility clinic.  Each of these statements was made, in words or substance, to Plaintiff by SGF during the course of her treatment.

242.    Plaintiff relied on Defendant's false representations to her detriment and was damaged by them because they induced her to enroll in the Egg Freezing Program, to pursue

56

years of additional fertility treatments with SGF, to forgo fertility preservation or fertility treatments at another clinic, and to expect that when she was ready to use her eggs, she could return to SGF to do so.  Plaintiff cannot get her years of fertility back.

243.    In addition, Defendant has made false statements of material fact related to its actions taken with respect to Plaintiff.  These false statements included its claims that threatening to treat J.S.         as a sperm donor, imposing new demands and conditions before it would continue her treatment (and then withdrawing them before Plaintiff could comply), and ultimately dismissing Plaintiff are consistent with its long-standing policy and are required by the FDA.  Plaintiff is unaware of any such policies and still has not been able to find any FDA regulation that supports Defendant's actions.

244.    If such actions or demands are material components of the Egg Freezing Program, Defendant had a duty to but failed to timely disclose them to Plaintiff.  Plaintiff relied on Defendant's omissions to her detriment and was damaged by for the reasons stated above.  This reliance was particularly reasonable given that Defendant has never previously imposed any such conditions during Plaintiff's previous fertility treatments and Defendant's prior written representations state the contrary.

245.    Defendant's actions were based on ill will, recklessness, wantonness, maliciousness and/or willful disregard of Plaintiff's rights.

246.    Wherefore, Plaintiff seeks damages of $83,338 or such other amount to be proved at trial, punitive damages of $3,000,000 or such other amount as this Court may deem proper, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

## <u>COUNT IX</u>
### Fraudulent Inducement of Contract

247.     Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

248.     In the alternative, Defendant made false material representations to Plaintiff with knowledge of their falsity and intent to deceive Plaintiff.  Defendant made these statements to induce Plaintiff to enter into contracts with Defendant, including the Egg Freezing Program, the Multi-Cycle IVF Program, and multiple IUI cycles.

249.     These false representations include (1) SGF's leadership in the fertility industry, such as with respect to using a patient's own cryopreserved eggs; (2) the "unparalleled" superiority of its laboratory and embryologists; (3) that Defendant complies with its own Patient Bill of Rights; (4) that SGF treats Plaintiff's frozen eggs as her property; and/or (5) that an egg freezing patient can return to SGF under the Egg Freezing Program when she is ready so that her eggs will be thawed and fertilized, her embryos grown, in its laboratory.

250.     Plaintiff reasonably relied on Defendant's false statements to her detriment and took action – by entering into multiple contracts with Defendant over six and one half years – based on these representations.

251.     Defendant's actions were based on ill will, recklessness, wantonness, maliciousness and/or willful disregard of Plaintiff's rights.

252.     Wherefore, Plaintiff seeks damages of $82,338 or such other amount to be proved at trial, punitive damages of $3,000,000 or such other amount as this Court may deem proper, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

**COUNT X**
**Fraud**

253.    Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

254.    In the alternative, Defendant has made false statements to Plaintiff in reference to material facts and/or made willful omissions of material facts with the knowledge of the falsity or material omission and intent to deceive.

255.    These false representations include those detailed above, including (1) SGF's leadership in the fertility industry, such as with respect to using a patient's own cryopreserved eggs; (2) the "unparalleled" superiority of its laboratory and embryologists; (3) that Defendant complies with its own Patient Bill of Rights; (4) that SGF treats Plaintiff's frozen eggs as her property; and/or (5) that an egg freezing patient has the right to return to SGF under the Egg Freezing Program when she is ready so that her eggs will be thawed and fertilized, her embryos grown, in its laboratory.

256.     Through these false representations, Defendant has engaged in long-term and massive fraud that has not only injured Plaintiff but also defrauded countless other SGF patients who relied upon these representations.  Each of these representations appear on Defendant's own website and are some of the core marketing statements that Defendant uses to attract and retain patients and are among the most critical criteria that patients – including Plaintiff – evaluate when selecting a fertility clinic.  Each of these statements was made, in words or substance, to Plaintiff by SGF during the course of her treatment.

257.    Plaintiff relied on Defendant's false representations to her detriment and was damaged by them because they induced her to enroll in the Egg Freezing Program, to pursue years of additional fertility treatments with SGF, to forgo fertility preservation or fertility

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

treatments at another clinic, and to expect that when she was ready to use her eggs, she could return to SGF to do so.  Plaintiff cannot get her years of fertility back.

