# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| E.M., | : | | |
| Plaintiff, | : | Civil Action No.: | 19-657 (RC) |
| v. | : | Re Document No.: | 5 |
| SHADY GROVE REPRODUCTIVE SCIENCE CENTER P.C., | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### I. INTRODUCTION

For years, Plaintiff E.M. used the services of Shady Grove Fertility ("SGF") in an effort to conceive a biological child. But in early 2019, as E.M. was preparing to use six eggs that SGF had frozen for her years earlier, SGF dismissed her as a patient—a decision that E.M. alleges was made in retaliation after she accused SGF of discriminating against her on the basis of marital status, in violation of the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1402.31. Since the dismissal, SGF has maintained that it would pay to transfer E.M.'s frozen eggs to another medical provider in the area, where E.M. could resume her fertility treatments. E.M. does not want her eggs moved, though, and she thinks that treatment at SGF gives her the best chance of successfully becoming pregnant and carrying to term. She therefore brought this lawsuit, seeking not only money damages but a permanent injunction preventing SGF from dismissing her from its practice and discontinuing her treatment.[1]

___

[1] The named Defendant is Shady Grove Reproductive Science Center P.C., a Maryland professional corporation that is registered as a foreign corporation with the Corporations

Presently before the Court is E.M.'s motion for a preliminary injunction, which would require SGF to reinstate her and resume treatment while her lawsuit is pending. According to E.M., such relief is necessary because her biological clock does not permit her to delay treatment, moving her eggs to another practice would make them less viable, and any other clinic would provide inferior care. As explained below, however, the Court finds E.M.'s contentions about the risks of transferring her eggs and using another practice to be too speculative to warrant the issuance of a preliminary injunction. And the current hostility between the parties makes reinstatement infeasible while they pursue discovery and prepare for trial. The Court thus concludes that this case is ill-suited for preliminary relief, and it denies E.M.'s motion while reserving judgment as to whether she is likely to ultimately succeed on the merits of her claims.

## II. FACTUAL BACKGROUND

E.M. first started going to SGF in 2012. Compl. ¶ 6, ECF No. 2. At the time thirty-nine years old, she decided to enroll in SGF's egg freezing program, under which multiple eggs are surgically removed and cryopreserved for future fertility use. *Id.* ¶¶ 6, 9. E.M. underwent one egg freezing cycle that ultimately produced six cryopreserved eggs—five mature and one immature, meaning of questionable viability. *Id.* ¶ 24.

With those age thirty-nine eggs saved for years down the road, E.M. then spent the next few years trying to become pregnant through other means. *See id.* ¶¶ 34–45. Her partner for these endeavors was J.S., with whom she has "been in a sexually intimate and strong emotionally supportive relationship" for about a decade. *Id.* ¶ 35. Though E.M. and J.S. "are not married or

---

Division of the D.C. Department of Consumer and Regulatory Affairs. *See* Compl. ¶ 2, ECF No. 2. Defendant typically refers to itself, however, as "Shady Grove Fertility Center," "Shady Grove Fertility," or simply "SGF" for short. *See id.* The Court uses the abbreviation in this opinion, which is also the practice that the parties tend to follow in their filings.

engaged, do not live together or share a household, and have no legal or financial ties," he is her "best friend" and they intend to co-parent any child they conceive together. *Id.*; *see also* Suppl. Decl. of E.M. ¶ 111, ECF No. 22. In 2014 and again in 2018, E.M. and J.S. conceived naturally, but both pregnancies sadly ended in miscarriages. Compl. ¶¶ 34, 46. In the years in between, they together underwent multiple cycles of intra-uterine insemination ("IUI") and in vitro fertilization ("IVF") treatments at SGF, but these treatments were unsuccessful. *Id.* ¶¶ 41–42, 44–45.

