**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| E.M., | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   19-657 (RC) |
| | : | |
| v. | : | Re Document Nos.:   15, 48, 50, 51 |
| | : | |
| SHADY GROVE REPRODUCTIVE | : | |
| SCIENCE CENTER P.C.,[1] | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**DENYING AS MOOT DEFENDANT'S MOTION TO DISMISS;**
**DENYING DEFENDANT'S MOTION IN LIMINE;**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT;**
**DENYING**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I. INTRODUCTION**

Plaintiff E.M. filed this action, bringing a number of claims against her longtime fertility

center, Shady Grove Fertility ("SGF") after she was dismissed as a patient in early 2019.  E.M.

claims that her dismissal violated the D.C. Human Rights Act ("DCHRA") because it was

discriminatory and retaliatory, and that in dismissing her SGF breached their contractual or

quasi-contractual agreements and committed several other torts.  She also alleges that SGF has

violated a D.C. consumer protection statute.

SGF responded by filing a motion to dismiss E.M.'s complaint in its entirety for failure to

state a claim.  Since then, the parties have conducted considerable discovery, SGF has filed a

---

[1] The named Defendant is Shady Grove Reproductive Science Center P.C., a Maryland professional corporation that is registered as a foreign corporation with the Corporations Division of the D.C. Department of Consumer and Regulatory Affairs.  *See* Compl. ¶ 2, ECF No. 2.  Defendant typically refers to itself, however, as "Shady Grove Fertility Center," "Shady Grove Fertility," or simply "SGF" for short.  *See id.*  The Court uses the abbreviation, which is the practice that the parties tend to follow as well.

motion for summary judgment, and E.M. has filed a motion for partial summary judgment.  SGF also filed a motion in limine.  Here the Court addresses all four motions and, in so doing, pares down this case considerably for trial.  The motion to dismiss is denied as moot and the motion in limine is denied.

A number of factual disputes remain to be considered at trial, but with the benefit of the parties' discovery and summary judgment briefing, the Court can take several theories of liability off the table at this stage.  SGF is entitled to summary judgment on certain theories of DCHRA liability, on contract and quasi-contract claims relating to E.M.'s egg-freezing procedures, and on all E.M.'s fraud-related claims.  On E.M.'s claims under a D.C. consumer protection statute, on her unjust enrichment claims, and on her claim for intentional infliction of emotional distress, SGF is entitled to partial summary judgment narrowing down the scope of the claims for trial.  Aspects of those three claims may go to trial, along with E.M.'s claims for source of income discrimination and retaliation under the DCHRA and her contract and quasi-contract claims relating to SGF's Patient Bill of Rights. Accordingly, SGF's motion for summary judgment is granted in part and denied in part, while E.M.'s motion for partial summary judgment is denied.

## II.  BACKGROUND

In 2012, at the age of thirty-nine, E.M. began looking for a fertility clinic that offered an egg freezing program, under which several of her eggs would be surgically removed and cryopreserved for future use in fertility treatments.  Pl.'s Statement of Undisputed Material Facts ¶¶ 1–2 ("Pl.'s SMF"), ECF 53.  During the search, she was drawn to SGF, a "medical practice specializing in the field of Assisted Reproductive Technology," Def.'s Statement of Undisputed Material Facts ¶ 1 ("Def.'s SMF"), ECF 50-1, which on its website and in other marketing materials claimed to have unparalleled experience in the field and highly skilled embryologists.

Pl.'s SMF ¶ 135.  E.M. ultimately decided to enroll as a patient that year, but, as is typically the case with these kinds of arrangements, she had to complete a fair amount of paperwork before she could undergo treatment.  *See* Def.'s SMF ¶¶ 4, 7, 9, 18, 22.  Among the forms she was provided was a "Patient Bill of Rights and Patient Responsibility Statement," ("PBOR") which, she says, "contained the material terms that SGF wanted to govern all interactions," and which, as E.M. saw it, "imposed obligations on each party."  Compl. ¶ 28; *see also* Def.'s SMF ¶ 22; Ex. 20 ("PBOR"), ECF No. 50-22.[2]  Among other things, the PBOR stated that E.M. would provide accurate and complete information about matters relating to her health and would fulfill the financial obligations of her treatment promptly.  *See* PBOR at 1.  Meanwhile, it stated that she would have, among other benefits, "the opportunity to participate in decisions involving [her] healthcare," to "expect reasonable continuity of care," and the ability to "voice a complaint or grievance. . . without fear of discrimination or reprisal."  *Id.*

Before beginning treatment, E.M. was also given an eleven-page form titled "Consent for Oocyte (Egg) Retrieval, Cryopreservation and Storage," which provided an overview of the egg freezing program, took note of the program's risks, and outlined different options for egg disposal.  Def.'s SMF Ex. 19 ("Egg Retrieval Consent"), ECF No. 50-21.  The consent form further stated, in two different places, that SGF could choose "not to participate in the later thawing, fertilization, or transfer" of E.M.'s eggs "at its sole discretion."  *Id.* at 8; *see also id.* at 9.  These disclaimers were notable because they arguably conflicted with SGF's prior assurances in their various marketing materials that E.M. could return to use her frozen eggs whenever she

---

[2] E.M. disputes that the version of the PBOR attached as an exhibit to Defendant's statement of material facts is the same version she received in 2012 (because it is dated 2016), but she agrees that the version she received was substantively identical.  Pl.'s Stmt. of Genuine Issues of Material Fact in Resp. to Def.'s SMF ¶ 22.1 ("Pl.'s Resp. SMF"), ECF No. 67.

was ready.  *See* Pl.'s SMF ¶¶ 136–38.  But the consent form's terms were non-negotiable, so E.M. signed it—along with all the other forms that SGF required—and in October 2012, she completed one egg freezing cycle, which produced six cryopreserved eggs.  Def.'s SMF ¶ 20; *see also* Egg Retrieval Consent at 6–7, 10.  E.M. paid roughly $7,500 for treatments and medications associated with that cycle, which included "approximately 20 medical procedures . . . clinical consults, and the first year of storage of her frozen eggs."  Pl.'s Resp. SMF ¶ 20.1. With those six eggs in storage, E.M. then spent the next few years trying to become pregnant through other means.  *See* Pl.'s SMF ¶ 12.  Her partner for these efforts was her "best friend," J.S.  Compl. ¶ 35.  E.M. and J.S. "are not married" and "do not share a household" but they "have maintained a long-term personal and sexually intimate relationship" for roughly a decade, and have been trying to have a child together since 2014.  Pl.'s SMF ¶¶ 5–8.  Between 2015 and 2018, they conceived naturally twice, but sadly neither pregnancy proceeded to viability.  *Id.* ¶ 13.  In the years in between those pregnancies, E.M. and J.S. together underwent multiple cycles of intra-uterine insemination ("IUI") and in vitro fertilization ("IVF") treatments at SGF.  Def.'s SMF ¶ 30; Pl.'s SMF ¶¶ 3, 12.  Though J.S. was "regularly and integrally involved" in the treatments, and often served as the point of contact with SGF, E.M. paid for all of her treatments herself—bills that eventually totaled around $48,936 in treatment costs, Pl.'s Resp. SMF ¶ 37.2, and another $33,402 for medications.[3]  Def.'s SMF ¶ 37.  Unfortunately, the treatments were not successful.  Pl.'s SMF ¶ 12.

---

[3] SFG disputes that EM "independently pa[id] for all of the expenses related to her fertility treatments," citing JS's testimony that "once or twice" he paid a "few hundred dollars here and there" for related fertility medications for EM.  Def.'s Stmt. of Disputed Facts in Resp. to Pl.'s SMF ("Def.'s Resp. SMF") ¶ 10, ECF 65.

By early 2019, E.M. was ready to try to become pregnant with the eggs she had frozen in 2012. *Id.* ¶ 39; Def's SMF ¶ 45.  She returned to SGF for an appointment on January 15, during which she raised a few outstanding questions.  *See* Def.'s SMF ¶ 46.  Some of these questions were clinical in nature: E.M. sought the advice of her longtime doctor at SGF, Barbara Osborn, regarding what medications she should take during the egg thaw process, and if Osborn recommended the use of the "assisted hatching" medical technique.  Pl.'s SMF ¶¶ 29, 32.  E.M. raised these issues with her SGF nurse contact, Robin Peterson, but Peterson did not have immediate answers.  *See* Pl.'s SMF ¶ 29.

E.M. had additional questions related to finances.  She had long been aware of a "Shared Help Program" that SGF offered to patients whose household income was below a certain threshold and who met other criteria.  Pl.'s SMF ¶ 48.  Years earlier, E.M. had inquired about the program, but Osborn had told her that she was not eligible, because SGF's policy was to include J.S. and his income as part of E.M.'s household for purposes of calculating household income. *See* Def.'s SMF ¶¶ 49.  E.M. had not previously challenged this determination, but as she began this new treatment stage she sought to have her potential eligibility reevaluated, given that her income taken alone "would qualify for [the] discounts" and she believed it was inappropriate to consider J.S.'s income as they "[were] not a financial unit."  *Id.* ¶ 49.

E.M.'s final category of questions related to a new consent form that she had been provided.  As E.M. understood it, this "Consent to Thaw" form would not allow her to thaw any of her frozen eggs without J.S.'s authorization, and it required J.S. to consent to procedures that involved only her body—such as the monitoring by SGF of E.M.'s endometrium lining in her uterus.  Pl.'s SMF ¶¶ 51, 54.  E.M. had no issue with J.S. "signing any consent items related to using his sperm to inseminate the eggs" or "making decisions regarding fertilized eggs and

embryos," but she wanted to be the sole "individual responsible for making all decisions regarding treatment involving her body and decisions about how many eggs to thaw during a cycle." Compl. ¶¶ 69, 74.

In the days that followed her January 15 appointment, E.M. tried to discuss these questions with various SGF employees. On a phone call with Peterson on January 17, she learned that the Consent to Thaw form had called for J.S.'s signatures because SGF had classified him as E.M.'s "partner," which meant that he was included within E.M.'s household for purposes of the discount program and was expected to consent to all of E.M.'s egg thawing and related procedures. Def.'s SMF ¶ 53. Peterson stated that if E.M. was in a single household and wanted to maintain sole financial responsibility and sole ownership of her eggs, SGF would have to treat J.S. as a "known sperm donor" rather than a "partner." *Id.* ¶ 56.

That decision would come with consequences, though. As Peterson explained, treating J.S. as a sperm donor would require him to go to a sperm bank and to have his sperm frozen and quarantined for six months so that it could be tested for infectious diseases. *Id.*; Pl.'s SMF ¶ 76. According to SGF, this policy was mandated by FDA regulations, but in reality, those regulations generally exempt donors who are sexually intimate with the female recipient. Pl.'s SMF ¶ 77. Thus, applying the regulations to J.S. and E.M. made SGF's policy more stringent. E.M. did not find this sperm donor option appealing. At her age, she felt that she could not afford to wait six months. Compl. ¶ 86. And as she understood things, using a sperm bank would mean incurring thousands of dollars in additional costs, and the thawed sperm would be medically inferior to fresh sperm. *Id.* ¶¶ 85, 87.

The issue remained unresolved on the morning of January 18, when E.M. received a call from Osborn. During that call, Osborn said that if E.M. wanted J.S. treated as her partner, SGF

could offer her a temporary courtesy discount on one egg thaw cycle, but that she would be ineligible for the Shared Help Program, as J.S. would be required to sign paperwork as a member of her household and share financial responsibility for any treatments.  Def.'s SMF ¶¶ 58.1, 61.1; Pl.'s SMF ¶ 88.  E.M. declined the offer, stating that she felt she was being discriminated against based on SGF's definition of "household", and instead asked to speak with someone in SGF's legal department to confirm that J.S. had to be included in her household if he was designated as her partner.  Pl.'s SMF ¶ 88, see Pl.'s Resp. SMF Ex. 3 ("Osborn Dep.") at 151:3-16, ECF 67-3.

Later in the afternoon on January 18, E.M. spoke on the phone with Sarah Crisp, an office supervisor at SGF.  Def.'s SMF ¶ 50; Pl.'s SMF ¶ 92.  Crisp said that SGF would provide E.M. three options for "moving forward."  Pl.'s SMF ¶ 92 (citing Pl.'s SMF Ex. 13 ("SGF E-Mail Chain") at 6, ECF No. 53-14).  Under the "Partner Option," E.M. could use J.S. as a sperm partner and SGF would still apply the 20% discount for one cycle, but only if the two of them complied with certain conditions, including SGF's partner policies along with two new requirements.  *Id.*; Def's SMF ¶ 61.  First, J.S. would need to sign the Egg Thaw Consent form as it was drafted.  *Id.* ¶¶ 61, 53.  Second, J.S. would be required to agree to assume joint financial responsibility over E.M.'s treatment.  *Id.* ¶ 53.  Third, because SGF now considered E.M.'s relationship with J.S to be a "different situation" with "great potential for miscommunication and misunderstanding," they could not receive any treatment until they met with a social worker. Pl.'s SMF ¶ 89 (citing SGF E-Mail Chain at 7).  And fourth, for the same reasons, E.M. and J.S. could not receive treatment until they had a "legal contract between themselves outlining their agreement concerning their respective roles in the fertility treatment and with respect to the child they were creating."  Def.'s SMF ¶ 61.

If E.M. and J.S. did not comply with those conditions—there was the "Donor Option." SGF E-Mail Chain at 6.  E.M. could use J.S. as a sperm donor, but only if she followed all of SGF's policies regarding sperm donors: the sperm freeze, the infectious disease testing, and the waiting period.  *Id.*  In addition, the social worker consultation and reproductive agreement requirements would also be imposed under this option.  Pl.'s SMF ¶ 92. Then finally, as Option Three, Crisp told E.M. and J.S. that if they did not like either of the other two options, SGF would "[t]ransition her care to another practice" and "transfer her oocytes to a different facility." *Id.*

Later in the day on January 18, E.M. received a call from Vicki Gerber, SGF's regional manager.  E.M. alleges that Gerber's tone was "aggressive," and she said that "she was 'very happy' to present" E.M. the option of leaving the practice, a statement Gerber denies making. Compl. ¶ 127; Def.'s SMF ¶ 68.  As memorialized by Gerber in an email sent shortly after the call, E.M. told Gerber that she believed SGF to be "discriminating against her because she does not have a cookie cutter relationship" and "because she asked 1 simple question about household" she was being retaliated against and "forced into additional processes and costs." Pl.'s SMF ¶ 97 (quoting SGF E-mail Chain at 5).

Later that same evening, in response to Gerber's email summarizing her call with E.M., SGF board member Dr. Gilbert Mottla emailed the relevant SGF personnel involved in this matter.  He noted that it "[s]ounds like we are at an impasse" with E.M. and "[t]here is clearly lost trust in the patient physician relationship" given that "[s]he won't accept our standards of care, best advice, and established practice protocols."  SGF E-mail Chain at 4–5.  He then directed Osborn to cancel E.M.'s thaw cycle and for SGF to move forward with dismissing E.M.

from their practice "in accordance with the usual protocol" due to "the above compromise in the patient-physician relationship and the lack of trust in the Practice." *Id.*

E.M. would not again speak to someone from SGF until the following Monday, January 21, when she spoke on the phone with Osborn. *See* Def.'s SMF ¶ 70; Pl.'s SMF ¶ 109 (citing Pl.'s SMF Ex. 27 ("Osborn Call Tr."), ECF No. 53-27). Osborn began the call by telling E.M. that "we need to ask you to move on your care to another practice," Osborn Call Tr. at 2:21-3:1, explaining that "the consensus of the group. . . was that we cannot move forward with your care." *Id.* at 33:17-34:6.[4] Accordingly, E.M.'s thaw cycle was cancelled and SGF offered to provide her with alternative local treatment centers and pay to transfer her embryos. Osborn Call Tr. at 30:2–6.

Following Mottla's instructions, Gerber sent E.M. a letter of termination dated January 22, 2019. The letter was a single page in length, and did not substantively engage with E.M.'s concerns, stating only that SGF had terminated their relationship because E.M. had been "unhappy with [SGF's] protocols and decisions" and was "unwilling to follow [its] practice decisions" resulting in a "irreversibl[e] compromise" of the doctor-patient relationship. Pl.'s SMF Ex. 24 ("E.M. Termination Letter"), at 1, ECF 53-24.

E.M. alleges that she did not receive this termination letter for quite some time. Following her call with Osborn, the Complaint states she made attempts to contact both SGF's general counsel and its CEO and to schedule an appointment with a different SGF physician, but she did not hear anything from SGF until February 21, when she a received a letter by Federal

---

[4] E.M. and J.S. testified that they understood Osborn to only be terminating her relationship with E.M. as her doctor during this call, not their entire relationship with SGF. *See* Pl.'s Resp. SMF ¶ 70.1. This understanding is belied by the transcript of the call, though this factual dispute between the parties is addressed in more detail below, *see infra* Section IV.F.

Express dated February 15.  Compl. ¶¶ 151–56.  That letter confirmed that SGF had decided to dismiss E.M. and J.S. from its practice, consistent with it "long-standing policies and procedures."  *Id.* ¶ 156.  E.M. then received a second letter from SGF on March 1, presumably the same letter drafted by Gerber in January, which was dated January 22 but postmarked February 11.  *Id.* ¶ 157.

Following receipt of the termination letter, E.M. filed this lawsuit—seeking, among other things, money damages and her permanent reinstatement as an SGF patient.  As noted earlier, the complaint asserts eleven claims.  Count One is a claim of discrimination and retaliation under the DCHRA, and Count Two is a claim of unfair trade practices under the D.C. Consumer Protection Procedures Act ("CPPA").  Compl. ¶¶ 177–208.  Those statutory claims are followed by three breach of contract claims: Count Three focuses on what E.M. refers to as the "Egg Freezing Program," Count Four on the Patient Bill of Rights, and Count Five on the contractually implied covenant of good faith and fair dealing.  *Id.* ¶¶ 209–27.  Count Six is then a claim of unjust enrichment, and Count Seven is a claim of promissory estoppel.  *Id.* ¶¶ 228–37.  Next are three claims alleging fraud: a negligent misrepresentation claim (Count Eight), a fraudulent inducement claim (Count Nine), and a fraudulent misrepresentation claim (Count Ten).  *Id.* ¶¶ 238–61.  Lastly, Count Eleven is a claim of intentional infliction of emotional distress.  *See id.* ¶¶ 262–77.

Early in the proceedings, SGF moved to dismiss the Complaint in its entirety.  Def.'s Mot. to Dismiss Pl.'s Compl. ("MTD"), ECF No. 15.  Around the same time, E.M. sought a preliminary injunction, which this Court denied.  *See* Order, ECF No. 32.  Since then, considerable discovery has been conducted by both parties, all while the Motion to Dismiss remained pending.  Since then, SGF has moved for summary judgment on all of E.M.'s claims.

Def.'s Mot. for Summ. J. ("Def.'s MSJ"), ECF No. 50.  E.M. moved for partial summary judgment, only on the liability elements of certain of her claims.  Pl.'s Mot. for Partial Summ. J. ("Pl.'s MSJ"), ECF No. 51.[5]  In connection with its motion for summary judgment, SGF also filed a motion in limine seeking to exclude evidence relating to Osborn's January 21 phone call, which E.M. and J.S. secretly recorded.  Mot. in Limine, ECF No. 48.  All of these motions are now ripe for decision.

## III.  LEGAL STANDARDS

### A.  Motion to Dismiss

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement" that gives the defendant fair notice of the claim and the grounds upon which it rests.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard; it asks whether the plaintiff has properly stated a claim.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  To defeat such a motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This means that a plaintiff's factual

---

[5] SGF has challenged the filing of this motion as untimely because it was filed in the early morning hours of the day following the Court's deadline for filing such motions.  *See* Mem. P. & A. in Opp'n to Pl.'s MSJ ("Def.'s MSJ Opp'n") at 1, ECF No. 64.  E.M. has, of course, opposed this, and has offered to file a motion for leave which would rectify the late filing.  *See* Pl.'s Reply Supp. MSJ ("Pl.'s MSJ Reply") at 6 n.3, ECF No. 75.  SGF could not realistically have been prejudiced by the slightly late filing, as all of E.M.'s filings were submitted by 5:01 A.M.  E.M.'s counsel contacted chambers as this Court's local rules suggest is proper.  *See* LCvR 5.4(g).  While the Court cannot *sua sponte* extend the time for filing after the filing deadline has passed, *see* Fed. R. Civ. P. 6(b), the Court's local rules indicate that technical difficulties, which E.M.'s counsel represents he encountered, may constitute cause for an order enlarging time, LCvR 5(g)(3).  Given the lack of any realistic prejudice to SGF, the Court will construe E.M.'s offer to file a motion as itself a motion, which it will grant.  Accordingly, E.M.'s motion for summary judgment is deemed timely filed.

allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555.

## B.  Motion for Summary Judgment

Summary judgment is appropriate only where the summary judgment "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When, as in this case, both parties file cross-motions for summary judgment, each must carry its own burden under the applicable legal standard." *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006). "[T]he [C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law." *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). "[N]either party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *Hodes v. U.S. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013) (quoting *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989)). "If the Court determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the

movant's opponent." *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 245 (D.D.C. 2018). "It is nonetheless still possible for a court to deny summary judgment to both sides." *Id.*

The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In determining whether a genuine issue exists, a court must refrain from making credibility determinations or weighing the evidence; rather, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255; *see also Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). "In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute." *United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 19–20 (D.D.C. 2016) (citing Fed. R. Civ. P. 56(c)(1)).

Finally, this Court has supplemented Rule 56 with Local Civil Rule 7(h), pursuant to which a party filing a motion for summary judgment must include a statement of material facts as to which that party contends there is no genuine dispute. *See Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 63–64 (D.D.C. 2011). "The party opposing the motion must, in turn, submit

a statement enumerating all material facts which the party contends are genuinely disputed." *Id.*
at 63 (citing LCvR 7(h)(1)). This local rule "places the burden on the parties and their counsel,
who are most familiar with the litigation and the record, to crystallize for the district court the
material facts and relevant portions of the record." *Id.* at 63–64 (quoting *Jackson v. Finnegan,
Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996)). Accordingly,
"evidence laying dormant in the record is not enough, for the district court is not obliged to sift
through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its]
own analysis and determination of what may, or may not, be a genuine issue of material disputed
fact." *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009) (internal quotations
omitted).

## IV.  ANALYSIS

### A.  Preliminary Issues

#### 1.  Motion to Dismiss

SGF's Motion to Dismiss has been overtaken by events and will be denied as moot. SGF
moved for dismissal only under Rule 12(b)(6), arguing that E.M. failed to "plead[] factual
content that [would] allow[] a court to draw the reasonable inference that the defendant is liable
for the misconduct alleged." Stmt. of P. & A. in Supp. of MTD ("MTD Mem.") at 8, ECF No.
15-1 (quoting *Libre by Nexus v. BuzzFeed, Inc.*, 311 F. Supp. 3d 149, 153 (D.D.C. 2018)). The
Motion was filed before discovery took place. One of the primary questions that a court asks in
considering a motion to dismiss for failure to state a claim is whether the allegations can be the
basis for a "reasonably founded hope that the [discovery] process will reveal relevant evidence."
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007) (quoting *Dura Pharms., Inc. v. Broudo*,
544 U.S. 336, 347 (2005)) (alteration in original). At this point, with discovery completed, there

would be little value to such an undertaking.  The Court could scrutinize the viability of E.M.'s

claims based on the facts alleged in the Complaint, but the equally ripe Motion for Summary

Judgment raises arguments concerning the viability of the same claims with the benefit of the

facts that were actually developed in the course of discovery.  Even if the Court were to grant

any part of the motion to dismiss based on the Complaint's lack of sufficient factual allegations,

E.M. could seek leave to amend the Complaint to allege those facts that—by now—she knows

have been established through discovery.  Courts "should freely give leave [to amend] when

justice so requires," and if E.M. were pointing to evidence already proven through discovery, she

would likely have a strong case for amendment.  Fed. R. Civ. P. 15(a)(2).

