## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| E.M. | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SHADY GROVE REPRODUCTIVE | )   Civil Action No: 19-657 |
| SCIENCE CENTER P.C. | ) |
| Defendant. | ) |
| | ) |

### JOINT PRETRIAL SUBMISSION

Plaintiff E.M., and Defendant Shady Grove Reproductive Science Center P.C., through their respective undersigned counsel, pursuant to the Court's May 8, 2023 Pretrial Order (ECF Dkt. No. 118), its May 24, 2024 Minute Order, and Local Rule 16.5(b), hereby submit the following in connection with the trial scheduled to begin on February 26, 2024: 1) Joint Pretrial Statement, including a schedule of witnesses, list of exhibits and deposition designations and corresponding objections; 2) proposed voir dire questions; 3) text of each proposed jury instruction; and 4) proposed verdict form.

### I.   JOINT PRETRIAL STATEMENT

#### A.   Statement of the Case

Jurisdiction is based upon diversity of citizenship.

This is a civil action brought by E.M., the plaintiff. The defendant is Shady Grove Reproductive Science Center P.C., also known as Shady Grove Fertility or SGF ("Shady Grove"), which is a medical facility that treats patients with fertility issues. E.M. was a patient of Shady Grove until she was dismissed from its practice in January 2019.

E.M. has brought seven (7) claims against SGF in this lawsuit.  In her first claim under the District of Columbia Human Rights Act ("DCHRA"), E.M.  alleges that SGF unlawfully discriminated against her based upon her source of income by treating her differently than other SGF patients and inconsistent with the terms of her agreement with SGF, including by seeking to require her fertility partner be jointly financially responsible for fertility treatments.  E.M. also alleges that SGF terminated her as a patient in retaliation for engaging in protected activity and claiming discrimination.  In her second claim, E.M. alleges that SGF violated the DC Consumer Procedures Act (CPPA) in connection with its treatment of E.M. as a patient of SGF.  In her third claim, E.M. alleges that SGF breached a contract between the parties, specifically the Patient Bill of Rights.  In her fourth claim, E.M. alleges that SGF breached the implied covenant of good faith and fair dealing, specifically with respect to HIPAA and the Patient Bill of Rights.  In her fifth claim, E.M. alleges SGF was unjustly enriched related to the money she paid for the 2017 IVF cycle and amounts paid related to the 2019 egg-thaw cycle that did not occur.  In her sixth claim, as an alternative theory to the breach of contract claim (third claim), E.M. alleges promissory estoppel related the alleged breach of the Patient Bill of Rights, that is that SGF made promises to E.M., she relied on those promises, and suffered damages.  In her final claim, E.M. alleges intentional infliction of emotional distress against SGF related to the harm E.M. suffered arising from SGF's dismissal of her as a patient in January 2019.

SGF denies all of the claims.  SGF denies that it discriminated against Ms. M based upon her source of income and denies that it dismissed Ms. M as a patient in retaliation for claiming that it discriminated against her.  SGF denies that is discriminated against Ms. M or engaged in retaliation. SGF also denies that it breached a contract with Ms. M., that it

**violated the DC Consumer Protection and Procedures Act, and that it intentionally inflicted emotional distress on Ms. M when it terminated her as a patient.**

Shady Grove objects to the inclusion of the bolded language above, because Shady Grove believes that it would be too technical and confusing to read in the context of Voir Dire, which is what is the contemplated purpose of this Statement.  Shady Grove proposes that it be replaced with the following, which is meant to give a neutral and general summary of the nature of the case, and not unnecessarily delve into specifying the legal claims at issue:

The dispute in this case relates to certain aspects of Shady Grove's treatment of E.M. as a patient, as well as the reasons why E.M. ultimately was dismissed as a patient.

E.M. alleges that Shady Grove discriminated against E.M. by treating her differently than other SGF patients, particularly with regard to her source of income and financial responsibility for fertility treatments, and otherwise that Shady Grove treated E.M. inconsistently with a Patient Bill of Rights and/or District of Columbia consumer protection laws.  E.M. further contends that that Shady Grove dismissed her as a patient for retaliatory reasons because E.M. claimed discrimination, and otherwise inflicted emotional distress upon E.M. in connection with its dismissal of her as a patient.  E.M. seeks damages and other non-monetary relief for her claims.

Shady Grove denies that it discriminated or retaliated against E.M.  Shady Grove asserts that it had legitimate and non-discriminatory reasons for any requirements it imposed concerning financial responsibility for E.M.'s treatment, and that it ultimately dismissed her as a patient because, among other things, E.M. lacked trust in Shady Grove and refused to abide by Shady Grove's policies.  Shady Grove further asserts that it complied with its Patient Bill of Rights and District of Columbia law in its treatment of E.M.  Shady Grove contends that it did not inflict, and

E.M. did not suffer, emotional distress as a result of Shady Grove's actions, which Shady Grove contends were reasonable given E.M.'s actions. Shady Grove denies that E.M. is entitled to any relief.

The parties' respective positions and allegations will be presented in further detail during the course of this trial.

### B.      Statement of Claims

In 2012 E.M. was a young professional focused on her career. Facing the impossible task of deciding how to juggle her career with her lifelong dream of becoming a biological mother, E.M. decide to seek out a fertility clinic to preserve her eggs for future use to have a biological child. E.M. was drawn to Shady Grove, a facility she understood was one of the largest and most trusted fertility clinics in the United States. In 2012 E.M. became a patient of Shady Grove. At the time she became a patient, E.M. was in a romantic relationship with her partner, J.S.

Beginning in 2014, E.M. and J.S. started trying to get pregnant. Between 2015 and 2017, E.M. and J.S. continued trying to get pregnant, including through IUI and IVF attempts with SGF. This included two natural pregnancies, which tragically both ended in miscarriage. E.M. paid for all fertility treatments with SGF. Beginning in 2017, based on advice from her physicians, E.M. started the process to unfreeze her eggs available for use in her fertility treatment at SGF. Beginning in October 2017, E.M. underwent the invasive and painful procedures to prepare for the egg thaw cycle. The process was delayed until November 2018, when E.M. again started the process to prepare for the egg thaw cycle.

In January 2019 it was time for E.M. to begin an egg thaw cycle. SGF agreed and they started the process. On January 15, 2019, E.M. again underwent invasive and painful medical procedures. SGF scheduled a tentative date for the egg thaw, January 29, 2019. Before that date,

SGF provided E.M. with an informed consent form, explaining that SGF would need it to be signed before the egg thaw could take place.  After reviewing the document, E.M., an accomplished lawyer, had a few questions about the form.  From her perspective, there were three areas that she needed more information on before deciding how to deal with the form—they were financial, legal, and clinical.  Regarding the financial questions, they mostly related to SGF's Shared Help Program and how SGF defined household income.  E.M. posed the questions to SGF but never heard back after contacting her assigned SGF financial coordinator.

