UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| E.M., : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. 1:19-cv-00657 (RC) |
| : | |
| SHADY GROVE REPRODUCTIVE : | |
| SCIENCE CENTER P.C., : | |
| : | |
| Defendant. : | |

PLAINTIFF'S MOTION FOR A NEW TRIAL

Plaintiff E.M., through counsel, respectfully moves this court for a new trial pursuant to Fed.R.Civ.P. 59(a).  This motion is limited to the portions of Count 1 of the Complaint, alleging source of income discrimination and related retaliation, that remained following the Court's Order on summary judgment (Dkt. Nos. 89 and 93).  Grounds for this motion follow.

Introduction and Summary of Argument

We respectfully submit that the state of the evidence concerning source of income discrimination and retaliation in violation of the District of Columbia Human Rights Act ("DC HRA") is such that a new trial on Count One of the Complaint is warranted.  Further, the strong public policy interests implemented by the DCHRA weigh in favor of a new trial on Count One.

District of Columbia Human Rights Act

In 1973, the District of Columbia Council promulgated Title 34 of the District of Columbia Rules and Regulations, which created human rights protection laws as an exercise of the District of Columbia's police power. 34 DCRR §§ 1.1-35.3 (1973), Reg. No. 73-22, 20 D.C. Reg. 345 (Nov. 17, 1973).  Title 34 was founded on the recognition that "the failure to provide equal opportunity to enjoy a full and productive life . . . threatens the rights and proper privileges

of [D.C.'s] inhabitants," "menaces the institutions and foundations of a free democratic society; and threatens the lives, limbs, health, comfort, quiet of all persons." 34 DCRR § 1.2. The District of Columbia Human Rights Act was re-enacted as a "permanent part" of D.C. Code in 1977. S*ee* D.C. Council, Comm. on Pub. Servs. and Consumer Affairs, Report on Bill 2-179 at 1 (July 5, 1977) (hereinafter "HRA Report"). The HRA Report further describes the DC HRA as "among our most important laws" and states that it is to be "vigorously enforced." HRA Report at 1. The DC HRA's has the stated purpose of "secur[ing] an end in the District of Columbia to discrimination for any reason. . ." D.C. Code § 2-1401.01. The law's anti-retaliation provision is crucial to the vigorous enforcement of this important law. The District of Columbia Circuit Court has recognized that "[t]he purpose of the statute is to protect access to the machinery available to seek *redress* for civil rights violations." *Howard Univ. v. Green*, 652 A.2d 41, 49 (D.C. 1994) (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989)) (emphasis in original). Protection from retaliation protects not just a claim of discrimination that is ultimately adjudged to be valid, but also a claim is that based on a "reasonable belief" that discrimination occurred. *See Allen-Brown v. District of Columbia,* 174 F.Supp.3d 463, 483 (D.D.C. 2016). This is important because an individual who cannot safely raise concerns about discrimination cannot protect her or his own rights.

Facts

On January 15, 2019, following years of a doctor-patient relationship with the Defendant, E.M. had an appointment at Shady Grove. DX 2[1] at 4. From January 17, 2019 through January 18, 2019, E.M. engaged in a series of calls with various Shady Grove personnel regarding medical, legal, and financial questions. *Id.* at 1–4. She communicated her desire to Shady Grove

---

[1] We utilize here the same exhibit numbers used at trial, and submit them as exhibits to this motion for the Court's easy reference.

that she be considered for a discount program based only on her income and other assets, not those of J.S. She was informed by Shady Grove that doing so would result in a series of adverse consequences, including J.S. being relegated to the role of a known sperm donor, and the imposition of a waiting period. By January 17, 2019, E.M. had raised to her nurse at Shady Grove, Robin Peterson, her concern that Shady Grove was discriminating against her on this basis. *Id.* at 3–4; DX 75 at 7.

At 9:00 a.m. on Friday, January 18, 2019, Dr. Osborn noted in an email that E.M. believed she was "being discriminated against." DX 75 at 4. Within minutes, Dr. Mottla responded, describing E.M. as "problematic." *Id.* A few hours later on the same day, January 18, 2019, Vicki Gerber, the regional director at Shady Grove, had a call with E.M. and J.S., during which she presented the "three options" that were the subject of extensive trial testimony. She later emailed Dr. Mottla, Dr. Osborn, Dr. Widra and others that E.M. again had stated that she felt as though Shady Grove was discriminating against her. *Id.* at 2. Ms. Gerber's email does not contain any assertion that E.M. refused any of the options offered to her. Rather, Ms. Gerber wrote that E.M. had asked for a sample agreement to review. *Id.* This evidence is further supported by testimony from E.M. and J.S. that they had requested additional information regarding their options. Less than an hour after receiving Ms. Gerber's email where she says that E.M. again raised concern about discrimination, Dr. Mottla directed Dr. Osborn to call E.M. and terminate her as a patient. DX 75 at 1.

Dr. Mottla made, and ordered implemented, the decision to discharge E.M. as a patient. DX 75 at 1. He testified specifically that he did not seek the input of Dr. Osborn, E.M.'s treating physician, prior to ordering the termination. In his deposition, Dr. Mottla testified that the decision had been made by three doctors: himself, Dr. Widra and Dr. Sasson. Tr. 43:13-15.

3

According to Dr. Mottla's trial testimony, he had never met E.M. prior to her termination as a patient.  Dr. Mottla testified that prior to the decision to terminate E.M., Dr. Osborn never told him that she believed the relationship between Shady Grove and E.M. should be terminated.  Dr. Osborn testified at trial that she did not talk to Dr. Mottla about termination of E.M. before the decision was communicated to her, though she acknowledged that, after the fact, she did not disagree with the decision.

