**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| E.M., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.: 19-657 (RC) |
| v. | : | |
| | : | Re Document No.: 170 |
| SHADY GROVE REPRODUCTIVE | : | |
| SCIENCE CENTER P.C.,[1] | : | |
| | : | |
| Defendant. | : | |

# MEMORANDUM OPINION

## DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL

## I. INTRODUCTION

Plaintiff E.M. brought this action against her longtime fertility center, Shady Grove Fertility ("SGF"), after she was dismissed as a patient in early 2019. In October 2025, the Court held a two-week jury trial in this case. The jury returned a complete verdict for SGF, including on E.M.'s claims for source-of-income discrimination and retaliation under the District of Columbia Human Rights Act ("D.C. Human Rights Act"), unfair trade practices under the D.C. Consumer Protection Procedures Act, breach of contract, breach of covenant of good faith and fair dealing, and promissory estoppel. *See* Jury Verdict, ECF No. 163. E.M. now moves the Court for a new trial pursuant to Federal Rule of Civil Procedure 59(a) solely with respect to her

[1] The named Defendant is Shady Grove Reproductive Science Center P.C., a Maryland professional corporation that is registered as a foreign corporation with the Corporations Division of the D.C. Department of Consumer and Regulatory Affairs. *See* Compl. ¶ 2, ECF No. 2. Defendant typically refers to itself, however, as "Shady Grove Fertility Center," "Shady Grove Fertility," or simply "SGF" for short. *See id.* The Court uses the abbreviation, which is the practice that the parties tend to follow as well.

claims under the D.C. Human Rights Act, which comprise Count One of her complaint. *See* Compl. ¶¶ 177–90. For the reasons below, this motion is denied.

## II. FACTUAL BACKGROUND

The facts of the case are set forth in detail in the Court's prior memorandum opinion resolving the parties' cross-motions for summary judgment. *See E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338 (D.D.C. 2020). The Court provides a brief summary below of the facts pertinent to the present motion.

In 2012, at the age of thirty-nine, E.M. enrolled in SGF's egg-freezing program, under which several of her eggs were surgically removed and cryopreserved for future use in fertility treatments. Oct. 14 Tr. at 25:2–26:17. With those eggs in storage, E.M. spent the next several years attempting to become pregnant through other means with her "person," J.S. Oct. 15 Tr. at 156:1–9, 159:24–160:5. Although E.M. and J.S. are not married and do not share a household, they have maintained "a continuing, intimate, sexual relationship" for over a decade. Oct. 17 Tr. at 131:12–13; Oct. 7 Tr. 39:22–40:4. Between 2014 and 2018, E.M. and J.S. conceived naturally twice, but sadly neither pregnancy proceeded to viability. Oct. 7 Tr. at 55:9–56:9, 101:23–102:11. At the same time, E.M. and J.S. pursued multiple cycles of intra-uterine insemination and in vitro fertilization treatments at SGF, none of which were successful. *Id.* at 58:8–62:8. Although J.S. was regularly involved in the treatments, E.M. paid for all her treatments herself. *Id.* at 156:24–25.

By early 2019, E.M. decided that it was time to try to become pregnant with the eggs she had frozen in 2012 and sperm from J.S. *Id* at 9:5–12. She returned to SGF for an appointment on January 15, during which she raised a few outstanding questions with SGF personnel. *Id.* at 9:13–10:7; DX-2 at 3–4. Some of these questions related to finances. E.M. had long been aware

of a "Shared Help Discount Program" that SGF offered to patients whose household income was below a certain threshold. Oct. 9 Tr. at 150:2–24. Years earlier, E.M. had inquired about the program, but her doctor, Barbara Osborn, had informed her that she was not eligible for it because under SGF policy, J.S.'s income was included alongside E.M.'s for purposes of calculating household income. *Id.* at 168:6–15. E.M. had not previously challenged that determination, but by 2019, she believed it made sense to follow up with SGF about the discount program because her income, taken alone, would likely qualify her to receive a discount. *See* Oct. 7 Tr. at 10:8–18.

Following her January 15 appointment, E.M. raised this issue with various SGF employees. DX-2 at 1–4. On January 17, E.M. had a phone call with Sarah Crisp, an office supervisor. DX-2 at 3. According to Crisp, E.M. objected to SGF's consideration of J.S.'s income in assessing her eligibility for the discount program because J.S. was not part of her household or "financially responsible for her treatment cycles." *Id.* SGF considered J.S.'s income because he was being treated as E.M.'s "partner"—a classification that, under SGF policies, involved the patient and partner assuming shared financial and legal responsibilities in their fertility treatments. *Id.* Crisp explained that alternatively, E.M. could proceed with J.S. as a "known sperm donor," which would eliminate J.S.'s financial and legal responsibilities and therefore allow E.M. to apply for the discount program using her income alone. *Id.*; DX-75 at 3. E.M. took issue with this option too, however, because under SGF policies, sperm from a "known sperm donor" had to be frozen, quarantined, and tested for infectious diseases, which would add months to her treatment plan. DX-2 at 3; DX-75 at 3.