258.    In addition, Defendant has intentionally made false statements of material fact with knowledge of their falsity related to its actions taken with respect to Plaintiff.  These false statements included its claims that threatening to treat J.S.       as a sperm donor, imposing new demands and conditions before it would continue her treatment (and then withdrawing them before Plaintiff could comply), and ultimately dismissing Plaintiff are consistent with its long-standing policy and are required by the FDA.  Plaintiff is unaware of any such policies and still has not been able to find any FDA regulation that supports Defendant's actions.

259.    If such actions or demands are material components of the Egg Freezing Program, Defendant's omission of these material facts was willful with the intent to deceive.  Plaintiff relied on Defendant's omissions to her detriment and was damaged by for the reasons stated above.  This reliance was particularly reasonable given that Defendant has never previously imposed any such conditions during Plaintiff's previous fertility treatments and Defendant's prior written representations state the contrary.

260.    Defendant's actions were based on ill will, recklessness, wantonness, maliciousness and/or willful disregard of Plaintiff's rights.

261.    Wherefore, Plaintiff seeks damages of $82,338 or such other amount to be proved at trial, punitive damages of $3,000,000 or such other amount as this Court may deem proper, attorneys' fees, pre- and post-judgment interest, costs, and such other relief as this Court may deem proper.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

## COUNT XI
### Intentional Infliction of Emotional Distress

262.    Plaintiff re-alleges and incorporates by reference the allegations in all other paragraphs of this Complaint as though fully set forth herein.

263.    As described above, Defendant intentionally and recklessly caused Plaintiff severe emotional distress.

264.    Defendant's actions towards Plaintiff are outrageous in character, go beyond all possible bounds of decency, and are intolerable in a civilized community.

265.    It is unconscionable that Defendant imposed conditions to help it decide whether to "allow" Plaintiff to use her own frozen eggs with J.S.        , the father of her two miscarried children, because Defendant "did not understand" their relationship.  Defendant does not get to decide which patients are "allowed" to have children.

266.    It is unconscionable for Defendant to threaten to treat J.S.        as a sperm donor and impose a six-month delay in Plaintiff's treatment because Plaintiff inquired about discount program eligibility, reminded Defendant that she was single, and stated that she wished to assume financial responsibility and to pay for her own treatment.  It is unconscionable Defendant falsely claimed that such treatment of J.S.        was required by FDA regulations.

267.    It is unconscionable that Defendant refused to treat Plaintiff unless J.S.        also consented to thaw Plaintiff's eggs – which are Plaintiff's property – and represented to Plaintiff that this would transfer joint ownership of all of her eggs, even the unused ones, to J.S.        .

268.    It is unconscionable that Defendant did not make a reasonable attempt to answer Plaintiff's reasonable questions about specific items on the consent forms, her clinical protocol, and the costs of the program but instead retaliated and harassed Plaintiff.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

269.   It is unconscionable that, in the middle of her treatment, Defendant suddenly imposed new demands and conditions with which Plaintiff could not comply in a single day – i.e. new contract terms to the Egg Freezing Program – on a Friday afternoon, when her next treatment appointment was early Monday morning, and refused to treat her further using J.S.      as her sperm partner until Plaintiff complied.  This effectively cancelled Plaintiff's treatment; Osborn on Monday expressly cancelled Plaintiff's treatment.

270.   It is unconscionable that Defendant conditioned Plaintiff's ability to receive further treatment on hiring an attorney approved by Defendant, entering into a third party contract with J.S.      containing terms acceptable to Defendant (without providing any guidance as to what these terms, or even the substance of the contract, needed to address), and waiving the attorney-client privilege to that Defendant could evaluate the contract and her attorney could report on privileged conversations.

271.   It is unconscionable that Defendant refused to provide any information, even when specifically asked, about what exactly Plaintiff needed to do to satisfy Defendant's new demands.

272.   It is unconscionable that after inducing Plaintiff to enroll in Defendant's Egg Freezing Program six and a half years ago (at the age of 39) and representing that she would be able to return to use the eggs with her SGF physician in the SGF laboratory when she chose, that it would discontinue her treatment in the middle of an egg thaw cycle when she was almost 46 and refuse to treat her further or allow her to complete the program.

273.   It is unconscionable that Defendant would promise to send a letter to Plaintiff letting her know the status of her care on January 21, 2019, and that even after Plaintiff's multiple attempts over the following weeks to contact Defendant via phone, fax, and mail to state

62

that Plaintiff had not received such letter, to inquire about her status and to attempt to have a reasonable conversation, Defendant would leave her in medical limbo for a month, causing her to lose a second cycle.

274.   It is unconscionable that Defendant refused to let Plaintiff use her frozen eggs with SGF after representing that transferring eggs to another facility is risky, that the same lab should thaw the eggs that froze them, and that it had the most experience and best laboratory.  It is unconscionable that Defendant would refer her to clinics that do not have significant (or in many cases any) experience in using a patient's own cryopreserved eggs and that do not use the identical laboratory processes as Defendant.