So by early 2019, E.M. decided that it was time to try to use her frozen eggs. *Id.* ¶ 51. She returned to SGF on January 15, and during that first appointment, she sought to raise a few outstanding questions with SGF personnel. *Id.* ¶ 54. Some of these questions were related to finances. E.M. had long been aware of a "Shared Help Discount Program" that SGF offered to patients whose household income was below a certain threshold and who met other criteria. *Id.* ¶ 61. Several years earlier, E.M. had inquired about the program because she believed that she was eligible, but her longtime doctor, Barbara Osborn, had informed her that she was not, because SGF's policy was to include J.S. as part of E.M.'s household for purposes of calculating household income. *See id.* ¶ 63. E.M. disagreed with that determination—maintaining that she and J.S. had no legal or financial ties and that she should be permitted to have sole financial responsibility for the treatments—but at the time, she had declined to press the issue. *See id.* ¶ 64. By 2019, though, E.M. "believed it made sense to follow up with SGF" about the discount program "given the amount of money [she] had spent with [SGF] by that time and the financial burden" that the next stage of the egg freezing program would represent. *Id.* ¶ 65.

E.M. also had questions related to a consent form that she had been provided. As E.M. understood it, SGF's "Consent to Thaw" form would not allow her to thaw any of her frozen

3

eggs without J.S.'s authorization, and it required J.S. to consent to procedures that involved solely E.M.'s body—like hormone treatments, ultrasound exams, and blood tests. *Id.* ¶¶ 67–68; *see also* Pl.'s Mot. Prelim. Inj., Ex. 2, ECF No. 5 at 47. E.M. had no issue with J.S. "signing any consent items related to using his sperm to inseminate the eggs"—as he had during past treatment cycles at SGF—or "making decisions regarding fertilized eggs and embryos," but she wished to be the sole "individual responsible for making all decisions regarding treatment involving her body and decisions about how many eggs to thaw during a cycle." Compl. ¶¶ 69, 74; *see also* Def.'s Opp'n Pl's Mot. Prelim. Inj. ("Def.'s Opp'n"), Exs. M, N, and O, ECF Nos. 14-13 to 14-15.

Over the course of the week that followed her January 15 appointment, E.M. attempted to discuss these questions with various SGF employees. Through several conversations, E.M. learned that the Consent to Thaw form had called for J.S.'s signatures because SGF had classified him as E.M.'s "partner" for purposes of all treatments. *See* Compl. ¶ 84. SGF says that it makes such a classification whenever "a couple (whether married or non-married, same sex, or different sex) come[s] through [its] doors for infertility treatments . . . unless directed otherwise." Decl. of Gilbert Mottla ¶ 16, ECF No. 14-1. According to SGF, because "all treatments are done to assist the patient and partner in creating a child together, both the patient and partner are required to consent to all infertility treatments, including all treatments and procedures the female patient" undergoes herself, "as well as sign all financial documents for the infertility treatments." *Id.* ¶ 21. That is why J.S. was expected to consent to E.M.'s egg thawing and related procedures, and why he was included within E.M.'s "household" for purposes of the discount program. *See id.* ¶ 24.

4

If E.M. wanted to opt out of this regime, she could, but there would be consequences. She learned that if J.S. was not treated as her "partner," he would be treated as a "sperm donor" and subject to at least three requirements that do not apply to partners. Compl. ¶ 85. First, when, as in this case, the prospective sperm donor is someone the female recipient knows, SGF "requires the female and known donor to separately undergo psychological counseling with a mental health provider" to make sure that "they have considered the mental and emotional ramifications of using or providing donor sperm to conceive a child when the parties know each other but are not in a relationship or do not plan to raise any child(ren) together." Mottla Decl. ¶ 18. Second, in known donor cases, SGF "requires that the female and known donor enter into a legal contract drafted by an attorney" to ensure that the parties understand their legal and financial rights. *Id.* And third, per FDA regulations, sperm donors must provide their sperm to a sperm bank, which then freezes and quarantines the sperm so that it can undergo infectious disease screening. *Id.*; Compl. ¶ 85. The FDA regulations generally exempt donors who are sexually intimate with the female recipient, but SGF's policy is, in its own words, "more stringent": SGF always requires that donor sperm be frozen, quarantined, and screened, "regardless of whether the recipient and the donor are sexually intimate." Mottla Decl. ¶ 18.

The third of these requirements was particularly unappealing to E.M. As she understood things, the quarantine process would take about six months and result in thawed sperm that would be medically inferior to fresh sperm. Compl. ¶¶ 85–87. So the donor route was not exactly an ideal alternative.