The situation would be different if the Motion to Dismiss raised any issues or arguments

that do not have equivalents in the Motion for Summary Judgment.  Here, this is not the case.

The Motion to Dismiss focuses on the sufficiency of the facts alleged and the Motion for

Summary Judgment focuses on what facts remain disputed after discovery and whether a

reasonable juror could find in E.M.'s favor based on the undisputed facts.  It is therefore

appropriate to deny the Motion to Dismiss as moot and to simply evaluate the Motion for

Summary Judgment.  *See Montgomery v. Risen*, 197 F. Supp. 3d 219, 233 n.7 (D.D.C. 2016)

(treating a motion to dismiss as moot where it had remained pending throughout discovery and

where a motion for summary judgment "address[ing] issues identical to the outstanding issues

addressed in [the] motion to dismiss" was also ripe for decision); *Molina v. March*, No. 07-cv-

4296, 2009 WL 10692989, at *2 (S.D. Tex. Sept. 2, 2009) (denying a motion to dismiss as moot

where the defendant had "assert[ed] the same arguments in its subsequently-filed motion for

summary judgment").

## 2. Choice of Law and Extraterritoriality

In its Motion for Summary Judgment, SGF argues for the first time that Maryland law, not D.C. law, governs E.M.'s claims under the DCHRA and DC CPPA and her claim for breach of the covenant of good faith and fair dealing. (Counts One, Two, and Five). Def.'s Mem. P. & A. in Supp. of Def.'s MSJ ("Def.'s MSJ Mem.") at 3–8, ECF No. 50-2; *see also* Def.'s MSJ Opp'n at 1–2. E.M. argues that D.C. law should apply to all of her claims. Pl.'s Opp'n to Def.'s MSJ ("Pl.'s MSJ Opp'n") at 2–12, ECF No. 66.[6]

In a diversity case like this one, choice of law determinations are governed by "the choice-of-law rules of the forum state—here the District of Columbia." *In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014). Under D.C. rules, "the first step in a choice-of-law analysis is determining whether a true conflict exists between the laws of the [competing] jurisdictions—that is, whether more than one jurisdiction has a potential interest in having its law applied, and, if so, whether the law of the competing jurisdictions is different." *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 27 (D.D.C. 2019) (alteration in original) (internal quotation omitted) (quoting *In re APA*, 766 F.3d at 51–52). Only a "false conflict" exists "when either (1) the laws of the interested states are the same; (2) when those laws, though different, produce the same result when applied to the facts at issue; or (3) when the policies of one state would be advanced by the application of its law and the policies of the states whose laws are claimed to be in

_____

[6] This section of E.M.'s briefing does not directly address Count Five. Later in her briefing, however, E.M. makes clear that she opposes the application of Maryland law to Count Five as well, and references her earlier choice-of-law arguments. *See* Pl.'s MSJ Opp'n at 41 (referring to SGF's "flawed argument[] . . . that Maryland law should apply" to Count Five which E.M. says "fail[s] for the reasons discussed above"). Although this is far from a clear identification of which reasons the Plaintiff thinks are most relevant to why Count Five should be governed by D.C. law, it is enough of a response to SGF's arguments that the Court will not treat the issue as waived.

conflict would not be advanced by application of their law." *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995) (citing *Biscoe v. Arlington Cnty.*, 738 F.2d 1352, 1360 (D.C. Cir. 1984)).  When no true conflict exists, D.C. law applies by default.  *See, e.g.*, *Sharpe v. Am. Acad. of Actuaries*, 285 F. Supp. 3d 285, 288 (D.D.C. 2018); *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992).

If there is a conflict courts apply a "modified governmental interests analysis which seeks to identify the jurisdiction with the most significant relationship to the dispute." *Krukas*, 376 F. Supp. 3d at 27 (quoting *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 180 (D.C. 2006)); *see also Shaw v. Marriot Int'l, Inc.*, 605 F.3d 1039, 1045 (D.C. Cir. 2010) ("District of Columbia courts apply two tests to determine which jurisdiction's law should govern a dispute: a 'governmental interests analysis' and a 'most significant relationship' test.").  "Under this approach the Court must 'balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more substantial interest in the resolution of the issue.'" *Paavola v. United States*, -- F. Supp. 3d --, --, No. 19-cv-1608, 2020 WL 2064789, at *3 (D.D.C. April 29, 2020) (quoting *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987)).  Courts look to "the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its laws" while also considering (1) where the injury occurred, (2) where the conduct causing the injury occurred, (3) where the parties reside or are incorporated, and (4) where the parties' relationship is centered.  *Washkoviak*, 900 A.2d at 180 (quoting *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995)); *see also Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (listing the same factors). Where the relevant considerations do not "clearly favor either jurisdiction," courts apply "the law

of the forum state (D.C.) as a tie-breaker." *In re APA*, 766 F.3d at 51 (citing *Washkoviak*, 900 A.2d at 182); *see also id.* at 55.

The most common variety of choice of law analysis entails evaluating the substantive differences between rules for common law liability of two states that both allow for the same common law causes of action.  SGF's arguments on Counts One and Two are less frequently seen.  The Court will address Count Five first because only that count presents a standard choice of law issue dealing with a common law cause of action.

There is a true conflict of laws regarding Count Five because Maryland does not allow a separate claim based on the duty of good faith and fair dealing that forms the basis for Count Five.  *Faddis Concrete, Inc. v. Brawner Builders, Inc.*, No. ELH-15-3975, 2017 WL 4098739, at *9 (D. Md. Sept. 15, 2017).  Because both the District of Columbia and Maryland have at least some interest in having their law applied to Count Five, the Court must then consider the dispute's relationship to each jurisdiction, including the above-listed factors: "(1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (4) the place where the relationship is centered." *Jaffe*, 374 F.3d at 1227 (internal quotations omitted).

First, regarding the place where the injury occurred, SGF says the alleged injury occurred in Virginia or Maryland.  SGF argues that the egg thaw procedure would have occurred in Maryland if it took place, Def.'s MSJ Mem. at 7, but this is an unduly constrained way to think of the alleged injury.  Allegedly E.M. herself was injured, so the injury occurred in E.M.'s location, not in the location of a procedure she was unable to get.  The injury was the termination of a provider-patient relationship centered in the District, which also points to the District's law

as the applicable law.  SGF notes that E.M. was residing and physically located in Virginia when she learned that she had been terminated as a patient.  *Id.*  Her location at the moment she received the phone call is not particularly relevant, as the injury does not occur only in that moment.  Her temporary residence in Virginia is more relevant, but is less important than the fact that she was domiciled in D.C., as the Court explains below.  Regardless, her Virginia residence would not weigh in favor of *Maryland* law applying.  Because of the non-physical nature of the injuries at issue in this suit, this first consideration does not weigh heavily in any particular direction, but there is no reason to think it suggests Maryland law is appropriate.

Skipping the second factor for the time being, the third factor is the one over which there is the most dispute.  SGF argues that "neither party had a domicile, residence, place of incorporation, or principal place of business in the District of Columbia at the relevant times."  Def.'s MSJ Mem. at 5.  This being a diversity case, it is necessary and not determinative when it comes to choice of law that one party—SGF—is not a D.C. resident or citizen.  SGF does have two places of business in D.C., however, so it is hardly a stranger to the District, and is subject to the District's jurisdiction.[7]  *See* Pl.'s Resp. SMF Ex. 18, ECF No. 67-18 (SGF mailer advertising two "full service" offices in D.C.).

---

[7] At one point in her Statement of Genuine Issues of Material Fact, E.M. disputes in part SGF's assertion that it is "incorporated under the laws of and has its principal place of business in the State of Maryland" and argues that "record evidence establishes that SGF executives are based in D.C. and carry out their responsibilities in D.C."  Pl.'s Resp. SMF ¶ 1.2; *see also id.* ¶ 1.3–1.6.  If true, this could mean that SGF's principal place of business is in the District, which would in turn mean that SGF is a corporate citizen of the District and that this Court would lack jurisdiction because this would not qualify as a diversity case.  *See CostCommand, LLC v. WH Administrators, Inc.*, 820 F.3d 19, 21 (D.C. Cir. 2016) ("A corporation is a citizen of its place or places of incorporation, as well as its principal place of business.  28 U.S.C. § 1332(c)(1).  Under *Hertz* [*Corp v. Friend*, 599 U.S. 77 (2010)]*,* a corporation's principal place of business is its "nerve center," i.e., "the place where the corporation's high level officers direct, control, and coordinate the corporation's activities."  559 U.S. at 80–81.").

The dispute on this factor focuses mostly on E.M., who has not had a permanent address for two years and who acknowledges she was physically located in Virginia, at what she describes as a "corporate temporary accommodation" when she learned SGF had terminated her as a patient. *See* Pl.'s Resp. SMF ¶ 3.1–3.3. The parties dispute E.M.'s living situation in somewhat more detail than is necessary for the Court to resolve this factor. *See id.* ¶ 3.1–3.10. In short, her living situation appears to have been in flux over the past few years, a fact she attributes to not wanting to commit to a permanent residence and living situation (with J.S.) before knowing whether she would be able to become pregnant and have a child. *Id.* Ex. 4, E.M. Deposition Transcript ("E.M. Dep."), at 18:15–19:15, ECF No. 67-4.[8] It is undisputed, though, that while E.M. may not have resided in D.C. at all relevant times, she remained *domiciled* in D.C. as a legal matter. Her last permanent address was on ██████ in the District of Columbia, she continued to identify this as her "legal address" which appeared on her driver license even after not having lived there for some time. *Id.* at 9:3–13, 11:22–12:5. She listed a different D.C. address, on ██████, on her Complaint in this matter because she resided there "from time to time," more recently than she had lived on ██████. *Id.* at 24:7–25:5. And she did begin leasing at the ██████ address shortly before her deposition in July 2019. *Id.* at 7:21–8:5.

---

In all the parties' briefing this potential jurisdictional issue is only referenced, obliquely, at this one point. It is not clear to the Court that E.M. recognizes the implication that disputing this point means disputing SGF's citizenship and this Court's jurisdiction. Accordingly, the Court does not understand the parties to be meaningfully contesting this issue and will not address it. It appears to the Court that SGF's principal place of business is, in fact, Maryland. However, owing to its obligation to be certain of its jurisdiction, the Court would be obligated to consider a motion for reconsideration of this Opinion and accompanying Order based on this issue, should either party raise it.

[8] E.M. has filed full deposition transcripts while, in many instances, SGF has filed only excerpts. In the interest of consistency, the Court has converted all citations by SGF to its own exhibits into citations to E.M.'s corresponding exhibits whenever possible. The page numbers on the underlying documents are the same regardless.

(Though this was over a year ago now, it is the most recent information the Court has concerning her residence.)

E.M. remained domiciled in the District of Columbia at all relevant times even though she may not have resided there continuously. A person's domicile, for jurisdictional purposes, is determined by (1) their physical presence in a state, and (2) their intent to remain there indefinitely. *Prakash v. American Univ.*, 727 F.2d 1174, 1180 (D.C. Cir. 1984). "[C]ourts apply a presumption of continuing domicile, so that domicile in one place remains until domicile in a new place is established." *Core VCT Plc. v. Hensley*, 59 F. Supp. 3d 123, 126 (D.D.C. 2014) (citing *Desmare v. United States*, 93 U.S. 605, 610 (1876)). SGF makes much of E.M.'s frequent moves, but does not suggest at any point that she resided in another state in which she intended to remain indefinitely. She therefore never established a new domicile. She also continued to reside in the District "from time to time" at the ▓▓▓▓▓ address which is, as far as the record is concerned, her most recent address. With E.M. firmly domiciled in D.C. and SGF as a corporate citizen of Maryland operating two places of business in D.C., this third consideration tilts in favor of the application of D.C. law.

The fourth consideration, where the relationship is centered, also points towards D.C. SGF argues otherwise because "[a]ll but one of E.M.'s *fertility procedures* . . . occurred in Maryland" and that "her frozen eggs are and always have been stored in Maryland." Def.'s MSJ Mem. at 6 (emphasis added). But "fertility procedures" were only a subset of E.M.'s interactions with SGF, and, though these procedures were the driving force behind the relationship, they do not necessarily tell the Court where the relationship was centered. SGF cites to the declaration of SGF board member Dr. Gilbert Mottla which states that "fertility procedures," an undefined term, were mostly conducted at SGF's laboratory and surgical center in Maryland. *Id.* (citing

Def.'s SMF, Ex. 1 ("Mottla Decl.") ¶ 21, ECF No. 50-3).  E.M. has attested that nearly all her *appointments* with SGF—a broader category of interactions—were in D.C.  Pl.'s Resp. SMF Ex. 79 ("E.M. Decl.") ¶ 7, ECF No. 68.  SGF has no response on this accounting of E.M.'s appointments.  *See* Def.'s Reply Supp. MSJ ("Def.'s MSJ Reply") at 2–7, ECF No. 74.  SGF also argues in its briefing on this consideration that its D.C. offices are merely "satellite offices." Def.'s MSJ Mem. at 6.  This appears to be incorrect.  SGF's own marketing material identifies five "satellite" offices outside the District and identifies the two D.C. locations as "Full Service." Pl.'s Resp. SMF Ex. 18 at 2.  Their website likewise lists the D.C. locations as "Full Service." Pl.'s Resp. SMF Ex. 17 at 9, ECF No. 67-17.  The D.C. offices may not have been outfitted for some of the most intensive "fertility procedures" SGF performs but SGF agrees that E.M. had regular "monitoring" appointments in D.C. involving blood work and ultrasounds.  Def.'s MSJ Reply at 7 n.9 (citing E.M. Dep. 226:11–14; 232:12–13).  The Court thinks the relationship was centered in D.C., around the office(s) where the parties interacted most frequently, especially considering that blood work and ultrasounds—which are still invasive and intimate procedures— were regularly conducted there.  The fourth consideration points strongly toward D.C. law.

The second consideration is where the conduct causing the injury occurred.  E.M. emphasizes that the call informing her that she had been terminated was made from SGF's D.C. office.  Pl.'s MSJ Opp'n at 8–9.  SGF emphasizes that the decisionmakers—including Mottla— were in Maryland.  Def.'s MSJ Mem. at 6.  E.M. argues in response that at least some of the decisionmakers work primarily in D.C.  *See* Pl.'s Resp. SMF at ¶ 1.3–1.6.  The Court does not need to delve into disputes over where each SGF employee was located at the time of the decision because, even assuming SGF is correct on this consideration, only one of the four

considerations would point to Maryland law.  The law of the District of Columbia will therefore govern Count Five.

As for Counts One and Two, although SGF argues in terms of choice of law, the issue it raises is more accurately described as one of extraterritoriality.  *See* Def.'s MSJ at 7–8 (putting the argument in these terms).  On these Counts SGF essentially argues that despite no jurisdictional bar, the Plaintiff's chosen statutory causes of action should not be available because they would not have been available to her had she sued in Maryland.  Specifically, SGF argues that a true conflict exists with regard to Count One, brought under the DCHRA, because the Maryland analogue to the DCHRA does not prohibit discrimination "based on source of income or family responsibilities"[9] and because Maryland law lacks a private right of action for claims of discrimination in places of public accommodation.  Def.'s MSJ Mem. at 4 (citing *M.R. v. Tajdor*, No. CV TDC-17-3836, 2018 WL 6050888, at *5 (D. Md. Nov. 19, 2018) and then citing Md. Code Ann., State Gov't § 20-304).  Regarding Count Two, SGF says, "Maryland's consumer protection statute explicitly does not apply to the professional services of medical practices."  *Id.* (citing Md. Code Ann., Com. Law § 13-104).

This is not a choice of law or conflict of laws problem because, quite simply, E.M. has sued under the DCHRA and CPPA.  The DCHRA does allow for claims based on source of income or family responsibilities and because the CPPA does apply to professional services of medical practices.  The statutes say what they say.  Maryland has its own statutes, but they are not being used as causes of action in this case.  To the extent that the choice of law framework could properly be applied to these statutory claims, the issue is resolved at the initial "false

---

[9] Maryland's law does prohibit discrimination based on marital status.  Md. Code Ann., State Gov't § 20-304.

conflict" stage of the inquiry because Maryland Courts would not develop Maryland law concerning the DCHRA or CPPA.[10]  The laws of the interested states are the same because a Maryland court evaluating a DCHRA or CPPA claim could not interpret the statute as though it were brought under a different, Maryland-specific cause of action.  Put another way, the forum of a lawsuit determines what causes of action are available to a plaintiff and while a defendant may argue that the forum's jurisdiction or the cause of action does not reach its conduct, this is not the same as arguing that the cause of action ought to be converted into an analogous cause of action available in a different forum.

The more relevant question for Counts One and Two is therefore not whether Maryland law governs these claims brought under D.C. causes of action, but whether the D.C. statutes properly reach the conduct and the defendant in this case.  SGF does frame the question in these terms toward the end of its discussion of choice of law.  Def.'s MSJ at 7–8.  Both statutes do reach the conduct at issue here.  "The [DCHRA] applies to a discrimination claim if: the challenged discriminatory decision was made in the District; the "effects" of that decision were felt in the District; or both. *Thomas v. Sotera Defense Solutions, Inc.*, 40 F. Supp. 3d 181, 185 (D.D.C. 2014) (citing *Monteilh v. AFSCME, AFL–CIO,* 982 A.2d 301, 303–05 (D.C. 2009)); Def.'s MSJ at 7 (stating the same rule); *see also Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 731 (D.C. 2000) ("We have specifically stated on several occasions that

---

[10] This is not a case that implicates the arguably unsettled area sometimes referred to as "statutory choice of law." *E.g. Paavola*, 2020 WL 2064789, at *4 (conducting a choice of law analysis in connection with a statutory wrongful death suit and noting inconsistencies over time in the D.C. Circuit's approach).  These cases concern inconsistent state statutes that set the contours of common law claims through statutes of limitations or similar restrictions.  *See, e.g.*, *Smith v. Hope Village, Inc.*, 481 F. Supp. 2d 172, 206 (D.D.C. 2007); *Jaffe v. Pallotta TeamWorks*, 276 F. Supp. 2d 102, 107 (D.D.C. 2003), *rev'd on other grounds*, 374 F.3d 1223 (D.C. Cir. 2004).  Here, by contrast, the state statute provides the cause of action itself.

the DCHRA is a remedial civil rights statute that must be generously construed.").  This

"effects" question suggests a somewhat broader inquiry than "the place where the injury

occurred," which the Court discussed above in the context of Count Five.  While "the place

where the injury occurred" weighed only somewhat in favor of D.C., the "effects" of the decision

can firmly be located in D.C. where E.M. is domiciled.  The DCHRA therefore applies and the

Court again does not need to review where the decision was made.

The CPPA has a similarly broad reach and "is not limited in its application to consumers

or companies who are residents of the District."  *Krukas*, 376 F. Supp. 3d at 28–29 (citing D.C.

Code § 28-3904).  It applies so long as "[t]he District of Columbia has an interest" which may be

"protecting its own citizens" or "regulating the conduct of its business entities."  *Id.* (quoting

*Shaw*, 605 F.3d at 1045); *see also* Def.'s MSJ at 8 (citing *Shaw*, 605 F.3d at 1045); *Renchard v.*

*Prince William Marine Sales, Inc.*, 87 F. Supp. 3d 271, 283 (D.D.C. 2015) (finding that D.C.

law, specifically the CPPA, applied in a case where "the injury complained of, and direct

conduct contributing to that injury, occurred in Washington, D.C.").  Again, this reaches the

conduct challenged here.  E.M. is a citizen of the District, and the District's interest in

"regulating the conduct of its business entities" surely extends to an interest in a Maryland-based

business with offices in the District.

Overall, SGF's choice-of-law arguments resemble jurisdictional arguments, and some

aspects of them are so sweeping that it is unclear what kinds of lawsuits stemming from SGF's

D.C. offices SGF thinks should be governed by D.C. law in circumstances where Maryland law

differs.  It goes without saying that a corporation that is a citizen of one state is not entitled to

have that state's laws applied to all claims against it in other states where it does business.

Personal jurisdiction and extraterritoriality, not choice of law, are the means by which a

defendant would typically argue against the application of the laws of a state in which it lacks sufficient connection. Absent a choice of law clause, a corporation doing business with citizens of other states should expect to be sued under the laws of the states where it operates, so long as the claims are properly within the jurisdiction of those states' courts. This is not to say that SGF's Maryland citizenship does nothing for it. SGF was only able to remove this case from D.C. Superior Court because the parties' citizenship was diverse. *See* Notice of Removal, ECF No. 1. But it will be the rare case where SGF should expect to supplant not only a diverse plaintiff's choice of forum but also her choice of the statutory law upon which she decides to bring her claims.

### 3. Motion in Limine

Finally, SGF has filed a Motion *in limine* seeking to exclude a recording and transcript of the Monday, January 21, 2019 phone call between E.M., J.S., and Osborn. Mot. in Limine; *see also* Osborn Call Tr. at 24, 83. SGF argues that E.M., a licensed attorney, wrongfully recorded this call without Osborn's consent, and that consequently "evidence of the recording and transcript of the telephone call should be excluded from this case." Mem. in Supp. of Mot. in Limine ("MIL Memo") at 1, ECF No. 48–1. However, in two briefs supporting its motion SGF has cited no Federal Rule of Evidence that would dictate excluding evidence of the January 21, phone call. MIL Memo; Reply in Supp. of MIL, ECF No. 59. Instead, the crux of SGF's argument is that this evidence should be excluded because E.M. violated the D.C. Bar's Rule of Professional Conduct 8.4(c), which prohibits conduct involving "dishonesty, fraud, deceit or misrepresentation," while engaging in self-help discovery. *Id.* at 7–9. This is not a compelling basis for excluding a piece of evidence which—as will be clear—is highly relevant and, furthermore, not entirely beneficial to E.M.

Both the District of Columbia, where Osborn made the call, and Virginia, where E.M. and J.S. accepted the call, are one-party consent states. D.C. Code § 23-542(b)(2); Va. Code Ann. § 19.2-62(B)(2). Accordingly, E.M. violated no law in recording the January 21, phone call, and SGF fails to explain why this *particular* action otherwise constitutes an ethical violation. SGF points to an American Bar Association opinion interpreting a similar model rule which states that "[w]here nonconsensual recording of conversations is permitted by the law of the jurisdiction where the recording occurs, a lawyer does not violate the Model Rules [including Model Rule 8.4(c)] merely by recording a conversation without the consent of the other parties to the conversation." ABA Formal Opinion 422 at 7 (2001). Similarly, prior to the issuance of this ABA opinion, the D.C. Bar refused to adopt a per se rule regarding surreptitious recordings, instead stating that the "applicable circumstances should be evaluated to determine whether the particular conduct constitutes dishonesty, fraud, deceit or misrepresentation." D.C. Bar Ethics Opinion 229 at 3 (1992). SGF spends a great deal of time analogizing and distinguishing cases, but fails to explain convincingly why the particular conduct here was dishonest or deceitful. Thus, this Court cannot conclude that E.M. violated her ethical obligations as an attorney. Furthermore, even if E.M.'s conduct had violated the D.C. Rules of Professional Conduct or the Model Rules of Professional Conduct, SGF has not explained why that would necessitate excluding relevant evidence. Accordingly, this Court denies SGF's motion in limine.