E.M. also had a number of legal questions.  They related to J.S., E.M.'s partner and the person that would be the father to the child she was trying to conceive through the fertility process at SGF.  The questions were whether SGF needed J.S.' permission and/consent before moving forward with the egg thaw process and whether J.S. needed to consent to other events related to the same process.  E.M. also questioned whether SGF would require J.S. to assume financial responsibility for the cost of the procedures E.M. was planning to undergo with SGF.  E.M. hoped these questions could be answered quickly by someone in SGF's legal department and she could proceed with the egg thaw tentatively scheduled for the end of January 2019.

Lastly, E.M. had clinical questions – specifically whether her physician thought E.M. should be taking any medications in connection with the planned egg thaw and her doctor's view about a particular fertility procedure.  E.M. raised these questions with her Nurse Coordinator, Robin Peterson, at SGF.  To say that things did not go as E.M. expected is a gross understatement.  E.M. expected SGF to answer what she considered to be routine questions and the process to continue as scheduled.  Instead, SGF was infuriated by E.M. posing these questions and refused to answer her questions or engage with her.  Within a matter of days, SGF inexplicably terminated E.M. from the practice and conjured up a "reason" to try to justify their actions.

E.M. discussed her clinical questions with Ms. Peterson on January 14, 2019.  The two spoke against on January 17, 2019, where E.M. politely asked to speak with her physician regarding her outstanding clinical questions.  E.M. also mentioned to the Ms. Peterson that she also had a few outstanding legal and financial questions.  Instead of referring E.M. to the correct SGF staff, Ms. Peterson tried to understand E.M.'s legal and financial questions and answered based on her incorrect understanding of what E.M. was asking.  Ms. Peterson compounded the problem by then inaccurately documenting her call with E.M. and the outstanding questions.  Shockingly, E.M.'s next conversation with someone at SGF would provide a stark choice—J.S. had to sign everything SGF was asking for in connection with the upcoming egg thaw or SGF would consider J.S. a Known Sperm Donor (KSD).  This choice was first presented by Nursing Supervisor Sarah Crisp.  E.M. had at least two calls with Ms. Crisp on January 17, 2019 and E.M. was able to correct some of the erroneous information that was conveyed by Ms. Peterson, but the proposal from SGF at that point remained the same—J.S. had to sign what SGF was asking for or he would be deemed a KSD.  In presenting this proposal, SGF attempted to disregard the wishes of their patient, E.M., and punish E.M. for raising questions.  SGF never provided a medical reason for trying to treat J.S. as a KSD if he did not sign the egg thaw forms as written.

After E.M. spoke with Ms. Crisp, SGF management quickly decided how to handle the situation—by terminating E.M. as a patient.  Ms. Crisp communicated with Dr. Gilbert Mottla, the individual responsible for risk management.  Dr. Mottla's immediate reaction was to characterize E.M. as a "challenging patient" and that the "best outcome would be for [E.M.] to transition to another practice."  Dr. Mottla took the position that there was "no negotiation" regarding the standards set by SGF.  Dr. Mottla also added another condition—E.M. needed to have an agreement done by a reproductive attorney to cover financial responsibility and parental rights

issues.  E.M. was able to speak with her physician, Dr. Sharon Osborn, on January 18, 2019.  Dr. Osborn did not say anything about E.M. being terminated as a SGF patient.  She offered to continue to treat E.M., offered a discount, and seemed to understand the relationship between J.S. and E.M. Behind the scenes, and unbeknownst to E.M., Dr. Mottla continued to advocate for terminating E.M. from the practice.  Dr. Mottla and others communicated and came up with three options to present to E.M.  On January 18, 2019, Ms. Crisp spoke with E.M. and presented the three options:

Option 1) The Partner Path:

    A.  E.M. and J.S. would be required to sign all lines of the Consent to Thaw, including requiring J.S. to assume financial responsibility for E.M.'s treatment,

    B.  SGF required a consultation with a social worker,*

    C.  SGF required an agreement between E.M. and J.S. drafted by a reproductive attorney,

Option 2) The Donor Path:

    A.  If E.M. and J.S. were unwilling to sign all lines of the Consent to Thaw, including requiring J.S. to assume financial responsibility for E.M.'s treatment, SGF would treat J.S. as a KSD,

    B.  SGF required a consultation with a social worker,

    C.  SGF required an agreement between E.M. and J.S. drafted by a reproductive attorney.

Option 3) E.M. could choose to seek treatment elsewhere.

SGF did not impose a deadline for E.M. to respond.  E.M. spoke with Ms. Crisp and Vicki Gerber about the options.  Within hours of being presented with the options, and while E.M. and J.S. were deciding how to proceed, Dr. Mottla determined that SGF was at an impasse with E.M., that E.M. lacked trust in SGF, and had decided to terminate her as a patient.  SGF sent E.M. a termination letter on January 22, 2019.

Plaintiff seeks relief at trial for the following claims:

In Count 1, E.M. alleges that Shady Grove violated the DC Human Rights Act in two ways.  First, E.M. alleges that Shady Grove discriminated against her based on her source of income.  SGF discriminated against E.M. by requiring J.S. to assume financial responsibility for her treatment at SGF and including him as part of E.M.'s household.    Second, E.M. alleges that Shady Grove engaged in retaliation.  After raising concerns about the actions of SGF and complaining about discriminatory actions, SGF terminated E.M. as a patient.

In Count 2, E.M. alleges that Shady Grove violated the DC Consumer Protections Procedures Act in four ways.  First, E.M. alleges that Shady Grove made misrepresentations concerning FDA regulations and the Shady Grove Patient Bill of Rights.  Second, E.M. alleges that Shady Grove made misrepresentations about the terms of the Shared Help Discount Program offered by Shady Grove.  Third, E.M. alleges Shady Grove made misrepresentations about HIPAA compliance.  Fourth, E.M. alleges Shady Grove engaged in harassment.

In Count 4, E.M. alleges Shady Grove breached the Patient Bill of Rights.

In Count 5, E.M. alleges that Shady Grove breached the implied covenant of good faith and fair dealing with respect to two provisions.  First, E.M. alleges that Shady Grove violated the implied covenant with respect to the Patient Bill of Rights.  Second, E.M. alleges Shady Grove violated the covenant with respect to HIPAA.

In Count 6, E.M. brings a claim for unjust enrichment related to the 2017 IVF cycle performed at Shady Grove and for compensation received related to the 2019 egg thaw cycle that was never completed.