On January 21, 2019, Dr. Osborn called E.M. concerning her termination.  The call was recorded by J.S. and played at trial.  *See* PX 71A.[2]  Dr. Osborn told E.M., "basically you've, you know, accused us of discriminating against you. And we would not treat any couple in the same situation." *Id.*  Dr. Osborn testified that she did not mean to say those words.  She testified that she actually had interrupted herself mid-sentence and meant to say that Shady Grove would not treat any couple in the same situation differently.  This, however, is not evident from the audio recording.   Dr. Osborn testified at trial that E.M.'s refusal to believe that Shady Grove was not discriminating against her was the basis for the asserted loss of trust in Shady Grove, and ultimately, her termination.

<u>Legal Standard</u>

"The court may … grant a new trial on all or some of the issues – and to any party – … after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1).  A new trial is appropriate "if the verdict is against the weight of the evidence, damages are excessive, for other reasons the trial was not fair, or substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions." *Lewis v. Elliott,* 628 F. Supp. 512, 515-16 (D.D.C. 1986); *National Car Rental*

---

[2] We are unable to attach the audio recording as an exhibit to this electronically filed motion, but of course could make a copy immediately available to the Court upon request.

4

*System, Inc. v. Better Monkey Grip Co.*, 511 F.2d 724, 725 (5th Cir.), *cert. denied*, 423 U.S. 894 (1975)).  Importantly, the "standards for granting a judgment notwithstanding the verdict and new trial are distinct, the standard for a new trial being less onerous." *Lewis v. Elliott,* 628 F. Supp. 512, 515-16 (D.D.C. 1986) (emphasis added). The trial court has both the "power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice." *Queen v. Schultz*, 310 F.R.D. 10, 21 (D.D.C. 2015) (quoting Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2805 (3d ed. 2012)).  "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Id.* (quoting *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36 (1980)).

The elements of claims of source of income discrimination, and retaliation, were set forth in the Court's charge to the jury.  In particular, to prevail on a claim of retaliation, a plaintiff must show (1) that she engaged in protected activity, (2) that the defendant took an adverse action against her, and (3) that a causal connection exists between the protected activity and the adverse action. *See Propp v. Counterpart Int'l*, 39 A.3d 856, 863 (D.C. 2012).  With respect to the first element, "protected activity, includes opposing or complaining about a practice that one "reasonably believe[s]" to be unlawfully discriminatory.  *Id.*  With respect to the third element, in the absence of direct evidence, the "temporal proximity between protected activity and adverse employment action" can be sufficient to establish causation provided that "the temporal proximity [is] 'very close.'" *Nicola v. Wash. Times Corp.*, 947 A.2d 1164, 1175 (D.C. 2008) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001)).

<u>Argument</u>

Our contention that a new trial is warranted here is predicated on a simple, straightforward set of facts:  There is an extraordinary temporal proximity, as demonstrated at

5

trial through largely uncontested evidence, between E.M.'s request for eligibility in the discount program based on only her income and assets and her contemporaneous assertion that Shady Grove's reaction to this request constituted retaliation, on the one hand, and her termination as a patient on the other. When E.M. reasonably believed she was facing discrimination, she engaged in a protected activity by raising these concerns to the three most appropriate individuals at Shady Grove: first her nurse, then her doctor, and finally the regional executive director, to whom complaints are to be directed according to the Patient Bill of Rights. PX 90. Less than an hour after reporting her concerns about discrimination to the regional director, Shady Grove took an adverse action against her, deciding to terminate her. The Court emphasized this temporal proximity in its Order on summary judgment, and during argument at trial concerning Shady Grove's motion for directed verdict. This compelling temporal proximity, when combined with Dr. Mottla's unambiguous assertions at trial that being a "difficult patient" did not itself warrant termination, as well as Dr. Osborn's above-referenced assertion during the audio recording, creates a strong inference of source of income discrimination and related retaliation, such that the weight of the evidence is in the Plaintiff's favor and allowing the verdict to stand as to Count One would be unjust. The Court's jury instructions, to which Shady Grove did not object, made unambiguously clear the importance of temporal proximity in evaluating these facts. *See also Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) ("[T]his circuit has held that a close temporal relationship *may alone* establish the required causal connection.") (emphasis added).

The viability of DC HRA, one of D.C.'s "most important laws" rests upon its vigorous enforcement. HRA Report at 1. D.C. citizens must feel as though they are able to raise concerns about discrimination without fear of reprisal. Otherwise the HRA's protections are hollow.

Relief pursuant to Rule 59(a) here would vindicate this public policy and thereby serve the interests of justice.

We have not sought relief based on Fed.R.Civ.P. 50(a), but we submit that the broader, more discretionary standard applicable to a request for a new trial warrants a new trial under these circumstances.

Date: November 17, 2025                  Respectfully submitted,

                                                         s/ Barry Coburn
                                                         Barry Coburn (D.C. Bar No. 358020)
                                                         Sarah Schwietz (D.C. Bar No. 90008610)
                                                         Coburn & Eisenstein, PLLC
                                                         1200 G St., NW, Suite 800
                                                         Washington, DC  20005
                                                         Telephone:  (202) 643-9472
                                                         Facsimile:  (866) 561-9712
                                                         barry@coburngreenbaum.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, a copy of the foregoing was filed with the Clerk of the Court and served on all counsel of record via ECF.

                                                         /s/ Barry Coburn
                                                         Barry Coburn