Shortly after the January 17 call, Crisp reached out to SGF Assistant Medical Director Gilbert Mottla for assistance. DX-75 at 5. Dr. Mottla then emailed Dr. Osborn to ask her to

"take the lead" with E.M. *Id.* Dr. Mottla stated that E.M. was "clearly a challenging patient" and that the "[b]est outcome would be for her to transition to another practice," in which case SGF would waive the charge of transferring her eggs. *Id.* But he also acknowledged that E.M. might decline that option. *Id.*

Dr. Osborn spoke with E.M. the following morning, on January 18. DX-75 at 4. She then informed Dr. Mottla that E.M.'s "issue [was] that she fe[lt] that she [was] being discriminated against based on [SGF's] definition of 'household.'" *Id.* Dr. Mottla emailed Dr. Osborn minutes later to reiterate that the "[b]est outcome would be to help [E.M.] transition," because "[i]f she stay[ed] as patient, at a minimum her care [would] be time consuming . . . and predictably problematic." *Id.* Dr. Mottla then emailed Crisp, who was scheduled to talk to E.M. later that day, to provide guidance regarding E.M.'s options for treatment if she chose to stay at SGF or move to another practice. *Id.* at 3–4.

On the afternoon of January 18, Crisp had another call with E.M. in which she outlined three options for E.M. DX-75 at 3. First, E.M. could proceed with J.S. as a "known sperm donor." *Id*. Second, she could proceed with J.S. as a "partner," but J.S.'s income would have to be considered in determining her eligibility for the discount program. *Id.* Third, if she did not like either option, she could transition her care to another practice. *Id.* The call did not go well. According to Crisp, E.M. "didn't like what [Crisp] had to say" and "demand[ed] that someone above [Crisp] speak to her." *Id.*

E.M.'s demand was thus elevated to SGF's Regional Manager, Vicki Gerber, who spoke with E.M that same evening. DX-75 at 2. Gerber again presented the three options to E.M. *Id.* However, as Gerber recounted in an email to Dr. Mottla and Dr. Osborn, E.M. "talk[ed] in circles," complained that "none of this [was] fair," "stat[ed] she wanted to speak with [SGF's]

attorney because she fe[lt] [SGF was] discriminating against her because she d[id] not have a cookie cutter relationship," and informed Gerber that she "[would] only speak with the person who [could] change the proffered options." *Id.*

Shortly thereafter, at 6:58 p.m. on January 18, Dr. Mottla replied to Gerber's email. DX-75 at 1. He stated:

> Sounds like we are at an impasse. She won't accept our standards of care, best advice and established practice protocols. There is clearly lost trust in the patient[-]physician relationship and our commitment to her best care and our support in helping her achieve pregnancy and delivery.

*Id.* Dr. Mottla directed Dr. Osborn to dismiss E.M. as a patient, noting in his email that the dismissal was "based on the above compromise in the patient-physician relationship and the lack of trust in the [p]ractice." *Id.* On January 21, Dr. Osborn informed E.M. of this decision on a phone call that E.M. surreptitiously recorded.

## III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 59, a court may, after a jury trial, "grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Such reasons exist (1) where the verdict is against the weight of the evidence, *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 433 (1996), or (2) where "the trial was not fair, or substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions," *Nyman v. Fed. Deposit Ins. Corp.*, 967 F. Supp. 1562, 1569 (D.D.C. 1997). A new trial "should be granted only where the court is convinced that the jury verdict was a seriously erroneous result and where denial of the motion will result in a clear miscarriage of justice." *Martinez v. Dist. of Columbia*,

503 F. Supp. 2d 353, 355 (D.D.C. 2007) (quoting *Nyman*, 967 F. Supp. at 1569); *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 467 F. Supp. 2d 74, 87 (D.D.C. 2006) ("Generally, a new trial may only be granted when a manifest error of law or fact is presented."). The decision whether to grant a new trial falls within the discretion of the trial court. *McNeal v. Hi-Lo Powered Scaffolding, Inc.*, 836 F.2d 637, 646 (D.C. Cir. 1988).