275.   And it is unconscionable that Defendant would take these actions with respect to Plaintiff's cryopreserved eggs – her future family – seriously compromising, if not destroying, her best chance of realizing her lifelong dream of having her own children.  Defendant refers to egg freezing as "type of insurance policy," but it is now refusing to "pay out." https://www.washingtonpost.com/news/soloish/wp/2015/10/15/podcast-thinking-of-freezing-your-eggs-here-are-some-women-whove-done-it/?utm_term=.ccf1acf2ded1.

276.   Defendant's actions have caused Plaintiff to suffer extreme and unhealthy levels of stress and mental anguish, and have left Plaintiff devastated and emotionally distraught.  It is personally catastrophic to her that Defendant is undermining her only real hope for a family and not allowing her a chance to realize her best medical outcome from her cryopreserved eggs. Plaintiff has suffered physical manifestations of her emotional distress caused by Defendant affecting her work.  Plaintiff's emotional distress and/or its physical manifestations may also compromise her medical care, reduce the chances of successful outcomes for that care and generally create an environment not suited for optimizing fertility treatment.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

277.     Wherefore, Plaintiff also seeks from Defendant damages in an amount to be determined at trial, punitive damages of $3,000,000 or such other amount as this Court may deem proper, pre- and post-judgment interest, attorneys' fees, costs, and such other relief as this Court may deem proper.

## PRAYER FOR RELIEF

Plaintiff repeats and incorporates herein by reference the allegations set forth in the preceding paragraphs of this Complaint.

WHEREFORE, Plaintiffs demand judgment against Defendant and respectfully requests the following relief:

a.   A temporary restraining order and preliminary and permanent injunctive relief through an order that enjoins Defendant from:

- discontinuing her medical treatment or dismissing her from its medical practice;

- withholding the "egg thaw" component of the Egg Freezing Program or failing to timely provide its best medical care and treatment under this program;

- imposing conditions on Plaintiff's use of her own frozen eggs, such as requiring Plaintiff to seek the services of an attorney and/or social worker;

- refusing allow Plaintiff to alone consent to having bloodwork and ultrasound monitoring of her own body;

- treating Plaintiff's cryopreserved eggs as jointly owned property rather than her sole property;

- conditioning Plaintiff's treatment on her source of income for payments to SGF, and discriminating against Plaintiff in determining discount eligibility;

- using email to contact Plaintiff and sending unencrypted PHI through email;

- refusing to comply and act in accordance with its own Patient Bill of Rights, the CPPA, and the DCHRA, including retaliating or discriminating against Plaintiff in any way;

- refusing to make a good faith and reasonable effort to resolve any questions, concerns or issues raised by Plaintiff;

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

- continuing its unlawful trade practices in violation of the CPPA;

b. An order requiring Defendant to provide Plaintiff with a copy of and an explanation for all bills from and payments to Defendant, consistent with the Patient Bill of Rights;

c. Specific performance of the Egg Freezing Program contract, including all medically necessary treatment for egg thaw cycle(s), insemination, embryo incubation, and transfer;

d. Specific performance of the Patient Bill of Rights, such as by providing a proper channel for reasonably resolving Plaintiff's questions and concerns without reprisal or retaliation and treating her without regard to her source of payment;

e. An award of $82,338 in damage or such other amount to be determined at trial;

f. Treble damages or $1500 per violation (whichever is greater) for each violation of the CPPA;

g. Punitive damages of $3,000,000 or such other amount as this Court may deem proper;

h. Attorneys' fees, pre- and post-judgment interest and costs;

i. The imposition of civil fines for violations of the DCHRA;

j. The revocation of any permit, license, franchise, benefit, exemption or advantage issued to Defendant by the D.C. government, for violations of the DCHRA; and

k. Such other relief as this Court may deem proper.

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19

Plaintiff demands that this action be tried by a jury.

## VERIFICATION

I, E.M.          , verify under penalty of perjury that I have read the above complaint and
its contents. I also verify that, to the best of my knowledge and recollection, the matters stated in
the complaint are true and correct.


Executed this 6th day of March, 2019.

E.M.


Respectfully submitted,

Lee E. Berlik (DC # 458370)
Jay M. McDannell, Of Counsel (DC #473675)
BERLIKLAW, LLC
1818 Library Street, Suite 500
Reston, Virginia 20190
Tel: (703) 722-0588
JMcDannell@berliklaw.com
*Counsel for Plaintiff*

DOCUMENT FILED UNDER SEAL - ORDER DATED 3-6-19