During a January 18 phone call, however, Osborn informed E.M. that she would need to choose between designating J.S. as a partner or a donor and then agree to comply with SGF's policies with respect to the chosen path. Mottla Decl. ¶ 38; *see also* Compl. ¶ 101. Osborn said

5

that if E.M. wanted J.S. treated as her partner, SGF could offer her a temporary courtesy discount on one egg thaw cycle, but she would be ineligible for the Shared Help Discount Program, as J.S. would be required to sign paperwork as a member of her household and share financial responsibility for any treatments. Compl. ¶ 101; Decl. of Barbara Osborn ¶ 36, ECF No. 14-2. E.M. declined the courtesy discount and instead asked to speak with someone in SGF's legal or financial department to confirm that J.S. had to be included in her household if he was designated as her partner. Compl. ¶¶ 99–100; Osborn Decl. ¶ 36.

E.M. never spoke to a representative from legal or financial, though. Rather, later in the afternoon on January 18, she spoke on the phone with Sarah Chris, an office supervisor at SGF. Compl. ¶ 105. Chris said that SGF had now decided to provide E.M. with three options. Option One would permit E.M. to proceed using J.S. as a known sperm donor as long as she followed all SGF policies that came with that decision: the sperm freeze, the infectious disease testing, the waiting period, the professional counseling, and the legal agreement with J.S. Mottla Decl. ¶ 39; Compl. ¶ 112. Option Two, by contrast, would allow J.S. to be E.M.'s partner, but he would be required to sign the Consent to Thaw and other release forms and assume joint financial responsibility for all of the treatments, making E.M. ineligible for the Shared Help Discount Program. *See* Mottla Decl. ¶ 39; Compl. ¶ 108. But unlike the typical case of recipient and partner, Option Two now came with additional conditions: E.M. and J.S. would need to visit with a mental health care professional and "obtain a legal agreement spelling out their understandings of J.S.'s duties and responsibilities." Mottla Decl. ¶ 39; *see also* Compl. ¶ 108. These added requirements were apparently necessary because of, in SGF's words, "E.M.'s shifting positions on whether J.S. was a donor or partner." Mottla Decl. ¶ 42. Option Three, finally, was straightforward: E.M. and J.S. could terminate their relationship with SGF, and SGF

would transfer her medical records and frozen eggs to another medical provider at no charge. *Id.* ¶ 39; Compl. ¶ 113.

After the conversation with Chris concluded, E.M. attempted to reach Osborn, but was not immediately successful. Compl. ¶¶ 122–23. Instead, later in the day on January 18, she received a call from Vicki Gerber, SGF's Regional Executive Director, who reiterated the same three options that Chris had presented earlier. *Id.* ¶¶ 124, 127; Mottla Decl. ¶ 41. E.M. responded that she believed these actions were retaliatory and discriminatory—a message she had conveyed on her call with Chris as well. Compl. ¶¶ 116, 131. Yet she nonetheless asked Gerber to "offer any clarification as to what was expected from either the contract" or the mental health visit required by Option Two. *Id.* ¶ 132. Gerber said that she did not have any answers to that question but indicated before the call ended that she would reach out to someone who did. *Id.*

According to SGF, it decided to terminate its relationship with E.M. after this phone call with Gerber. Mottla Decl. ¶¶ 41–42. Because E.M. remained unwilling to choose between Options One and Two, SGF says that it was left with Option Three as a "default." *Id.* ¶ 42. According to SGF, this decision, which was made by Assistant Medical Director Dr. Gilbert Mottla, "had nothing to do with E.M.'s marital status, source of income, or family obligations," and it "was not made to retaliate against her" for "voicing her complaints." *Id.* Rather, in Mottla's words "it had become clear" that E.M. was unwilling "to accept [SGF's] standards of care, best advice, and established practice protocols." *Id.* As Mottla saw it, "E.M. wanted [SGF] to modify its policies and procedures to suit her specific and changing situation"—"to be treated differently" than any other patient. *Id.* By questioning SGF's "commitment to her best care and [its] support in helping her achieve pregnancy and delivery," E.M. had shown that she did not

7

"trust" the judgment of SGF's medical providers, which necessitated her dismissal as a patient. *Id.*