### B.  The DCHRA (Count One)

The Court begins its analysis with E.M.'s claim under the DCHRA. Count One of the Complaint alleges that SGF violated the DCHRA in five ways: by discriminating against E.M. based on her (a) source of income, (b) marital status, and (c) family responsibilities, Compl. ¶ 183; (d) by retaliating against E.M. when she claimed she was being discriminated against, *id*.

¶ 184; and finally (e)) failing to "post and keep posted in a conspicuous location" a required notice "whose language and form has been prepared by the [D.C Office of Human Rights] setting forth excerpts from or summaries of, the pertinent provisions of [the DCHRA] and information pertinent to the filing of a complaint," *id*. ¶ 187 (quoting D.C. Code. § 2–1402.51). SGF is entitled to summary judgment on all but two of E.M.'s five claims.  Only E.M.'s claims for source of income discrimination and retaliation survive the summary judgment stage.

Among other things, the DCHRA makes it unlawful to deny "any person the full and equal enjoyment of the goods, services, facilities, and accommodations of any place of public accommodations," if such denial is motivated "wholly or partially" by certain enumerated "discriminatory reason[s]" which include "source of income," "marital status," and "family responsibilities."  D.C. Code § 2-1402.31(a)(1).  DCHRA also makes it unlawful to "retaliate against . . . on account of having exercised or enjoyed . . . any right granted or protected" by the DCHRA.  *Id.* § 2-1402.61(a).  Elsewhere in the statute, covered entities are required to post notices summarizing the DCHRA and providing information on filing complaints under it.  *Id.* § 1402.51.  SGF has not disputed that it is a place of public accommodation covered by this provision.  To prevail on a claim of retaliation, a plaintiff must ultimately show (1) that she engaged in protected activity, (2) that the defendant took an adverse action against her, and (3) that a causal connection exists between the protected activity and the adverse action.  *See Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012).  For purposes of the first element, "protected activity, includes opposing or complaining about a practice that one "reasonably believe[s]" to be unlawfully discriminatory.  *Id.*

DCHRA claims are analyzed in accordance with law applicable to federal Title VII claims.  *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 & n.14 (D.C. 1998).  A discrimination claim

under the DCHRA may be proved either by direct or indirect evidence.  *Mazloum v. D.C. Metro. Police Dep't*, 522 F. Supp. 2d 24, 41 (D.D.C. 2007).  When plaintiffs offer only indirect evidence of discrimination or retaliation at summary judgment, their claims are evaluated under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See, e.g.*, *Wallace v. Eckert, Seamans, Cherin & Mellott, LLC*, 57 A.3d 943, 956 (D.C. 2012); *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (applying the framework to a discrimination claim); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 650–51 (D.C. Cir. 2003) (applying the framework to a retaliation claim, in addition to a discrimination claim). Under this framework, "the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if [s]he does, then the [defendant] must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the [defendant's] reason was a pretextual cover for discrimination." *Townsend v. United States*, 236 F. Supp. 3d 280, 297 (D.D.C. 2017).  Although *McDonnell Douglas* shifts the burden of production between the parties, the plaintiff retains the burden of persuasion.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

"Assuming the [defendant has] proffer[ed] [ a legitimate, non-discriminatory] reason, the central question at summary judgment becomes whether the [plaintiff] produced sufficient evidence for a reasonable jury to find that the [defendant]'s asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the [defendant] intentionally discriminated or retaliated against the [plaintiff]." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quotations omitted). A plaintiff may not show pretext by "simply criticizing the [defendant]'s decisionmaking process." *Hairston v. Vance–Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014).  "The plaintiff must identify evidence from which a reasonable jury could find that the [defendant]'s

stated reasons were 'phony.'" *Moeller v. LaFleur*, 246 F. Supp. 3d 130, 140 (D.D.C. 2017)

(quoting *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996).  In addition,

"[t]he evidence of record must be such that a reasonable jury could not only disbelieve the

employer's reasons, but conclude that the real reason the employer took a challenged action was

a prohibited one."  *Walker*, 798 F.3d at 1093; *see also Mount v. Johnson*, 174 F. Supp. 3d 553,

561 (D.D.C. 2016) ("[P]roviding sufficient evidence for a jury to reject the defendant's reason is

not sufficient 'if it is nevertheless impossible for a rational factfinder to conclude the action was

discriminatory.'" (quoting *Rochon v. Lynch*, 139 F. Supp. 3d 394, 404 (D.D.C. 2015))).

E.M. claims that SGF violated the DCHRA in five ways.  Her primary argument is that

SGF illegally discriminated against her based on "marital status," which the DCHRA defines "as

the state of being married, in a domestic partnership, single, divorced, separated, or widowed[,]

and the usual conditions associated therewith."  D.C. Code § 2-1401.2(17); *see also id.* § 2-

1402.31(a).  She says that SGF ultimately terminated her as a patient because she was single and

did not share any financial or legal ties with J.S.  E.M. cites in support of this argument internal

SGF emails where SGF staff characterized her relationship with J.S. as a "different situation"

with "great potential for miscommunication and misunderstanding."  Pl.'s SMF ¶ 89 (citing SGF

E-Mail Chain at 7).  She asserts that it was these concerns over her relationship status that led

SGF to withhold further treatment until E.M. and J.S. met with a social worker and hired an

attorney to memorialize their arrangement by contract.  Def.'s SMF ¶ 61.3.  E.M. also interprets

an exchange she had with Osborn during a January 21, 2019 call as, Osborn acknowledging that

these conditions would not have been imposed if E.M. and J.S. were married.[11]  Pl.'s SMF ¶ 121.

---

[11] SGF disputes this characterization of the call, during which E.M. stated to Osborn:
"[n]one of these conversation we would have [sic] if I were married," and Osborn responded by

E.M. also claims that she was discriminated against because of her "family responsibilities" and "source of income."  Within the meaning of the DCHRA, "family responsibilities" refers to "the state of being, or the potential to become, a contributor to the support of a person or persons in a dependent relationship."  D.C. Code § 2-1401.02(12).  "Source of income" is defined under the statute as "the point, the cause, or the form of the origination, or transmittal of gains of property accruing to a person in a stated period of time," including money "secured from any occupation, profession or activity, from any contract, agreement or settlement," or "from payments received as gifts."  *Id.* § 2401.02(29).  Here, E.M. argues that SGF required that the "source of income" for her treatment be derived from a "contract or agreement" with, or "gift" from, J.S.  She bases this claim on SGF's requirement that in order for J.S. to proceed as E.M.'s partner, he had to assume financial responsibility for the treatments with E.M., and had to be included in her household income for purposes of the Shared Help Discount Program.  *See, e.g.*, Def.'s SMF ¶ 53.1–53.2.

E.M. has also brought a retaliation claim.  She points to the record to argue that, on multiple occasions, she voiced reasonable complaints to SGF about conduct that she believed to be discriminatory.  *See* Pl.'s SMF ¶¶ 82–83, 88, 97.  And she posits that, as a result of her complaints, SGF took an adverse action by dismissing her as a patient.  *See* Pl.'s SMF ¶ 123.  Indeed, during the January 21, 2019 call between Osborn and E.M., Osborn stated, while explaining SGF's decision to terminate E.M., that it was due to the fact that "basically you've,

---

saying, "You know, the, the—you would be a household then and none of this would have, would have come to be. . . ."  Osborn Call Tr. at 24:7-13.  SGF asserts that this demonstrates not that Osborn agreed with E.M.'s statement, but rather that if E.M. and J.S. were married, "she speculates that the situation would have been different because E.M. would never have argued that they were not a "household" for purposes of the Shared Help Discount Program."  Def.'s Resp. SMF ¶ 121.

you know, accused us of discriminating against you.  And we would not treat any couple in the same situation."  *Id*.

Finally, E.M. claims SGF violated the DCHRA by failing in its obligation to post a particular notice poster created by the D.C. Office of Human Rights, Pl.'s SMF Ex. 28, ECF No. 53-28.  *See* Pl.'s SMF ¶¶ 117–18.  E.M. asserts, and SGF does not argue otherwise, that the required notice was "never been displayed in SGF's D.C. offices at any point from 2012-2019." Pl.'s SMF ¶ 118.  SGF has moved for summary judgment on Count One and E.M. has moved for partial summary judgment—on liability but not damages.  All three alleged violations have been addressed in the motions by both parties.

### a.  E.M.'s Motion – Marital Status Discrimination

The Court will first evaluate E.M.'s argument for summary judgment on marital status discrimination.  E.M. argues that "[i]f E.M. and J.S. were married the vast majority of the issues that arose in January 2019 would not have come up," and more specifically states that "questions asked by E.M. regarding the meaning of SGF's Consent to Thaw and her rights would not have been seen as alleged 'red flags'" relating to her relationship with J.S. and that "SGF would not have proposed that he be treated as a sperm donor" and consequently subjected him to the additional burdens of quarantine and testing required for donors.  Pl.'s Mem. Supp. Pl.'s MSJ ("Pl.'s MSJ Mem.") at 34, ECF No. 52.  This is appropriately in line with the Complaint, where E.M. challenged that she was discriminated against based on her marital status (1) when she was told that J.S. would be treated as a sperm donor if she would not have him proceed as a sperm partner, and (2) when SGF "questioned their relationship" by requiring a contract and a meeting with a social worker if E.M. was going to proceed as a sperm partner.  *See* Compl. ¶ 183.  As

SGF notes, however, E.M. fails to identify any evidence showing or suggesting that her marital status was a factor in the application of either policy. *See* Def.'s MSJ Opp'n at 6.

The only evidence E.M. cites when discussing discrimination based on marital status is the transcript of a phone call between E.M. and J.S. and Osborn. Pl.'s MSJ Mem. at 34. This is the transcript that was the subject of the now-denied motion in limine. E.M. argues that on the call "Osborn acknowledged that if E.M. and J.S. were married, SGF would not have proposed that he be treated as a sperm donor at all." Pl.'s MSJ Mem. at 34 (citing Pl.'s SMF ¶ 121 (citing Osborn Call Tr. at 24, 83). But Osborn does not say this on the call. At one point in the transcript E.M. says "None of these conversations we would have if I were married. None of them Dr. Osborn." Osborn Call Tr. at 24. Osborn replies "You know, the, the – you would be a household then and none of this would have, would have come to be in terms of all, you know, all of that." *Id.* Even if this could be characterized as an agreement with the preceding statement by E.M., it would not be an admission that E.M. was discriminated against because it is not clear whether it would mean that SGF would not have applied the policies to a married woman or whether, more broadly, the parties would not be having the same conversations because the situation would be entirely different and would have been resolved some other way.

At another point identified by E.M.'s briefing, there is the following exchange:

E.M.: [W]e would not be having these conversations if J.S. and I were married. That's true isn't it?

Osborn: I mean it's all -- I mean things are brought up in marriages too. We have, you know, wives call and say, don't let my husband, you know, do such and such and it happening --

E.M.: Would you --

Osborn: -- in marriages too though.

E.M.: I, I -- would, would you be considering J.S. as a sperm donor, if we were married?

> Osborn: -- I mean that would be a different – if you're married, he's, he's liable for
> whatever child you have. Well depending on the state, depending . . . even if you
> have a child with somebody else, he's liable for child support if you're married. So
> anyway, that's a whole different ball of wax.

*Id.* at 82–83.  Again, Osborn does not agree with E.M.'s suggestion that SGF's policies are only

being applied because she is unmarried, but instead only observes that the situation would be

very different.  Drawing inferences in SGF's favor, as the Court must when considering E.M.'s

motion, it is certainly plausible that Osborn is suggesting not that the policies are different for

married women, but that E.M.'s argument that she and J.S. are not a household or financial unit

would not be tenable if they were married and that the situation would be different in that

regard.[12]

Also in her discussion of marital status discrimination, E.M. arguably incorporates by

reference some of her discussion of alleged discrimination based on income source, by stating

that her marital status claim "rests on many of the same facts as the Source of Income argument

above."  Pl.'s MSJ Mem. at 33.  The referenced source of income briefing does not discuss

marital status at all.  *Id.* at 32–33 & n.18.  In it, E.M. cites to seven points from her Statement of

Undisputed Facts, only one of which references marital status.  *See id.* (citing Pl.'s SMF ¶¶ 59,

60–61, 63, 68, 69, 120).  Most of E.M.'s argumentation on source of income discrimination

attempts to establish that SGF would have required J.S.'s signature and joint financial

responsibility if E.M. wanted to proceed with him as a "sperm partner."  *See id.*  SGF does not

appear to dispute that this requirement existed, and mostly disputes E.M.'s characterization of it

---

[12] E.M. could counter that her question to Osborn was whether they would be having the
same conversations if she were a married woman who represented to SGF that she kept her
finances separate from her spouse and that she did not want her spouse to have any legal
involvement or rights concerning the fertilization procedures or any future children.  That is a
complicated hypothetical, though, and it is certainly plausible that Osborn did not understand the
question in that precise way.

as discriminatory. *See* Def.'s MSJ Opp'n at 64; Def.'s Resp. SMF ¶¶ 60–61, 63. E.M.'s one alleged fact that touches on her marital status simply references an email from SGF's office manager to Mottla memorializing a call during which E.M. "state[d] that she is legally a single female," Pl.'s SMF ¶ 59 (citing SGF E-Mail Chain at 9). Other emails on this thread strongly suggest that Mottla was the primary decisionmaker behind terminating E.M. as a patient. SGF E-Mail Chain at 4–5, 5–6, 7–8 (Mottla emails). But the fact that SGF and Mottla knew this does not necessarily mean that any decision they made depended on it.

In her brief opposing SGF's motion for summary judgment, E.M. raises an alternate theory of liability. She suggests that even if SGF's policies are facially neutral, they "can work an obvious discriminatory impact." Pl.'s MSJ Opp'n at 16. Indeed, the DCHRA does contain an "effects clause" which dictates that even in "the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Estenos v. PAHO/WHO Federal Credit Union*, 952 A.2d 878, 887 (D.C. 2008) (citing D.C. Code § 2–1402.68 and quoting *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc)). The effects clause is neither cited nor referenced in the Complaint, and this theory is not discussed there, or in E.M.'s own motion for summary judgment. It was, however, discussed in E.M.'s opposition to SGF's motion to dismiss. Pl.'s Opp'n to MTD ("MTD Opp'n") at 4–5, ECF No. 24. This is arguably enough to have raised the theory, although normally a plaintiff "may not amend [her] Complaint through [her] Opposition to [a defendant's] Motion for Summary Judgment." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 97 (D.D.C. 2019) (citing *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173–74 (D.C. Cir. 1994)). Even assuming that the Court should consider this effects theory, it is not a basis for summary judgment in E.M.'s favor.

E.M.'s opposition brief cites no evidence to support the notion that SGF's policies disparately impacted unmarried patients, nor does it even lay out a theory of how this might occur.  Most importantly, E.M. did not raise the discriminatory impact theory in her own motion and therefore has not asked the Court for summary judgment on this basis.

Because E.M. cannot point to undisputed evidence showing that SGF treated her differently based on her marital status, she has not met her burden of establishing that she is entitled to judgment as a matter of law on her claim of discrimination.  Her motion for summary judgment on this claim therefore fails.

### b. SGF's Motion – Marital Status Discrimination

Next, the Court evaluates the same claim from the other side, this time drawing all justifiable inferences in E.M.'s favor as it evaluates SGF's argument for summary judgment. SGF argues that E.M. fails to identify evidence supporting a claim for discrimination, and that its reasons for acting as it did were legitimate and nondiscriminatory.[13]  *See* Def.'s MSJ Mem. at 10–12.  SGF is correct that even when reasonable inferences from the evidence are drawn in E.M.'s favor, there is simply not enough there for a reasonable juror to conclude that SGF treated her differently because of her marital status.  Summary judgment in a defendant's favor is appropriate "where the plaintiff has produced no direct or circumstantial evidence of discriminatory animus."  *Brandywine Apartments, LLC v. McCaster*, 964 A.2d 162, 168 (D.C.

---

[13] SGF's opening brief focuses primarily on the legitimacy and nondiscriminatory nature of its reasons for imposing the conditions it did and for terminating E.M. as a patient, but it does also briefly make the argument that "[t]here is no evidence to support a *prima facie* case of discrimination" because "E.M.'s marital status was never a consideration."  Def.'s MSJ Mem. at 10.  This argument is developed more thoroughly in SGF's reply brief.  Def.'s MSJ Reply at 9–11.

2009) (citing *Futrell v. Dep't of Labor Federal Credit Union*, 816 F.3d 793, 802 n.11 (D.C. 2003)).

A business may permissibly have a policy that treats couples differently from individuals without discriminating based on marital status, so long as married couples are treated the same as unmarried couples.  In *Brandywine Apartments*, the D.C. Court of Appeals overturned a jury verdict in favor of a prospective tenant who claimed he had been discriminated against based on his marital status when an apartment building turned down a joint application he had filed with his common-law wife.  *See id.* at 166, 170.  The managing agent of the building had testified that "when people applied for an apartment together, whether they were married or not, they were treated as joint applicants."  *Id.* at 169 (quoting her testimony that "[t]he policy is the same for everyone" and that "[a] joint application is the application of two persons at the same time for the same unit").  If the plaintiff tenant had applied on his own for the apartment, he likely would have been approved, as it was his common-law wife's past arrests that had doomed their joint application.  *See id.* at 165.  The defendant had never told him that he had this option, but there was no evidence that he ever expressed interest in renting the apartment by himself or that the defendant had failed to suggest this option out of animus.  *See id.* at 168–69.[14]  SGF is entitled to summary judgment on this claim for the same general reasons.  While SGF treats patients without partners differently from patients with partners, E.M. has not identified any genuinely

---

[14] E.M. mischaracterizes the holding of *Brandywine Apartments* as turning on the fact that there "was 'absolutely no evidence' that a joint application was required."  Pl.'s MSJ Opp'n at 17.  While it is true that there was no evidence that a joint application was required, this was not particularly important, and it is not clear from the case that it was even disputed.  *See Brandywine Apartments*, 964 A.2d at 168.  The important details were that the plaintiff gave no indication he was interested in applying without his common-law wife, and that there was no indication that the building's failure to inform him of this alternative was due to animus.  *See id.* at 168.  E.M. quotes the phrase "absolutely no evidence" out of context—the Court stated that there was "absolutely no evidence to support" the jury's verdict.  *Id.* at 169.

disputed facts to undermine the idea that SGF treats unmarried patients the same as married patients under otherwise similar circumstance.

When a patient is seeking treatment with a sperm partner, SGF asserts that it requires both the patient and the partner to be financially responsible for the treatment. *See* Def.'s SMF ¶ 9 & n.1 (citing Pl.'s Resp. SMF Ex. 2 ("Mottla Dep."), ECF No. 67-2; Pl.'s Resp. SMF Ex. 6 ("Purcell Dep."), ECF No. 67-6; Osborn Dep.; and Def.'s SMF Ex. 21 ("2015 Financial Policy"), ECF No. 50-23). To support this claim, SGF points first to the depositions of three of its employees, all of which support the notion that this is SGF's standard practice. *See* Mottla Dep. 89:14–90:4 ("We require that they are equally financially responsible for the care that they have come to us for. . . . We don't care who pays. . . . But both are responsible because we see them as one."); Purcell Dep. 113:3–6 ("When they come in as a couple, both seeking to obtain treatment from us, they both sign that they're acknowledging that they are jointly responsible for treatment."); *id.* at 126:4–6 (explaining that although one or the other partner's insurances is typically billed first, "if that balance [is] not paid, its's the balance of the couple that are responsible for paying it"); Osborn Dep. 92:8–93:6 ("[T]his is a treatment for both of them. They are both patients. . . . We require every patient to be financially responsible for their treatment."). SGF also points to a 2015 Financial Policy signed by both E.M. and J.S. which reads, in part, "By signing below, you authorize to apply any excess payments from you to any outstanding account balance on either you or your partner's account" and "I/we have read and I/we understand the above financial policy and agree to be financially responsible for services rendered[.]" 2015 Financial Policy at 2.

E.M. disputes that SGF requires joint financial responsibility from patients and partners, but she points to no evidence inconsistent with SGF's evidence. Instead, she suggests a strained

reading of the 2015 Financial Policy that is inconsistent with the document's plain meaning and natural import.  *See* Pl.'s Resp. SMF ¶ 9.1–9.3.  She argues that the policy "makes clear that a patient and a 'partner' [each] have their own account at SGF."  *Id.* (quoting 2015 Financial Policy at 2 (referencing "you or your partner's account" and stating that "[o]verpayments will be refunded to your account or, at your direction, your partner's account")).  The fact that SGF maintains two different accounts for the patient and the partner is irrelevant to the question of financial responsibility.  J.S. signed a document that read "[b]y signing below, you authorize to apply any excess payments" and "I/we have read and I/we understand the above financial policy and agree to be financially responsible."  2015 Financial Policy at 2.  The use of "I/we" makes clear that SGF is holding both patients and partners financially responsible, notwithstanding how many accounts their payments are organized under.

More broadly, SGF asserts that it "treats couples who are married, not married, same sex, and different sex, without regard to whether they are married."  Def.'s SMF ¶ 28.  E.M. disputes this pointing first to testimony from Mottla, which E.M. distorts somewhat.  *See* Pl.'s Resp. SMF ¶ 28 (citing Mottla Dep. 87:11–21).  Mottla explained that he would ask questions about the relationship status of a single woman coming in for treatment while he would assume that a couple coming in as partners are monogamous and not ask them questions.  Mottla Dep. 87:11–21 ("We don't ask partners whether they're having affairs outside of their relationship. None of my business."); *id.* at 195:16–196:21 ("If someone says they're single, I would presume they don't have a partner by definition . . . . But I would still inquire about is there somebody else in your life.").  E.M. frames this as testimony as an example of Mottla admitting he would scrutinize the sex life of an unmarried woman, but the testimony says nothing about marriage. Shortly before stating that partners are not questioned, he explained that "[p]atients self-

determine" whether they have a partner: "They come to [SGF] for care. They sign documents together. They present as partner and patient. They present as wanting to have a child together." Mottla Dep. 82:17–21 (responding to the question "Who determines whether you're a partner?"). This testimony from Mottla is entirely consistent with the "single" versus "partnered" dichotomy that SGF claims it draws.

E.M. also claims that unmarried couples were treated differently from married couples because, she asserts, "Mottla also stated that he considered E.M.'s statement that she was 'legally a single female' as a change in the relationship between E.M. and J.S." Pl.'s Resp. SMF ¶ 28 (citing Mottla Dep. 233:16–235:8). This also fails to show that unmarried persons were treated differently, because there is no evidence that a married woman whose husband had been her sperm partner and who then told SGF that she was "legally a single female" would have been treated differently. Mottla testified that E.M.'s representation that she and J.S. were not a couple "appeared to [him] to be another change—another substantive change in the relationship." Mottla Dep. 234:16–18. E.M. has pointed to no evidence from which a jury might infer that SGF would not have identified the same kind of "substantive change in the relationship" if a married woman had told them that she and her husband were not a couple.

E.M. also argues that SGF's medical director, Dr. Eric Widra, "testified that Shady Grove does not require social worker visits or legal visits of married couples, specifically because of their status." Pl.'s Resp. SMF ¶ 28 (citing Pl.'s Resp. SMF Ex. 4. ("Widra Dep.") at 356:5–357:13, ECF No. 67-4). This misrepresents the testimony because Widra never stated that unmarried couples are required to have either type of visit. Rather, he agreed that "practitioners will require *legal agreements between the parties* or social work visits," and stated that "[m]arried couples have a contract," meaning their legal marital relationship, and agreed that

"the existence of a marriage between the patient and the partner sufficiently identifies the financial consequences of having a child to those individuals."  Widra Dep. 356:12–357:13 (emphasis added).  It is therefore undisputed that for all couples, SGF requires either a legal agreement or a social work visit.  The marital relationship simply fulfills this requirement— because it is a legal agreement—if the couple is married.  Again, there is no discriminatory treatment based on marital status in this system.