In Count 7, E.M. brings claims for promissory estoppel as an alternative theory for Count 4 (breach of contract of the Patient Bill of Rights).

In Count 11, E.M. brings a claim for intentional infliction of emotional distress based on Shady Grove's dismissal of her as a patient in January 2019.

### C.      Statement of Defenses

E.M. includes within her Statement of Claims a summary of what she contends are the facts giving rise to her claims.  Shady Grove disputes E.M.'s characterizations of the events and facts that led to her termination as a patient as set forth in Plaintiff's Statement of Claims, which characterizations are belied by the voluminous record in this case, including testimony and documents.  Shady Grove will present at trial evidence of the actual facts and documents in this case, consistent with Shady Grove's position as stated in, *inter alia*, its summary judgment briefing, its written discovery responses, and extensive deposition testimony.  As further defenses, Shady Grove states as follows:[1]

Count I -- DCHRA Source of Income Discrimination

Shady Grove denies that it discriminated against E.M. based upon her source of income or otherwise. Shady Grove denies that it took any adverse action against E.M. based in whole or in part upon her source of income or that E.M.'s source of income is in whole or in part causally connected to any adverse action by Shady Grove. If E.M. did not want her partner to be financially responsible for treatment, she could have received fertility treatments from Shady Grove by choosing the donor path for treatment. In this case, there would be no harm to E.M. by using either a donor or a partner for fertility treatment.

Further, Shady Grove had and has legitimate, non-discriminatory reasons for requiring partners to be jointly financially responsible for fertility treatments.  Among other things, through fertility treatments, both parties receive medical care in order to create a child over which they both will have legal and financial responsibilities. Both parties also are receiving the benefit of

---

[1] Shady Grove further summarizes, in both its Answer and its Answers to Plaintiff's Interrogatories, its factual and other bases for its defenses.  Shady Grove adopts and incorporates those documents by this express reference.

treatment to create a child whom they will parent. Partners are couplet treatment meaning they are both trying to receive the benefit of a child and in all aspects of counseling from the doctors and nurses and treatment by Shady Grove Fertility from the beginning of treatment to the end. In contrast, a donor typically has no involvement in fertility treatments and relinquishes all rights to the resulting child. Shady Grove imposes financial obligations on partners who will have legal responsibilities for raising a child and not on those – donors – who will not. There would be no reason for a donor who is not going to be involved with the mother, embryo, and child going forward to pay for treatments or be financially responsible to Shady Grove at all. Donors donate their tissue to prospective parents and receive nothing in return from Shady Grove.

Count I -- DCHRA Retaliation

Shady Grove denies that it terminated E.M. as a patient in retaliation for anything, including E.M.'s allegations of discrimination. Instead, Shady Grove's legitimate, non-discriminatory reasons for terminating E.M. as a patient were due to, *inter alia*, her demonstrated lack of trust in Shady Grove and her refusal to abide by its policies. This lack of trust prevented Shady Grove from continuing to treat her.

Over the course of her relationship with Shady Grove, E.M. was a challenging patient, refusing to follow Shady Grove's recommended processes and procedures, including, among other things, refusing to take recommended and routine medications used in fertility treatments; accusing Shady Grove's physicians of not providing adequate care; accusing the laboratory of not providing adequate care; and questioning Shady Grove's established processes and procedures that all patients receiving treatment must follow.  Other examples of E.M.'s lack of trust include: she did not believe the clinic was administering its Shared Help Program appropriately; she did not trust (or agree to abide by) the clinic's policies and procedures regarding requiring a partner being

financially responsible for fertility treatments that could result in the partner having a child; she did not trust (or agree to abide by) the clinic's decision that it would require all donor sperm to be frozen and quarantined; she demanded that she be treated differently than other patients and be given a special waiver for her situation; she did not trust that she was being treated the same as other similarly situated patients when the clinic refused to alter its requirements to allow J.S. to be treated in some ways as a donor and in some ways as a partner; she did not trust (or agree to abide by) that a "time out" was warranted in her case when she suggested that her relationship with J.S. was not what the clinic understood it to be; she did not trust (or agree to abide by) that a social worker visit or legal contract was warranted in her case given the indications she made to Shady Grove that her relationship with J.S. had changed.

Count II -- District of Columbia Consumer Protection Act (CPPA)

1. <u>Subsections (e) (e-1) (f) and (f-1) alleging misrepresentations regarding FDA.</u> Shady Grove denies that it violated the CPPA with respect to any representations regarding the FDA. Shady Grove denies that it told E.M. that the FDA prohibited her from being solely financially responsible for her treatment and retaining control over her eggs. Among other things, the FDA requires the quarantine of donor sperm (even if not sperm from a "sexually intimate partner"). Shady Grove requires the quarantine of all sperm from donors. It does not require the quarantine of sperm from partners. Moreover, no reasonable consumer would have been misled by any purported representation Shady Grove may have made regarding FDA requirements. The statement(s) at issue in E.M.'s claim were not material or misleading, and were not made in the conduct of trade or commerce. In any event, E.M. was not harmed by any statement by Shady Grove, and no legal right of E.M. was violated.

2. <u>Subsections (e) (e-1) (f) and (f-1) alleging misrepresentations regarding the Patient</u>

Bill of Rights. Shady Grove made no misrepresentations of material fact in the Patient Bill of Rights. Shady Grove provides patients with treatment options without regard to source of payment, except for fiscal capability thereof; allows patients to voice complaints without fear of discrimination or reprisal, and provides reasonable resolution of patient complaints. The statement(s) at issue in E.M.'s claim were not material or misleading, and were not made in the conduct of trade or commerce. In any event, E.M. was not harmed by any statement by Shady Grove, and no legal right of E.M. was violated.

3.      Shared Help Program, subsection (j). E.M. contends that Shady Grove violated the CPPA by publishing detailed criteria for receiving a price reduction or discount based on a patient's U.S. household income as reported on U.S. federal tax returns, and then representing to E.M. that the discount did not exist as advertised. Shady Grove denies that it misrepresented, by publication on its website or otherwise, its Shared Help Program. Among other things, the Shady Grove website regarding its Shared Help Program states to be eligible: "Gross annual household income (including business income, rents, capital gains, etc.) must be $95,000 or less based on last 2 years' U.S. federal tax returns (75 percent weighting toward most recent year)."