## IV. ANALYSIS

E.M. argues that a new trial is warranted with respect to the source-of-income discrimination and retaliation claims she alleges under the D.C. Human Rights Act in Count One of her complaint. In pressing this argument, she references a single adverse action: her termination as a patient in January 2019. In short, she contends that uncontested evidence at trial demonstrated an "extraordinary temporal proximity" between her request for eligibility in SGF's discount program and her accusations of discrimination, on the one hand, and SGF's decision to dismiss her as a patient, on the other hand. Def.'s Mot. New Trial ("Def.'s Mot.") at 5–6, ECF No. 170. This evidence, E.M. asserts, "creates a strong inference of source-of-income discrimination and related retaliation, such that the weight of the evidence is in [her] favor and allowing the verdict to stand as to Count One would be unjust." *Id.* at 6. The Court addresses E.M.'s retaliation claim first and her source-of-income discrimination claim second.

### A. Retaliation

To prove her retaliation claim, E.M. had the burden to establish that: (1) she engaged in an activity protected under the D.C. Human Rights Act; (2) SGF took an adverse action against her; and (3) her engagement in the protected activity was a substantial contributing factor in SGF's decision to dismiss her as a patient. *See* Jury Instructions at 28, ECF No. 166; *Kimmel v. Gallaudet Univ.*, 639 F. Supp. 2d 34, 44 (D.D.C. 2009). E.M. alleged at trial that SGF dismissed

her as a patient in retaliation for complaining about policies she believed to be discriminatory. *See* Jury Instructions at 28. The jury, however, declined to find that E.M.'s dismissal constituted retaliation under the D.C. Human Rights Act. *See* Jury Verdict at 1. The Court believes that this verdict rests on a solid evidentiary foundation.

As SGF observes, there was ample testimony and evidence at trial—which the jury was entitled to credit—that SGF's termination of E.M. as a patient was motivated not by her accusations of discrimination, but instead by SGF's "belief that E.M. had lost trust in the practice for her treatment" and "E.M.'s refusal to abide by [SGF's] policies." Def.'s Opp'n to Pl.'s Mot. at 7, ECF No. 177. Dr. Mottla instructed Dr. Osborn to discharge E.M. in an email he sent on the evening of January 18, 2019. DX-75 at 1. In that email, he explicitly noted that E.M.'s dismissal was based on a "compromise in the patient-physician relationship" that was instigated by her "lack of trust" in SGF's commitment to her "best care" and to "helping her achieve pregnancy." *Id.* Furthermore, Dr. Eric Widra, who had provided prior treatments to E.M. and J.S., voiced his "complete[ ] agree[ment]" with Dr. Mottla's decision. *Id.* At trial, Dr. Widra testified about his "uniquely contentious" relationship with E.M., describing her frequent "veiled accusations" of wrongdoing. Oct. 14 Tr. at 41:13–19. Even compared to these prior disputes, Dr. Widra explained, E.M.'s behavior in January 2019—"refusing to follow any of the recommendations [SGF] made"—"crossed the line" into misconduct sufficiently serious to warrant dismissal. *Id.* at 55:13–23.

E.M. suggests that these justifications are pretext for retaliation. How else could it be, she asks, that SGF complained about her being a "difficult patient" for over six years but did not fire her until she "press[ed] the point about [SGF's] refusal to consider only her income" in evaluating her eligibility for the discount program? Pl.'s Reply in Supp. Mot. New Trial ("Pl.'s

Reply") at 2, ECF No. 178. Indeed, E.M. stresses, her dismissal came "[l]ess than an hour after reporting her concerns about discrimination" to SGF Regional Manager Vicki Gerber on the afternoon of January 18. Pl.'s Mot. at 6. This point, however, fails to persuade the Court that the jury's verdict must be set aside.

First, Gerber was not the first person to whom E.M. complained about discrimination. Earlier on January 18, E.M. had spoken with Dr. Osborn and likewise informed her that she felt that SGF was "discriminat[ing] against [her] based on [its] definition of 'household.'" DX-75 at 4. Dr. Osborn conveyed this concern to Dr. Mottla, who did not, at that point, make the decision to dismiss her. Instead, he then provided guidance to Crisp, who was scheduled to speak with E.M. later that afternoon to offer her three options for future treatment: (1) proceed with J.S. as a "known sperm donor," (2) proceed with J.S. as a "partner," or (3) transition her care to another practice. *Id.* at 3–4. At trial, Dr. Mottla testified that when E.M. was presented with those three options, SGF was "sincere in [its] willingness to let [E.M.] pick one of those three options" and "keep [E.M.] as a patient" if she picked either of the first two options. Oct. 14 Tr. at 161:13–23. But E.M. declined to pick an option then. Instead, she told Gerber that she "[would] only speak with the person who [could] *change* the offered options." DX-75 at 2 (emphasis added). Only at that point—when Dr. Mottla understood the parties to be at an "impasse"—did he instruct Dr. Osborn to dismiss E.M. *Id.* at 1. The jury thus had ample evidence from which it could infer that SGF dismissed E.M. as a patient because she refused to pick one of the three options, rather than because she accused SGF of discrimination.[2]

---

[2] E.M. counters that Gerber's email to Dr. Mottla lacked "any assertion that E.M. refused any of the options offered to her." Pl.'s Mot. at 3. But Dr. Mottla clearly took Gerber's email to mean that the parties had reached an "impasse." DX-75 at 1. The jury was entitled to credit that statement as evidence that SGF dismissed E.M. not because she complained about discrimination, but because SGF believed she was refusing the options offered to her.