E.M. was not informed of this decision until the following Monday—January 21—on a phone call with Osborn that E.M. surreptitiously recorded. Osborn began the call by sharing the determination that Mottla had purportedly made at the end of the preceding week: the "consensus" among SGF staff, Osborn said, was that E.M. had "lost trust" in SGF "as a practice," which "compromise[d]" SGF's ability to care for her and required Osborn "to ask" E.M. to move her care to another practice. E.M. Suppl. Decl. Ex. 48 at 2–3, ECF No. 22-49. E.M. unsurprisingly objected, saying that her questions "had nothing to do with the medical care or . . . advice" that she had received. *Id.* at 3. As the call went on, SGF's explanation appeared to shift. Osborn, who, again, did not know she was being recorded, said that E.M. had "accused [SGF] of discriminating against" her and that SGF "would not treat any couple in the same situation." *Id.* at 8. She later added that E.M.'s dismissal was the "culmination of all the . . . questioning and the accusations," which apparently dated back to E.M.'s IVF cycles, when E.M. had questions related to egg retrieval and lab procedures. *Id.* at 36. Thus, E.M.'s latest round of questions was "just . . . the last straw." *Id.* Osborn said that SGF would pay for E.M.'s eggs to be transferred to another fertility center, but it would not, under any circumstances, resume treatment. *Id.* at 30.

Following the call with Osborn, E.M. made attempts to contact both SGF's general counsel and its CEO and to schedule an appointment with a different SGF physician, but she did not receive any communications from SGF until late February, when she received two different letters from Gerber confirming her dismissal as a patient. *See* Compl. ¶¶ 151–52, 155; Pl.'s Mot. Prelim. Inj., Exs. 4–5, ECF No. 5 at 56–63. These letters reiterated that the doctor-patient

relationship had been "irreversibly compromised" because E.M. had "stated in conversations with [SGF] staff" that she "ha[d] lost trust in SGF and [was] unhappy with [its] protocols and decisions." Pl.'s Mot. Prelim. Inj., Ex. 5 at 62. And the letters maintained that the decision had been "consistent with SGF's long-standing policies and procedures . . . developed and implemented to ensure that [SGF's] patients receive the best clinical care while meeting the various regulatory and ethical standards that govern fertility practices." *Id.*, Ex. 4 at 57.

At what she believed to be a dead end, E.M. initiated this lawsuit in early March and filed the present motion for preliminary injunction on the same day. The complaint asserts claims under the DCHRA and the D.C. Consumer Protection Procedures Act, as well as common law contract and tort claims. *See* Compl. ¶¶ 177–277. The motion for preliminary injunction, however, focuses primarily on the DCHRA and contract claims. In the motion, E.M. argues that SGF's decision to discontinue E.M.'s treatment and dismiss her from the practice leaves her suffering ongoing, irreparable harm because it jeopardizes E.M.'s last, "best hope at having her own kids." Pl.'s Mot. Prelim. Inj. at 1, ECF No. 5. Transferring to another practice is not an adequate alternative, E.M. says, because moving her frozen eggs would risk their viability and because no other practice has "lab quality, experience, and expertise" comparable to SGF's. *Id.* at 18.

In opposing E.M.'s motion, SGF disputes that E.M. is suffering any cognizable irreparable harm; it claims that transporting frozen eggs to another facility is a routine, low-risk process and that there are multiple other suitable facilities available to continue E.M.'s treatments. Def.'s Opp'n at 42, ECF No. 14. But before even getting to the issue of harm, SGF contends that E.M. is unlikely to succeed on the merits. It maintains that it had legitimate nondiscriminatory and nonretaliatory reasons for developing the policies at issue and dismissing

9

E.M. as a patient. *Id.* at 29. E.M., SGF alleges, proved "a challenging patient" over the years: she refused to take recommended medications, accused physicians of not providing adequate care, and questioned the established processes and procedures that all patients are required to follow. *Id.* at 12. Given this history, SGF says that it dismissed E.M. in early 2019, not to discriminate or retaliate, but because her demands for exemptions from generally applicable policies had left the "the physician-patient relationship . . . irreparably damaged." *Id.* at 30.