E.M. suggests that the questions she asked in January 2019 were "questions that only a single woman would have," Pl.'s MSJ Opp'n at 16— but there is no evidence to support this notion.  There is no reason that a married couple could not keep separate finances, and no reason why a married woman keeping separate finances could not ask SGF to ignore her husband's income or request that her husband not have any say in egg-thawing or treatment decisions.  *See* Compl. ¶¶ 59–65, 67–68.  Indeed, this is what Osborn suggested in her phone conversation with E.M. and J.S.  Osborn Call Tr. at 82.  She explained to E.M. that "things are brought up in marriages too.  We have, you know, wives call and say, don't let my husband, you know, do such and such[.]" *Id.*  Osborn's comment would suggest that a married woman making requests like this is probably atypical, but it is clear that SGF took E.M.'s requests to be atypical as well. E.M. has presented no evidence indicating that a married woman would be treated any differently if, like E.M., she had at first included her sperm-provider (presumably her husband) in the fertility process and then subsequently surprised SGF by explaining that her relationship with her husband was not what SGF had understood.  This is not to say that E.M. would need to point to a comparator.  This is not required to make out a claim for discrimination.  *See Holmes v. Univ. of D.C.*, 244 F. Supp. 2d 52, 65 (D.D.C. 2017) ("[C]omparators are not required at any stage of the litigation.") (citing *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)).

However, there must be some direct or indirect evidence from which a jury could find or infer that E.M. would have been treated differently or had an easier path to parenthood if she were married, and E.M. has identified no such evidence.

E.M.'s "effects" theory—which she has only raised in opposition to SGF's motions and never addressed in her Complaint or her own motion—fails to preclude summary judgment for similar reasons. "The DCHRA's effects clause is modeled on the federal disparate-impact doctrine" and "prohibits 'practices' or 'policies' that have the effect of discriminating against a protected group of people." *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 157 (D.D.C. 2014). "[A] prima facie case of disparate impact requires the identification of a specific . . . *practice* that, while facially neutral, nonetheless had a disproportionate adverse effect on a protected class of *individuals*." *Id.* (quoting *Anderson v. Duncan*, 20 F. Supp. 3d 42, 54 (D.D.C. 2013). Often it "requires a demonstration of causation through 'statistical evidence'" showing the impact on the protected class. *Id.* There is no suggestion in this record that E.M. has any such evidence to point to. E.M. has identified no evidence that the policies she challenges have ever been applied to anyone else, let alone that they have disparately impacted SGF's unmarried patients. "[O]ne-time decisions that affect only one person are not typically actionable" under a disparate impact or effects theory. *Id.* The theory exists to allow plaintiffs to challenge facially neutral policies that hurt a class of individuals "because of their membership in a protected group" not to enable plaintiffs to "convert a failed discriminatory-intent claim into one for disparate impact." *Id.* Even if E.M. might have developed Count One as a claim under the DCHRA's effects clause, it is too late to do so at this stage. The two sentences and single citation she provides in her opposition briefing are not enough to warrant taking the Count to trial on this distinct theory. *See Allaithi v. Rumsfeld*, 753 F.3d 1327, 1334 (D.C. Cir 2014) ("In

this circuit, it is not enough merely to mention a possible argument in the most skeletal way,

leaving the court to do counsel's work . . . .") (quoting *Davis v. Pension Benefit Guar. Corp.,* 734

F. 3d 1161, 1166–67 (D.C. Cir. 2013).

In short, E.M. has not pointed to any evidence suggesting that a married woman

presenting the same questions and concerns that she did would have encountered any less friction

or been presented with any different alternatives if she had likewise requested that her significant

other be treated in some respects as a sperm partner and in other respects as a sperm donor.  Her

evidence consists of distorted readings of SGF employees' testimony and her own self-serving

assertions.  Similar to *Brandywine Apartments*, some of the breakdown in the relationship

between E.M. and SGF might have been avoided if every relevant policy had been explained

more clearly at the outset, but there is still "no direct evidence that this failure was motivated by

discriminatory intent," "no evidence to contradict [Defendant's] testimony," and "no evidence of

disparate treatment." *Brandywine Apartments*, 964 A.2d at 168–69.  Summary judgment for

SGF on this theory is therefore appropriate because a reasonable jury could not conclude that

E.M. was discriminated against based on her marital status.

### c. Family Responsibilities

For similar reasons concerning the insufficiency of E.M.'s evidence, SGF is entitled to

summary judgment on E.M.'s claim for discrimination based on family responsibilities.  The

deficiencies in E.M.'s evidence are sufficiently clear that the Court can address both cross-

motions simultaneously.

Within the meaning of the DCHRA, "family responsibilities" refers to "the state of being,

or the potential to become, a contributor to the support of a person or persons in a dependent

relationship."  D.C. Code § 2-1401.02(12).  E.M. alleges that SGF discriminated against her

when it "impos[ed] conditions . . . that it did not impose on all patients because of the family responsibilities that it perceived she and [J.S.] would assume" and "by terminating her treatment, in part based on the perceived family responsibilities that it believed [J.S.] would or would not assume." Compl. ¶ 183.  To support this claim, E.M. points primarily to two statements by SGF employees.[15]  Pl.'s MSJ Mem. at 34–35 (citing Pl.'s SMF ¶¶ 89, 122); Pl.'s MSJ Opp'n at 18. One is from Osborn on the recorded phone call.  With relevant context, she said this:[16]

> I don't, you know, want to or need to go into what is and is not part of your relationship, but that's where, you know, we do have the right in that type of situation to request the social work consult and we do have the right to request a letter from a reproductive attorney, because you know, this gets very complicated. . . . [I] n terms of your rights, J.S.'s right, you know, our responsibility to you, to J.S., to the baby -- you know, is J.S. gonna visit the baby?  I mean again, you don't have to answer any of these questions.  I'm just saying, you know, we -- there have been cases where, you know, sperm donors are sued by the government for, for whatever the word is, for financial support, even though they didn't plan to give any.

Osborn Call Tr. at 10–11.  E.M. also points to an email in which Mottla suggested that "an agreement prepared by a reproductive attorney . . . would be protective to [J.S.] too regarding child support potentially" if he was going to be a sperm partner.  SGF E-mail Chain at 7.  E.M.

---

[15] In her opposition to SGF's motion, E.M. also points to 30(b)(6) testimony by Crisp in which she expressed SGF's policy that "the financial obligations in relationship to treatment are in relationship to any embryos created, any children that are created from them."  Pl.'s MSJ Opp'n at 18 (quoting Pl.'s Resp. SMF Ex. 8 ("Crisp Dep.") at 62:18–21, ECF No. 67-8.  E.M. says this shows that SGF used payment for treatment "as a discriminatory proxy for" future family responsibilities.  This adds nothing to the family responsibility discrimination claim because at best this amounts to a statement that SGF imposes financial obligations on sperm providers who will have a role in raising a child and not on those—donors—who will not.  But there would be no reason for a donor who is not going to be involved with the mother, embryo, and child going forward to pay SGF at all—he is merely "donating," and not receiving anything from SGF.  Whether this discriminates against potential parents in less conventional relationships is a different question, but no reasonable juror could fail to recognize that it is not discriminating based on parental responsibilities to treat a standard sperm donor differently from a standard sperm partner.

[16] E.M. selectively quotes Dr. Osborn, noting only that she said, "is J.S. gonna visit the baby?" and "there have been cases where...sperm donors are sued...for financial support..." Pl.'s MSJ Mem. at 35; Pl.'s SMF ¶ 122; Pl.'s MSJ Opp'n at 18.

characterizes these comments and policies as "paternalistic" and says that "the imposition of additional conditions on E.M. . . . [was] discriminatory."  Pl.'s. MSJ Mem. at 35.

Drawing all inferences in E.M.'s favor, these comments could be viewed as inquiries about her parenting plans, and while they may indeed be paternalistic, that does not mean they suggest discrimination based on family responsibilities.  All of these comments show that SGF thinks about family responsibilities.  This is to be expected given its line of work.  But none of these statements suggest that any particular family responsibility plans (or lack thereof) suggested by E.M. and J.S. had were the basis for any decision.  Osborn's comments suggest that she did not know, and did not need to know, what J.S.'s responsibilities would be.  Mottla's comment expresses one potential benefit of a negotiated agreement, but does not make any reference to what J.S.'s level of family responsibilities will or should be.  Both comments suggest that the unconventional nature of the relationship between J.S. and E.M. was raising red flags, but SGF has admitted as much and this is not discrimination on the basis of family responsibility.  Neither comment suggests that the negotiated agreement would not have been required if E.M. and J.S. had different family responsibilities in mind.  At best the fact that SGF had given some thought to family responsibilities amounts to a "mere scintilla of evidence" that "does not create a genuine dispute of material fact" that can avoid summary judgment.  *Massey v. Tillerson*, 246 F. Supp. 3d 92, 100 (D.D.C. 2017).  A reasonable juror therefore could not infer from this evidence that any particular action was taken even "partially for a discriminatory reason *based on* the actual or perceived . . . family responsibilities" of E.M. and J.S.  D.C. Code § 2-1402.31(a)(1) (emphasis added).  This means summary judgment must be denied to E.M. and granted to SGF on the DCHRA claim premised on family responsibilities discrimination.

### d. *Source of Income*

Next is E.M.'s claim that she was discriminated against based on "source of income."

The DCHRA defines "source of income" as:

> [T]he point, the cause, or the form of the origination, or transmittal of gains of property accruing to a person in a stated period of time; including, but not limited to, money and property secured from any occupation, profession or activity, from any contract, agreement or settlement . . . [or, among others] . . . from payments received as gifts.

D.C. Code § 2-1401.02(29). D.C. courts have held that this is a broad definition. *Blodgett v. Univ. Club*, 930 A.2d 210, 220 (D.C. 2007) ("The definition the [D.C.] Council crafted demonstrates that it intended the prohibition against 'source of income' discrimination to have a significant reach."). For instance, "source of income" discrimination has been held to encompass situations where landlords refuse to accept income provided on a plaintiff's behalf by a third party. *Feemster v. BSA Ltd. P'ship*, 548 F.3d 1063, 1070 (D.C. Cir. 2008) (finding a violation based on a landlord's refusal to accept Section 8 funds from local public housing agencies to cover part of plaintiff's rent payments); *Bourbeau v. Jonathan Woodner Co.*, 549 F. Supp. 2d 78, 89 (D.D.C. 2008) (same); *see also* D.C. Code § 2–1402.21(e) (stating explicitly that source of income discrimination covers discrimination based on use of Section 8 funds). It also applies when a defendant is alleged to have discriminated based on where the plaintiff gets his or her money. *See Blodgett*, 930 A.2d at 219–20 (affirming the grant of summary judgment to defendant for lack of evidence showing discrimination, but not questioning whether the plaintiff might have a claim based on the defendant's discrimination against his sources of income). Beyond these examples, there has been little guidance from the D.C. courts regarding the meaning of "source of income." *See Feemster*, 548 F.3d at 1070 ("[T]he District of Columbia Court of Appeals has not yet 'outlined the boundaries of source-of-income discrimination under the Human Rights Act . . . .'" (quoting *Blodgett*, 930 A.2d at 220)).

On E.M.'s claim for discrimination based on source of income, there are no material facts in dispute.  SGF does not dispute that its policy "requires that patients and partners both be *financially responsible* for their fertility treatments."  Def.'s MSJ Opp'n at 4.  As described above, E.M. disputes whether this is a consistently applied policy, but she points to no evidence inconsistent with SGF's evidence, so the dispute is not genuine.  This is not much of a problem for this claim, though, because E.M. argues that even if the policy is consistently applied, an "admitted policy of tying a patient's treatment options . . . to whether her partner will co-sign for her medical bills is discriminatory in and of itself."  Pl.'s MSJ Reply at 9 (emphasis removed); *see also id.* ("SGF is effectively admitting it discriminates against <u>all</u> [women presenting with a partner] based on source of income.").  SGF's stated policy amounts to treating patients like E.M. differently if they refuse to provide a second potential source of income for the clinic.  This suffices to establish a *prima facie* case of discrimination, even if all reasonable inferences are drawn in SGF's favor.

Because SGF has agreed that there is evidence from which a jury could find a *prima facie* case of discrimination, the Court proceeds to the next stage of the *McDonnell Douglas* analysis and evaluates whether SGF has produced evidence suggesting it has a legitimate and nondiscriminatory reason for treating female patients who do not provide a partner's source of income differently from those who do.  The D.C. Circuit has said that in "most cases" the second stage of *McDonnell Douglas* should focus on factors like whether the defendant has produced admissible evidence suggesting a nondiscriminatory reason, whether the factfinder could reasonably find that that reason was the defendant's motivation, whether the reason is facially credible, and whether the reason is "clear and reasonably specific."  *Figueroa v. Pompeo*, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019) (quoting *Segar v. Smith*, 738 F.2d 1249, 1269 n.13 (D.C.

Cir. 1984)).  SGF's explanation is that fertility is a "couplet treatment," and that J.S. is required

to be financially responsible for treatment because "a couple is being treated to produce a child

for which both patient and partner will have legal responsibilities."  Def.'s MSJ Opp'n at 4–5;

*see also* Def.'s MSJ Reply at 8 ("Both parties must agree to be liable for the services. . . because

it is both partners' treatment.").  SGF further explains that this is standard practice in the fertility

industry, and cites to deposition testimony saying the same.  Def.'s MSJ Opp'n at 4 (citing

Purcell Dep. 115:20–116:6; Def.'s MSJ Opp'n Ex. 1, ("Maxson Dep.") at 1154:2–14, ECF No.

65-1).  Even if this is the case, consistency with industry practices does not constitute a

*nondiscriminatory* reason because it does not give a "clear and reasonably specific" explanation

for why the policy is nondiscriminatory.  Consider a racial discrimination claim by way of

comparison.  If a company admitted that it had never hired a nonwhite manager, it could not

justify this by saying, "no one in our industry has."

     However, drawing all inferences in SGF's favor, their explanation about why this policy

is industry practice—that through fertility treatments, both partners receive medical care in order

to create a child over which both individuals will have legal responsibilities—can justify treating

potential mothers differently based on if they have a donor or partner.  As SGF explains, because

both the patient and their partner "are receiving [the] benefit" of a child, they both "can be held

financially responsible for that service."  Def.'s MSJ Opp'n at 5.  In contrast, a donor does not

receive this benefit from the fertility services.  This explanation is clear and facially credible

such that a jury might reasonably conclude that SGF's policy was imposed for these neutral and

nondiscriminatory reasons.

     Turning now to the third stage of *McDonnell Douglas* analysis, E.M. could still be

granted summary judgment if a reasonable jury could find that SGF's stated reasons for this

policy were pretextual.  Granting summary judgment to a plaintiff at this point of the analysis is

extraordinarily rare and on this record is not possible.  The Supreme Court has said that "a reason

cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was

false, and that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.

E.M. cannot meet this burden.  She argues that SGF's policy governing couplet treatments was

actually financially motivated due to a desire for a "'co-signer' or a guarantor' for its bills."  Pl.'s

MSJ at 33 (citing Pl.'s SMF ¶ 68).   But she is not able to point to any concrete evidence to

demonstrate that this is the real reason for the policy in question, and that the stated explanation

for the policy is false.  Accordingly, without more, a reasonable jury would be unable "disbelieve

[SGF's] reasons" and "conclude that the real reason" for SGF's policy regarding shared financial

responsibility for couplet treatments was a discriminatory one.  *Walker*, 798 F.3d at 1093.

E.M.'s motion for summary judgment for liability on this claim therefore must fail.

　　　SGF's motion for summary judgment on this claim also cannot succeed because there is

at least some evidence, drawing all inferences in E.M.'s favor, that a jury would see SGF's

policy as a pretext to discriminate against patients based on source of income.  SGF agrees that it

treats potential mothers differently—allowing them to proceed on the "partner path" or requiring

the slower "donor path"—based on whether the person they want providing sperm will agree to

provide a second source of income for SGF.  And SGF's explanation as to why a second income

is required rests heavily on industry practice (which as described above is not necessarily a non-

discriminatory rationale), and a bald assertion by SGF that this is simply what SGF requires for

"couplet treatments"— and there is only a limited explanation of why the treatment at issue must

be considered a "couplet treatment."  Viewed in the light most favorable to E.M., SGF's

explanation amounts to little more than a restatement of the policy—which SGF agrees treats

women differently based on whether a partner's source of income is provided, regardless of whether the woman who will become pregnant is able to pay on her own. Based on this evidence, it is possible a reasonable juror could conclude that this policy was imposed at least partially for a discriminatory reason based on E.M.'s source of income, and "accordingly summary judgment is inappropriate." *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998). For these reasons, neither SGF nor E.M. are entitled to summary judgment on this issue, and the claim will proceed to a jury.

### e. Retaliation

The Court next considers whether either party is entitled to summary judgment on the retaliation claim. As the Court will explain, there are sufficient, and sufficiently obvious disputes of material fact when it comes to this claim that the cross-motions can again be addressed simultaneously without undue confusion. There is sufficient evidence from which a jury could find for either party on this claim.

DCHRA retaliation claims can be analyzed under the same *McDonnell Douglas* burden-shifting framework as discrimination claims. *See, e.g.*, *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010); *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 235 n. 3 (D.C. Cir. 1999). And "[t]he elements of a retaliatory claim are the same under the DCHRA as under the federal employment discrimination laws." *Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 97 (D.D.C. 2012) (citing *Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994)). To make a *prima facie* case of retaliation under the DCHRA, a plaintiff must show "that (1) she engaged in a protected activity; (2) she suffered an adverse action; and (3) there is a causal connection between the two." *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 44 (D.D.C. 2009) (citing *Carpenter*, 174 F.3d at 235 n. 3). In the Title VII context, the D.C. Circuit has said that this

means "an employee may not be punished for opposing a practice that he or she 'reasonably and in good faith believed was unlawful under [the statute].'" *Arafi v. Mandarin Oriental*, 867 F. Supp. 2d 66, 74 (D.D.C. 2012) (quoting *McGrath v. Clinton,* 666 F.3d 1377, 1380 (D.C. Cir. 2012)); *see also* D.C. Code § 2–1402.61.

SGF's motion for summary judgment fails on this claim because there is at least some evidence that a jury might see as convincing evidence of retaliation.  Drawing all inferences in E.M.'s favor, a jury could also view Mottla's comment that "[h]er dismissal is based on the above compromise in the patient-physician relationship and the lack of trust in the Practice" as referencing her protected activity and thus as convincing evidence of retaliation.  SGF E-mail Chain at 5.  The same goes for Osborn's comment on the phone with E.M. that "[b]asically you've, you know, accused us of discriminating against you.  And we would not treat any couple in the same situation[.]" Osborn Call Tr. at 8; *see* Pl.'s SMF ¶ 123.  A jury could take this at face value.[17]  This significant evidence means that SGF's motion for summary judgment fails at this stage.  Because a jury could credit this evidence of retaliation, there is no need to consider how SGF could justify its actions.  *See Vasquez-Mills v. District of Columbia*, 278 F. Supp. 3d 167, 174 (D.D.C. 2017) ("[T]he '*McDonnell Douglas* framework applies only if . . . the plaintiff relies on an inference of discrimination' . . . . 'Where the plaintiff provides direct evidence of discrimination, *McDonnel Douglas* is inapplicable.'" (quoting *Stone v. Landis Constr. Corp.*, 442 F. App'x 568, 569 (D.C. Cir. 2011)).  But suffice it to say that E.M. presents evidence that SGF's "lack of trust" rationale may be pretextual, for example Dr. Osborn's above-quoted

---

[17] E.M does not win summary judgment based on this statement—though it could be read as an admission of discrimination—because a jury could also believe Osborn's clarification at her deposition that she "interrupt[ed] [her]self" mid-sentence and meant to say "we would not treat any couple in the same situation *differently*." Osborn Dep. 311:5–16 (emphasis added); *see* Def.'s Resp. SMF ¶ 123.

comment about discrimination accusations on the phone call, and her testimony suggesting a connection between her accusations of discrimination and the loss of trust.  Osborn Dep. 239:21–240:3 ("We were not discriminating against them.  But she refused to believe it.  So that's where the loss of trust came and we could no longer continue . . . ."); *see also* SGF E-mail Chain at 4–5 (reflecting that Mottla unilaterally claimed the parties were "at an impasse" even though Gerber had just spoken with E.M. and indicated that E.M. thought negotiations were ongoing).

While that resolves SGF's motion on this theory, E.M.'s remains.  Assuming, as the Court must for E.M.'s motion, that the jury does not view the above-referenced testimony as enough to settle the question of discrimination, *McDonnell Douglas* would apply, and the first question would be whether E.M. can make out a *prima facie* case of retaliation.  There is no lack of record evidence here from which a jury could conclude that E.M. was engaged in a protected activity.  As early as 9:00 A.M. on January 18, Osborn sent an email memorializing a conversation she had just had with E.M. in which she noted that "[E.M.] feels that she is being discriminated against based on our definition of 'household.'"  SGF E-mail Chain at 8.[18]  Neither party argues that E.M.'s termination as a patient was not an adverse action, and because the relationship deteriorated over only a few days, the temporal link between her complaints and her termination is enough for a jury to infer that her protected activity may have been the cause of her termination.  *See, e.g.*, *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1175 (D.C. 2008) (noting the "temporal proximity between protected activity and adverse employment action" can

---

[18] E.M. suggests that an earlier email shows she was engaged in protected activity.  Pl.'s MSJ Mem. at 36 ("By the second call with SGF on January 17th (with Ms. Crisp), E.M. mentioned that her concerns about the legality of SGF's actions.").  Crisp's email is less clear than Osborn's the next day about what exactly E.M. was suggesting was illegal.  *See* SGF E-mail Chain at 9.  Because the clearer email the following day is enough to make out a prima facie case, the Court need not scrutinize the earlier email.

be sufficient to establish causation provided that "the temporal proximity [is] 'very close'")
(quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).  Here, no one disputes
that the temporal proximity is extremely close.

SGF does not appear to dispute that there is sufficient evidence from which a jury could
find a *prima facie* case of retaliation, as it focuses both its motion and its opposition to E.M.'s
motion on the next stage of the *McDonnell Douglas* analysis.  *See* Def.'s MSJ Mem. at 19–21;
Def.'s MSJ Opp'n at 13–17.  Again, this stage focuses on the defendant's nondiscriminatory
reasons.  *See Figueroa*, 923 F.3d at 1087–88.  E.M. argues that SGF's proffered reason for
terminating E.M.—her loss of trust in their practice—is not "clear and reasonably specific" and
thus that it fails to suffice for the second stage of *McDonnell Douglas* analysis because it is too
vague to be interrogated for pretext.  *See* Pl.'s MSJ Mem. at 38–40; *Figueroa*, 923 F.3d at 1088
("[W]ith subjective standards, we . . . perceive an intolerable risk that a nefarious employer will
use them as cover for discrimination.").