Shady Grove's position is that its use of the term "household income" means patient and partner if a partner is being used. If a donor is being used, then only the patient's income is considered. A reasonable consumer would read Shady Grove's statements and publication about its Shared Help Program in context and in their entirety, which statements and publications consistently discuss different treatment options available in terms of whether a partner is included in the treatment or whether a donor will be used. It would be unreasonable to conclude that only a patient's income would be considered for the Shared Help Program if the patient has a partner who is also being treated and will benefit from the treatment with a child for whom the

partner will be responsible. Thus, Shady Grove denies that a reasonable consumer would read its published statements in the manner characterized by E.M., and denies that its statements were unfair or deceptive. Shady Grove further denies that a reasonable consumer would find that the statements were material misrepresentations, made in the conduct of trade or commerce.  In any event, E.M. was not harmed by any statement by Shady Grove, and no legal right of E.M. was violated.  Further, E.M. never applied for the Shared Help Program.

4.    Subsection (a) alleging misrepresentations about HIPAA compliance.  Shady Grove denies that it violated the CPPA with respect to any representations about HIPAA compliance. Shady Grove complies with HIPAA, so representations that it does so are not misrepresentations. No reasonable consumer would have been misled by SGF's representations regarding its HIPAA compliance. The statement(s) at issue in E.M.'s claim were not material or misleading, and were not made in the conduct of trade or commerce.  In any event, E.M. was not harmed by any statement by Shady Grove, and no legal right of E.M. was violated.

5.    Subsection (m) alleging harassment.  Shady Grove denies that it violated subsection (m) of the CPPA. Shady Grove denies that it harassed or threatened E.M. during any communication with E.M. in January 2019 or otherwise, or when it terminated her as a patient. No reasonable consumer would have felt harassed or threatened in the same situation by Shady Grove's words or actions, especially in light of E.M.'s own words, conduct and actions. In any event, E.M. was not harmed by any action by Shady Grove, and no legal right of E.M. was violated.

6.    Punitive Damages under the CPPA. None of the representations or conduct E.M. alleges in this case to be violations of the CPPA were committed by Shady Grove (i) with any evil motive, actual malice, deliberate violence or oppression; (ii) with any intent to injure; or (iii) in willful disregard for the rights of a reasonable consumer. Nor was Shady Grove's conduct

outrageous, grossly fraudulent, or reckless toward the safety of a reasonable consumer.  The factual and legal prerequisites to any award of punitive damages therefore are lacking from this case. Moreover, the amount of punitive damages that E.M. seeks is neither reasonable nor proportionate to any alleged wrong committed, and otherwise bears no relation to any conceivable harm E.M. alleges to have suffered.

Count IV -- Patient Bill of Rights ("PBoR") Breach of Contract

Shady Grove denies that the Patient Bill of Rights creates an enforceable contract between Shady Grove and E.M.  Instead, it is part of a brochure distributed to patients containing aspirations of conduct. Here, the parties did not objectively manifest any intent to be contractually bound under the Patient Bill of Rights; they did not agree on material terms; and they did not assume mutual enforceable obligations, supported by consideration, under the Patient Bill of Rights.

Even if the PBoR were a contract, Shady Grove did not materially breach it (or any other alleged contractual obligations that survive this Court's entry of summary judgment in this case). Shady Grove substantially complied with the Patient Bill of Rights by, among other things, providing treatment options without regard to source of payment, except for fiscal capability thereof; allowing E.M. to voice complaints without fear of discrimination or reprisal; and providing reasonable resolution of her complaints.  Moreover, E.M. did not comply with any "patient responsibilities" required of her, in that she, among other things, failed to provide accurate information regarding matters related to her health, failed to comply with financial obligations required of her if she were to proceed with a partner, and refused to comply with Shady Grove's rules.

E.M. further has not suffered any compensatory damages as a result of any alleged breach of contract.

Count V -- Breach of the Covenant of Good Faith Fair Dealing

If the Patient Bill of Rights is found to be a contract, Shady Grove denies that it breached any implied covenant of good faith and fair dealing that can be read into it.  As an initial matter, if the Patient Bill of Rights comprises any contract, its express language, and not any implied terms, necessarily must state any rights and/or obligations thereunder.  The obligations that E.M. alleges must be read into the Patient Bill of Rights would contradict, modify, negate or override the express terms of the Patient Bill of Rights.   Indeed, E.M.'s claims under this count are virtually identical to other claims for relief under established causes of action.  As such Count V necessarily fails.

Shady Grove did not breach any arguable obligations, express *or* implied, under the Patient Bill of Rights, nor was E.M. damaged thereby from any alleged breach. Shady Grove's conduct did not rise to the level of bad faith. Instead, Shady Grove performed all arguable obligations, express and implied, under the Patient Bill of Rights in good faith in its dealings with E.M.  Among other things, in January 2019 when E.M. indicated that her relationship with J.S. was not what Shady Grove understood it to be, Shady Grove was within its rights to call a time out and require that its standard, additional conditions be met given this change in circumstance. Shady Grove was within its rights to require a legal contract and/or a social worker visit. None of these acts by Shady Grove breached the covenant of good faith and fair dealing. In contrast, E.M. is the party that did not comply with her patient responsibilities or act in good faith in that, among other things, she failed to provide accurate information regarding matters related to her

health, refused to comply with financial obligations required of her if she were to proceed with a partner, and refused to comply with Shady Grove's requirements and rules.

As to any surviving claim(s) regarding HIPAA, Shady Grove asserts that it complies with HIPAA.  Indeed, it has extensive processes and procedures in place to comply. Shady Grove further denies that the incidents on which E.M. relies constitute any HIPAA violation.

Count VI -- Unjust Enrichment

First, Shady Grove maintains that the 2017 Multicycle Agreement is the contract that controls the parties' obligations and precludes an unjust enrichment claim.

Second, Shady Grove denies that it was unjustly enriched under circumstances that would make it inequitable to retain the benefit. E.M. received services for the $18,500.00 that she paid for in the form of, among other things, one completed IVF procedure, three cancelled IVF procedures, one IVF procedure converted to IUI then to TI. Shady Grove correctly refunded E.M. $6,740 after subtracted amounts E.M. owed for services provided to her by Shady Grove.

Count VII -- Promissory Estoppel

If the Patient Bill of Rights is not found to be a contract, and thus E.M. may pursue her promissory estoppel claim, Shady Grove denies  that the Patient Bill of Rights comprised any promise to E.M. on which she reasonably relied to her detriment, or that Shady Grove made promises to E.M. that caused her damage. The alleged promise on which E.M. relies is not definite in terms, and it would be unreasonable for E.M. to rely on such a promise. Shady Grove never promised E.M. that she alone could be financially responsible for her treatments if she sought treatment  with a partner. Further, Shady Grove provided E.M., among other things, treatment options without regard to source of payment, except for fiscal capability thereof; allowed E.M. to voice complaints without fear of discrimination or reprisal; and provided

16

reasonable resolution of her complaints. Instead, E.M. is the party that would not comply with her "patient responsibilities" in that, among other things, she failed to provide accurate information regarding matters related to her health, failed to comply with financial obligations required of her if she were to proceed with a partner, and refused to comply with Shady Grove's rules.