Second, although a "close temporal relationship" between a plaintiff's protected activity and an adverse action "may alone establish the required causal connection" to make out a prima facie case of retaliation, whether the plaintiff has established a prima facie case becomes irrelevant once the defendant offers evidence of a legitimate, non-retaliatory reason for the adverse action. *Kayode v. McHenry*, No. 22-cv-3802, 2025 WL 2408434, at *6 (D.D.C. Jan. 22, 2025). At that stage, the presumption of unlawful retaliation "drops from the case and the factfinder must then decide the ultimate factual issue of whether the defendant intentionally [retaliated] against the plaintiff." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 711 (1983). Because this case proceeded to trial, it therefore fell to the jury to "determine whether the close temporal relationship" between E.M.'s complaints about discrimination and her dismissal, "in the context of other evidence offered by [E.M.] and [SGF],"[3] was sufficient to conclude that SFG unlawfully retaliated against E.M. *Singletary v. D.C.*, 351 F.3d 519, 525 (D.C. Cir. 2003). In view of the substantial evidence supporting its verdict, the jury was entitled to conclude otherwise.

**B. Source-of-Income Discrimination**

For her source-of-income discrimination claim, E.M. had the burden to establish that: (1) she was a member of a protected class; (2) SGF denied her goods, services, facilities, privileges,

---

[3] E.M.'s argument that other evidence at trial undermines the jury's verdict fails. E.M. makes much of the following comments that Dr. Osborn made to E.M. on the call that E.M. surreptitiously recorded: "[B]asically you've, you know, accused us of discriminating against you. And we would not treat any couple in the same situation." PX-71A. However, as E.M. herself notes, Dr. Osborn testified at trial that she did not mean to say that SGF would not treat anyone who accused it of discrimination, but rather that SGF would not treat any couple in the same situation *differently*. Pl.'s Mot. at 4; *see also* Oct. 15 Tr. at 62:8–63:1. Because the jury assesses a witness's credibility, it was entitled to believe Osborn's explanation. *See Morris v. Pruitt*, 308 F. Supp. 3d 153, 166 (D.D.C. 2018).

advantages, or accommodations; and (3) her source of income was a substantial factor in SGF's denial of goods, services, facilities, privileges, advantages, or accommodations. *See* Jury Instructions at 24–25; D.C. Code § 2-1402.31(a)(1). At trial, E.M. argued that her request that SGF evaluate her eligibility for the discount program based on her income alone was a substantial factor in SGF's decision to dismiss her as a patient, among other adverse actions SGF took.[4] *See* Jury Instructions at 24. SGF countered that it had legitimate and non-discriminatory reasons for dismissing E.M., *see id.* at 26, and the jury ultimately found for SGF on this claim, *see* Jury Verdict at 1.

As detailed above, there was ample evidence from which the jury could find that SGF dismissed E.M. as a patient because it believed she had lost trust in the practice and that the patient-physician relationship was therefore compromised. The Court further explained above that the jury was entitled to accept this justification as the true reason for E.M.'s dismissal, rather than E.M.'s claim of retaliation. For similar reasons, the jury was allowed to infer from the same evidence that E.M.'s insistence that SGF not consider J.S.'s income in evaluating her eligibility for the discount program was not a substantial factor in SGF's decision to terminate her. Accordingly, as with E.M.'s retaliation claim, the Court will not disturb the jury's verdict with respect to her discrimination claim.

[4] E.M. additionally argued at trial that SGF's insistence that J.S. assume joint financial responsibility as a "partner" in the fertility treatments and its refusal to determine her eligibility for the discount program based on her income alone in themselves constituted discriminatory actions. *See* Jury Instructions at 24. She does not press these points in her instant motion, however. *See* Pl.'s Reply at 2 (noting that the issue in her motion "is whether the extraordinary 'temporal proximity' between the discriminatory act and *E.M.'s termination as a patient* . . . instigates sufficient concern about the verdict on Count One to warrant a new trial").

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for a new trial (ECF No. 170) is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 2, 2026

RUDOLPH CONTRERAS
United States District Judge