### III. ANALYSIS

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'" *John Doe. Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). The movant has the burden of establishing that "four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). Courts used to weigh these factors on a "sliding-scale"—an approach under which "a strong showing on one factor could make up for a weaker showing on another." *Id.* at 7 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). But use of a sliding scale has been called into question following the Supreme Court's decision in *Winter*, which the D.C. Circuit "has suggested . . . should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26, (D.D.C. 2016) (citing *Sherley*, 644 F.3d at 392–93); *Davis v.*

10

*Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)). Even if the movant can make those independent showings, relief does not issue automatically either. Rather, as the third and fourth factors likely suggest, a preliminary injunction is an equitable remedy that is committed to the court's "sound discretion." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). It is "never awarded as of right." *Id.*

In this case, the Court concludes that the issuance of a preliminary injunction would not be an appropriate exercise of its discretion. Even assuming, for the sake of argument, that E.M. has demonstrated a strong likelihood of success on the merits, the other three factors do not tilt meaningfully in favor of an injunction. For one, as explained below, E.M.'s claim of irreparable harm ultimately hinges on whether it is unsafe to move her frozen eggs to another lab, and she has not made a sufficiently concrete showing in that regard. But also, under the specific circumstances present here, the Court is unconvinced that a preliminary injunction accords with the balance of the equities or the public interest, as the observable hostility between the parties makes E.M.'s reinstatement as a patient impractical, at least while discovery is ongoing and this case is proceeding to trial. Thus, although the Court appreciates the gravity of E.M.'s allegations, it declines to issue a preliminary injunction while withholding judgment on whether E.M. is likely to succeed on the merits.

### A. Irreparable Harm

The Court begins its analysis with irreparable harm, a concept that admittedly "does not readily lend itself to definition." *Ramirez v. U.S. Immigration & Customs Enf't*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018) (quoting *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007)). The D.C. Circuit has, however, articulated "several well known and indisputable principles to guide" courts' analyses. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674

(D.C. Cir. 1985). "First, the injury must be both certain and great." *Id.* Second, the injury must be "so 'imminen[t] that there is clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters*, 838 F.3d at 8 (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "And, finally, the injury must be 'beyond remediation.'" *Ramirez*, 310 F. Supp. 3d at 31 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

E.M.'s claim of irreparable harm here is multi-faceted. The core of her argument is the notion that delayed treatment constitutes irreparable harm: the older she gets, the less likely she will be medically capable of carrying a fetus to term without serious medical risk. But whether this injury is "beyond remediation" is dependent on two other contentions that E.M. makes: (1) that transporting her frozen eggs to another medical provider risks compromising the eggs' viability, Pl.'s Reply at 18–20, ECF No. 20; and (2) that SGF is far superior to its "second-rate" competitors and gives E.M. the "the best chance" of successfully having her own child, *id.* at 20.[2]

---

[2] E.M. also argues that "discrimination itself constitutes irreparable harm." Pl.'s Reply at 21. The case she principally cites for this proposition, however—*Singh v. Carter*, 168 F. Supp. 3d 216, 233 (D.D.C. 2016)—involved a plaintiff who, absent an injunction, was to be subject to discriminatory conduct in the near future. Indeed, the plaintiff there, an Army officer, was scheduled to undergo "three days of helmet and gas mask testing simply because of his request for a religious accommodation," which the court concluded constituted irreparable harm that could be prevented through issuance of a preliminary injunction. *Id.* By contrast, here there is no future discriminatory conduct to be prevented—making this case more analogous to the typical employment discrimination case. And in that context, discrimination is not treated as per se irreparable. Rather, plaintiffs claiming wrongful termination usually must demonstrate the existence of some additional ongoing, irreparable injury to be entitled to reinstatement in the form of a preliminary injunction. *See, e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998) (plaintiff alleging sex discrimination and retaliatory discharge not entitled to preliminary injunction because loss of income could be redressed by damages, and reputational harm could be "palliated by a favorable decision at the end of the case as effectively as by interlocutory relief—which although it comes sooner, is tentative and therefore does less to rehabilitate a reputation"); *Holt v. Continental Grp., Inc.*, 708 F.2d 87, 91 (2d Cir. 1983) ("We

The Court can reject the second of these contentions rather quickly. According to SGF's Director of Laboratory Services, James Graham, SGF's thawing procedures are not considered proprietary, and other clinics in the D.C. area employ "the same or a very similar process" using "the same commercially available kit that [SGF] uses." Decl. of James Graham ¶ 19, ECF No. 14-3. Graham has specifically named four of those clinics and says that there are seven others within a fifty-mile radius.