While SGF has used the vague overarching description "loss of trust" to describe the
difficulties it encountered in proceeding with E.M. as a patient, the clinic has also been more
specific.  It specified in interrogatory responses the specific points on which it says E.M. refused
to trust SGF's judgment concerning the propriety of its own policies.  Def.'s MSJ Opp'n Ex. 4,
Def.'s Objections and Responses to Pl.'s Third Set of Interrogatories ¶ 21, ECF No. 65-4.  These
were (1) E.M. "did not trust that [SGF] was administering its discount program appropriately"
because she disagreed with their definition of "household"; (2) E.M. did not trust SGF's
"policies and procedures regarding requiring a partner to be financially responsible for the
fertility treatments that could result in the partner having a child"; (3) E.M. did not trust SGF's
decision to require freezing and quarantining of donor sperm; (4) E.M. did not trust that she was

being treated the same as other similarly situated patients when SGF refused to alter its requirements to allow J.S. to be treated in some ways as a donor and in some ways as a partner; (5) E.M. did not trust SGF's judgment that a "time out" was warranted when she suggested that her relationship with J.S. was not what SGF had understood it to be. *Id.*

These more specific reasons provided by SGF elaborate on the breakdown in trust and suffice to overcome *Figueroa*'s caution against overly vague reasons.  There is sufficient evidence from which a jury might reasonably conclude that SGF terminated E.M. as a patient for these neutral and nondiscriminatory reasons—because she refused to trust SGF and abide by its policies and not because she had complained about discrimination.  Mottla's email stating that it "sound[ed] like" SGF and E.M. were "at an impasse" and determining that "[m]oving forward, she needs to be dismissed from our care" emphasized that "[t]here is clearly lost trust in the patient physician relationship and our commitment to her best care and our support."  SGF E-mail Chain at 4–5.  Mottla and other SGF employees testified to the same.  *See, e.g.*, Osborn Dep. 301:10-302:6 ("[W]e gave her all of these options, she over and over refused . . . . She states she's not going to do those things.  She is absolutely not going to freeze sperm and she's not going to have [J.S.] be financially responsible. . . . She didn't believe we were treating her the same as we would a married patient."); Mottla Dep. 47:8-50:15 ("She wouldn't comply with our best judgment that a social worker was needed to evaluate this changed chaotic relationship . . . .  [W]e had a complete breakdown in the patient/physician relationship between Osborn . . . and [E.M.] and [J.S.]"); Widra Dep. 164:1-7 ("[T]he lack of trust had finally reached the point where no one involved in this set of decisions, including myself, felt it was appropriate to continue.").  The Court need not delve into each of the five specific points of distrust in detail because SGF does not need to be able to show evidence supporting each and every one in order

to survive summary judgment here.  It is enough to say that there is sufficient evidence that a

jury could find credible supporting the notion that some of these reasons, and the broader notion

of lack of trust, and not retaliation, motivated E.M.'s termination.

This brings the analysis to the third stage of *McDonnell Douglas*.  E.M. could still be

granted summary judgment at this stage if a reasonable jury could only find that SGF's stated

reasons were pretextual.  As previously stated, granting summary judgment to a *plaintiff* at this

point of the analysis is extraordinarily rare and acceptable only where "it is shown *both* that the

[asserted] reason was false, *and* that discrimination was the real reason."  *St. Mary's Honor Ctr.*,

509 U.S. at 515.  The same analysis goes for retaliation.  E.M. points to a handful of statements

in the SGF E-mail Chain that she says reveal pretext: Mottla's comments that E.M. was "clearly

a challenging patient" and that "[i]f she stays as [a] patient, at a minimum her care will be time

consuming . . . and predictably problematic," as well as his determination that they were "at an

impasse" and his instruction that E.M. should be sent "the standard letter."  Pl.'s MSJ Mem. at

39 (citing and quoting SGF E-mail Chain at 4–5, 8).  These comments show that SGF was

frustrated with E.M., and they show that SGF employees were perhaps less polite behind her

back than they were to her face.  This falls far short of showing that SGF is necessarily lying

when it suggests that lack of trust, and not retaliation, was its motive.  E.M. also points to

Osborn's comments on the transcribed phone call, Pl.'s MSJ Mem. at 39–40, which, as discussed

above, could be interpreted either way.  *See supra* & n.17.  She also argues that "the hour-long

conversation between Osborn and E.M. is replete with E.M.'s attempts to assure Osborn that . . .

E.M. still trusted the medical advice she was receiving."  Pl.'s MSJ Mem. at 40.  A jury might

not find these assertions by E.M. credible, in light of the clear points of contention identified by

SGF so, again, they do not show that SGF's stated reasons were necessarily pretextual.  Finally,

E.M. suggests that SGF's pretext is revealed by a termination letter SGF sent to another patient,

identified as "Patient 1," in which SGF used the same language regarding loss of trust. *Id.* at 40–

41 (citing Pl.'s SMF ¶¶ 114–15 and comparing E.M. Termination Letter with Pl.'s SMF Ex. 25

("Patient 1 Termination Letter"), ECF No. 53-25).   Comparator evidence can be "[e]specially

relevant" to a demonstration of pretext. *McDonnell Douglas*, 411 U.S. at 804.   By E.M.'s own

account (based on information SGF produced in discovery), Patient 1 was actually terminated

not for lack of trust but because her "expectations regarding physician's availability" were

"unrealistic."   Pl.'s MSJ Mem. at 40 (citing Pl.'s SMF ¶ 116).   This could suggest that "loss of

trust" is a pretextual reason given by SGF in official discharge papers whenever the clinic finds a

patient too difficult to deal with, but it is far from clear that it would show that retaliation

actually motivated E.M.'s dismissal, which is required to grant summary judgment in *her* favor.

For these reasons, E.M. is not entitled to summary judgment on her retaliation claim.

   SGF is not entitled to summary judgment on retaliation either, though.   Drawing

inferences in SGF's favor, all the evidence suggesting pretext could be read the other way.

Comments about E.M. being a challenging patient and Mottla's unilateral decision to cut off

negotiation when E.M. was still willing to talk could be seen as indicative of the clinic's spiteful

reaction to her suggestion that they were discriminating.   Pl.'s MSJ Mem. at 39 (citing and

quoting SGF E-mail Chain at 4–5, 8).   And the evidence from Patient 1 could likewise be seen as

suggesting that "loss of trust" is used as a generic reason on official documentation when

patients are terminated for complex or unlawful reasons.   In short, "though evidence of pretext is

not *per se* sufficient to permit an inference of discrimination [or retaliation], it usually will be

enough to get a plaintiff's claim to a jury." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir.

2009) (internal quotations, citations, ellipses, and brackets omitted); *see also Hamilton v.*

*Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (noting that courts "do not routinely require plaintiffs to submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment.") (internal quotations omitted).  Accordingly, summary judgment on the retaliation claim will be denied to both parties and that claim will be decided by a jury.

### f. Notice Posting

Finally, the Court considers if E.M. is entitled to summary judgment on her claim that SGF violated the notice requirements of the DCHRA by not displaying a designated poster in their offices.  The DCHRA requires that covered entities, which include places of public accommodation such as the medical offices of SGF, "shall post and keep posted . . . a notice whose language and form has been prepared by [D.C. OHR]" in order to alert patrons to their rights to non-discrimination under the DCHRA.  D.C. Code § 2-1402.51; *see also* D.C. Code § 2-1401.02(24) (defining covered entities).  While both parties agree that the notice in question was not posted in the SGF offices, E.M.'s summary judgment motion on this claim still fails, as a review of the mandatory notice requirements shows that the display of the poster in question is in fact optional, meaning SGF did not violate the DCHRA by not having it posted in their offices.

In opposing E.M.'s motion for summary judgment, SGF first argues that there is no private right of action available to challenge a business's failure to post the required notice.  Def.'s MSJ Opp'n at 2–3.  If there were no private right of action, this would mean that E.M. failed to state a claim on this theory, but, in fact, the private right of action does exist.  The DCHRA states that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction."  D.C. Code § 2–1403.16.  An "unlawful discriminatory practice" is defined as "those discriminatory practices which are so specified in subchapter II of Unit A of this chapter," *id.* § 2–1401.02(31), and that

subchapter states that "[i]t shall be an unlawful discriminatory practice for a person subject to this chapter, to fail to post notices, maintain records, file reports, as required by [§ 2-1402.51]," *id.* § 2–1402.64(b). The question thus becomes if E.M. qualifies as a "person claiming to be aggrieved." The D.C. Court of Appeals has "specifically stated on several occasions that the DCHRA is a remedial civil rights statute that must be generously construed." *Exec. Sandwich Shoppe*, 749 A.2d at 731, 732 ("standing under the DCHRA should be accorded a broad enough construction to make a remedy available from those forms of discrimination which the statute does reach."). However, "standing under the DCHRA is co-extensive with standing under Article III." *Id.* at 733 (citing *Molovinsky v. Fair Emp't Council of Greater Wash.*, 683 A.2d 142, 146 (D.C.1996). Therefore, to have standing to bring this claim under the DCHRA, E.M. needs to have "a minima of injury in fact" due to SGF's failure to post the notice. *See id.* (citations omitted).

The Court will assume without deciding that E.M. suffered an injury from the lack of notice and qualifies as "aggrieved person" under the DCHRA, as we need not reach this issue given that the allegation that SGF violated the DCHRA's notice posting requirement falls apart under the closer evidentiary scrutiny of the summary judgment stage. E.M.'s summary judgment motion clarifies that the alleged violation focuses on SGF's failure to post a particular poster created by the D.C. Office of Human Rights, Pl.'s SMF Ex. 28. *See* Pl.'s SMF ¶¶ 117–18. There is no dispute that SGF did not have this particular poster displayed in its offices, as Gerber testified that SGF viewed the relevant poster as an optional one which it understood it was not obligated to display. Pl.'s SMF Ex. 7 ("Gerber Dep.") at 24:14–26:20, ECF No. 53-7; Def.'s Resp. SMF ¶ 117. Indeed, the D.C. Office of Human Rights identifies this poster as optional on its website, which has been produced as an exhibit here, Pl.'s MSJ Reply, Ex. C, and which the

Court was able to independently access and review.  *See* D.C. Office of Human Rights, Workplace and Business Posters (accessed July 2020), https://ohr.dc.gov/page/workplaceposters ("D.C. OHR Website").  The website provides links to a number of posters which, according to the website, "were created by the Office of Human Rights to advise customers about their rights" in certain areas, including public accommodations, and states that "[e]mployers in the District of Columbia are required by law to display specific employment-related posters in locations accessible to their employees."  D.C. OHR Website.  It then lists required posters.  *Id.*  Below the required posters, the website explains that "OHR also encourages businesses to post this optional poster," and links to the Poster E.M. identified.  *Id.*

The Court agrees with SGF that it was not obligated to display this poster.  While the DCHRA says that covered entities "shall post and keep posted . . . a notice whose language and form has been prepared by [D.C. OHR]," D.C. Code § 2-1402.51, it is clear from the D.C. OHR website that OHR does not view this particular poster as the one identified by the statute. Certainly it fits the statute's description of "a notice whose language and form has been prepared by the Office, setting forth excerpts from or summaries of, the pertinent provisions of this chapter and information pertinent to the filing of a complaint," but OHR has explicitly stated that the poster is "optional" not "required," so OHR must not view this poster as the one that D.C. Code § 2–1402.51 permits it to require.  E.M. argues that the poster is designated "optional" because only some businesses—places of public accommodation—are required to post it.  Pl.'s MSJ Reply at 7.  But this is an incredibly strained reading of the website, which explicitly states that the posters are for public accommodations but nonetheless does no more than "encourage[]" businesses to post" the "optional" poster.  D.C. OHR Website.  Even though the poster identified by E.M. would appear to fit the description of the poster OHR is empowered to require, the D.C.

OHR has not identified it as such.  The Court therefore cannot assume that the poster attached as

Exhibit C to E.M.'s reply qualifies as the described "notice whose language and form has been

prepared by the Office," in the face of the Office's explicit statement to the contrary.  This poster

is the only one E.M. has suggested is required but missing from SGF's offices.  The Court will

therefore grant summary judgment to SGF on this theory of liability because the identified poster

is not, in fact, required.

### C.  Contract Claims (Counts Three, Four, and Five) and Promissory Estoppel (Count Seven)

Each claim in this group is grounded in contract or quasi-contract.  The Court addresses

them together because these theories of liability are two sides of the same coin.  Promissory

estoppel is an alternative to a claim for breach of contract available only in the absence of "an

express, enforceable contract."  *Daisley v. Riggs Bank*, 372 F. Supp. 2d 61, 71 (D.D.C. 2005)

(applying D.C. law).  "To prevail on a claim of breach of contract, a party must establish (1) a

valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a

breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984

A.2d 181, 187 (D.C.2009).  "In order to find a party liable on a theory of promissory estoppel,

there must be evidence of a promise, the promise must reasonably induce reliance upon it, and

the promise must be relied upon to the detriment of the promisee."  *Parker v. John Moriarty &*

*Assocs. of Va., LLC*, 332 F. Supp. 3d 220, 240 (D.D.C. 2018) (quoting *Plesha v. Ferguson*, 725

F. Supp. 2d 106, 111–12 (D.D.C. 2010)).  E.M. acknowledges that she has pled promissory

estoppel in the alternative to her breach of contract claims.  *See, e.g.*, Pl.'s MSJ Mem. at 54.

Count Three alleges that SGF breached what she terms the "Egg Freezing Program"

contract by refusing to go through with an egg thaw, Count Four alleges a breach of the Patient

Bill of Rights ("PBOR"), and Count Five alleges a breach of the contractually-implied covenant

of good faith and fair dealing.  Count Seven is a claim of promissory estoppel based on two theories that correspond to Counts Three and Four.  SGF has moved for summary judgment on all four claims.  E.M. has moved for summary judgment with respect to liability on Counts Three and Four but not on Count Five or Seven.

### 1. Egg Freezing Program (Counts Three and Seven)

Count Three alleges that SGF breached a contract with E.M. by which it had agreed to provide services "including thawing, inseminating her eggs, subsequently incubating her embryos, in SGF's laboratory."  Compl. ¶ 213.  To start, the parties disagree regarding whether such a contract existed.  "For a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations."  *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009) (citing *Eastbanc, Inc. v. Georgetown Park Assoc. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008)).  "The party asserting the existence of a contract has the burden of proof on that issue."  *Eastbanc, Inc.,* 940 A.2d at 1002 (quoting *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995)).  "A contract must be sufficiently definite as to its material terms (which include, *e.g.,* subject matter, price, payment terms, quantity, quality, and duration) that the promises and performance to be rendered by each party are reasonably certain."  *Id.* (quoting *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990)).

E.M. argues that she and SGF entered into an oral "Egg Freezing Contract."  Pl.'s MSJ at 52.  She says that "[a]t the time Plaintiff enrolled as an egg freezing patient, SGF presented to her all the material terms of what is now called the Egg Freezing Program and indicated an intent to be bound to these terms, forming an oral 'Egg Freezing Contract.'" and that "SGF retrieved E.M.'s eggs, arranged to store them and told her she could return to SGF to use her frozen eggs when she was ready" and also "accepted money in exchange for those services and promises."

*Id.* E.M. provides no citations for any of this, and provides no additional details concerning what material terms she believes were agreed to. E.M. points to her statement of material facts to establish that SGF "act[ed] as though it intended to be bound by" this alleged oral contract, but the cited facts, even if true, say nothing about an agreement. *Id.* (citing Pl.'s SMF ¶¶ 31–35). These facts would only establish discussion about thawing E.M.'s eggs. *E.g.*, Pl's SMF ¶ 31 ("Dr. Widra admits he had a number of conversations with E.M. about potentially thawing her eggs . . . ."); *id.* ¶ 33 ("Osborn had multiple discussions about E.M. returning to thaw her eggs . . . and Osborn specifically recommended that E.M. do so."); *id.* ¶ 35 ("E.M. had multiple additional discussions with her clinical providers . . . regarding returning to use her frozen eggs.").

In her opposition to SGF's motion for summary judgment, E.M. provides somewhat more detail about the alleged oral contract. She explains that as she sees it the Egg Freezing Contract was "the oral agreement for the two-part process, the fertility 'insurance policy' SGF was advertising and selling" and cites to a portion of her response to SGF's statement of facts. *See* Pl.'s MSJ Opp'n at 38 (citing Pl.'s Resp. SMF ¶ 18.1). This in turn cites to extended discussion in E.M.'s own statement of facts regarding SGF's marketing materials, its website, various literature handouts, and comments from SGF employees suggesting that women who have their eggs frozen by SGF can return to have them thawed, inseminated, and implanted. *See* Pl.'s Resp. SMF ¶ 18.1 ("At all points in time from 2012 to 2019, including in written literature and oral representations . . . SGF has consistently represented to E.M. that egg freezing and egg thawing were the two bookends of the Fertility Preservation Program, . . . .") (citing Pl.'s SMF ¶¶ 135–46). E.M. also cites her own testimony that she understood egg-freezing to be "the first half of a two-part process." *Id.* (quoting E.M. Dep. 83:12–15). None of what she cites contains

more than the vaguest guarantees that freezing patients can return for thawing. *See* Pl.'s SMF ¶¶ 135–46.

E.M. bears the burden of establishing that a contract existed, but has pointed to little evidence supporting her claim that there was one, and even less to establish what its terms were beyond the fact that it involved a right to return and thaw her eggs at SGF. "Reasonable definiteness in the essential terms of a purported contract must . . . be a precondition for its enforceability, for otherwise the court has no adequate means of identifying the obligations which it should enforce." *Rosenthal*, 573 A.2d at 370; *see also Strauss v. NewMarket Global Consulting Grp., LLC*, 5 A.3d 1027, 1033 (D.C. 2010) ("We have declined to uphold oral contracts in cases where critical details of the proposed transaction could not be proved."). Even assuming that an oral contract was reached, it would not be enforceable if it were merely a vague, open-ended guarantee of a right to return for egg-thawing with no further terms. *See Rosenthal*, 573 A.2d at 370 (finding the oral contract "we will deliver produce; you will pay us" to be unenforceably indefinite). Because E.M. cannot establish the existence or terms of a contract for egg thawing,[19] her motion necessarily fails as to Count Three.

For the same reason E.M.'s motion fails, SGF's motion for summary judgment on the same Count must be granted. E.M. identifies no testimony or documents from which a juror could infer that a sufficiently detailed oral contract existed. *See Marshall v. Allison*, 908 F. Supp. 2d 186, 202 (D.D.C. 2012) (granting summary judgment to defendant on a D.C. tortious

---

[19] To the extent that E.M. would argue that SGF's course of conduct gave rise to an implied contract, this too would fail to establish a contract. While a course of conduct may serve to clarify the terms of an existing contract, *see Waverly Taylor, Inc. v. Polinger*, 583 A.2d 179, 182 (D.C. 1990), or constitute a waiver of contractual provisions, *see LanQuest Corp. v. McManus & Darden LLP*, 796 F. Supp. 2d 98, 102–03 (D.D.C. 2011), the "mere expectancy of a continued course of conduct is not enough" to establish a contract by implication. *Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997).

interference claim in part because "[t]he claim that there were valid oral contracts [that could have been interfered with]. . . is undermined completely by the dearth of evidence regarding any of the key terms of such alleged contracts.").  Because a valid contract between the parties is the foundational element of a claim for breach of contract, this claim cannot succeed.

Count Seven includes a promissory estoppel claim premised on the notion that even if there was no contract by which SGF agreed that E.M. could return to thaw her eggs SGF nonetheless "made a number of promises to [EM] to induce her to enroll in the Egg Freezing Program and to continue her fertility treatments with [SGF]."  Compl. ¶ 234.  "In order to prevail on a promissory estoppel claim, a plaintiff must establish (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his detriment."  *Osseiran v. Int'l Fin. Corp.*, 889 F. Supp. 2d 30, 34 (D.D.C. 2012) (applying District of Columbia law) (quotations omitted).  "However, because reliance on an indefinite promise is unreasonable, a promissory estoppel claim must rest on 'a promise with definite terms on which the promisor would expect the promise to rely.'"  *Id.* (quoting *In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 58, 73 (D.D.C. 2003)).

The Court will assume without deciding that the statements by SGF suggesting that patients can return to SGF for egg-thawing could support an inference that SGF made a promise. These are fairly nonspecific promises, but the Court will assume for now that they could support the requisite inference because the claim fails to establish the next element either way—relying on this promise, if one was made, was not reasonable.  First, the promise, even if made, was indefinite.  E.M. has not explained the terms on which she believed SGF had promised she could return to thaw her eggs.  Her briefing says simply that "SGF promised E.M. that she could return to thaw her eggs when she was ready."  Pl.'s MSJ Mem. at 54.  If E.M. is suggesting that SGF

placed no conditions on the right to return for thawing, this was unreasonable.  No reasonable person would expect a medical clinic could make such an open-ended guarantee.

More specifically, E.M.'s reliance on a vague promise was additionally unreasonable because, at the time she had her eggs frozen, SGF required, and E.M. complied, that she sign a "Consent for Oocyte (Egg) Retrieval Cryopreservation and Storage" (the "Egg Retrieval Consent") which stated explicitly that SGF was not promising that she could necessarily return to thaw her eggs.  Egg Retrieval Consent at 9.  This consent form stated that "[SGF], at its sole discretion may choose for any reason not to participate in the later thawing, fertilization, or transfer of your eggs," and that "[SGF] reserves the right to terminate its participation of the cryopreservation of [your] eggs and/or may, at its sole discretion, refuse to participate in the thawing and/or fertilization in vitro and/or transfer of resulting embryos."  *Id.* at 8, 9.  E.M. claims that "[t]he informed consent form . . . itself only indicated three situations in which frozen eggs might not be later used," all of which involved the woman choosing not to use her eggs or being physically unable to do so, Pl.'s Resp. SMF ¶ 19.3–.7 (citing Egg Retrieval Consent at 5– 6), but this argument ignores the sweeping reservation of SGF's right not to participate in later thawing.[20]  E.M. herself points to Mottla's characterization of a consent form as "document[ing] the patient's understanding of the conversation" she has with her doctor.  Def.'s Resp. SMF ¶ 19.5–.7 (quoting Mottla Dep. 120:15–121:11).

The parties dispute whether the Egg Retrieval Consent form was a contract, *see, e.g.*, Def.'s MSJ Opp'n at 38–39, but the Court does not need to decide that issue in order to resolve

---

[20] It is possible to read these provisions together as suggesting that while SGF may decline to participate, women are guaranteed the opportunity to use their eggs *somewhere* so long as they are willing and able.  This reading does not save E.M.'s argument, though, because only E.M.'s opportunity to complete fertility procedures *with SGF* is at issue in this litigation.

this claim.  By signing it, even if she was not forming a contract, E.M. was demonstrating her understanding of the limits to what SGF was promising—or, at the very least, it was unreasonable for her to fail to understand such limits.  Even if it was not a contract, the Egg Retrieval Consent was a fairly formal and legalistic written communication that E.M. received and acknowledged and which stated with specificity that SGF was not promising to do what she alleges it was.  It would have been unreasonable for her to disregard this communication, contract or not.  A reasonable juror considering this formal document, which SGF required her to sign at the start of the process, could not fail to infer that it was unreasonable for E.M. to rely on any contrary and nonspecific statements SGF made.  For that reason, the promissory estoppel claim concerning the Egg Freezing Program turns out the same way as the breach of contract claim—SGF's motion is granted and E.M.'s denied.

## 2. Patient Bill of Rights (Counts Four and Seven)

The parties dispute whether the PBOR is a contract.  They disagree on whether the PBOR is something that SGF expressed an intent to comply with or whether it is merely an aspirational document.  *Compare* Def.'s SMF ¶ 22 ("Shady Grove provides the [PBOR] to all patients seeking treatment . . . and aspires to comply with it."), *with* Pl.'s Resp. SMF ¶ 22.3 (disputing this and arguing that "SGF testified that the PBOR set more than an aspiration, but an expectation in its patients").  This factual dispute precludes summary judgment for either party. Because there is sufficient evidence from which a reasonable juror could find either way, neither party is entitled to even partial summary judgment.