Count XI -- Intentional Infliction of Emotional Distress

Shady Grove denies that it intentionally inflicted emotional distress on E.M. when it terminated her as a patient on January 21, 2019, or otherwise. Shady Grove's conduct was not extreme and outrageous nor did Shady Grove act intentionally or recklessly with the purpose of causing E.M. severe emotional distress. Instead, Shady Grove acted reasonably in response to E.M.'s actions and statements regarding her status with J.S. which indicated to Shady Grove that there was a change in their relationship. In response to E.M.'s assertions and refusals to comply with certain Shady Grove requirements for treatment, Shady Grove offered E.M. options for treatment whereby she could choose treatment with a partner or a donor. In addition, depending on the path E.M. chose, it was reasonable, and in keeping with standards in assisted reproductive technology, for Shady Grove to require a legal contract and social worker visit at this point. When E.M. indicated that she would not comply with Shady Grove's requirements and given all of the circumstances, Shady Grove's actions were reasonable to terminate E.M. as a patient.

Further, E.M. has not suffered emotional distress, let alone severe emotional distress, as a result of Shady Grove's actions. E.M. cannot prove either that she suffered severe emotional distress or that she suffered any other compensable damages. There is no evidence that any purported emotional distress E.M. claims to have suffered was caused by Shady Grove's actions, rather than by other causes.

<u>Plaintiff failed to mitigate her alleged damages</u>.  As to all her claims, E.M. failed to mitigate her damages. E.M. continues to fail and refuse to provide an amount or factual basis underlying her damages claim (except for amounts she claims as reimbursement for medical procedures and/or medications).  To the extent E.M. is claiming any unquantified damages for an alleged delay in her ability to become a parent, even assuming that E.M. somehow can quantify any such damages, Shady Grove is not responsible for any delay. Alternative clinics in the District of Columbia and across the country exist where E.M., in 2019, could have sought and obtained fertility treatments, but she did not.

To the extent she claims that she could not seek treatment elsewhere sooner because shipping her oocytes presents too great a risk, Shady Grove denies that it would have been unsafe or hazardous to ship the oocytes and will present substantial evidence to the contrary. Specimens are safely shipped on a daily basis from clinic to clinic. Shipping oocytes does not affect the outcome of whether a patient becomes pregnant.

<u>Additional Bars to Recovery</u>

<u>Statute of Limitations</u>. To the extent E.M.'s allegations are based upon actions that occurred prior to March 6, 2016, the statute of limitations precludes any such claim.

<u>Unclean Hands</u>.  E.M. does not come into this Court with clean hands.  E.M. is the party that would not comply with her "patient responsibilities" in that, among other things, she failed to provide accurate information regarding matters related to her health, failed to comply with financial obligations required of her if she were to proceed with a partner, and refused to comply with Shady Grove's rules.

<u>Shady Grove denies the nature and extent of E.M.'s alleged damages and the availability of other requested relief</u>.  Even if Shady Grove is found liable for any of the above causes of action,

E.M. has not suffered any recoverable compensable damages as a result.  E.M. further failed and refused to quantify any such damages, beyond the amounts she claims to have paid for Shady Grove's services and for medications, and otherwise now purports to seek damages that she never disclosed in discovery or otherwise

Moreover, E.M. is not entitled to any of the other affirmative relief she seeks in this case. E.M.'s claims to additional relief are vague and unspecified, and further lack basis in law or in fact.

Punitive Damages. None of Shady Grove's actions in this case were taken (i) with any evil motive, actual malice, deliberate violence or oppression; (ii) with any intent to injure; or (iii) in willful disregard for E.M.'s rights. Nor was Shady Grove's conduct outrageous, grossly fraudulent, or reckless toward the safety of E.M.  The factual and legal prerequisites to any award of punitive damages therefore are lacking from this case.  Moreover, the amount of punitive damages that E.M. seeks is neither reasonable nor proportionate to any alleged wrong committed, and otherwise bears no relation to any conceivable harm E.M. alleges to have suffered.

### D.      Schedule of Witnesses

#### 1.  *Plaintiff's Schedule of Witnesses*[2]

J.S. J.S. is the partner of E.M.  He is expected to testify about his interactions with E.M. and SGF during the course of E.M.'s tenure as a patient.  He will testify about his observations of interactions between E.M. and SGF staff.  He will testify about his observations and involvement of the series of events that led to E.M. being terminated by SGF.  He will also testify about the damages incurred by E.M., including the emotional distress E.M. suffered due to SGF's conduct. He helped E.M. try to find clinics to take her after she was terminated by SGF.  He may also testify about other subject matters covered in his deposition.

---

[2] Shady Grove may move to preclude the testimony of one or more of Plaintiff's identified trial witnesses as part of a motion *in limine*, which motions are due to be filed on August 12, 2024.

5 hours

Dr. Eric Widra.  Dr. Widra was E.M.'s primary treatment physician when she first started with SGF in 2012.  He is expected to testify in his individual capacity and as a corporate representative of SGF.  He is expected to testify about his interactions with E.M.  Dr. Widra communicated with E.M. about the services offered by SGF that she ultimately went forward with.  Dr. Widra made a number of representations to E.M., including that she would be able to use and her eggs if she became a patient of SGF and had her eggs frozen there.  Dr. Widra was involved in the decision to terminate E.M. as a patient.  He may also testify about other subject matters covered in his deposition.

6 hours

Dr. Barbara Osborn.  Dr. Osborn was E.M.'s primary treating physician at SGF.  She is expected to testify in her individual capacity and as a corporate representative of SGF.  She is expected to testify about her interactions with E.M. and the treatment she received at SGF.  She will testify about SGF practices and procedures generally and as it relates to E.M.  Dr. Osborn communicated with E.M. and was involved in the decision to terminate E.M. as a patient.  Dr. Osborn is expected to testify about how SGF treated E.M. and how it compared to other SGF patients.   She may also testify about other subject matters covered in her deposition, including statements about her intent, the intent of SGF, and admissions of wrongful conduct.

7 hours

Robin Peterson.  Ms. Peterson was a nurse that was assigned to E.M. while she was a patient at SGF.  She was working with E.M. in January 2019 when E.M. was terminated as a patient.  She is expected to testify about her interactions with E.M. and the treatment she received at SGF.  Ms. Peterson also observed interactions between E.M. and other SGF staff.  Ms. Peterson is expected to testify about how SGF treated E.M. and how it compared to other SGF patients.  Ms. Peterson fielded questions from E.M. and started the internal SGF discussion that resulted in E.M.'s termination as a patient at SGF.  She will testify about communications with SGF staff and management about E.M, including the decision to terminate her as a patient.   She may also testify about other subject matters covered in her deposition.