The evidence that E.M. submits in response to these assertions is not sufficient. She has identified various representations made by SGF personnel that tout SGF's abilities, but these statements do not address whether other labs are similarly capable. *See* E.M. Suppl. Decl. ¶¶ 38–39. She has also pulled information from websites that emphasize the importance of lab quality and personnel, but these sources speak in inexact terms—one even emphasizes labs' "secret sauce" as a "key element" of success—and they do not speak to E.M.'s particular circumstances. *See id.* ¶¶ 40–42. The sole evidence that does address those circumstances is a Clinical Summary Report by the Society for Assisted Reproductive Technology ("SART") that allows "patients to view national and individual clinic IVF success rates." E.M. Suppl. Decl., Ex. 51 at 2, ECF No. 22-52. But that Report states on the first page that the "data presented . . . should not be used for comparing clinics." *Id.* Thus, E.M. has not provided any reliable, concrete evidence suggesting that the other clinics in this area would be medically inferior to SGF. The Court understands that compiling such evidence in a case like this one might be particularly difficult, but the irreparable harm requirement for this kind of immediate relief is a "high standard,"

---

do not . . . accept the . . . suggestion that there is irreparable injury sufficient to warrant a preliminary injunction in every retaliation case."); *cf. Sampson v. Murray*, 415 U.S. 61, 89–92 (1974) (holding, in case where plaintiff alleged termination in violation of procedural protections provided by statute, that temporary loss of income, reputational harm, and difficulty finding new position were not irreparable for purposes of preliminary injunction).

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, and speculative injuries are not enough, *see, e.g.*, *Henke v. Dep't of the Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (citing *Wis. Gas*, 758 F.2d at 674). On the evidence here, E.M. has, at best, shown the "mere possibility" that SGF is medically superior to its competitors. *Brown v. District of Columbia*, 888 F. Supp. 2d 28, 31 (D.D.C. 2012) (citing *Winter*, 555 U.S. at 22). The law requires more.

E.M.'s other contention—that moving her frozen eggs to another lab could compromise the eggs' viability—gives the Court more pause, but E.M. ultimately fares no better. E.M.'s best evidence on this issue are two scientific studies. The first, from 2011, was published by the American Society for Reproductive Medicine and examined eighty frozen eggs. *See* E.M. Suppl. Decl., Ex. 8, ECF No. 22-9.[3] Thirty of those eggs were shipped to a long-term storage facility for forty-eight hours and then returned to the lab for thawing. *Id.* The other fifty were not shipped. The study found that ninety-six percent of the non-shipped eggs survived thaw, but that only 73.3 percent of the thirty shipped eggs survived—the result, the study hypothesized, of the shipped eggs being exposed briefly to air during the shipping process. *Id.*

The second study, from 2017, was published by the Reproductive Medicine Unit of GynePro Medical Centers in Bologna, Italy. E.M. Suppl. Decl., Ex. 9, ECF No. 22-10. It examined over 1,200 frozen eggs—all but twenty-four of which were shipped from two different egg banks in Spain to GynePro's bank in Italy, where they were eventually thawed. *Id.* at 6. Those other twenty-four were donated, frozen, and thawed at the GynePro bank without ever being shipped. *Id.* at 5–6. According to E.M., the study concluded that 87.5 percent of the non-

---

[3] For purposes of precision, this study actually looked at 171 eggs, but only eighty of them had been frozen through vitrification, as opposed to a slow freezing process. *See* E.M. Suppl. Decl., Ex. 8 at 3. In support of her motion, E.M. focuses on the study's eighty vitrified eggs, because her own eggs were frozen through vitrification. *See* E.M. Suppl. Decl. ¶¶ 23–24.