Again, "[f]or a contract to be enforceable, the parties must (1) express an intent to be bound, (2) agree to all material terms, and (3) assume mutual obligations."  *Dyer*, 983 A.2d at 356 (citing *Eastbanc, Inc.*, 940 A.2d at 1002).  The first of these requirements is implicated by

the dispute over whether SGF intended the PBOR as a promise of certain conduct or merely as an aspiration.  "[R]egardless of the parties' actual, subjective intentions, the ultimate issue is whether . . . they *objectively* manifested a mutual intent to be bound contractually." *Id.* at 357 (quoting *1836 S Street Tenants Ass'n, Inc. v. Estate of Battle,* 965 A.2d 832, 837 (D.C. 2009)).

Whether two parties intended to be bound by the terms of a document that does not resemble a conventional or prototypical contract can be a question of fact for the jury.  *Strass v. Kaiser Found. Health Plan of Mid–Atl. States, Inc.*, 744 A.2d 1000, 1013–14 (D.C. 2000) (holding that "a jury could conclude reasonably that the employer intended to be bound by" the terms of an employee handbook).  This issue has arisen in the District of Columbia most frequently in the context of employee handbooks or manuals.  *See, e.g.*, *Wash. Welfare Ass'n, Inc. v. Wheeler*, 496 A.2d 613, 615 (D.C. 1985) ("Whether a personnel manual creates contractual rights for the employee is a question for the jury."); *Nickens v. Labor Agency of Metro. Wash.*, 600 A.2d 813, 817 (D.C. 1991) (same); *Austin v. Howard Univ.*, 267 F. Supp. 2d 22, 25 (D.D.C. 2003) ("Whether an employee handbook creates contractual rights for an employee is a question for a jury.") (citing *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 745 (D.C. Cir. 1998); and *Wheeler*, 496 A.2d at 615); *cf Dahl v. Brunswick Corp.*, 356 A.2d 221, 224 (Md. 1976) (collecting cases supporting "the proposition that employer policy directives regarding aspects of the employment relation" may "become contractual obligations" depending on the circumstances).  SGF also highlights several cases from other courts concerning whether "[b]rochures and informational documents" qualify as contracts.  Def.'s MSJ Mem. at 40 (citing *Rayess v. Educ. Comm. for Foreign Med. Graduates*, 983 N.E.2d 1267, 1272 (Ohio 2012) (distinguishing "an express written promise" from a statement in an "informational pamphlet" that merely "*implies*" certain conduct on the part of the drafter); and *Lewand v. Mazda*

*Motor of Am., Inc.*, No. 17-cv-620, 2017 WL 7080291, at *5 (C.D. Cal. Aug. 8, 2017) (holding

that "statements in [a] brochure" were not "contractual in nature")). The PBOR resembles these

contested documents in that it, on the one hand, it arguably lays out a set of mutual obligations

while, on the other, it is distributed by one party to the other, is not negotiated, does not identify

itself as a contract, and is not signed.

There is some evidence on both sides of this issue. To start, the fact that SGF drafted and

distributed the document is at least some evidence from which a jury could find that SGF meant

to commit to what the document describes. More substantively, E.M. points to deposition

testimony from SGF employees, including Gerber's 30(b)(6) testimony on behalf of SGF itself.

Pl.'s Resp. SMF ¶¶ 22.3, 23.2–.3 (citing Gerber Dep. 8:13–17; Widra Dep. 55:1–11; Mottla Dep.

300:21–301:6). A reasonable jury might find some support in this testimony for the idea that

SGF intended to be bound by the PBOR, though overall the testimony is inconsistent. Mottla

agreed that he views the PBOR "being sort of an exchange of some rights with some

responsibilities" and as "Shady Grove promising to its patients that it's going to comply with

these rights," at least "[t]o the best of [its] ability." Mottla Dep. 300:21–301:6. Gerber's

testimony, on the other hand, arguably supports SGF's view of the document as much as or more

than it does E.M.'s. Gerber agreed with E.M.'s counsel that "by providing [the PBOR] to the

patients, [SGF is] expecting that patients are going to understand the[] rights and expect to be

treated consistently with them," but, before prompted by his description, she had described the

document only as "a code of conduct" and as a list of "aspirations of what [SGF] want[s] to live

up to." Gerber Dep. 7:8–8:17. She did not agree that SGF necessarily intended to be "bound to

it." *Id.* 8:10–12. Widra's testimony is ambiguous as to whether SGF intended to be bound. He

described the patient bill of rights merely as "a way to establish some mutually agreed ground

rules . . . or expectations" but also testified that he would expect his staff to follow those guidelines.  Widra Dep. 55:1–11.

Because a reasonable jury could find either way as to whether the parties agreed to be bound by the PBOR, E.M. cannot win summary judgment on Count Four.  Nor is SGF entitled to summary judgment on this Count, because, as the Court explained above, at least two provisions in the PBOR could reasonably be interpreted as guaranteeing E.M. that she would be free from retaliation or reprisal if she voiced complaints or grievances.  The Court cannot say, as a matter of law, that these provisions are insufficiently definite to be enforced if the PBOR is in fact a contract.  SGF's motion for summary judgment on Count Four thus fails.

Because Count Four remains open and could come out either way, the same is true for Count Five and the PBOR claim under Count Seven.  SGF's only arguments against E.M.'s claim for breach of the covenant of good faith and fair dealing are that Maryland law applies and that there was no contract.  Def.'s MSJ Mem. at 42–44.  The Court has ruled that D.C. law applies, and that the PBOR may be a contract, so both of these arguments fail.[21]  As for Count

---

[21] SGF also argues that any portion of Count Five that relates to HIPAA must fail because HIPAA does not allow for a private right of action and courts do not allow "attempts to bring a backdoor HIPAA private right of action" through state law.  Def.'s MSJ Mem. at 54–55.  As E.M. has explained, though, she does not allege that SGF breached a contract or committed a tort by violating HIPPA.  *See* Pl.'s MSJ Opp'n at 36 n.30.  Rather, she claims that SGF made false representations that it would follow HIPAA.  *See* Compl. ¶ 204.  Further, the cases from this district that SGF cites to support its claim, *see* Def.'s MSJ Mem. at 55, do not stand for the propositions SGF cites them for.  In *Hudes v. Aetna Life Ins. Co.*, 806 F. Supp. 2d 180, 185 (D.D.C. 2011), the plaintiff had not "specifically set[] out her causes of action," so the Court construed one claim as a "claim against [defendant] for violating HIPAA" which it dismissed because there is no private right of action under HIPAA.  *Id.* at 195–96. This case therefore did not concern a state law claim premised on a violation of HIPAA.  *Id.* at 196.  In *Ihebereme v. Capital One, N.A.*, 933 F. Supp. 2d 86, 109 (D.D.C. 2013), a court rejected an argument that the violation of a particular statute directly constituted a CPPA violation where that statute did not provide a private right of action.  Neither of these resembles E.M.'s HIPAA claim.  E.M.'s theory of a breach of contract relating to representations concerning HIPAA compliance thus remains viable.

Seven's PBOR claim, on which both parties seek summary judgment, promissory estoppel remains a viable theory on which E.M. could win if the PBOR is found not to be a contract.  By expressing as an "aspiration" or "ground rule" that it would not retaliate against complainants, SGF may have made E.M. a non-contractual promise on which she relied to her detriment.  *See Kaufman v. Int'l Bhd. of Teamsters*, 950 A.2d 44, 49 n.7 (D.C. 2008) (defining the elements of promissory estoppel); *Parker*, 332 F. Supp. 3d at 240 (same).  E.M. cannot succeed on both her breach claim and her promissory estoppel claim, but if the former fails she may argue the latter to the jury.  Fed. R. Civ. P. 8(d)(2); *see, e.g.*, *McNamara v. Picken*, 950 F. Supp. 2d 125, 128 (D.D.C. 2013) ("[A] plaintiff may plead inconsistent theories of liability, and may even argue alternative claims to a jury.").  Accordingly, it would be premature to issue summary judgment against her on this alternate theory and SGF's motion is denied as to Count Seven.

### D.  Unjust Enrichment (Count Six)

Only SGF has moved for summary judgment on Count Six, which alleges unjust enrichment. "Unjust enrichment occurs when (1) the plaintiff confer[s] a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust."  *In re APA*, 766 F.3d at 45–46 (quoting *New World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005)).  Like promissory estoppel, it is a theory of quasi-contract.  *Thompsen*, 878 A.2d at 1222.  E.M.'s theory of unjust enrichment here is premised on her claim that SGF "induced [her] to enroll as a patient in its Egg Freezing Program, for which [she] paid a substantial sum to [SGF], representing to her that she would be able to return to use her frozen eggs in its laboratory" and that she also paid "a substantial sum for subsequent fertility services in order to maintain this relationship" but that SGF then "refus[ed]

to provide [E.M.] with the benefit of the very bargain that induced [her]" to pay them for all these treatments in the first place.  Compl. ¶ 229–30.

E.M. seeks damages in the amount of $48,936 on her unjust enrichment claim.  *Id.* ¶ 232 (requesting this "or such other amount to be proved" and interest and costs).  The parties agree that the $48,936 she has identified in connection with her unjust enrichment claim represents the amount she paid for the egg freeze procedure, an IUI procedure, three IVF procedures, and other medical services she received from SGF.  Pl.'s Resp. SMF ¶ 37.2.  Some of the money at issue can be taken off the table at summary judgment because E.M. agrees that SGF "tracks and bills most medical procedures . . . separately," Pl.'s Resp. SMF ¶ 32.7, and because she retained the benefit of certain procedures that had little if anything to do with her egg freezing and thawing process.  Summary judgment on the claim is impossible, however, because of uncertainty surrounding some of SGF's billing.

E.M. paid roughly $7,500 for her egg freezing procedure in 2012.  *See* Pl.'s Resp. SMF ¶ 20.1 (agreeing that "she paid at least $7,500 to SGF in 2012" which covered "approximately 20 medical procedures . . . clinical consults, and the first year of storage of her frozen eggs").  SGF notes that E.M. testified she "ha[d] no complaints of how they performed the service."  Def.'s SMF ¶ 20 (citing E.M. Dep. 81:14–15).  E.M. disputes this, arguing that "the service was incomplete, as she was promised she could return to use her frozen eggs when she was ready" and because egg freezing and egg thawing were two parts of the same program.  Pl.'s Resp. SMF ¶ 20.3.  This argument fails because of the Egg Retrieval Consent.  In discussing E.M.'s promissory estoppel claim, the Court observed that this document made clear that SGF was not promising that E.M. could necessarily return to thaw and fertilize her eggs.  *See* Egg Retrieval Consent at 8, 9.  It functions similarly in this quasi-contract claim.  It makes clear that, in 2012,

E.M. was not paying for the right to return and thaw her eggs in the future.  The Egg Retrieval

Consent does not need to be a contract in order to serve as evidence of what E.M. was paying for

at the time, and—as was the case for unjust enrichment—a reasonable juror considering this

evidence could not find it was outweighed by generalized statements from SGF about returning

to thaw the eggs.

E.M. agrees that the series of procedures that constituted the "IUI procedure" or "IUI

cycle," which did not use her frozen eggs and involved injecting processed sperm into her uterus

was priced separately.  Pl.'s Resp. SMF ¶ 32.2–.3, 32.8.  She does not dispute that SGF

"performed its obligations with respect to" the IUI cycle, which cost "a few thousand dollars."

*Id.* ¶ 32.8, 32.10.  A consent form signed by E.M. and J.S. in connection with the IUI cycle

outlined the procedures being consented to and required both to indicate their understanding that

"there are not guarantees of success" with the treatments.  Def.'s SMF Ex. 30 ("IUI Consent"),

ECF No. 50-32.  E.M. disputes whether this consent was a contract, Pl.'s Resp. SMF ¶ 32.4–.6,

but whether or not it was contractual, her acknowledgment of the limits of the procedure evinces

her understanding of what she was signing up for (and paying for) in 2015.  It is unclear how

much exactly E.M. paid for the IUI procedure, but she retained the "benefit" of the procedure,

despite is lack of success.  The "few thousand dollars" she paid for the IUI procedure is therefore

not recoverable through an unjust enrichment claim.

The IVF cycles are more of a mixed bag.  In 2016 E.M. and J.S. signed a "Multi-Cycle

Discount Program Information and Agreement" providing that SGF would perform two attempts

at in vitro fertilization and embryo transfers for $16,000.  Def.'s SMF Ex. 32 ("2016 Multi-Cycle

Agmt."), ECF No. 50-34.  In 2017 they signed another document with the same title providing

that SGF would perform two more attempts for $18,500.  Def.'s SMF Ex. 33 ("2017 Multi-Cycle

Agmt."), ECF No. 50-35. E.M. disputes whether these were contracts.  *See* Pl.'s Resp. SMF ¶¶ 34.1, 36.2–3.  She repeats her argument, made elsewhere, that "SGF's consent forms . . . are not contracts."  Pl.'s Resp. SMF ¶ 36.2.  But both these documents are titled as "Agreement[s]" not as "Consents," *compare* 2016 Multi-Cycle Agmt., *with* Egg Retrieval Consent (titled a "Consent").  The Multi-Cycle Agreements are unmistakably contracts.  They describe mutual obligations—payment and the performance of the procedures—include detailed material terms, and are signed by E.M., J.S., and an SGF representative.  *See Dyer*, 983 A.2d at 356 (describing requirements for an enforceable contract).  However, "the existence of a contract does not automatically foreclose an unjust enrichment claim" as it would a promissory estoppel claim. *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016).

The 2016 Multi-Cycle Agreement provided, in bold lettering, that the plan E.M. was agreeing to "[did] not offer any refund of fees if a baby is not born."  2016 Multi-Cycle Agmt. at 1.  So did the 2017 agreement, and E.M. circled this text and noted by hand near it the "refund/cancellation" provisions later in the contract, which she observed would apply "if two IVF cycles are not completed."  2017 Multi-Cycle Agmt. at 1.  The IVF cycles did not use any of E.M.'s frozen eggs.  *See* Pl.'s Resp. SMF ¶ 33.1 (not disputing this).  E.M. agrees she paid the fee and that SGF performed the two IVF cycles in 2016.  *Id.* ¶¶ 34.6, 35.1.  E.M. disputes SGF's assertion that she "does not claim that she has any complaints about the quality of these procedures," but she points only to issues she had with "lack of professionalism," and to the fact that she "challenged" SGF, and that she was "upset" following the first of these two cycles.  *Id.* ¶ 35.2.  These small frustrations are not significant enough that a reasonable jury could find SGF did not confer the contractually-outlined benefit of the 2016 IVF cycles to E.M.

E.M.'s only argument for recovering the money she paid for egg freezing, IUI procedures, and the 2016 IVF procedures is that "all her care at SGF was interrelated" and "she stayed with SGF to build a relationship with the practice and her clinical team to ensure continuity of care" with an eye toward using her frozen eggs in the future.  Pl.'s Resp. SMF ¶ 32.2.  This is not enough for her claim to survive summary judgment with regard to these first three expenses because this ancillary benefit is not enough to make it "unjust" for SGF to retain the funds E.M. paid for procedures that had nothing directly to do with the freezing and thawing of her eggs.  The IUI Consent and the 2016 Multi-Cycle Agreement delineate the scope of what E.M. was paying for.  Even if E.M. is correct that the IUI Consent is not a contract, it is evidence of what she could reasonably expect to receive when she paid for the IUI procedure.  A reasonable jury considering the IUI Consent would have to conclude that it was not unjust for SGF to keep the money E.M. paid these procedures, which she agrees were performed.  Further, if continuity of care benefits are the only benefits that E.M. did not receive, it is unclear that damages could be ever be calculated.[22]

As for the 2017 Multi-Cycle Agreement, E.M. does not dispute that she paid the $18,500 required by the 2017 agreement, that SGF provided one IVF cycle, that the second cycle was not performed, and that she received a refund check from SGF.  Id. ¶ 36.6–.8.  E.M. says she never cashed the check and that she is not sure whether she received a full refund, id. ¶ 36.8 (citing E.M. Dep. 93:20–94:2).  Neither party has said how much this refund check was for.  The

---

[22] To the extent SGF can be said to have charged E.M. for the benefits she ought to have derived from continuity of care, these benefits were not itemized separately.  What's more, E.M. did receive some of the benefits of continuity of care between 2012 and early 2019.  For instance, even though the 2016 and 2017 IVF cycles were unsuccessful, they likely benefitted from the continuity of care established in the preceding years.  It may be impossible to separate the value of continuity-of-care benefits received by E.M. from those she paid for but did not receive.

question of what E.M. paid for and received in 2017 only becomes more complicated from there.

E.M. identifies SGF treatment records that she says show "three canceled and/or converted IVF

cycles" over the course of 2017.  Pl.'s Resp. SMF ¶ 36.6–.7 (citing Pl.'s Resp. SMF Ex. 30

("SGF Treatment Notes") at SGF0049–52, SGF0072–76, SGF0079–82, ECF No. 67-30).  The

treatment records do not speak for themselves.  They do mention "cycles" but without deposition

testimony or other evidence to help interpret or explain these records, the Court cannot tell

whether E.M.'s characterization is accurate.  Neither party has explained quite what a "canceled

and/or converted IVF cycle" is or how it should be billed.  On top of that, E.M. points to a

February 2019 invoice indicating that SGF charged her $1,300 at that time for services dating

back to 2017.  *Id.* ¶ 36.8 (citing Pl.'s Resp. SMF Ex. 85, ECF No. 67-85).  Purcell was unable to

explain these charges.  *See* Purcell Dep. 119:4–122:8.  Accordingly, the Court cannot say that

there are no disputed material facts regarding whether E.M. retained the benefit of what she paid

for in 2017.

Neither party has provided a coherent account of what happened in 2017, so the Court

cannot say as a matter of law that E.M. is not entitled to recover anything.  The terms of the 2017

Multi-Cycle Agreement could still manage to bar any unjust enrichment claim for these funds.

*See Falconi-Sachs*, 142 A.3d at 556 (explaining that while a contract does not foreclose an unjust

enrichment claim, the contract should resolve the dispute whenever possible).  Without a clearer

understanding of what happened, though, the Court cannot say that this is necessarily the case.

The unexplained February 2019 charges also confound any arguments concerning what

aspects of the egg thaw process E.M. paid for before she was terminated as a patient and whether

SGF retained the benefit she was owed.  Although the invoice seems to indicate that it was for

procedures performed in 2017, it was charged in February 2019, just after the relationship

between SGF and E.M. broke down.  The fact that Purcell, testifying as a 30(b)(6) witness, was unable to explain the charges could be the basis for any number of inferences unfavorable to SGF.  With the facts so unclear, the Court cannot conclude that nothing material is in dispute.

SGF's motion for summary judgment is thus granted in part and denied in part with regard to Count Six.  Under an unjust enrichment theory, E.M. is not entitled to recover any money she paid for the 2012 egg-freezing treatment, the 2015 IUI cycle, or the 2016 IVF cycle.  The Court cannot say at this time by how much this reduces the $48,936 in potential damages she had sought under this Count.  E.M. may be able to recover money she paid for the 2017 IVF cycle or money she paid in the runup to the never-performed 2019 egg thaw cycle.  SGF may yet be entitled to judgment as a matter of law in connection with these payments, but the facts are too unclear to say at this stage.

### E.  Fraud Claims (Count Eight, Nine, and Ten)

E.M.'s next three claims are claims related to fraud: Count Eight is a claim of negligent misrepresentation, Count Nine is a claim of fraudulent inducement of contract, and Count Ten is a claim of fraudulent misrepresentation.  SGF has moved for summary judgment on all of these, but E.M. has not.  For a variety of reasons, SGF is entitled to summary judgment on all claims under Counts Eight, Nine, and Ten.

The elements for these claims are similar.  Fraudulent misrepresentation and fraudulent inducement both require "(1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 46–47 (D.D.C. 2014) (quoting *Hercules & Co. v. Shama Res. Corp.*, 613 A.2d 916, 923 (D.C. 1992)); *see also Sibley v. St. Albans Sch.*, 134 A.3d 789, 808 (D.C. 2016).  "A

misrepresentation is 'material' if it would be 'likely to induce a reasonable person to manifest his

assent, or if the maker knows that it would be likely to induce the recipient to do so.'" *Sundberg*

*v. TRR Realty, LLC*, 109 A.3d 1123, 1131 (D.C. 2015) (quoting *Saucier v. Countrywide Home*

*Loans*, 64 A.3d 428, 438 (D.C. 2013)).  "Under D.C. law fraud "must be established by clear and

convincing evidence" meaning more than just evidence that is "equally consistent with either

honesty or deceit." *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs.,*

*Inc.*, 878 A.2d 1226, 1233 (D.C. 2005) (quoting *Atraqchi v. GUMC Unified Billing Servs.*, 788

A.2d 559, 563 (D.C. 2002)).  This means that "the nonmovant claimant must produce more

substantial evidence to successfully oppose summary judgment" than under the typical standard

of proof.  *Id.*

Negligent misrepresentation, meanwhile, lacks the state of mind requirements and instead

requires a breach of duty of care.  Its elements are that "(1) the defendant made a false statement

or omission of a fact, (2) the statement or omission was in violation of a duty to exercise

reasonable care, (3) the false statement or omission involved a material issue, and (4) the

plaintiffs reasonably and to their detriment relied on the false information." *Regan v. Spicer HB,*

*LLC*, 134 F. Supp. 3d 21, 38 (D.D.C. 2015).  Plaintiffs must prove negligent misrepresentation

only by the typical preponderance of the evidence standard.[23]

---

[23] The D.C. courts do not appear to have articulated in a published case whether the
standard of proof for a negligent misrepresentation claim is the clear and convincing standard
applied to fraud claims, *see Va. Acad. of Clinical Psychologists*, 878 A.2d at 1233, or the
preponderance of the evidence standard employed in an action for negligence.  *See Varner v.
District of Columbia*, 891 A.2d 260, 265 (D.C. 2006) (applying preponderance standard to a
negligence claim).  Because D.C. cases addressing claims for negligent misrepresentation that
did not overlap with fraud claims have made no mention of a heightened standard, the Court
understands the District to require only a preponderance of the evidence to make out a claim for
negligent misrepresentation.  *See, e.g.*, *Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322,
324–25 (D.C. 1999) (adopting heightened "clear and convincing" standard of proof for CPPA

These three Counts concern many of the same alleged misrepresentations.  Under each

Count E.M. points to the following alleged false representations:

> (1) SGF's leadership in the fertility industry . . . ; (2) the "unparalleled" superiority
> of its laboratory and embryologists; (3) that Defendant complies with its own
> Patient Bill of Rights; (4) that SGF treats Plaintiff's frozen eggs as her property;
> [and]  (5) that an egg freezing patient can return to SGF under the Egg Freezing
> Program when she is ready so that her eggs will be thawed and fertilized, her
> embryos grown, in its laboratory.

Compl. ¶¶ 240 (Count Eight), 249 (Count Nine), 255 (Count Ten).  In addition, under Counts

Eight and Ten (but not Nine) she points to "Defendant's omissions" concerning the Egg Freezing

Program, which E.M. says she "relied on . . . to her detriment."  *Id.* ¶¶ 244 (Count Eight), 259

(Count Ten).  This allegation appears to relate to "false statements" including "that threatening to

treat [J.S.] as a sperm donor, imposing new demands and conditions before it would continue

[E.M.'s] treatment (and then withdrawing before [she] could comply), and ultimately dismissing

Plaintiff are consistent with its long-standing policy and are required by the FDA."  *Id.* ¶¶ 243,

258.[24]  The Court organizes its discussion by alleged misrepresentation—as opposed to by

Count.