4 hours

Sarah Crisp.  Ms. Crisp was an Officer Supervisor with SGF.  She is expected to testify about her interactions with E.M. during the time she was a patient with SGF.  Ms. Crisp is expected to testify about how SGF treated E.M. and how it compared to other SGF patients.  She is expected to testify about SGF practices and procedures generally and as it relates to E.M.   Ms. Crisp presented E.M. with three options after E.M. posed the series of questions that led to her termination as a patient.  She will testify about how the three options were decided and internal

SGF discussions about the same.  She will testify about communications with SGF about E.M, including the decision to terminate her as a patient.  She was involved in the decision to terminate E.M.  She may also testify about other subject matters covered in her deposition.

    3 hours

    Vicki Gerber.  Ms. Gerber was a Regional Manager of SGF.  She is expected to testify in her individual capacity and as a corporate representative of SGF.  She is expected to testify about her interactions with E.M. during the time she was a patient with SGF.  Ms. Crisp is expected to testify about how SGF treated E.M. and how it compared to other SGF patients.  She is expected to testify about SGF practices and procedures generally and as it relates to E.M.  Ms. Gerber communicated with E.M. after Sarah Crisp and imposed additional conditions on the options communicated by Ms. Crisp.  She will testify about how the decision was made to impose additional conditions.  She is expected to testify about her duties and responsibilities within SGF, including addressing issues between SGF and patients arising under the SGF Patient Bill of Rights, in the decision to terminate E.M. as a patient and the additional conditions on the options communicated by Ms. Crisp.  She may also testify about other subject matters covered in her deposition.

    3 hours

    Dr. Gilbert Mottla. Dr. Mottla is a physician with SGF.  He is expected to testify in his individual capacity and as a corporate representative of SGF.  He was involved in the decision to terminate E.M. as a patient and will testify about the process and his involvement and interactions with SGF staff and management about the decision.  He is expected to testify about how SGF treated E.M. and how it compared to other SGF patients.   He may also testify about other subject matters covered in his deposition.

    6 hours

    Tony Yi. Tony Yi is expected to testify about SGF policies and procedures.  He may also testify about other subject matters covered in his deposition

    2 hours

    Michael Tucker. Mr. Tucker is expected to testify about SGF policies and procedures.  He is expected to testify in his individual capacity and as a corporate representative of SGF.  He may also testify about other subject matters covered in his deposition.

    2 hours

    James Graham. Mr. Graham is expected to testify about SGF policies and procedures.  He may also testify about other subject matters covered in his deposition.

2 hours

Michelle Purcell. She is expected to testify in her individual capacity and as a corporate representative of SGF.  She is expected to testify about any interactions with E.M. during the time she was a patient with SGF.  Ms. Purcell is expected to testify about how SGF treated E.M. and how it compared to other SGF patients.  She is expected to testify about SGF practices and procedures generally and as it relates to E.M.  She may also testify about other subject matters covered in his deposition.

3 hours

Corporate Designee of SGF. To the extent necessary, one or more corporate designees of SGF may be called to authenticate documents.

1 hour

Dr. Lawrence Udoff. Dr. Udoff is a physician at GIVF that worked with E.M. after she was terminated by SGF.  He is expected to testify about his treatment of E.M. and his interactions with her and J.S.  He is also expected to testify about the efforts E.M. and J.S. took to obtain E.M.'s eggs from SGF after she was terminated and his observations and interactions with E.M. during this time.

2 hours

Mandy Zeng. Mandy Zeng is a nurse with GIVF that was involved in E.M.'s treatment at GIVF.  She is expected to testify about GIVF's treatment of E.M. and her interactions with E.M. and J.S.  She is also expected to testify about the efforts E.M. and J.S. took to obtain E.M.'s eggs from SGF after she was terminated and her observations and interactions with E.M. during this time.

2 hours

*Dr. Jim Wheeler. Dr. Wheeler is an expert witness for E.M.  He is expected to testify consistent with his expert opinion, which is incorporated by reference.  He may also testify about other subject matters covered in his deposition.

4 hours

E.M.  E.M. will testify about the allegations in the complaint in this matter.  She will testify about her treatment while a patient at SGF.  She will testify about her interactions with SGF staff and management between 2012 and January 2019.  She will testify about the harm she suffered as a result of the conduct of SGF.  She will testify about her relationship with SGF and her understanding of the Patient Bill of Rights and communications with SGF staff and

management regarding the same.  She will testify about the questions she posed in January 2019 that led to her termination.  She will testify about her interactions after she posed the questions and her ultimate termination.  She will testify about her efforts to find treatment at other clinics and trying to get her eggs from SGF.  She may also testify about other subject matters covered in his deposition.

      7 hours

      <u>Lori Ebersohl</u>. Lori Ebersohl is expected to testify about the efforts E.M. and J.S. took to obtain E.M.'s eggs from SGF.

      1 hour

      E.M. reserves the right to call impeachment witnesses and to call any witness identified on SGF's Schedule of Witnesses.  E.M. further reserves the right to supplement this Schedule of Witnesses with witnesses who may authenticate any document on E.M.'s Trial Exhibit List, to the extent that it becomes necessary based on any objection by SGF.

### 2. *Defendant's Schedule of Witnesses*[3]

      <u>Sarah Crisp.</u> Ms. Crisp was the office supervisor at Shady Grove who spoke with E.M. in the days prior to E.M.'s termination as patient. Ms. Crisp had her deposition taken prior to trial and may testify concerning the subjects discussed therein. She is expected to testify concerning her conversations with Robin Peterson, E.M., J.S., and the doctors at Shady Grove leading up to E.M.'s termination. She may also testify concerning E.M.'s history at the clinic, the nurses assigned to E.M., Shady Grove's compliance with HIPAA and the alleged HIPAA violations in this case, training of Shady Grove employees, the Shared Help Program, and the Patient Bill of Rights.

      2 hours

      <u>Vicki Gerber.</u> Vicki Gerber was the regional executive director at Shady Grove who spoke with E.M. and J.S. leading up to E.M.'s termination as patient. She had her deposition taken prior to trial and may testify concerning the subjects discussed therein. She is expected to testify concerning the conversations leading up to E.M.'s termination, including those with E.M. and J.S. She will also testify concerning dismissal of patients, Shady Grove's compliance with HIPAA, the

---

[3] E.M. may move to preclude the testimony of one or more of SGF's identified trial witnesses as part of a motion *in limine*, which motions are due to be filed on August 12, 2024.

alleged HIPAA violations in this case, the DCHRA, employee training, the Shared Help Program, the Patient Bill of Rights issues, and Shady Grove's complaint process.