14

shipped eggs survived after thawing, compared to a 64.7 percent survival rate for the shipped eggs. E.M. Suppl. Decl. ¶ 25. But this interpretation of the study is a little off. In fact, the 64.7 percent survival rate applied to the eggs shipped from one of the two banks in Spain; the other bank had a survival rate of 81.1 percent—much closer to the 87.5 rate applicable to the eggs that were never shipped. E.M. Suppl. Decl., Ex. 9 at 6. Taking the two Spain banks together, 74.6 percent of the shipped eggs survived. *See id.*

SGF responds to these studies through submission of a declaration from Zsolt Peter Nagy, the Scientific and Laboratory Director of Reproductive Biology Associates in Atlanta, who purports to "have personal knowledge of thousands of shipments of cryopreserved" eggs. Decl. of Zsolt Peter Nagy ¶¶ 3, 9, ECF No. 25-9. "Transportation of frozen [eggs]," Nagy says, "does not cause them to degrade if done properly." *Id.* ¶ 10. And having reviewed E.M.'s studies, he concludes that it is questionable whether either of them used the correct procedures. *Id.* ¶¶ 12–13. Indeed, Nagy states that one of his clinics "transports and receives cryopreserved [eggs] to and from different facilities across the country approximately 5 to 6 times a week." *Id.* ¶ 8. This assertion is echoed by James Graham, SGF's Director of Laboratory Services, who says that SGF transports frozen eggs to different facilities around thirty times a month, both locally and across the United States and Canada. Graham Decl. ¶ 15. Shipment is, in Graham's words, "a routine . . . occurrence." *Id.* ¶ 16.

The Court sees value in both parties' evidence on this issue, but it finds none of it conclusive. Although the Court credits Graham and Nagy as experts in this field, neither of their declarations are particularly thorough. E.M.'s studies, meanwhile, raise concerns about potential harm, but the Court finds neither of them definitive. The first study from 2011 involved only thirty shipped eggs, which were compared to fifty that were not shipped. *See* E.M. Suppl. Decl.,

Ex. 8. The second study from 2017 involved an even greater sample disparity in the opposite direction: over one thousand eggs were shipped compared to a mere twenty-four that were not shipped. E.M. Suppl. Decl., Ex. 9 at 6. That second study also involved a host of shipment methods that varied by temperature and type of courier. *Id.* at 5. And perhaps most significantly, the results of that second study showed that one group of shipped eggs—the eggs from the second egg bank in Spain—had a survival rate that was similar to the eggs that were not shipped: 81.4 percent compared to 87.5 percent. *Id.* at 6. If one focuses on that second bank—a sample size of over seven hundred eggs—the study is not nearly as damning as E.M. suggests, and it might even support SGF's view.

Taking all of this into account, the Court ultimately lands here: were this case to go to trial, the jury would likely be presented with comprehensive expert testimony from both sides, which the jury would be tasked with weighing. But at this juncture, the Court has nowhere near that wealth of information before it, and E.M.'s burden at this preliminary stage is higher than it would be at trial. She must make a "clear showing," *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Cobell v. Norton*, 391 F.2d 251, 258 (D.C. Cir. 2004)), that her asserted injury is "certain" and not merely "theoretical," *id.* (quoting *Wis. Gas*, 758 F.2d at 674). She has not made such a showing. Without more, E.M. has failed to establish that delaying her fertility treatments is "beyond remediation," as SGF has offered to facilitate the transfer of her frozen eggs to another medical provider. *Id.* A preliminary injunction is thus unwarranted.

### B. Balance of the Equities and Accord with Public Interest

In addition to E.M.'s problems with establishing irreparable harm, there is another reason why a preliminary injunction is inappropriate. As the Court noted above, "the decision whether to grant a preliminary injunction is a matter of discretion, not a question of right," *Sherley*, 644

16

F.3d at 398, and requires the Court to balance the equities and account for the interest of the public, *e.g.*, *Pursuing Am.'s Greatness*, 831 F.3d at 511.  The equities and the public interest are of particular importance in a case like this one, where the plaintiff seeks injunctive relief in the form of reinstatement.  Indeed, the D.C. Court of Appeals has recognized that reinstatement "is not the exclusive remedy" in DCHRA employment cases, "because it is not always feasible." *Howard Univ. v. Wilkins*, 22 A.3d 774, 787 (D.C. 2011) (quoting *Feldman v. Phila. Hous. Auth.*, 43 F.3d 823, 831 (3d Cir. 1994)).  "Whether reinstatement is . . . appropriate may be determined only after careful consideration of the circumstances of a particular case," including the "environment in which [the parties'] relationship is situated."  *Webb v. District of Columbia*, 146 F.3d 964, 976 (D.C. Cir. 1998)).  "Courts have, for example, deemed reinstatement to be inappropriate when there is 'evidence of extreme animosity' between the plaintiff and the defendant."  *Id.* at 976–77 (quoting *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 730 (8th Cir. 1992)).