E.M.'s first two sets of allegedly false representations are a pair.  SGF says that E.M. has

no clear and convincing evidence from which she can establish that SGF is misrepresenting its

"leadership in the fertility industry" or its "'unparalleled' depth and breadth of experience" in

egg freezing.  Def.'s MSJ Mem. at 23–24.  SGF also argues that these claims are "puffery," *id.* at

---

intentional misrepresentation claims but not with references to negligent misrepresentation
claims); *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1207–08 (D.C. 1999).

[24] The Complaint is not entirely clear with regard to how the alleged "omissions" relate to
the alleged false statements about SGF policies and FDA requirements.  To the extent that the
false statements about SGF policies and FDA requirements were meant to articulate a separate
set of misrepresentations, any claims based on these would fail because E.M. has not explained
any actions she took in January and February 2019 in reliance on any representations that these
policies were long-standing or required by the FDA.

23 n.10, which is non-actionable "exaggeration[] reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined," *Pearson v. Chung*, 961 A.2d 1067, 1076 (D.C. 2008).  SGF is correct that these claims are puffery, which makes the sufficiency of E.M.'s evidence irrelevant.  E.M. acknowledges that SGF's witnesses often "play[ed] down [these statements'] significance by calling [them] 'marketing language' or similar or claiming that they were not, in fact, true."  Pl.'s MSJ Opp'n at 29 (citing Pl.'s Resp. SMF ¶ 81.1).  "[G]eneralized statements of optimism that are not capable of objective verification are not actionable."  *Freeland v. Iridium World Commc'ns*, 545 F. Supp. 2d 59, 76 (D.D.C. 2008) (internal quotations omitted); *see also Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 196 (D.D.C. 2016) ("[D]efendants' characterization of the Property as a 'stunning renovation' is a classic example of commercial puffery on which no reasonable person would rely.") (internal quotation omitted)); *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24, 30 (D.D.C. 2007) ("KFC's claims that its restaurants serve the 'best food' is a non-measurable, 'bald statement of superiority' that is non-actionable puffery."); *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W. 2d 233, 237 (Wisc. 2004) (finding "advertising material describ[ing] [a] motorcycle engine as 'premium' quality, [and as] 'a masterpiece'" to be puffery).

E.M. argues against summary judgment on puffery grounds, citing a case establishing that "statements of opinion, if that are material, may be actionable if they are not actually believed when made."  *Freeland*, 545 F. Supp. 2d at 76 (cited in Pl.'s MSJ Opp'n at 29).  In that case, Defendants had made fairly specific statements about the strength of demand for their products and there was a question of material fact as to whether they knew this was untrue.  *See id.* at 77–78.  That court noted that "statements that do more than offer 'rosy predictions' can be actionable."  *Id.* at 77 (citing *Manavazian v. Atec Grp., Inc.*, 160 F. Supp. 2d 468, 480 (E.D.N.Y.

2001)).  SGF's statements here do not even offer predictions of any kind.  They are only the sorts of "bald statement[s] of superiority" identified above.  *See Hoyte*, 489 F. Supp. 2d at 30.  SGF is entitled to summary judgment on fraud claims relating to these statements of puffery.

The next group of allegedly false representations relate to the PBOR.  SGF argues that E.M. can point to no evidence that SGF knew any representations it made in the PBOR were false at the time they were made.  Def.'s MSJ Mem. at 25.  This is correct.  E.M. argues that SGF "failed to follow and deliver upon" the protections and grievance process outlined in the PBOR, Pl.'s MSJ Opp'n at 30 (citing Pl.'s Resp. SMF ¶ 68.4), but all of the deposition testimony she referred to in citing her response to SGF's statement of material facts concerns SGF's failure to follow these processes during the breakdown in the relationship with E.M.  *See* Pl.'s Resp. SMF ¶ 68.4.  Elsewhere she cites testimony from SGF employees suggesting that they were not trained on the PBOR.  *Id.* ¶ 23.4 (citing, *e.g.*, Pl.'s SMF Ex. 7 ("Peterson Dep.") at 28:20–29:12, ECF No. 53-8; Osborn Dep. 237:10-238:4).  This adds very little because staff would not necessarily have needed to be trained on the PBOR, *specifically*, in order for SGF to have, at least, intended to comply with the fairly generalized obligations it sets forth.  Training could still have emphasized all the obligations and rights the PBOR establishes.  Considering the high standard of proof required for an intentional fraud claim, "there is simply nothing in the record that would indicate that this promise was made with any intent to deceive as opposed to, for example, the promise having been made and then subsequently reneged on for other reasons." *Steele v. Fannie Mae*, 134 F. Supp. 3d 191, 200 (D.D.C. 2015) (granting summary judgment to defendant on a fraudulent misrepresentation claim).

For essentially the same reason, E.M.'s negligent misrepresentation claim regarding the PBOR also fails.  While negligent misrepresentation does not require intentional deception, it

requires a violation of a duty of care, *see Regan*, 134 F. Supp. 3d at 38, and finding such a violation depends in large part on what the defendant knew or should have known at the time of the alleged misrepresentation.  "Whether a defendant owed the plaintiff a duty of care is a question of law to be decided by the court, with an eye to whether 'injury to [the plaintiff] was reasonably foreseeable to the defendant' at the time of the accident."  *Rodriguez v. Lab. Corp. of Am. Holdings*, 13 F. Supp. 3d 121, 130 (D.D.C. 2014) (quoting *Haynesworth v. D.H. Stevens Co.,* 645 A.2d 1095, 1098 (D.C. 1994)).  "Negligent misrepresentation requires that the defendants made statements that they knew or should have known were false," *Sherman v. Adoption Ctr. of Wash., Inc.*, 741 A.2d 1031, 1037 (D.C. 1999), and E.M. does not even argue that SGF knew or should have known it would not abide by the PBOR.  Neither the Verified Complaint, nor any of E.M.'s summary judgment briefing makes such a case.  *See* Pl.'s MSJ Opp'n at 34 (arguing that the Verified Complaint contains evidentiary support for the negligent misrepresentation claim). SGF is therefore entitled to summary judgment with regard to this set of alleged misrepresentations as well.

Next is the allegation that SGF misrepresented that it "treats Plaintiff's frozen eggs as her property."  Compl. ¶¶ 240, 249, 255.  SGF does not appear to dispute that it represented, at times, that "your eggs are your property."  *See e.g.*, Def.'s MSJ Reply at 16.  E.M. says that this was false because by requiring J.S.'s signature on the Consent to Thaw form, SGF was not treating her eggs as her own.  *See* Pl.'s MSJ Opp'n at 30–31.  This claim fails because even accepting E.M.'s characterization of the form, the alleged statement is not false.  Even if E.M. is correct that requiring J.S. to sign entailed no longer treating the frozen eggs as E.M.'s property, she overlooks the fact that she was not obligated to take this course of action.  She could have left her eggs frozen, proceeded with J.S. as only a donor, or could have taken the eggs to another

clinic.  She also overlooks the fact that the form required *her* consent as well.  Nothing was going to happen to her eggs without her consent.  The form provided one option for what she could do with her eggs, an option that—at worst—would have afforded J.S. some shared property interest if both partners had committed to this course of action.  The fact that one option provided by SGF was to share property rights over embryos created with a sperm partner (or over eggs on their way to becoming embryos) does not make the initial statement "your eggs are your property" false.  Thawing the eggs with J.S. as a sperm partner was one way E.M. could have disposed of *her* property. *Cf. Cowell v. Colo. Springs Co.*, 100 U.S. 55, 57 (1879) ("[T]he owner of property has a right to dispose of it . . . .").  Because E.M. has not identified evidence from which a reasonable jury could find the statement "your eggs are your property" to be false, SGF is entitled to summary judgment with respect to these allegations on all three counts.

E.M. next alleges that it was false for SGF to represent "that an egg freezing patient can return to SGF under the Egg Freezing Program when she is ready so that her eggs will be thawed and fertilized, her embryos grown, in its laboratory."  Compl. ¶¶ 240, 249.  E.M. explains that SGF made representations that patients can return to use their eggs on their website, in their marketing materials, and in patient literature.  *See* Pl.'s SMF ¶¶ 135–38, 141 (citing various exhibits).  She also points to Osborn's testimony that she had conversations with E.M. about returning to use her eggs at SGF during which Osborn did not place any caveats on the right to return to SGF.  Pl.'s Resp. SMF ¶ 19.5–.7 (citing Osborn Dep. 193:1–8; 195:11–196:8).

These allegations fail to make out a claim for any type of fraud, though, because—regardless of whatever else E.M. can prove—the Egg Retrieval Consent made E.M.'s reliance on these representations unreasonable.  Negligent misrepresentation requires reasonable reliance as an element, and a fraudulent misrepresentation is not material if a reasonable person would not

have relied on it, so E.M.'s unreasonable reliance dooms all three claims. *See Regan*, 134 F. Supp. 3d at 38; *Sundberg*, 109 A.3d at 1131. Above, in discussing E.M.'s quasi-contract claims the Court observed that even if the Egg Retrieval Consent is not a contract, it is nonetheless a formal document communicating to E.M. many of the terms of the egg freezing procedure which SGF required her to review before freezing her eggs. *See* Def.'s Resp. SMF ¶ 19.5–.7 (quoting Mottla Dep. 121:7–9 (describing the consent as "document[ing] the patient's understanding of the conversation")). The Egg Retrieval Consent explained that "[SGF], at its sole discretion may choose for any reason not to participate in the later thawing, fertilization, or transfer of your eggs," and that "[SGF] reserves the right to terminate its participation of the cryopreservation of [your] eggs and/or may, at its sole discretion, refuse to participate in the thawing and/or fertilization in vitro and/or transfer of resulting embryos." Egg Retrieval Consent at 8, 9. With these clear disclosures having been made at the beginning of the clinic-patient relationship, it was not reasonable for E.M. to rely on less detailed marketing materials, patient literature, and informal conversations.[25]

---

[25] E.M. points also to deposition testimony from Widra in which he appears to suggest that it is reasonable for her to rely on the possibility of coming back to SGF to thaw her eggs. Pl.'s Resp. SMF ¶ 19.5–.7 (citing Widra Dep. 198:6–199:4, 217:10–13). This testimony does not change anything for a few reasons. First, Widra is not the factfinder in this case and was not asked to weigh all the relevant evidence. Second, even if he were qualified to evaluate reasonable reliance, he was asked only whether "it is [was] reasonable for her to rely on the fact that she can come back to thaw those eggs." Widra Dep. 198:22–199:3. This is a broader question than whether it was reasonable for her to rely on any particular representations made on a website, in marketing materials, or in patient literature. Last, E.M. selectively quotes around Widra's testimony, leaving out his comments suggesting that E.M. would not be reasonable to blindly assume she could necessarily return to SGF without taking context into account. Widra Dep. 198:16–18 ("I think it would be naive for her to think that [her] relationship [with SGF] hadn't had some problems."); *id.* at 217:10–16 ("Q: You agree that it [referencing a particular section of an information guide] sounds like . . . we are definitely going to use your eggs? A: I agree it sounds like that, yeah. But it's also not a consent document or you know a medical recommendation. It's an information sheet.").

SGF is correct to compare E.M.'s claim here to one the D.C. Court of Appeals rejected in *Sibley v. St. Alban's School*, in part because "no reasonable jury could find that a person in [the plaintiff's] position who read[] [a particular] statement . . . on a website would have reasonably taken it as a guarantee that personal . . . circumstances would have no impact on" whether the broadly phrased guarantee would hold true in that plaintiff's particular case. *Sibley v. St. Alban's School*, 134 A.3d 789, 813 (D.C. 2016). *Sibley* is distinguishable from this case in that the statement the plaintiff allegedly relied on there was "an aspirational statement of the goal and purpose animating a fundraising effort." *Id.* Marketing materials aimed at customers and patient guides are closer to the kinds of statements that can reasonably be relied upon, and could be enough to get the issue to a jury if there were no contrary evidence. When weighed against a formal consent form that says the opposite, which the patient reviewed and signed, these kinds of statements are not a reasonable basis for reliance and a reasonable juror could not find in E.M.'s favor on these claims.

E.M.'s final fraud claims—now for negligent misrepresentation and fraudulent misrepresentation but no longer for fraudulent inducement—concern SGF's "omissions of . . . material facts" concerning "material components of the Egg Freezing Program." Compl. ¶¶ 244, 259. These claims fail also because the undisputed facts show that the material components of the Egg Freezing Program were explained to E.M. or at least accessible to her from some of the same sources of information that her other fraud claims suggest she was carefully reviewing.

SGF identifies several pages on its website or pieces of patient literature in which it says the disclosures E.M. suggests it omitted were actually made. *See* Def.'s MSJ at 26; Def.'s SMF ¶ 61 n.7 (citing Def.'s SMF Ex. 38, Donor Sperm Webpage at EM_04345, ECF No. 50-40 ("In the case of a known donor . . . you will still need to have . . . a counseling session with a Mental

Health Professional.  SGF also strong[ly] recommends that you seek legal counsel from a reproductive attorney to establish an Agreement . . . SGF requires a 45-day quarantine [for] the sperm sample[.]"); Def.'s SMF Ex. 39, Egg Freezing Webpage at SGF4761, ECF No. 50-41 ("Should you not have a partner . . . donor sperm is an option.  In this case you would need to schedule an appointment with your physician as well as a social worker to discuss the emotional aspects of using a donor."); Def.'s SMF Ex. 43, SGF Information Packet for Use of Donor Sperm at SGF1107, ECF No. 50-45 (explaining that sperm donors will be tested for sexually transmitted diseases); *see also* Def.'s SMF Ex. 40, SGF Guidelines for Psychological Services at SGF1120, ECF No. 50-42 ("All known donors and recipients are required to participate in psychosocial assessment and psycho-educational preparation.").  E.M. argues that these "cited references . . . establish there are only limited circumstances in which Shady Grove requires social worker consults or legal agreements," Pl.'s Resp. SMF ¶ 61.4, but this does not serve to undermine the fact that the disclosures were available.  Her claim is not that SGF requires social worker consults or legal agreements in every case, so it stands to reason that any disclosures would only relate to limited circumstances—and those limited circumstances describe the situation that E.M. was in at the time that SGF required these conditions in 2019.

Further, Osborn testified that E.M. indicated to her in 2017 that she and J.S. were "off and on," but that she did not take this to mean they were not proceeding as partners.  Osborn Dep. 51:14–52:11.  At that time Osborn did not understand E.M. to be saying she and J.S. were not sexually intimate partners.  *Id.* at 81:3–12.  Osborn testified that if this were her understanding, she would have told E.M. that she needed to proceed with J.S. as a known sperm donor.  *Id.*  According to medical record notes drafted by Osborn, she did explain to E.M. in 2017 that "being a known donor entails . . . freezing and quarantining sperm . . . separate and

group . . . social work consult, and strongly recommending [a] legal contract about custody and support." SGF Treatment Notes at SGF0081. E.M. told her that J.S. "[was] still her partner and they would like to move ahead." *Id.* E.M.'s response to these facts disputes only whether she told Osborn that she and J.S. were not partners. Pl.'s Resp. SMF ¶ 42. She does not dispute that Osborn made these disclosures, nor could she plausibly given the contemporaneous evidence that Osborn did make them.

E.M.'s response regarding her claims suggesting fraud by omission fails to place any material facts in dispute—or even to explain clearly how she sees SGF as liable. *See* Pl.'s MSJ Opp'n at 33. She does not challenge the availability of the website excerpts or patient literature, which suggest SGF disclosed the conditions for proceeding with donor sperm at the outset. Nor does she address Osborn's 2017 disclosures. Her briefing addresses "affirmative representations," which would not be relevant to fraud by omission, and she references her discussion elsewhere of the 2012 Egg Retrieval Consent, which is not relevant to this claim. *Id.* (citing Pl.'s Resp. SMF ¶ 19.5–.7 (discussing the Egg Retrieval Consent)). This opposition fails to identify a dispute of fact, to challenge whether SGF made the disclosures it says it made, or to explain what actions she took to her detriment as a result of these omissions. To avoid summary judgment in SGF's favor, E.M. was obligated to "set forth specific facts showing that there is a genuine issue for trial," and on this claim she has failed to do so. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 280 (1968)). SGF's motion to for summary judgment is consequently granted as to Counts Eight, Nine, and Ten.

### F.  Intentional Infliction of Emotional Distress (Count Eleven)

E.M.'s eleventh claim is one of intentional infliction of emotional distress ("IIED").

Such a claim requires "(1) extreme and outrageous conduct on the part of the defendant[], which

(2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Competitive*

*Enter. Inst. v. Mann*, 150 A.3d 1213, 1260 (D.C. 2016) (quoting *Williams v. District of*

*Columbia*, 9 A.3d 484, 493–94 (D.C. 2010)).  SGF has moved for summary judgment on this

claim, and E.M. has not.  For an IIED claim to succeed, a defendant's conduct must be "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991).  The outrageousness requirement "is

not an easy one to meet."  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 264 (D.D.C. 2018) (quoting

*Drejza v. Vaccaro*, 650 A.2d 1038, 1312 (D.C. 1994)).  That said, "the specific context in which

the conduct took place" also matters, so in determining whether conduct was extreme and

outrageous, courts must consider "the nature of the activity at issue, the relationship between the

parties, and the particular environment in which the conduct" occurred.  *King v. Kidd*, 640 A.2d

656, 668 (D.C. 1993).  And although the extreme and outrageous determination "is in the first

instance a question of law," the issue should proceed to trial "where reasonable people could

differ on the question."  *Morton v. D.C. Hous. Auth.*, 720 F. Supp. 2d 1, 8–9 (D.D.C. 2010)

(internal citation omitted).

Here, E.M.'s IIED claim overlaps significantly with her DCHRA claim of discrimination

and retaliation.  But the IIED claim also highlights the particular way that SGF allegedly went

about dismissing her as a patient.  It is premised, for example, on the "aggressive" language and

tone that SGF's regional manager, Vicki Gerber, used during the January 18 phone call with

E.M. and J.S.—including Gerber's statement that she would be "very happy" to present E.M. the option of leaving the practice.  Compl. ¶ 127.  It is also based on the fact that SGF left E.M. in limbo for about a month following her January 21 phone call with Osborn, when Osborn said that E.M. would "likely be dismissed."  *Id.* ¶ 136.  The complaint alleges that, following that phone call, E.M. made multiple attempts to contact SGF personnel and to schedule an appointment with a different SGF doctor, but that she did not hear anything until February 21, when she a received a letter with SGF's formal dismissal decision.  *Id.* ¶¶ 151–56.  Then, about a week later, on March 1, she received a similar second letter, which was dated January 22 but postmarked February 11—suggesting that SGF may have deliberately withheld its decision from E.M. for nearly three weeks.  *Id.* ¶ 157.

   To survive summary judgment on her IIED claim, E.M. must demonstrate that there exists a genuine issue of material fact regarding each challenged element of the tort.  E.M. has established a genuine dispute of fact on the first point with regard to her allegations of retaliation.  As the Court has explained above, a reasonable jury could find that SGF retaliated against E.M. in response to her complaints about discrimination, and that in doing so they violated the PBOR.  Given the relevance of context, *see King*, 640 A.2d at 668, and the uniquely intimate relationship between a fertility clinic and patient, the Court is unable to say as a matter of law that no reasonable jury could not find that this rises to the level of outrageousness required for IIED.  *See Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998) ("Where reasonable persons may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.").  While E.M. points to no specific evidence regarding intent, it is permissible for a jury "to infer the existence of the second element of the tort—intent or recklessness—from the

very outrageousness of a defendant's conduct." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007). As for the third, "a plaintiff's own self-serving, conclusory statements" are not enough to create a genuine dispute of material fact at summary judgment. *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015) (quoting *Bonieskie v. Mukasey*, 540 F. Supp. 2d 190, 195 (D.D.C. 2008)). Here, though, E.M.'s testimony about her experience and the level of distress it caused her has been reasonably detailed. *See, e.g.*, E.M. Dep. 450:9–13 ("I am 46 years old. I don't have a child. It's been delayed indefinitely."); *id.* at 449:2–9 (describing additional symptoms). The Court cannot pass on the credibility of her testimony, so this too will go to the jury, again taking into account the context.

However, not all the conduct that E.M. alleged in relation to her IIED claim may properly move forward. The allegation that Gerber used "aggressive language" in the course of relaying information that E.M. would have found distressing regardless of Gerber's tone is patently insufficient as a matter of D.C. law. Liability for IIED "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Hollis v. Rosa Mexicano, DC, LLC*, 582 F. Supp. 2d 22, 26 (D.D.C. 2008) (applying D.C. law); Restatement (Second) of Torts § 46 cmt. d. (1965). While E.M.'s call with Gerber was undoubtedly distressing for other reasons, Gerber's tone and choice of language are not plausibly outrageous enough to have added to that distress in an actionable way. E.M. may not move forward on this legally insufficient theory.

Similarly, E.M.'s allegation that she was left in "medical limbo" after her call with Osborn on January 21 cannot go to trial. The facts of this claim are disputed by the parties, but the dispute is not genuine and resolves in SGF's favor. The transcript of the call shows that Osborn was quite clear that the relationship was over, and a reasonable jury could not find

otherwise.  At the start of the phone call, Osborn stated, "we need to ask you to move on your care to another practice," Osborn Call Tr. at 2:21–3:1, and shortly thereafter said "I think, you know, our relationship is ending," *id.* at 8:9–10.  She reiterated this point throughout the call.  *Id.* at 20:8–11 ("I've tried to stick with you, but you know, we've not involved other people in the practice and, and we are not willing to go forward with care."); *id.* at 30:2–4 ("[A]t this point, the only option is to move on to another center and we will pay for the, the embryo, the eggs to be transferred."); *id.* at 33:17–34:6 ("[T]he consensus of the group . . . was that we cannot move forward with your care . . . Vicki [Gerber] will prepare a letter to send to you, you know, informing you of this, the next steps in terms of moving on to another practice.").  Osborn explained that it was "out of [her] hands," *id.* at 47:22–48:1, and E.M. indicated that she understood she was being terminated as she responded, by asking for a letter memorializing "the reasons why we're being terminated," *id.* at 48:9–11.  Osborn responded by explaining that she did not think the letter was likely to cover all the information E.M. was asking for, but that SGF would "provide you with other names of other clinics to go to."  *Id.* at 49:5–12.  She continued explaining that E.M. was being terminated, noting, among other things, that "this conversation is not going to change the status."  *Id.* at 54:16–17; *see also id.* at 57:4–6 ("[T]his is not working out . . . it's beyond me at this point.").  Near the end of the call, E.M. again indicated that she understood the situation, protesting that it made no sense to her and J.S. that they were "getting fired from the practice," to which Osborn responded, in part, "unfortunately this is the way it is." *Id.* at 77:17–22.

Against this, E.M. points only to deposition testimony—her own and J.S.'s—that they were not sure whether they had been dismissed.  *See* Def.'s Resp. SMF ¶ 70 (citing E.M. Dep. 348:4–22; Pl.'s Resp. SMF Ex. 5 ("J.S. Dep.") at 137:4–14, ECF No. 67-5).  E.M.'s testimony is

self-serving by definition and inconsistent with her own acknowledgment on the call that she knew she was being terminated as a patient.   Testimony from J.S., who has been in a "sexually intimate and strong emotionally supportive relationship [with E.M.] for approximately a decade," Compl. ¶ 35, should be viewed as similarly self-interested in this context.   E.M. testified that she "was told *if* they decided to terminate [E.M. and J.S.], [she] would be receiving a letter," E.M. Dep. 348:22–349:2 (emphasis added), but Osborn had said, "you *will* get a letter," and "we *will* be in touch with this letter at minimum," Osborn Call Tr. at 72:2–3, 80:6–7 (emphasis added). E.M. has asserted privilege over conversations with J.S. that immediately followed the call with Osborn, and she began doing legal research in anticipation of litigation the "very next day." E.M. Dep. 357:9–358:21.

A reasonable jury could potentially find that E.M. was not one hundred percent sure that her relationship with SGF was permanently over.   Whether this would qualify as "medical limbo" is irrelevant, as that is not a legal term, but any uncertainty that remained would not rise to the level necessary for the third element of an IIED claim.   Whether SGF intentionally inflicted emotional distress on her when it dismissed her remains an open question, and the Court agrees that the pain caused by the dismissal may qualify for the third element of IIED.   Taking into account the phone call transcript and E.M.'s actions immediately following the call, however, a reasonable juror could not conclude that SGF compounded this injury by leaving E.M. completely in the dark for a month.   There can be no genuine dispute that during February 2019 she was quite certain she was being terminated as a patient.   Accordingly, the "medical limbo" aspect of E.M.'s IIED theory cannot be presented at trial.

### G.  The CPPA (Count Two)

Last, Count Two of E.M.'s complaint is brought under the CPPA, which makes it illegal "for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby."  D.C. Code § 28-3904.  The statute provides a long list of those illegal practices, *see id.*, and it provides consumers a private right of action to "seek[] relief from the use" of one or more of the listed practices, *id.* § 28-3905(k)(1)(A). The CPPA itself provides that it should "be construed and applied liberally to promote its purpose." *Id.* § 28-3901(c).  The standard of proof for a CPPA claim is "clear and convincing evidence." *Osbourne*, 727 A.2d at 326.

A CPPA claim is "properly considered in terms of how the practice would be viewed and understood by a reasonable consumer."  *Mero v. City Segway Tours of Washington DC, LLC*, 826 F. Supp. 2d 100, 107 (D.D.C. 2011) (quoting *Whiting v. AARP*, 701 F. Supp. 2d 21, 29 (D.D.C. 2010)).  Thus, although CPPA plaintiffs need not show that they were actually deceived by the practice, they have no claim if they merely point to statements that are "accurate, not misleading to a reasonable consumer, or mere puffery."  *Id.* (quoting *Whiting*, 701 F. Supp. 2d at 29).  "How the practice would be viewed by a reasonable consumer is generally a question for the jury, although there are times when it is sufficiently clear to be determined as a matter of law." *Krukas*, 376 F. Supp. 3d at 39 (citing *Mann v. Bahi*, 251 F. Supp. 3d 112, 126 (D.D.C. 2017)) (quotation marks and citation omitted); *see also Saucier*, 64 A.3d at 442 ("Ordinarily the question of materiality should not be treated as a matter of law.").

The D.C. Court of Appeals has recently clarified that "a consumer is not required to proffer evidence of an 'entrepreneurial motive' or an 'entrepreneurial nexus'" for a CPPA claim against a medical service provider.  *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999, 1007

(D.C. 2020).  Nor do plaintiffs need to show motive or intent for certain types of

misrepresentation-based CPPA claims.  *See id.* (referencing D.C. Code. § 28-3904(a) or (d)–(f)).

Nor do they need to prove that they suffered damages.  *Id.*  At the same time, medical practices

have certain protections in the CPPA context.  "[C]ertain aspects of the practice of medicine,

such as those premised on public service or ethical norms, may lend necessary context to

evaluate a medical professional's conduct and determine whether it can support a CPPA claim."

*Id.* at 1008 (citing *Arizona v. Maricopa Cty. Med. Soc.,* 457 U.S. 332, 348–49 (1982) (applying a

similar rule in the antitrust context and suggesting that if "the quality of the professional service .

. . is enhanced by" a restriction on trade that would otherwise be illegal, it might be permissible).

    E.M. has alleged twenty-four separate violations of the CPPA, based on ten different

subsections of D.C. Code 28-3904.[26]  Compl. ¶¶ 196–205.  There is some overlap among the

claims.  Again, SGF has moved for summary judgment on all these claims and E.M. has moved

for partial summary judgment, on liability but not on damages.  The Court considers the general

arguments raised in SGF's Motion first, then proceeds claim-by-claim through each of E.M.'s

assertions, following the organization of the Complaint.  With respect to the CPPA claims,

E.M.'s motion is denied and SGF's is granted in part.  At the end of its review the Court provides

a summary of what claims remain to be resolved at trial.

### 1. SGF's General Arguments

    SGF only discusses one of E.M.'s twenty-four alleged violations in any specific detail.

First, it levels a number of broad attacks on Count Two as a whole.  Several of the attacks it

---

[26] At two points in her Complaint E.M. introduces a list of alleged violations by saying
that SGF violated certain provisions "in numerous ways and on multiple occasions, including
*inter alia* . . . ."  Compl. ¶¶ 194, 198.  To the extent that the inclusion of "*inter alia*" suggests that
additional conduct may also have violated the CPPA, this vague gesture is conclusory at best and
insufficient to state a claim for anything beyond what is covered by the conduct E.M. outlines.

brings at the outset of its motion are nonstarters.  First is the already-rejected argument that

Maryland law governs and that the CPPA does not apply.  Def.'s MSJ at 30.  Next, SGF argues

that E.M. fails to point to evidence demonstrating an "entrepreneurial nexus" connecting SGF's

alleged misrepresentations to its ability to generate fees.  *See id.* at 30–32 (citing, *e.g.*, *Caulfield*

*v. Stark*, 893 A.2d 970, 978 (D.C. 2006)).  While some earlier cases treated this as a requirement

for CPPA liability against a medical practice, *Frankeny*—a decision issued after SGF briefed its

motion—has made clear that this is no longer the rule.  *Frankeny*, 225 A.3d at 1007.  SGF also

argues that E.M.'s claims are only "conclusory statements that there has been a violation."

Def.'s MSJ Mem. at 32.  This argument fails because the allegations in the Complaint are

reasonably specific about what statements SGF made that E.M. claims were false.  The claims

are stated briefly, but with only two elements to allege for most CPPA claims, there is simply not

too much to say about most individual claims.

      After raising a specific challenge to E.M.'s claim under subsection (j) of the CPPA—a

challenge the Court addresses below—SGF argues that E.M.'s allegations under subsections (e)

and (f) fail because E.M. has not shown that SGF knew its misrepresentations were false at the

time they were made.[27]  Def.'s MSJ Mem. at 33.  SGF cites *Sloan v. Urban Title Servs., Inc.*, 689

F. Supp. 2d 123, 139 (D.D.C. 2010), in which a defendant's "lack of knowledge defeat[ed] [a]

misrepresentation claim under sections 28-3904(e) and (f)."  Def.'s MSJ Mem. at 33.  *Sloan* is

easily distinguishable, though, because it was undisputed in that case that the relevant defendant,

Brickshire, had no way of knowing the facts that made its representation false.  *See id.* at 136–

39.  Brickshire had prepared a settlement document for a loan that it had no role in originating,

---

[27] E.M. does not directly address this argument in her opposition.  The Court will not treat this issue as conceded because it is incorrect and because E.M.'s opposition to related arguments makes clear that she did not intend to treat the issue as conceded.

based on information provided to it by a different defendant. *See id.* Here, on the other hand, all of E.M.'s claims under subsections (e) and (f) allege that SGF made misrepresentations by misstating or failing to disclose certain of its own policies. Compl. ¶¶ 197–98. SGF knew what its own policies were, so it cannot realistically argue it was in the same situation as Brickshire in *Sloan*. Those policies are the basis for SGF's entire defense, and the testimony from its employees concerning those policies is voluminous.

Finally, SGF argues that E.M. lacks standing to pursue a CPPA claim because she has not suffered an injury in fact. *See* Def.'s MSJ Mem. at 33–36. The Court fails to see how this could possibly be the case if the appropriate inferences are drawn in E.M.'s favor. E.M. is claiming $82,338 in damages, an amount "she has spent on medications and previous, unrelated, completed fertility treatments, with which she claims no dissatisfaction," according to SGF. Def.'s MSJ Mem. at 34 (citing Compl. ¶ 208). SGF appears to misunderstand the theory under which E.M. may pursue her case. The Complaint seeks "the return of any monies Defendant acquired by means of these unlawful trade practices in an amount of $82,338 or such other amount to be proven at trial." Compl. ¶ 208. It is irrelevant that E.M. does not take issue with SGF's performance of the completed egg-freezing treatments and that she is not dissatisfied with how those turned out, because what she is alleging is that she would not have agreed to have that procedure at SGF if she had known that the relationship between egg-freezing and egg-thawing at SGF was not what she was led to believe. The amount she feels she was deceived into spending is "fairly traceable to the challenged conduct of the defendant"— the alleged misrepresentation—and is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543 (2016).

All of SGF's general arguments for summary judgment on Count Two thus fail.  It also raises the aforementioned argument against E.M.'s subsection (j) claim and argues that "no clear and convincing evidence supports these claims."  Def.'s MSJ Mem. at 30.  The Court considers these arguments as it proceeds through the claims.

## 2.  Subsections (e), (f), (f-1)

Subsection (e) of the CPPA establishes a violation for a person who "misrepresent[s] as to a material fact which has a tendency to mislead."  D.C. Code § 28-3904(e).  Subsection (f) makes it illegal to "fail to state a material fact if such failure tends to mislead," and subsection (f-1) makes it illegal to "use innuendo or ambiguity as to a material fact, which has a tendency to mislead."  D.C. Code § 28-3904(f), (f-1).  A plaintiff does not have to establish intentional misrepresentation in order to make out a claim under these provisions.  *Frankeny*, 225 A.3d at 1004–05 (citing *Fort Lincoln Civic Ass'n. Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1073 (D.C. 2008)).  E.M. lays out six violations of these provisions.  Compl. ¶¶ 196–97.

E.M.'s first claim under subsections (e), (f), and (f-1) alleges that SGF violated the CPPA by "imposing new demands and 'conditions' on Plaintiff in the middle of her egg thaw cycle in order for her to continue to receive benefits under the Egg Freezing Program."  Compl. ¶ 196.  Relatedly, her fifth claim under these subsections alleges that SGF "falsely represented that the Egg Freezing Program granted Plaintiff the right or benefit to return to SGF to use her frozen eggs."  *Id.* ¶ 197.  The Court has already explained, in addressing E.M.'s fraud claims, that reasonable consumers would not have been misled by comments suggesting that patients could return to thaw their eggs because SGF had made clear on its website, in its patient literature, in its Egg Retrieval Consent that any invitations to return to SGF for thawing were not without terms and conditions.  Osborn specifically explained a number of these conditions to E.M. in

2017.  Further, a reasonable consumer would not have understood a medical practice to be making any sort of open-ended guarantees in regard to future treatment without leaving open the possibility that complications would arise—especially if the patient reveals new and surprising information about her situation as E.M. did here.

E.M.'s second claim under these subsections fails on its own terms.  She says SGF violated the CPPA by "representing to Plaintiff and [J.S.] that she could continue her treatment cycle if she met [SGF's] new demands and 'conditions,' a statement that had the tendency to mislead, but dismissing her from its care when she asked for specific details on what she had to do in order to comply."  Compl. ¶ 196.  If, as E.M. says, she was dismissed before she complied with these conditions, then she could not know whether it was false for SGF to say that she could have proceeded if she did comply.  And she has identified no evidence that this was the case.

E.M.'s third and fourth claims under subsections (e) (f) and (f-1), on the other hand, may proceed.  The third claim alleges that SGF violated the CPPA by misrepresenting to her that FDA regulations required treating J.S. as a sperm donor.  Compl. ¶ 196.  SGF does not dispute that it "represented to E.M. and to the public as late as on or about August 1, 2019" that the FDA required that sperm from known donors be quarantined; nor does it dispute that, in fact, the FDA does not require this for "sexually intimate partners."  *Compare* Pl.'s SMF ¶¶ 73–77, *with* Def.'s Resp. SMF (not addressing these paragraphs).  SGF concedes that it inaccurately identified the source of this requirement on its website.  Def.'s MSJ Opp'n at 28.  A reasonable juror could find this to amount to a violation of the CPPA because a reasonable consumer might be misled.  As E.M. explains, a patient unhappy with the quarantine requirement is less likely to change clinics if she is under the mistaken impression that the same quarantine would be imposed elsewhere.  *See* Pl.'s MSJ at 46–47.  E.M. may argue this claim to the jury.  E.M.'s fourth claim

under the same subsections alleges that SGF "falsely represented that the [PBOR] granted certain rights and remedies to Plaintiff and imposed obligations on SGF."  Compl. ¶ 197.  The Court has already explained that a jury might find the PBOR was a contract.  *Supra* section IV.C.2.  If a reasonable factfinder could find that SGF expressed an intent to be bound by what it represented in the PBOR, the same factfinder could also find that the PBOR clears the lower bar of simply misrepresenting how SGF would behave.

The sixth and final claim E.M. brings under this first set of subsections fails as a matter of law.  She challenges SGF's "representations regarding its leadership in the fertility industry."  Compl. ¶ 197.  As the Court explained above any assertions along these lines are non-actionable puffery.  *See Freeland*, 545 F. Supp. 2d at 76.

### 3.  Subsection (e-1)

Subsection (e-1) establishes that there is a CPPA violation when a person or business "represent[s] that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law."  D.C. Code § 28-3904(e-1).  E.M. identifies eight representations or groups of representations that she claims violated this subsection.  Compl. ¶¶ 198, 200.  Seven of these relate to what E.M. calls the "Egg Freezing Program."  This is fatal to most of the six claims because, as the Court has explained, the Egg Retrieval Consent makes clear that no such "Program" exists at SGF.  Patients are not guaranteed to be able to return to thaw their eggs.  There is no "Egg Freezing Program" that spans the entire time from egg-freezing to egg-thawing—these are related but separate procedures.

Of the six claims under subsection (e-1), the first three, the sixth, and the eighth all stem from E.M.'s misapprehension of the "Egg Freezing Program."  *See id.* ¶¶ 198, 200.  They allege that SGF falsely represented that it had certain rights "under the Egg Freezing Program."  *Id.*

Because no such program exists, the representations could not have been made—or at least understood by a reasonable consumer—in the way that E.M. presents them. SGF placed conditions on the egg thaw procedure, to be sure, but these were not assertions of rights under any "Egg Freezing Program." These five claims therefore fail.

E.M.'s fourth and fifth claims under subsection (e-1) may proceed to the extent they concern alleged misrepresentations that certain policies were required by FDA regulations. These allegations are not phrased in a very specific manner, but to the extent they involve misrepresentations of FDA policies that SGF has conceded it made, *see* Def.'s MSJ Opp'n at 28, E.M. may argue to a jury that a reasonable consumer would have found these materials. The fourth and fifth claims under this subsection necessarily fail, however, to the extent that they depend on the existence of the "Egg Freezing Program," which each mentions.

Last to discuss under subsection (e-1) is E.M.'s seventh claim, which alleges misrepresentations involving E.M.'s rights and SGF's obligations under the PBOR. This claim may proceed for the same reason as E.M.'s other PBOR-based CPPA claim. Because a jury could find that the PBOR was a contract that SGF breached, they could also find that it misrepresented the rights and obligations it laid out.

### 4. Subsection (r)

Subsection (r) of the CPPA makes it an unfair or deceptive trade practice to "make or enforce unconscionable terms." D.C. Code § 28-3904(r). Unlike most of the CPPA this provision does require that the practice be intentional. *Frankeny*, 225 A.3d at 1004. E.M. alleges that SGF "made and enforced a number of unconscionable restrictions on her right to use her own frozen eggs." Compl. ¶ 199. The Complaint explains that this refers to those restrictions refer requiring J.S.'s consent for certain procedures, as described in the previous

paragraph of the Complaint. *See id.* ¶ 198.  This claim fails because, as the Court explained, SGF was not actually imposing the restrictions she describes.  To the extent E.M. means to challenge anything beyond those practices described in the previous paragraph, she has failed to identify them, and the claim is unsupported by evidence in that regard.  SGF's motion will be granted as to this claim and E.M.'s denied.

### 5. Subsection (h)

Subsection (h) of the CPPA makes it a violation to "advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered."  D.C. Code § 28-3904(h).  E.M.'s claim with regard to this subsection is more specific than most of what she alleges under the CPPA.  She says SGF offered her "a discount for continued service without conditions on the morning of Friday, January 18 [2019], yet did not intend to provide such service as offered."  Compl. ¶ 201.  Neither party addressed the substance of this claim in their briefing, but the record makes clear that there is insufficient evidence for a jury to find for E.M. on this claim.  The SGF e-mail chain reflects, and E.M. and Osborn both testified that on the morning of January 18 Osborn offered E.M. a twenty percent "professional courtesy" discount.  SGF E-Mail Chain at 8; E.M. Dep. 299:8–300:6; Osborn Dep. 151:3-152:1.  E.M. does not dispute that she refused this offer.  E.M. Dep. 299:8–300:6; Def.'s Resp. SMF ¶ 58.2. By late that afternoon when E.M. spoke to Crisp, Mottla had clarified to Crisp and Osborn that the twenty percent discount option would require J.S. and E.M. working out an agreement with a reproductive attorney and meeting with a social worker.  *See* SGF E-mail Chain at 6–7.  But the fact that these conditions were imposed later does not help E.M. prove that the offer was not genuine when Osborn made it—E.M. has identified no evidence from which a jury could infer the intent element necessary for a claim under subsection (h).  This claim therefore fails.

6.  Subsection (j)

Subsection (j) creates liability for any person who "make[s] false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time." D.C. Code § 28-3904(j).  E.M. argues that SGF violated this provision "by publishing detailed criteria for receiving a price reduction or discount . . . based on a patient's U.S. household income as reported on her U.S. federal tax returns, and then representing to Plaintiff that the discount did not exist as advertised."  Compl. ¶ 202.  This is the one CPPA claim that SGF addresses directly in its own briefing, arguing that it did not make a misrepresentation and that it is free to set its own discount criteria.  Def.'s MSJ Mem. at 33.  This argument misunderstands E.M.'s claim here, though.  SGF does not dispute that its website advertised discounts based on "[a]nnual gross household income . . . based on U.S. federal tax returns," and that after this litigation began it was changed to state that discounts were based on "[a]nnual gross combined income (i.e. income of both the patient and partner regardless of marital status or living arrangement)."  *Compare* Pl.'s SMF ¶¶ 133–34, *with* Def.'s Resp. SMF ¶ 134.  Because SGF did not use the "household" definition used by the IRS, a reasonable juror could find that the earlier version of the website made a misrepresentation with reference to an available price reduction, which would have misled a reasonable consumer.  However, a reasonable juror could also find that a reasonable consumer would not have read the original website text in the way E.M. suggests.  So E.M. has not proven her case as a matter of law either, and this claim may proceed.

7.  Subsection (m)

Subsection (m) makes it a violation to "harass or threaten a consumer with any act other than legal process, either by telephone, cards, letters, or any form of electronic or social media."  D.C.

Code § 28-3904(m).  For essentially the same reasons that E.M.'s IIED claim may proceed to trial, so too may this one.  The D.C. courts have not elaborated what qualifies as "harass[ing] or threaten[ing]" under this subsection.  Termination as a patient qualifies as an "act other than legal process."  Because a jury could reasonably find that SGF retaliated against E.M., it is also possible that it could find that a reasonable person faced with the responses SGF gave E.M. would have felt harassed.

### 8.  Subsection (a)

Subsection (a) establishes that it is a CPPA violation for a business to "represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have."  D.C. Code § 28-3904(a). Intentionality is not required, so "a consumer need not prove that a merchant intentionally or knowingly represented that the goods or services have a characteristic or were of a standard or quality that they did not, in fact, have."  *Frankeny*, 225 A.3d at 1005.  E.M. identifies five misrepresentations that she says violated this subsection.  Compl. ¶ 204.

The first misrepresentation E.M. identifies under this subsection is that SGF "represented that it offers thawing frozen eggs as [a] 'benefit to egg-freezing patients' and that '[t]hawing frozen eggs is an incredibly important aspect of the egg freezing program' but has refused to provide this benefit to [E.M.]."  *Id.*  This fails as a matter of law because the identified statement is plainly not false.  E.M obviously agrees that thawing eggs is an important benefit offered to egg-freezing patients, and the fact that SGF has denied this service to her—even if for improper reasons—does not change this fact.  She does not argue that SGF represented it "guarantees thawing frozen eggs as a benefit to egg-freezing patients."

The next two misrepresentations E.M. identifies under this subsection more or less duplicate claims the Court has already addressed under other subsections.  One says that SGF "represented that as part of the Egg Freezing Program [E.M.] could return to SGF to use her frozen eggs when she was ready and that her eggs would be thawed and inseminated."  *Id.*  As the Court explained, a reasonable consumer would not have understood this to be the case.  The other makes two assertions related to the Shared Help Discount Program.  First it says that SGF "represented it offers [the discount program] as a 'benefit' to patients in the Egg Freezing Program."  *Id.*  This is not false.  It then says that SGF represents that the program "is based on a patient's household income as reported [on] U.S. tax returns."  *Id.*  While SGF did misrepresent how closely the discount program would track tax returns, the discount program is not a "good[] or service[]" so this claim cannot proceed under subsection (a).  This alleged misrepresentation fits much better under subsection (j), which concerns false representations concerning price reductions, and the Court has said that the same claim may proceed under that provision.

E.M.'s fourth claim under subsection (a) also unsuccessfully repeats a claim better brought under a different CPPA provision.  Here she challenges that SGF "represented that all services provided by it would be in accordance with its [PBOR]."  *Id.*  While claims relating to the PBOR may proceed under subsections (e), (e-1), (f), and (f-1), these concern misrepresentations of fact or of rights and obligations.  It strains the language of subsection (a) too far to also pursue a PBOR-based claim under this subsection, which focuses on the characteristics of goods or services.

E.M. also claims under subsection (a) that SGF "represented to [her] that the services it offered were in compliance with HIPAA privacy requirements and that she had a right to the privacy of her own medical records but consistently breached these privacy laws."  *Id.*  This

claim may proceed because, as the Court has explained, *see supra* n.21, a claim based on a misrepresentation concerning HIPAA compliance is viable.  And E.M. has produced evidence suggesting that HIPAA was in fact violated by SFG.  *See* SGF Treatment Notes at SGF0089.

### 9.   Subsection (u)

Last, E.M. brings a claim under subsection (u), which makes it a CPPA violation to "represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not."  D.C. Code § 28-3904(u).  As articulated in the Complaint, this claim refers back to several of E.M.'s other claims, *see* Compl. ¶ 205, but it can be disposed of easily because all those claims reference the Egg Freezing Program or rely on E.M.'s unreasonable misconceptions regarding the connection between egg freezing and egg thawing. This claim fails and SGF is entitled to summary judgment on it.

### 10.   CPPA Summary

In the interest of clarity, the Court will summarize which of E.M.'s CPPA claims may move forward.  The following claims may be presented at trial:

1. E.M. may present her claims alleging misrepresentations concerning FDA regulations and the PBOR under subsections (e), (e-1), (f), and (f-1).

2. E.M. may present her claims concerning misrepresentations about the terms of SGF's Shared Help Discount Program under subsections (a) and (j).

3. E.M. may present her claim concerning misrepresentations about HIPAA compliance under subsection (a).

4.  E.M. may present her claim alleging harassment under subsection (m).

## V.  CONCLUSION

For the foregoing reasons, SGF's Motion to Dismiss is **DENIED** as **MOOT**.  SGF's

Motion in Limine is **DENIED**, and E.M.'s Construed Motion for Enlargement of Time is

**GRANTED**.  SGF's Motion for Summary Judgment is **GRANTED IN PART AND DENIED**

**IN PART** and E.M.'s Motion for Partial Summary Judgment is **DENIED**.  The remaining

Counts have been narrowed as described above.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.


Dated:  October 7, 2020                                  RUDOLPH CONTRERAS
                                                        United States District Judge