4 hours

<u>James Graham.</u> James Graham is an embryologist at Shady Grove. He had his deposition taken prior to trial and may testify concerning the subjects discussed therein. If the need arises, he may testify concerning the transportation of cryopreserved specimens, and alternative fertility treatment centers available to E.M. and J.S. that can perform the same treatments and techniques as Shady Grove and can treat E.M. and J.S. He may testify concerning pregnancy rates using shipped vs. non-shipped specimens, using fresh vs. frozen sperm, the cryopreservation and thawing process, techniques, and procedures. He may also testify concerning E.M.'s and J.S.'s treatments at Shady Grove with respect to embryology and lab issues.

2 hours

<u>Gilbert Mottla.</u> Gilbert Mottla is a reproductive endocrinologist at Shady Grove. He had his deposition taken prior to trial and may testify concerning the subjects discussed therein. He is expected to testify concerning E.M.'s treatment at Shady Grove, as well as her history as a patient at SGF; the events that led up to her termination; and the reason for her termination as a patient. He will testify that she was terminated as a patient not for any discriminatory reason or in retaliation for claiming discrimination, but instead due to her lack of trust in Shady Grove and the evidence establishing that lack of trust. He will testify as to Shady Grove's policy of requiring partners to be jointly financially responsible for treatment, and that this policy is not based on illegal discrimination. Instead, it is required for legitimate, non-discriminatory reasons in that both the patient and partner are being treated that will result in the benefit of a child over which both individuals will have legal responsibilities. He may also testify concerning dismissal of patients; Shady Grove's website; Shady Grove's compliance with HIPAA; the Shared Help Program; the Patient Bill of Rights; Shady Grove's treatment of partners and patients as well as Shady Grove's requirements relating thereto; the types of patients Shady Grove treats; the role of donors in fertility treatment and Shady Grove's requirements relating thereto; the use of frozen or fresh sperm; the use of a time out; the role social workers and legal counsel play in the fertility journey and when they are used; and the FDA and its role and requirements.

6 hours

<u>E.M.</u> She is the plaintiff in this case. She had her deposition taken prior to trial and may testify concerning the subjects discussed therein. She is expected to testify concerning all issues in the case.

Barbara Osborn. Barbara Osborn is a reproductive endocrinologist at Shady Grove. She had her deposition taken prior to trial and may testify concerning the subjects discussed therein. She is expected to testify concerning E.M.'s treatment at Shady Grove, as well as her history as a patient at SGF; the events that led up to her termination; and the reason for her termination as a patient. She will testify that E.M. was terminated as a patient not for any discriminatory reason or in retaliation for claiming discrimination, but instead due to her lack of trust in Shady Grove and the evidence establishing that lack of trust. She will testify as to Shady Grove's policy of requiring partners to be jointly financially responsible for treatment, and that this policy is not based on illegal discrimination. Instead, it is required for legitimate, non-discriminatory reasons in that both the patient and partner are being treated that will result in the benefit of a child over which both individuals will have legal responsibilities. She may also testify concerning dismissal of patients; Shady Grove's website; Shady Grove's compliance with HIPAA; the Shared Help Program; the Patient Bill of Rights; Shady Grove's treatment of partners and patients as well as Shady Grove's requirements relating thereto; the types of patients Shady Grove treats; the role of donors in fertility treatment and Shady Grove's requirements relating thereto; the use of frozen or fresh sperm; the use of a time out; the role social workers and legal counsel play in the fertility journey and when they are used; and the FDA and its role and requirements.

6 hours

Nancy Paredes. Nancy Paredes was E.M.'s financial counselor at Shady Grove. She is expected to testify concerning financial issues with respect to E.M. and J.S. She will testify concerning her conversations with E.M. and J.S. and regarding the financial issues remaining in the case.

2 hours

Robin Peterson. Robin Peterson is a nurse at Shady Grove and was E.M.'s last nurse with the clinic. She had her deposition taken prior to trial and may testify concerning the subjects discussed therein. She is expected to testify concerning E.M.'s treatment with Shady Grove, her interactions with E.M. and J.S., and E.M.'s history at the clinic. She will also testify concerning her conversations with E.M. and Shady Grove staff prior to E.M.'s termination as a patient.

3 hours

Michele Purcell. Michele Purcell is the director of specialty programs at Shady Grove. She had her deposition taken prior to trial and may testify concerning the subjects discussed therein. She is expected to testify concerning Shady Grove's treatment of partners and patients; Shady Grove's treatment of patients using donors; Shady Grove's financial responsibility policies; the types of patients Shady Grove treats; the role of donors in fertility treatment; Shady Grove's time out policy; Shady Grove's website; the Shared Help Program; the use of social workers and legal counsel in fertility treatment; Shady Grove's privacy policy; the FDA and its role and requirements

in assisted reproductive technology and fertility treatments; Shady Grove's compliance with FDA requirements; FDA requirements vs. Shady Grove requirements; consent and release forms utilized by Shady Grove; the alleged HIPAA violations in this case as well as Shady Grove's compliance with HIPAA; Shady Grove's training of employees; the financial issues in this case including the calculations to demonstrate that E.M. was given the correct refund; and E.M.'s and J.S.'s financial record with Shady Grove.

3 hours

<u>J.S.</u> J.S. is expected to testify concerning his and E.M.'s fertility treatments. He is also expected to testify concerning the termination and the events that transpired thereafter. He had his deposition taken prior to trial and may testify concerning the subject matters discussed therein and all issues in the case.

4 hours

<u>Michael Tucker, PhD.</u>  Michael Tucker is a clinical embryologist and the scientific director at Shady Grove. He had his deposition taken prior to trial and may testify concerning the subjects discussed therein. If the need arises, he may testify concerning the transportation of cryopreserved specimens, and alternative fertility treatment centers available to E.M. and J.S. that can perform the same treatments and techniques as Shady Grove and can treat E.M. and J.S. He may testify concerning pregnancy rates using shipped vs. non-shipped specimens, using fresh vs. frozen sperm, the cryopreservation and thawing process, techniques, and procedures. He may also testify concerning E.M.'s and J.S.'s treatments at Shady Grove with respect to embryology and lab issues.

2 hours

<u>Eric Widra.</u> Eric Widra is the medical director and a reproductive endocrinologist at Shady Grove. He had his deposition taken prior to trial and may testify concerning the subjects discussed therein. He is expected to testify concerning E.M.'s treatment at Shady Grove, as well as her history as a patient at SGF; the events that led up to her termination; and the reason for her termination as a patient. He will testify that E.M. was terminated as a patient not for any discriminatory reason or in retaliation for claiming discrimination, but instead due to her lack of trust in Shady Grove and the evidence establishing that lack of trust. He will testify as to Shady Grove's policy of requiring partners to be jointly financially responsible for treatment, and that this policy is not based on illegal discrimination. Instead, it is required for legitimate, non-discriminatory reasons in that both the patient and partner are being treated that will result in the benefit of a child over which both individuals will have legal responsibilities. He may also testify concerning dismissal of patients; Shady Grove's website; Shady Grove's compliance with HIPAA; the Shared Help Program; the Patient Bill of Rights; Shady Grove's treatment of partners and patients as well as Shady Grove's requirements relating thereto; the types of patients Shady Grove treats; the role of donors in fertility treatment and Shady Grove's requirements relating thereto;

the use of frozen or fresh sperm; the use of a time out; the role social workers and legal counsel play in the fertility journey and when they are used; and the FDA and its role and requirements.

5 hours


<u>Dr. Laura Cowen. 3800 Reservoir Road NW, Washington DC 20007.</u>  Dr. Laura Cohen was E.M.'s medical provider who treated E.M.'s thyroid levels in and about 2019.  She will testify regarding E.M.'s thyroid conditions and other health manifestations, symptoms, conditions, and issues that long pre-dated January 2019.


*<u>James Graham</u>. Rockville, Maryland. Specialty—Embryology

James Graham is an expert in the field of embryology. He is expected to testify consistent with the Defendant's Expert Disclosure, which is incorporated by this reference.

2 hours


*<u>Dr. Wayne S. Maxson</u>. Florida. Specialty—Reproductive Endocrinology

Dr. Maxson is an expert in the field of reproductive endocrinology. The opinions and bases therefor that Dr. Maxson is expected to offer at trial are set forth in his report and in his deposition. He had his deposition taken prior to trial and may testify concerning the subjects discussed therein.

3 hours


*<u>Dr. Kimball O. Pomeroy</u>. Arizona. Specialty—Embryology

Dr. Pomeroy is an expert in the field of embryology. The opinions and bases therefor that Dr. Pomeroy is expected to offer at trial are set forth in his reports and in his deposition. He had his deposition taken prior to trial and may testify concerning the subjects discussed therein.

3 hours


*<u>Dr. Michael Tucker</u>. Rockville, Maryland. Specialty – Embryology

Dr. Tucker is an expert in the field of embryology. He is expected to testify consistent with the Defendant's Expert Disclosure, which is incorporated by this reference.

2 hours


Shady Grove reserves the right to call impeachment witnesses and to call any witness

identified on E.M.'s Schedule of Witnesses.  Shady Grove further reserves the right to supplement

this Schedule of Witnesses with witnesses who may authenticate any document on Shady Grove's Trial Exhibit List, to the extent that it becomes necessary based on any objection by E.M.

### E.      List of Exhibits

The exhibit list for Plaintiff is attached hereto as Exhibit A.   The exhibit list for Defendant is attached hereto as Exhibit B.   The parties are in the process of conferring on appropriate redactions to trial exhibits and coordinating delivery to chambers of a thumb drive containing exhibits.   The parties have agreed to submit their objections to trial exhibits within ten (10) days from the filing of this Joint Pretrial Statement.

### F.      Designation of Depositions

Plaintiff's Designation of Depositions is attached hereto as Exhibit C. Defendant's Designation of Depositions is attached hereto as Exhibit D.

### G.      Itemization of Damages

E.M.'s itemization of damages is as follows:

- $82,338.00, plus prejudgment interest; SGF medical treatment paid to date

- Fees paid to GIVF and other clinics in seeking care post termination from SGF

- Treble damages or $1,500.00 per violation of CPPA, whichever is greater

- $3,000,000.00 in punitive damages

### H.      Any Other Relief Sought

E.M. seeks the following additional relief:

- Attorney's fees and costs

- Emotional distress, including pain and suffering, amount to be determined by jury

- Civil fine payable to DC General Fund

28

- Revocation of permits, licenses, franchise, benefits, exemptions and/or advantages issued to SGF by the District of Columbia Government.

- Permanent injunctive relief re damages

Relief Sought by Defendant:

Defendant requests judgment in favor of Defendant and against E.M. on all remaining Counts of the Complaint, along with an award of costs, expenses and attorneys' fees, as well as any such other and further relief as the Court deems just and equitable.

## II.      Proposed Voir Dire

The parties jointly submit their Proposed Voir Dire, attached hereto as Exhibit E, with exceptions to certain questions as follows:

Shady Grove objects to redline question 10, because as phrased (asking about experience "reading" legal documents or contracts), it could apply to virtually every member of the jury pool, and apply to everyday life experiences.  Any useful information elicited by any more narrow version of this question would be elicited in response to redline question 12.

Shady Grove proposes the following language in place of redline question 11:  "Have you or someone close to you ever been a plaintiff, defendant, or witness in a civil case, criminal case, or arbitration?"

Shady Grove objects to redline questions 13b, 23, and 25 as duplicative of what Shady Grove proposes as question 11.

## III.     Jury Instructions

The parties have reached agreement on a significant number of joint proposed jury instructions.  The jury instructions agreed upon by the parties are attached hereto as Exhibit F.  The parties' disputed jury instructions are attached hereto as Exhibit G.  Shady Grove reserves the right to argue that some or all of the issues set forth in the instructions, should not go to the jury and, instead, should be decided in favor of Shady Grove as a matter of law at the appropriate time. By submitting these proposed jury instructions, Shady Grove specifically does not waive the right to argue that any issue set forth herein is not appropriate for the jury to decide, and, thus, the jury should not be instructed on the issue based on the evidence at trial.

## IV.     Proposed Verdict Form

E.M.'s proposed Verdict Form is attached hereto as Exhibit H.  SGF's proposed Verdict

Form is attached hereto as Exhibit I.

Respectfully submitted,


 /s/ Marc Eisenstein
Marc Eisenstein (DC Bar No. 1007208)
Barry Coburn (DC Bar No. 3580202)
Sarah Schwietz (DC Bar No. 90008610)
Coburn, Greenbaum & Eisenstein PLLC
1710 Rhode Island Avenue, N.W.
Second Floor
Washington, DC 20036
Phone: (202) 470-2695
Fax: (866) 561-9712
marc@coburngreenbaum.com
barry@coburngreenbaum.com

*Counsel for Plaintiff*


/s/ Jeffrey M. Schwaber
Jeffrey M. Schwaber (Bar ID 419681)
Deanna Peters (Bar ID 486717)
Stein Sperling Bennett De Jong Driscoll PC
1101 Wootton Parkway, Suite 700
Rockville, MD 20852
Phone: (301) 340-2020
Fax: (301) 354-8131
jschwaber@steinsperling.com
dpeters@steinsperling.com

*Counsel for Defendant*