Here, the Court takes no position on whether reinstatement might be appropriate at the conclusion of the case, but the current animosity between the parties is apparent, and the Court thinks that compelling them to maintain a doctor-patient relationship while the litigation is ongoing could undermine the just and efficient resolution of the underlying issues.  The Court might feel differently if only SGF appeared to be responsible for the hostility, but in preparing and pursuing this litigation, E.M. has taken actions that have led SGF to justifiably distrust her.

One of those actions was already alluded to earlier: E.M., who is a practicing lawyer, surreptitiously recorded her January 21 phone call with Osborn and is now using that phone call as evidence against SGF.  Though D.C. law does not criminalize this kind of "one party consent" recording, *see* D.C. Code § 23-542(b)(3), it is easy to see how it could lead SGF to be suspicious

17

of E.M. in future interactions. And the ethical implications of such recording are not entirely clear. *Compare* D.C. Bar. Ethics Opinion 229 (1992) (declining to adopt "a per se rule with respect to tape recording" and stating instead that "applicable circumstances should be evaluated to determine whether the particular conduct constitutes dishonesty, fraud, deceit, or misrepresentation"), *with* ABA Comm. on Ethics and Prof'l Responsibility Formal Op. 01-422 (2001) (nonconsensual recording not a per se violation of the Model Rules of Professional Responsibility where permitted under the laws of the jurisdiction in which the recording takes place, but possibly a violation of Model Rules where prohibited by law of applicable jurisdiction, particularly if "purpose of the recording is to obtain evidence").

The second of E.M.'s actions has thus far gone unmentioned. Well after E.M. had filed her complaint and while her motion for preliminary injunction was still being briefed, E.M. became dissatisfied with the responses her attorney was receiving from SGF about its release form for transporting frozen eggs, so she made direct contact with an SGF staff member at an SGF office and succeeded in obtaining a version of the form herself. *See* E.M. Suppl. Decl. ¶¶ 31–32. At the hearing on the preliminary injunction motion, counsel for E.M. admitted that this contact was undertaken, at least in part, to gather evidence for this case. In speaking directly with this SGF staff member, E.M. may have violated Rule 4.2 of the D.C. Rules of Professional Conduct, which prohibits communications with a represented party about the subject of the representation without the party's prior consent. As a practicing attorney, E.M. either knew or should have known about this rule.

In light of these events, the Court concludes that reinstatement of E.M. as a patient is not "feasible" while this litigation is ongoing. *Howard Univ.*, 22 A.3d at 787 (quoting *Feldman*, 43 F.3d at 831). The Court worries that reinstatement could impair SGF's ability to mount a

vigorous defense to the allegations, which is of course SGF's right. *See Pursuing Am.'s Greatness*, 831 F.3d at 511 ("The balance of the equities weighs the harm to [the plaintiff] if there is no injunction against the harm to the [defendant] if there is."). And it worries that reinstatement could complicate the discovery process in a manner that leads to increased conflict between the parties and undermines the public interest in the fair and expeditious resolution of E.M.'s claims. The Court questions, moreover, whether a workable doctor-patient relationship could be maintained as a practical matter: SGF doctors and staff would need to be on guard for the possibility that any interaction with E.M. could be taped—or even worse, staged—for purposes of gathering evidence rather than advancing E.M.'s medical needs.

None of this should be read to preclude reinstatement as a form of preliminary relief in all circumstances, nor should it be read to discount the seriousness of E.M.'s allegations. Under the specific circumstances here, however, the Court thinks that the priority should be getting those allegations before a jury as quickly and efficiently as possible. Because E.M.'s reinstatement in the interim could impair that goal—and because E.M.'s asserted irreparable harm is overly speculative—the Court concludes that preliminary relief is inappropriate.

## IV. CONCLUSION

For the foregoing reasons, E.M.'s motion for preliminary injunction is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: May 7, 2019　　　　　　　　　　　　　　　　　　　　RUDOLPH CONTRERAS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge